Page 10

you're a consultant for LoanStream?

A.    Just exactly that, that I work as a consultant capacity.

Q.    Are you a W-2 employee with LoanStream in that capacity or are you a 1099 employee?

A.    I am a 1099 employee.

Q.    Prior to being a 1099 employee with LoanStream, what was your position at LoanStream?

A.    President of LoanStream.

Q.    And did you found LoanStream?

A.    Yes.

Q.    When did you found LoanStream?

A.    2015.

Q.    And when you founded LoanStream, you were president of LoanStream the entire time up to when?

A.    I was not.

Q.    So you weren't president of LoanStream?

A.    Not the entire time.

Q.    Okay.  Let's walk through, what were you -- what was your position at LoanStream when you started LoanStream in 2015?

A.    Chief operating officer.

Q.    And in your position as chief operating officer, were you a 1099 or were you a W-2?

A.    W-2.



MAGNA
LEGAL SERVICES

Page 11

Q.    After you were chief operating officer, what was your position at LoanStream?

A.    President.

Q.    And when did you make that change?

A.    2019.

Q.    How did your roles differ from when you were the chief operating officer to the president?

A.    Just the reporting lines.

Q.    How was the reporting line with respect to when you were chief operating officer?

A.    Just a portion of the company.

Q.    Who did you report to?

A.    To Madelina Colon.

Q.    Who is Madelina Colon?

A.    She's currently our chief administrative officer.

Q.    And who did Madelina Colon report to at the time?

A.    Our CEO Rabi Aziz.

Q.    Did Rabi Aziz also found LoanStream?

A.    Yes.

Q.    Who else founded LoanStream?

A.    Same.  Lina Colon.

Q.    And then did Mr. Aziz remain at LoanStream when you became president of LoanStream?



Page 14

A.    They -- they have a group of loan officers who work directly with consumers, so it's a consumer direct division.

Q.    So these branches originate loans directly with consumers?

A.    Yes.

Q.    And what is these branches' relationship with LoanStream?

A.    They are W-2 employees for the most part that drum up their own business and bring that into LoanStream as consumer direct loans.

Q.    Is LoanStream itself a lender?

A.    Yes.

Q.    Is -- these consumer direct loans, would they be -- would the money lent be coming from LoanStream then or would it be coming from some third-party source?

A.    Please clarify.

Q.    I'm not really too familiar with how the mortgage industry operates so when you say that it's a consumer direct lender, is -- is the -- is the entity that's lending the consumer money LoanStream?

A.    Yes.

Q.    Does LoanStream hold a banking license?

A.    Please clarify.



Page 15

Q.    Is LoanStream a -- a bank or is it a lender?

A.    A lender.

Q.    Who was responsible for the operations of these LoanStream branches?

MR. LANDERS:    Objection; vague and ambiguous as to time.

BY MR. PERRONG:

Q.    During 2021 and 2022, what -- who was responsible for the day-to-day operations of these -- of these branches within LoanStream?

A.    Please clarify "operations."

Q.    Who oversaw the branches?

A.    Myself and Greg Armstrong.

Q.    Who was Greg Armstrong?

A.    Our chief operating officer at the time.

Q.    Approximately how many branches did LoanStream have during the period 2021 to 2022?

A.    During that time period -- period of 2021 and 2022, there were eight branches.

Q.    Was the C. Roberts Branch one of those branches?

A.    Yes.

Q.    Who was responsible for setting up and managing branch reimbursements?

A.    Please clarify "setting up."



Page 20

right?

A.    Correct.  They're minimal, but yes.

Q.    Did LoanStream pay for advertising costs associated with the C. Roberts Branch?

A.    Nope.

Q.    Why?

A.    We never do.  It's not our model.  They -- they go out and deal with Realtors.

Q.    I'm a bit confused.  Because you said LoanStream would pay for certain -- take on expenses in starting a branch, right?

A.    Certain expenses, yes.

Q.    What expenses would LoanStream take on?

A.    Basically the only expenses that we would take on initially until they got in the black, were just the costs of the staff.

Q.    All right.  So are you aware that we noticed a 30(b)(6) deposition of LoanStream practically over a year ago at this point?

        MR. LANDERS:  Objection; calls for speculation.

        THE WITNESS:  Yes.

BY MR. PERRONG:

Q.    What was the answer?

A.    I believe so.



Page 25

I will allow the witness to answer questions about the existence of other legal proceedings, but nothing about the legal proceedings and nothing about the facts underlying the legal proceedings.  Now if you -- if you feel like you need to ask her those questions that you already know the answer to because it's a matter of public record, go for it.  But that is the extent of the answers that I will permit her to give.

BY MR. PERRONG:

Q.    Are you currently facing any criminal charges, Ms. Vernon?

MR. LANDERS:  Let me pose the objection that it exceeds the scope of the deposition notice.  It is not relevant to the party's claims or defenses.

Subject to those objections, I will permit you to answer, Ms. Vernon.

THE WITNESS:  Yes, I am.

BY MR. PERRONG:

Q.    What charges are you currently facing?

MR. LANDERS:  Objection; exceeds the scope of the deposition notice; not relevant to the party's claims or defenses.

You may answer.

THE WITNESS:  I am currently facing a murder



MAGNA
LEGAL SERVICES

Page 26

charge.

THE REPORTER:  I'm sorry?  I'm currently facing a...

THE WITNESS:  Murder charge.

BY MR. PERRONG:

Q.   And what is the status currently of that proceeding?

MR. LANDERS:  Objection; exceeds the scope of the deposition notice; not relevant to the party's claims or defenses.

You may answer as to the status of the proceeding, if you know.

THE WITNESS:  There is no current status to share, and I will not answer any further questions.

BY MR. PERRONG:

Q.   When you say that there is no current status, has the matter been adjudicated or are the charges still pending?

MR. LANDERS:  Objection.  Objection.  Exceeds the scope of the deposition notice; not relevant to the party's claims or defenses.

With that, you may answer the narrow question asked:  Are the charges still pending.

THE WITNESS:  They are still pending.



Page 29

e-mails are essentially gone at this point?

A.    Yes, a lot of them are gone.  Yes.

Q.    Did you also search for and review payment records with respect to LoanStream -- or I'm sorry, with respect to the C. Roberts Branch at LoanStream?

A.    We did, yes.

Q.    And we discussed some of the payments that were made.  We discussed a $7,000 profit payment, right?

A.    Correct.

Q.    There were also records of payments for W-2 employees, correct?

A.    Please clarify which employees you're thinking of.

Q.    I don't know because I haven't received the documents, but who all was paid as a W-2 employee based on your review of the documents?

A.    Cynthia Roberts and Bruce Cohen.  Sorry, that's all I kind of remember off the top of my head.

Q.    Other than those payments, were any other payments made to Cynthia Roberts?

A.    No.

Q.    Were any payments to Sean Roberts?

A.    No.

Q.    Were any payments made to Resmo?



A.   No.

Q.   Were any payments made to Premier Financial Marketing?

A.   Yes.  That was the 7,000 profit to Cynthia. That was her corporation.

Q.   And in terms of the Premier Financial Marketing payment, was the amount of the payment for $7,000 in profit?

A.   Yes.

Q.   Okay.  So that implies that there were expenses, correct?

MR. LANDERS:  Objection; calls for speculation; misstates testimony.

THE WITNESS:  No.

BY MR. PERRONG:

Q.   If there's a profit -- what is the basis for calling it a profit payment?

A.   What it was was it was actually an advance against future pro- -- profits.  Unfortunately, her branch was never profitable.  They pulled at my heart -- you know, she pulled at my heartstrings there right before Christmas that, you know, she needed -- she needed money and, you know, I -- I gave her that, but unfortunately, it never became profitable so that was the only profit payment I ever made to her.



Page 35

A.   I believe they did.

Q.   Who would pay for that office space?

A.   I believe they did.

Q.   And who -- would they receive any payments from LoanStream for the cost of that office space?

A.   Yes.

Q.   How would they receive payments from LoanStream for the cost of that office space?

A.   During the time that a branch is together with LoanStream, LoanStream would actually cut that payment directly to the landlord, so it -- it would have been direct from LoanStream accounting to that landlord for whatever period of time they were employed by LoanStream.

Q.   Would LoanStream also do that same arrangement with respect to venders that conducted marketing and advertising for the branches?

MR. LANDERS:  Objection; calls for speculation; assumes facts not in evidence.

You may answer if you know.

THE WITNESS:  Well, first of all, we -- we would -- we would never allow any sort of marketing or advertisement so absolutely not.

BY MR. PERRONG:

Q.   When you say that you wouldn't allow marketing



Page 36

or advertisement, how do you mean?

A.    We don't -- just exactly like I said.  We don't allow any sort of telemarketing or advertising.

Q.    So how were the branches supposed to get business?

A.    They work with -- for the most part, they work with B2B with the Realtors.  Some work with, you know, department of -- Department of Commerce.  A lot of different ways.  They do what's called, you know, self-sourcing their business.

Q.    Would LoanStream pay for costs associated with that self-sourcing of business?

A.    No.

Q.    Did LoanStream ever explicitly prohibit its branches from engaging in forms of marketing other than reaching out to Realtors?

A.    Yes.

Q.    Where?

A.    It's in the -- the branch manager agreement. We don't allow them to enter into any contract, period.

Q.    Would LoanStream enter into contracts then?

MR. LANDERS:  Objection; calls for speculation; vague and ambiguous.

THE WITNESS:  I'm sorry.

MR. LANDERS:  Contracts with whom, Counselor?


MAGNA
LEGAL SERVICES

Page 40

MR. PERRONG:  So we can go back on the record then.

MR. LANDERS:  Yes.

BY MR. PERRONG:

Q.    All right.  So before we broke, we were looking at Exhibit A and, specifically, paragraphs f -- or I'm sorry, paragraph 5f and paragraph 6.

So with respect to paragraph 5f iv, there is a -- there is a representation that the branch manager has read the following OCMBC policies and one of those is the policy regarding telemarketing and phone fax solicitation laws.

Do you have a copy of that policy?

A.    As I mentioned right before we went off the record, unfortunately I was unable to get my hands on that one, so we can't produce that, unfortunately.

Q.    Do you recall reviewing that policy when it was drafted?

A.    You know, the -- the -- vaguely.  We had everybody sign that.  We don't do it, but it's -- irregardless, unfortunately, because we can't get our hands on it.

Q.    Did the policy ever state that the telemarketing was prohibited?

A.    Yes.



Page 41

Q.   So there was no permission to conduct any sort of telephonic marketing of any sort?

A.   Absolutely not.

Q.   Would telemarketing be permitted to customers with their consent?

A.   No.

Q.   Did LoanStream ever discipline or terminate branches for making telephone calls?

A.   No.

Q.   Did LoanStream ever communicate that the only permissible form of marketing was through Realtors to its branch managers?

MR. LANDERS:  Objection; misstates testimony.

You may proceed.

THE WITNESS:  No, because that wasn't the only method.

BY MR. LANDERS:

Q.   What are the methods that LoanStream authorized its branch managers to advertise?

A.   Anything that was self-sourced.

Q.   If they self-sourced telephone calls, would that be authorized?

A.   No.  That's why it was specifically called out.

Q.   What other forms of marketing would be



Page 42

authorized as opposed to not authorized?

A.    Again, things that -- that drummed up business through third-party relationships, the biggest one being Realtor.  Other was things like chamber of commerce work.  You know, a lot of people -- people that, you know, were ethnic had things that were done in those communities.  You know, things like that.

Q.    Would branch managers be authorized to self-source leads from lead generators?

A.    No.

Q.    But you're not in possession of any documents that reflect that that was the position?

A.    Unfortunately, I was unable to get my hands on that -- that for Cynthia Roberts.

Q.    If telemarketing was forbidden outright, then why is there a telemarketing compliance policy instead of simply just a statement that telemarketing is prohibited?

            MR. LANDERS:  Objection; misstates testimony.

            You may proceed.

            THE WITNESS:  Because it was important enough to call out.

BY MR. PERRONG:

Q.    Was telemarketing forbidden outright?

A.    Absolutely.



Page 43

Q.   And I realize that you were not at Cynthia Roberts' deposition, but at Cynthia Roberts' deposition she testified that LoanStream helped us have funding by paying marketing.  Why would she make such a statement?

MR. LANDERS:  Objection; calls for speculation.  Also, exceeds the scope of the deposition notice.

You may proceed.

THE WITNESS:  Unfortunately, you would have to ask her.  If I had to guess, she may be confusing us with another firm.

MR. LANDERS:  Ms. Vernon, on a going-forward basis, please don't guess.

MR. PERRONG:  Please don't coach the witness.

MR. LANDERS:  You should have told her that, Counselor.

MR. PERRONG:  I did.

BY MR. PERRONG:

Q.   Did Cynthia Roberts ever send invoices to LoanStream's accounting department referencing LizDev's telephone calls?

A.   In -- in hindsight now it looks like that they were at least one occasion one came over.

Q.   And LoanStream didn't instruct Ms. Roberts that telephone calls were impermissible, did it?



Page 46

BY MR. PERRONG:

Q.   Ms. Vernon, are you familiar with the document I'm referring to?

A.   Yes, I believe so.

Q.   As a result of receiving that document, did LoanStream take any action against the C. Roberts Branch?

A.   No, it appears to have been discarded.

Q.   In your review of the e-mails responsive to this litigation, did you recall -- do you recall reviewing an e-mail chain regarding missing money that was due to the branch?

A.   I reviewed an e-mail chain pur- -- purporting that there may be missing profit and loss statements, not missing money.

Q.   Do you have a copy of those profit and loss statements that were allegedly missing?

A.   I don't have any materials in front of me today as we take this deposition.

Q.   During the break, did you speak with anybody?

A.   No.

Q.   Did the C. Roberts Branch have a cost center number in OCMBC's accounting system?

A.   They did.

Q.   What is the cost center number used for?



Page 47

A.    As I don't have that in front of me, I would be -- I would be guessing.  It's a four-digit number we assign to each.

Q.    Does LoanStream have the ability to create a report with respect to the C. Roberts Branch call center number?

A.    Please rephrase that.  Produce or create?

Q.    It can search for documents based on cost center number, correct?

A.    Generally, yes.

Q.    Was a search conducted for invoices for the C. Roberts Branch cost center number?

A.    Yes.

Q.    And what did that search reveal?

A.    That by 2022, that branch was in the red or in the hole or, you know, negative by over $20,000.

Q.    When you say that it was in the hole by $20,000, what were the expenses that led for the branch to be in the hole?

A.    Just mostly W-2 employment expenses and the one profit advance that we gave them.

Q.    And there were no other expenses?

A.    There's a hard expense to every file.  There's a credit report expenses.  So, again, I don't have it in front of me.  I couldn't bring any materials to this



Page 48

sort of deposition, but with every file there is typically a credit report fee. There's errors and omission fee. There are also profit-related fees from the loans such as, you know -- such as origination fees on the file. Fees for -- for selling the loan on the secondary market. There's profit, you know, and there's loss, all, you know, together to figure out if they're in the green or in the red.

Q. And there were no marketing fees?

A. Correct.

Q. No advertising fees?

A. Correct.

Q. Did OCMBC pay the LizDev invoice?

A. No.

Q. Did it reimburse the Roberts branch or anybody else for that invoice?

A. No.

Q. Did it delete the invoice?

A. Did it what?

Q. Delete the invoice.

A. It -- it appears to have just been discarded by our accounting team.

Q. Was any record made of why it was discarded?

A. No.

Q. Has OCMBC ever shut a branch down on the basis



Page 49

that it was conducting telephone marketing?

A.    Not that I can recall.

Q.    Why did OCMBC terminate the C. Roberts Branch?

A.    I don't believe we did.  I believe business just dried up.

Q.    And LoanStream accepted the business that was generated by the C. Roberts Branch?

A.    Yeah, there were a few loans that came through the branch.  Not very many, but there were a few.

Q.    And LoanStream never sent any notices to the C. Roberts Branch stating that the use of LizDev violated Section 6 of the agreement, did it?

A.    We -- our accounting department wouldn't have known what LizDev was.

Q.    Does LoanStream have the prohibited activity policy in section 5f ii of the agreement?

A.    Prohibited activities?  I'm not sure.  I know we -- we didn't have that as it related to Cynthia Roberts, but we can look and see if we have those in general even though we didn't have them in Cynthia's file to put our fingers on.  We can -- we can certainly get you a copy of just those policies.

Q.    Does LoanStream maintain an internal, do-not-call list?

A.    No, there's no reason to.  We don't -- we



Page 50

don't participate in any sort of telemarketing campaigns.

Q.   Does it maintain an internal do-not-call policy?

A.   No, for the same reason.

Q.   So sitting here today, you can't point to any specific document stating that telemarketing is prohibited?

A.   I did not look for it outside of just Cynthia's records.

Q.   Did LoanStream require its branches to disclose to LoanStream where it obtained a particular customer from?

A.   No.

Q.   Who designed the LoanStream beta branch concept?

MR. LANDERS:  Objection; vague and ambiguous.

THE WITNESS:  Sorry.  There is no beta branch concept.

BY MR. PERRONG:

Q.   Who designed this beta branch -- this C. Roberts Branch, this branch idea?

A.   So are you -- are you asking who developed just our retail branch network in general?

Q.   Who developed that business plan to hire



MAGNA
LEGAL SERVICES

Page 51

branches like the C. Roberts Branch?

A.   To -- okay.  To -- to have a retail branch network, really the -- the -- the market built it. It's very similar across lenders in our market.  You can come to me, you can come to New American Funding, you can go to, you know, loanDepot down the street.  We all operate the same way so I wouldn't say it was any one individual.  In 2021, business was still good after COVID so why not go after it.  Like I said, it wasn't really anyone's one concept.  It was just, you know, market driven.

Q.   How often did you communicate with Cynthia Roberts during the branch's operation?

A.   Oh, gosh.  Maybe three times over the course of her employment.

Q.   And approximately when was the branch in operation for?

A.   If I recall, it was August of '21 through mid-'22.

Q.   Did you ever ask Cynthia Roberts about how the branch was generating leads?

A.   No.

Q.   Did anybody at LoanStream ask about how the branch was generating leads?

A.   No.



Page 59

Q.   So in that time frame, that would -- the idea to use a lead generator, that would have been shot down during that time as well?

A.   Hundred percent.  I -- I would not, you know, give anybody hundreds of thousands of dollars to, you know, try -- try to make some call campaign work.  That would be a hard no.

Q.   Was LoanStream aware that Cynthia Roberts's husband was banned from the mortgage company by the DFPI?

MR. LANDERS:  Objection; vague and ambiguous as to time.

BY MR. PERRONG:

Q.   At any time.

A.   He wasn't banned from the mortgage industry. He had lost one of his licenses so he was -- from what I can recall, he was still active with his DRE license, but he had lost his DFPI license, yes.

Q.   And when did LoanStream become aware of this fact?

A.   I think June or July of 2021.

Q.   And it continued to permit the C. Roberts Branch to operate?

A.   I -- you'll have to rephrase it.  I don't get what that one has to do with the other.


MAGNA
LEGAL SERVICES

Page 60

Q.    Why did LoanStream find out -- in what context did LoanStream find out that Sean Roberts had some issues with the DFPI?

A.    By checking his license.  He had first pitched LoanStream on him being the branch manager.

Q.    And knowing that fact, LoanStream still allowed his wife to be the branch manager, right?

A.    Yes.  She was clean.

Q.    Did LoanStream undertake any steps or restrictions on Mr. Roberts' ability to participate in or -- or work in his -- his wife's branch?

A.    Not that I recall.  There was no reason to.

Q.    Was LoanStream aware that Mr. Roberts was working in his wife's branch?

MR. LANDERS:  Objection; mischaracterizes the evidence; misstates testimony; assumes facts not in evidence; calls for speculation.

You may answer if you can.

THE WITNESS:  Yeah, I have no knowledge that he was working in her branch.

BY MR. PERRONG:

Q.    You have no knowledge of whether or not he was working or you have -- you had no knowledge that he was working?

A.    I had no knowledge -- knowledge that he was



Page 61

physically working in her branch, no.

MR. PERRONG:  I want to bring up a document that's been -- that we'll mark as Exhibit B.

[Whereupon, Exhibit B was marked for identification.]

MR. PERRONG:  Just let me know when you have it and are ready to discuss it.

THE WITNESS:  Got it.  Give me a minute.

Okay.  I'm ready.

BY MR. PERRONG:

Q.   If you can go to page 4 it looks like Sean Roberts e-mailed you directly on February 7th of 2022. And in this e-mail he discusses -- third -- third line from -- in that paragraph:  (Reading.)

"We are continuing to build our pipeline and we have some fixed (office rent) and variable (marketing) expenses due/past due."

Do you see that?

A.   I do.

Q.   And then you replied:  (Reading.)

Oh no!  Please reply with your cost center number and I will ask accounting for produce asap!

Do you recall sending that message?



Page 63

their -- their print media.  So like I said, it's --
it's routine that our people have these, you know, desk
rental fees.

A lot of times, you know, we -- we have, you
know, the -- the -- the cover -- what are they called?
Oh, like print media campaigns.  So they'll do like
co-branding, the agent along with our mortgage company,
and then they'll have flyers and pamphlets and whatever
and there will be a training session done -- done with
the real estate agents.  Anyway, we're very used to
marketing, just not telemarketing campaigns.

So I have no issue with what they asked for
here, but certainly not telemarketing.

BY MR. PERRONG:

Q.    Did LoanStream ever pay for expenses that were
characterized as marketing for the C. Roberts Branch?

A.    Sorry.  Sorry.  Somebody was knocking on my
door.  My apologies.  Please restate that.

Q.    Yes.  So did LoanStream ever pay invoices for
marketing as articulated here with respect to the
C. Roberts Branch?

A.    No.  In fact, there were no lump-sum payments
at all after that $7,000 one.

Q.    And that 7,000 was in approximately
December of '21?



Page 67

Q.    Did you speak with anybody during the break?

A.    No, I did not.

Q.    Are you familiar with the Bistango Restaurant in Irvine, California?

A.    Yes.

Q.    Did you meet with Cynthia Roberts and Sean Roberts at that restaurant in around May or June of 2022?

A.    No.

Q.    Did you meet with Cynthia Roberts and Sean Roberts at that restaurant at any time?

A.    No.

Q.    In what context, then, do you know the Bistango Restaurant in Irvine, California?

A.    I met with Sean Roberts and one of my employees at the Bistango in 2021.

Q.    What was the purpose of that meeting?

A.    My employee at the time was personal friends with Sean Roberts and asked me to go to lunch because I guess at the time Sean Roberts was looking -- looking to move from his -- I believe the company was lending three (phonetic) or something -- something similar to that name and was looking for a new branch away from this lending three.

Q.    And who was the employee?



Page 79

let me know if you heard it.

(Audio played.)

BY MR. PERRONG:

Q.   Can you hear that?

A.   Yes.

Q.   Okay.  So I'm going to play the file now. Like I said, it doesn't need to be transcribed, and we'll just listen to it and I've got a few questions about it.

(Audio played.)

BY MR. PERRONG:

Q.   Okay.  You heard in that recording where it's stated that my name is Karisha with LoanStream Mortgage, correct?

A.   That's what I heard, yes.

Q.   So global experts or this LizDev was contacting customers identifying themselves as being with LoanStream Mortgage, correct?

MR. LANDERS:  Objection; calls for speculation; assumes facts not in evidence; and an incomplete hypothetical.

THE WITNESS:  Not that I'm aware of.

BY MR. PERRONG:

Q.   A reasonable customer that would receive such a call would believe that the call was being made by



Page 83

MR. LANDERS:  So you would prefer me to say the words "objection as to form," and then just leave it to you to speculate what my objection was?

MR. PERRONG:  That is how the federal rules anticipate an objection during a deposition to work is just stating an objection to form.

MR. LANDERS:  And that's how you want to proceed?

MR. PERRONG:  Yes.

MR. LANDERS:  Okay.

BY MR. PERRONG:

Q.   So, Ms. Vernon, would a customer receiving such a call believe that the call was made on LoanStream's behalf?

MR. LANDERS:  Object as to form.

THE WITNESS:  Yes, I can see that.

BY MR. PERRONG:

Q.   Did LoanStream ever investigate the calling practices or telemarketing practices allegedly used by the C. Roberts Branch?

A.   I mean, hindsight, you know, yes.  Once we got that information, we certainly -- we certainly looked into it.

Q.   When you say "when we got this information," what -- what is this information that you refer to?



Page 84

A.    This lawsuit that you've pushed on us.

Q.    When you say "pushed on us," why do you say pushed on us?

A.    We don't -- we don't concur that we ever, you know, made any phone calls.  We don't concur that we've ever had a call center.  I can go on and go on for days, but in any case, we certainly did our due diligence to confirm those things.

Q.    By the plain audio of the call, LoanStream was the entity whose products and services were being promoted, right?

        MR. LANDERS:  Object as to form.

        THE WITNESS:  By somebody, possibly.

BY MR. PERRONG:

Q.    And it would have been the beneficiary of the call if the person had said that they were interested?

        MR. LANDERS:  Object as to form.

        THE WITNESS:  None of us know that.

BY MR. PERRONG:

Q.    Is LoanStream a defendant in any other telemarketing case?

A.    No.

Q.    Are you aware of a case against LoanStream entitled Winslow versus OCMBC, Inc.?

A.    Vaguely.



Page 87

answer that.  I'm not sure how they had their phone

system set up.  They're obviously -- there was

obviously a lot we did not know that they had -- had

going on behind our back.

BY MR. PERRONG:

Q.    Who paid for the phone bills of the

C. Roberts Branch?

A.    I would guess -- sorry.  I'm not going to

guess.  I'm -- I'm not sure.

Q.    Who set up their phone system?

MR. LANDERS:  Object as to form.

THE WITNESS:  So we would have set up at least

one corporate phone number.  Typically a VoIP system.

BY MR. PERRONG:

Q.    Would it provide a phone for every desk with

that corporate phone system?

A.    Generally -- generally not.  There would be in

the branch at least one for the branch manager, and

if -- if there was a processor maybe a processor, but

the salespeople typically work outside of the office

drumming up business from their Realtors so they would

typically use their cell phones.

Q.    And the phone system that LoanStream provided,

was that billed to LoanStream?

A.    That would have been billed to -- to



MAGNA
LEGAL SERVICES

Page 88

LoanStream, yes.

Q.    And LoanStream presumably would have the calling records of the calls sent and received through those phones?

A.    I'm not sure, after all this time.  We would have to check.

Q.    Did it periodically review the phone bills?

A.    I don't know.

Q.    As part of the branch concept, if a loan officer was using their personal phone to make and receive calls, would that be a reimbursable expense for the use of their cell phone?

MR. LANDERS:  Object as to form.

THE WITNESS:  Typically not, no.  It's a cost of their doing business.

BY MR. PERRONG:

Q.    So they would pay for that individually?

A.    Yes.

Q.    I'm trying to understand the structure of how this branch operated a little more.

If I'm a loan officer at a branch, do potential customers get assigned to me or am I on my own to obtain potential customers?

MR. LANDERS:  Objection as to form.

THE WITNESS:  You're on your own to go -- to



MAGNA
LEGAL SERVICES

Page 92

BY MR. PERRONG:

Q.    Do you have any idea as to when your criminal proceedings are scheduled to conclude?

MR. LANDERS:  Object as to form.

THE WITNESS:  No, I don't.

BY MR. PERRONG:

Q.    Do you have a trial date set?

A.    No.

Q.    Are you on house arrest?

MR. LANDERS:  Object as to form and I instruct the witness not to answer.

MR. PERRONG:  Public record.

MR. LANDERS:  I don't believe it is.

BY MR. PERRONG:

Q.    Have you ever been convicted of any other crimes?

A.    Yes.

Q.    What crimes have you been convicted of?

A.    DUI several -- well, a decade ago.

Q.    Have you ever been convicted of a crime of honesty or dishonesty?

A.    No.

Q.    How did you first meet Cynthia Roberts?

A.    I've never personally met Cynthia Roberts.

Q.    You've only spoken to her over the telephone?

