# EXHIBIT 10

Videotaped Deposition of

# Kimberly Hudson-Bryant

March 26, 2026

Kimberly Hudson-Bryant

vs.

OCMBC, Inc. dba Loanstream



www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

KIMBERLY HUDSON-BRYANT,

individually and on behalf

of all others similarly

situated,

      Plaintiffs,

  vs.                     No. 8:24-cv-00067-FWS-JDE

OCMBC, INC. dba LOANSTREAM,

      Defendant.

_____

VIDEO DEPOSITION OF KIMBERLY HUDSON-BRYANT

Reported Remotely through Videoconference

March 26, 2026

Reported by:
Margaret A. Smith
RPR, CRR, CSR No. 9733

Job No.:  10186005

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

KIMBERLY HUDSON-BRYANT,

individually and on behalf

of all others similarly

situated,

      Plaintiffs,

  vs.                     No. 8:24-cv-00067-FWS-JDE

OCMBC, INC. dba LOANSTREAM,

      Defendant.

_____

Deposition of KIMBERLY HUDSON-BRYANT taken on behalf of Defendant, reported remotely through videoconference, beginning at 9:30 a.m. PDT, and ending at 5:39 p.m. PDT, on Thursday, March 26, 2026, before Margaret A. Smith, RPR, CRR, Certified Shorthand Reporter No. 9733.

Case 8:24-cv-00067-FWS-JDE   Document 81-18   Filed 06/04/26   Page 5 of 46   Page ID #:2304

**Kimberly Hudson-Bryant vs. OCMBC, Inc. dba Loanstream**

**Kimberly Hudson-Bryant**

A     Yes.

Q     How many?

A     One.

Q     What's your sibling's name?

A     ████, ████████████████████████.

Q     How old is ███████████?

A     I'm -- █.

Q     And pardon me.  Is ██████ male, or female?

A     Male.

Q     Where does ███████████ live?

A     I don't know.

Q     Are you not in contact with ███████████?

A     I am not.

Q     When was the last time you had contact with ███████████?

A     It's been about a year, but we are estranged.

Q     To your knowledge, has ███████████ ever made a TCPA claim or filed a TCPA lawsuit?

A     I don't know.

Q     Before you became estranged from ███████████, how frequently were you in contact with ███████████?

A     Not often.

Q     By "not often," do you mean once or twice a month, once or twice a year, for example?

A     I mean hardly ever.  We've -- the estrangement

**Kimberly Hudson-Bryant**





Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

A    I do recall him having a shoe store.  And I'm trying to -- that is -- and I do recall him working as a counselor at one of the schools that he attended.

Q    Do you know if he ever attended graduate school or professional school?

A    Yes.

Q    What did he attend?

A    Graduate school.

Q    Where?

A    Cal State Dominguez.

Q    When was that, to the best of your knowledge?

A    I have no recollection or knowledge of -- of that.

Q    More than 10 years ago?

A    Again, I have no recollection of when.

Q    Do you have any recollection of ever emailing with ▉▉▉▉▉▉?

A    Yes.

Q    When would be the last time, to the best of your knowledge, or best estimate of the last time you emailed with ▉▉▉▉▉▉?

A    Best estimate would be 2016.

Q    What did you email him about in 2016, if you recall?

A    Real estate transaction.

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

Q	What type of a real estate transaction?

A	My mom was selling the house that he was living in.

Q	Where was that house located?

A	Moreno Valley.

Q	Do you remember the address?

A	No.

Q	Was it on ███████████ in Moreno Valley?

A	The street name is familiar, yes.  That's the street name.  I do not recall the number.

Q	So Eleanora Woods owned a home on ███████████ in Moreno Valley.  Is that correct?

A	Correct.

Q	Did she live there?

A	She stayed there for a little.  But I don't remember how long -- I don't recall how long.

Q	How long did she -- from what years did Eleanora Woods own the ███████ home in Moreno Valley?

A	I -- I don't recall the year of purchase.

Q	To your best -- the best of your knowledge.

A	I can't say -- I can't even give a good faith estimate.  I couldn't say without digging through her files.

Q	But -- but ███████ was living at that

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

house for some period of time.  Is that right?

A    Yes.

Q    And he was living there when your mother decided to sell it?

A    Yes.

Q    And you emailed ██████████ in connection with your mother selling the ███████████ house.  Is that right?

A    Yes.

Q    What did you email ██████ about?

A    I don't recall.  The -- the specifics of the -- the email.  I do recall email regarding the availability, being able to show the home, and, you know, making it available for showings, cooperating with the sale, that -- that kind of thing.

Q    But Eleanora Woods was not living at the home during the period that she put it up for sale?

A    No.

Q    Okay.  Where was she living at that time?

A    ███████████.

Q    Okay.  And does the email address ████████████████████ sound familiar to you as perhaps ███████ email address?

A    Yes. that sounds familiar.

Q    Having -- having refreshed your recollection,

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

are you able to now say that that is ███████████ email address, ███████████████████?

A    Yes.   Thank you for refreshing my memory.

Q    Okay.   So we've mentioned the ████████████ ██████████ property.

And, for the record, the address is ████ ██████████████████████████, Los Angeles, California 90043. Is that correct?

A    Yes.

Q    Going forward, can we just refer to it as the ████████████████████████ property or house?   Will you understand what I'm meaning?

A    Yes.

Q    Okay.   Who currently lives at the A██████████ ███████████ house?

A    Me and my husband and my youngest son.

Q    What is your youngest son's name?

A    First name is ███████████████████████████. Last name, ████████.

Q    How old is ██████████████?

A    ██████████████.

████████████████████████████████████████████████
████████████████████████████
████████████████████████████████████████████████████
████████████████████

**Kimberly Hudson-Bryant**



Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream



Q    Okay.  So we've been going for about an hour and a half.

You wanted to take a five-minute break?

A    Yes.

MR. OLIVER:  That's -- that's fine.

MR. LANDERS:  All right.

VIDEOGRAPHER:  We are going off the video record.  The time is 10:54 a.m.

(Recess from 10:54 a.m. to 11:10 a.m.)

VIDEOGRAPHER:  We are back on the record.  This is the beginning of Media No. 2, and the time is 11:10 a.m.

BY MR. LANDERS:

Q    Okay.  Ms. Hudson-Bryant, I remind you you're still under oath.

**Kimberly Hudson-Bryant**



Q    Okay.  Okay.  All right.

So when did Eleanora Woods move into the house?

A    She moved into that house in 1965.

Q    Okay.  Did she buy it herself?

A    My parents did.

Q    Your parents brought it.  Okay.

A    Yes.

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

BY MR. LANDERS:

Q    Okay.  Good afternoon, Ms. Hudson-Bryant.

You understand you're still testifying under oath.  Correct?

A    Correct.

Q    And you're still alone in the room that you're in?

A    Yes.



Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

Q    And then that -- and then when Eleanora got a -- a mobile phone, she transferred the ███████████ --

A    Oh.

Q    -- phone number to the mobile phone?

A    Mr. -- Mr. Landers --

Q    Yeah.

A    -- I misspoke.  And I -- I need to make a correction.

Q    Okay.

A    I do need to make a correction.  With regard to the -- the landline phone, that is the -- the correct number.

With regard to the cell phone, it was a -- it was a ████ number, and it had, like, some threes and one. Like ██████.  It was a number that was picked to try to help her make -- you know, make it easier for her.

So -- but I -- I -- I can't tell with you a -- with a great amount of certainty the exact number of the cell phone.  But it was different.  I -- I misspoke earlier.

Q    Okay. So ████████ at one point was a landline to the ██████████████ house.  Is that right?

A    Yes.

Q    Okay.  When did ██████████ stop being a

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream



Q    landline to the ▮▮▮▮▮▮▮ house?

A    It was prior to -- it was prior to 2021.  And I'm not really sure of exactly when.

Q    Okay.  And when that telephone number stopped being a landline to the house, what use was made of that telephone number?

A    What use was made of the ▮▮▮▮▮?

Q    Yes.

A    It has ultimately been converted over to a cell phone, a -- a wireless.

Q    When was ▮▮▮▮▮ converted to a wireless phone?

A    I cannot tell you without looking at my -- my documents, the exact sort of month.

Q    What documents would you need to look at to tell you that?

A    I have some documents in my home office.

Q    What type of documents are they?

A    From the -- the prior carrier.

Q    Okay.

A    Her prior carrier was her -- her prior carrier -- and I want to make sure that -- that I don't misspeak here.  It was a landline.  AT&T was the carrier.  It got converted from AT&T over to -- I -- I am not really sure of -- of -- because there was a lot

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

of -- there was a lot of transferring happening.  I would have to check my records to give you the precise dates of when that transitioned over.  I'm just not recalling the exact date right now.

Q    Okay.  So AT&T was the service provider for ▇▇▇▇▇▇▇ as a landline.

And then what happened next?  A different carrier stepped in for that number, or the number was converted to a cellular telephone number?

A    The number was ultimately converted over to a cellular number.

Q    Why was the number converted to a cellular number?

A    Because it was cheaper.

Q    But when it was first converted to a cellular number, was AT&T still the service provider for it?

A    No.

Q    Okay.  Who was the service provider once the phone number was converted to a cellular number?

A    I believe -- and I can't be for certain.  But I can give you -- I believe it was T-Mobile.

Q    But without looking at records that you have in your office, you can't tell me the specifics of when ▇▇▇▇▇▇▇ was converted to a cell phone?

A    Not the exact date and year, no.

Kimberly Hudson-Bryant

Q     What -- what's that telephone number?

A     To the best of my recollection, ███████████ .

Q     Okay.  And you think that -- that that's a cell phone number that Eleanora Woods had because she got rid of the landline?

A     No.  She had -- she had both at the same time. I --

Q     Okay.

A     -- I wanted her to have a cell phone.

Q     I got it.

Okay.  So she got the ████████████ cell phone before getting rid of her landline.  Is that right?

A     To the best of my recollection, I believe so.

Q     And -- and the landline had the ████████████ telephone number?

A     Correct.

Q     Okay.  So then by the time Eleanora Woods got rid of the -- the landline with that number that she had had for years, was that -- was that phone number immediately transferred to a cell phone number in your family's possession?

A     I don't know that it was immediately transferred again.  I'd have to go back and check the records for the -- the ███████ transfer.  She -- she had the cell phone for games and -- and being able to be

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

accessible when not at home.

Q    Because it would seem to me that someone who had had a landline number for years, maybe decades, would want to retain that telephone number when they were giving up their landline.

Is -- is that what happened here?

A    The number has still been retained.  It's just now a wireless number.

Q    Okay.  And so my question is:  When it became a wireless number, whose telephone number was it?

A    When it became a wireless number, I believe that's when I transferred it into my name to manage the payments.

Q    Okay.  And when you transferred it into your name to manage the payment, who had physical possession of the phone that would ring when that telephone number was dialed?

A    Oh, dang.  He left.

MR. OLIVER:  I'm right here.  Don't worry about me.

THE WITNESS:  Oh, okay.  I'm sorry.  Can you repeat the question, Mr. -- Mr. Landers.

MR. LANDERS:  Madam Court Reporter, can you reread the question.

THE REPORTER:  One moment.

**Kimberly Hudson-Bryant**

**Kimberly Hudson-Bryant vs. OCMBC, Inc. dba Loanstream**



Q    So sometime in 2022?

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

BY MR. LANDERS:

Q    You allege --

A    And --

Q    -- you received two telephone calls.  Is that correct?

A    I heard two telephone calls.  I didn't hear what came before that.

Q    You allege that you received two telephone calls on telephone ██████████.  Is that right?

A    Yes.

Q    What are the damages that are available under the TCPA?

A    Per violation, $500 per call, up to $1,500 if willful.

Q    Okay.  So how much in damages can you recover through litigation for those two telephone calls if they are found to be unlawful?

MR. OLIVER:  Objection.

THE WITNESS:  If they're found --

MR. OLIVER:  Hold on.  Objection to the form of the question.

You can answer if you understand that.

THE WITNESS:  My understanding of the law is $500 per call, which would equal $1,000 -- excuse me.  If found to be willful, they're -- they're tripled to

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

Kimberly Hudson-Bryant

Q    Okay.  Do you have any information to suggest to you that that telemarketing call campaign lasted any longer than the year 2021?

A    Outside of what is outlined in the complaint, I don't -- I don't know.

Q    Telephone number ████████ did not receive any telephone calls from anyone using the name LoanStream, other than the two that you've alleged in your complaint.  Correct?

A    Oh.  Correct.  I apologize.

Q    Yeah.  And both of those happened in 2021.  Right?

A    Yes.

Q    So what I'm hearing you say is that you want to enforce the law to stop unlawful telemarketing campaigns.  Yet, you're also acknowledging that there's -- you have no information at all that the telemarketing campaign that LoanStream's name was a part of has continued at any time within the last five years.

So what law are you enforcing?

MR. OLIVER:  Objection to the form of the question.

You can answer if you know.

THE WITNESS:  Okay.  I'm not -- I'm not sure that I understand the question.  So if you can rephrase

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

██████████████ as her primary number at some point in the past, didn't she?

A   Yes.

Q   And she uses her primary number both as a landline and a cell phone.  Is that correct?

A   Yes.

Q   Isn't it true that in October 2021, telephone number ██████████ was Eleanora Woods' phone number?

A   Again, I don't recall the exact date.  But I do know that in 2021, it was transitioned from Eleanora Woods to Kimberly Hudson.

Q   Have you ever made a false statement in connection with this lawsuit?

A   Not that I recall, no.

Q   In October of 2021, what was the service provider for phone number ██████████?

A   AT&T.

Q   In October 2021, whose name was on the monthly billing statements for phone number ██████████?

A   I would have to -- without -- I can't tell you without looking at my documents.

Q   Okay.  In October of 2021, if someone dialed the number ██████████, would that ring to Eleanora Woods' cell phone, or to Kimberly Hudson-Bryant's cell phone?

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

A    There are documents in my home office that would help me answer this question.

Q    **What documents are those?**

A    Physical files.

Q    **Containing what?**

A    AT&T correspondence.

Q    **Now, you worked with your lawyers to provide discovery responses in this case, didn't you?**

A    I'm sorry.  Can you repeat that first part?

Q    **You worked with your lawyers to provide discovery responses in this case, didn't you?**

A    Yes.  Excuse me.

Q    **In fact, working with your lawyers to provide discovery responses is part of the role of a class representative.**

**Don't you agree?**

A    Yes.

Q    **Do you have any recollection of providing your lawyers with the records that you were just referring to that would refresh your recollection as to when phone number ▮▮▮▮▮▮▮ transferred from Eleanora Woods to you?**

A    I don't recall.  I have 'provided quite a bit of information.  I don't recall.

Q    **Okay.  Paragraph 16 alleges the number has been**

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

registered on a national do not call registry continuously since September 1st, 2023.

Do you see that?

A    Yes.

Q    How do you know that?

A    I believe it's donotcall.gov.  You type in the phone number, and it will tell you when the number was registered and the date.

Q    Who registered phone number ▮▮▮▮▮▮▮ on the national do not call registry?

A    I don't know.

Q    Did you do it?

A    I don't recall.

Q    Did Eleanora Woods do it?

A    I don't know the answer to that either.

Q    On September 1, 2023, was ▮▮▮▮▮▮▮ even Eleanora Woods' telephone number?

A    I know that she's had this number for a very long time.  I can't answer that without checking some of her old paperwork.

Q    Okay.  Let's talk a look at paragraph 17. Paragraph 17 alleges that you received two telephone calls on October 12, 2021.  One at 1:07 p.m. and another at 2:18 p.m.

Do you see that?

Kimberly Hudson-Bryant

A    Yes.

Q    Now, you verified that that allegation was accurate before the first amended complaint was filed. Right?

MR. OLIVER:  Objection to the form of the question.

You can answer.

THE WITNESS:  I'm sorry.  Please repeat the question.

(The following was read by the reporter:

Q.  Now, you verified that that allegation was accurate before the first amended complaint was filed.  Right?)

THE WITNESS:  I believe so.

BY MR. LANDERS:

Q    As you sit here today, do you believe that that allegation was correct?

A    I do.

Q    Okay.  If we look at paragraph 19, it alleges that the first call at 1:07 p.m. was unanswered and went to voicemail.

Was a voicemail left?

A    I'd have to review my records to -- to verify.

Q    To the best of your knowledge, was a voicemail left?

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

A    To the best of my -- my recollection, I don't recall.  And I'd have to verify my records to en -- to provide a more accurate answer.

Q    In October of 2021, did telephone number ███████████ have a personalized outgoing voice message?

MR. OLIVER:  Objection to the form of the question.

But go ahead.

THE WITNESS:  I don't recall if it was personalized or standard, generic.

BY MR. LANDERS:

Q    By "personalized," you understand that we're talking about, for example, with my phone, if someone were to call me and get my voicemail, it would say, hi, this is Tom Landers' cell phone.  That -- that -- you understand that to be a personalized outgoing voicemail. Right?

A    Right.

Q    Okay.  And -- and your testimony is that you don't know one way or the other whether in October of 2021 phone number ███████████ had a personalized outgoing message?

A    Correct, I don't recall.

Q    Does phone number ███████████ have a personalized voicemail today?

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

A     I believe it's just a standard one.  There is no personalized.  It's -- no.  It's standard and not personal.

Q     Now, paragraph 20 alleges that the second call at 208 -- excuse me -- at 2:18 p.m. was answered by the plaintiff.  Is that you?

A     Yes.

Q     So you personally, Kimberly Hudson-Bryant, answered the second call that was placed on October 12th, 2021 at 218PT -- 2:18 p.m.  Is that correct?

A     Yes.

Q     Okay.

A     Excuse me.

Q     Where were you -- where were you when you answered that phone call?

A     As best I recall, Texas.

Q     Were you at work?

A     I can't recall if I was working that day.

Q     But you were physically present in Texas?

A     As I recall, yes.

Q     Okay.  Where was Eleanora C. Woods on October 12th, 2021?

A     I don't recall that.

Q     Was she physically present with you?

**Kimberly Hudson-Bryant**

**Kimberly Hudson-Bryant vs. OCMBC, Inc. dba Loanstream**

A    Not with me.

Q    Okay.

A    No.

Q    Why did you not answer the first call?

A    I don't recall.  I don't know.

Q    Did -- did your phone ring before it went to voicemail?

A    My phone typically rings before it goes to voicemail unless there was a ringless voicemail.

Q    Do you think that there was a ringless voicemail in this instance?

A    I don't know.

Q    How do you know that the call went to voicemail?

A    On the -- well, I guess it -- it depends.  I believe it depends on the -- on the system that you use. Like, you know, I get ringless voicemails, and the phone will not ring but a call log is displayed on your phone and immediately thereafter there's a voicemail.  I don't recall what happened in this particular instance.

Q    So the allegation is the first call at 1:07 p.m. was unanswered and went to voicemail.  That sounds to me like it rang and was not answered and then went to voicemail.  But I'm asking you what you recall about what actually happened on October 12, 2021 at

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

Q    Yeah.  Is that correct?

A    Yes.

Q    And -- and -- and is that allegation factually correct, that the caller was asking for Ms. Woods?

A    Yes.

Q    Okay.  On October -- excuse me.

In October of 2021, you weren't Ms. Woods, were you?

A    No.

Q    But you know who Ms. Woods was, don't you?

A    Yes.

Q    You know it's Eleanora Woods.  Right?

A    Yes.

Q    Your mother?

A    Yes.

Q    Now, at the time that you answered this second phone call, was Eleanora Woods physically present with you?

A    As I mentioned before, I was in Texas.

Q    And you have a distinct memory of having the phone conversation with the caller who mentioned LoanStream and your mother not being physically present with you?  You know that for a fact?

A    Recall that I was in Texas, and by default, she would not have been present.

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

Q    Is that because Eleanora Woods never visited you in Texas?

A    No, that's not because of that.

Q    So what do you mean by default?

A    By default, she wouldn't have been there at the time of this call.  She wasn't -- she -- by default, she wouldn't have been there at the time of this call.

Q    Okay.  So you're certain that Eleanora Woods was not physically present with you when you received this second phone call that you answered?

A    Yes.

Q    Okay.  And you understood at the time of the call that the caller was asking for your mother, Eleanora C. Woods, didn't you?

A    Yes.

Q    But you did not tell the caller that you weren't Eleanora Woods, did you?

A    Not on this call, as I've mentioned previously.

Q    Instead, you told the caller that you were Ms. Woods, didn't you?

        MR. OLIVER:  Objection to the form of the question.

        If you know the answer, answer.

        THE WITNESS:  I answered yes.

**Kimberly Hudson-Bryant**

BY MR. LANDERS:

Q    You told -- you told the caller that were Ms. Woods, didn't you?

MR. OLIVER:  Objection.  Same objection.

THE WITNESS:  The caller said, Ms. Woods?  I said yes.

BY MR. LANDERS:

Q    And that was a false statement, wasn't it?

MR. OLIVER:  Objection.

THE WITNESS:  As I mentioned previously, earlier in the deposition, that I oftentimes would indicate that I am her Power of Attorney.  And sometimes I would not.  And that was just merely the -- the barrage of phone calls that were coming.  So --

BY MR. LANDERS:

Q    The Power of Attorney does not make you Eleanora C. Woods.

A    I understand.

Q    So when you told this caller that you were Eleanora C. Woods, you made a false statement to the caller.  Isn't that correct?

A    I told them --

MR. OLIVER:  Objection to the form -- hold on.

Objection to the form of the question.

You can answer.

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

THE WITNESS:  The caller asked, Ms. Woods?  And I said yes.

BY MR. LANDERS:

Q     And that was false?

MR. OLIVER:  Objection to the form of the question.

You can answer if you know.

THE WITNESS:  That was incorrect.

MR. LANDERS:  Okay, Adam, are you still here?

MR. SCOTT:  Yes.

MR. LANDERS:  Let's pull up No. 19.  We're going to mark as Exhibit 12.

Is that correct, Madam Court Reporter?

THE REPORTER:  Thirteen.

MR. OLIVER:  Thirteen.

MR. LANDERS:  Sorry about that.  Okay. Exhibit 13 will be an audio recording that Adam will play.  And I'll represent to you before he plays it that this audio recording was produced to us in this lawsuit by your lawyers.

(Exhibit 13 was marked for identification.)

MR. SCOTT:  Okay.  I'm going to -- if you do not hear this, please let me know.

(Audio played)

Kimberly Hudson-Bryant

BY MR. LANDERS:

Q    Okay.  Is -- is Exhibit 13 the call recording that you made of the second telephone call that you received?

A    Yes.

Q    Tell me how you made that call recording.

A    If I recall, it was just a regular recording device.

Q    Was it something that you held up to your phone?

A    It -- my recollection is it -- it could have been something that was held up to my phone, yes.

Q    Well, okay.  Was it a function on your phone?

A    No.  I -- I don't -- I don't believe so.  I believe it was a --

Q    What kind -- sorry.  Go ahead.  I interrupted you.

A    My recollection is that it was an external recording device.

Q    Did you record the entire phone call between you and that caller?

A    Yes.

Q    What type of phone were you using when you answered the second call?

A    I have an Android.  I don't remember the

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

version at that time.

Q    Tell me why you recorded that second call.

A    I -- I -- I recorded that -- I record my calls.

Q    You record your calls --

A    Mm-hmm.

Q    -- all of them?

A    No, not all of them.

Q    Which calls do you record?

A    Recordings that are allowed in one-party states.

Q    Okay.  Let's unpack that.  You received the call in Texas.  Is that right?

A    As best I can recall, yes.

Q    Okay.  And Texas is a one-party consent state. Is that right?

A    Yes.

Q    So is it your testimony that you record every telephone call that you receive in the state of Texas?

A    No, that is not my testimony.

Q    Okay.  So how did you -- how did you decide to record this particular call?

A    I didn't make a decision.  Depending on where I am, what I'm doing, depending on if the recorder is next to me or not will dictate a lot of that, but, no, I do not record every call.

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

Q    Okay.  All right.  Let's look again at the first amended complaint exhibit.  Let's go to paragraph 23.

Are you able to see this, Ms. Hudson-Bryant?

A    Yes.

Q    Okay.  Paragraph 23 alleges that on January 20 -- excuse me -- on January 3rd, 2023, the plaintiff sent an email to Defendant LoanStream.

Do you see that?

A    Yes.

Q    Do you recall sending such an email to LoanStream?

A    Yes.

Q    To whom did you send it?

A    If I recall correctly, perhaps the CEO and their legal counsel.  I'm not certain without checking my documents.

Q    How did you obtain their names and address -- and email addresses?

A    Public information.

Q    From what email address did you send the email?

A    Oh, I don't -- it -- I can't recall.  I don't want to speculate.

Q    But you do have a specific recollection of sending an email to LoanStream on January 3rd, 2023.  Is

**Kimberly Hudson-Bryant**

**Kimberly Hudson-Bryant vs. OCMBC, Inc. dba Loanstream**

that right?

A   Yes.

Q   Now, did you draft the email as a text and an email, say, from Microsoft Outlook, or did you draft it as a letter, say, in Microsoft Word, and then attach that letter to an email?

A   I drafted it -- my recollection is that I drafted it in Microsoft Word and copy and pasted it into the body of an email and also attached a PDF.

Q   What was in the PDF?

A   A copy of the body of the email with any images.  My recollection -- if my recollection serves me correctly, as best I can recall, there were no images in the body of the email.

Q   Okay.  Adam, can we have No. 20 up.  And is this Exhibit 14?

THE REPORTER:  Correct.

BY MR. LANDERS:

Q   Okay.  I will represent to you that this is a document that was produced to us in discovery in this case.  It has a date of January 3rd, 2023, and it appears to be a letter addressed to OCMBC, Inc., dba LoanStream Wholesale.

(Exhibit 14 was marked for identification.)

**Kimberly Hudson-Bryant**

BY MR. LANDERS:

Q    Does -- does this Exhibit 14 appear to be a true and correct copy of the email that you sent to LoanStream as alleged in your first amended complaint?

A    Yes, it appears to be.

Q    Okay.  And you recall drafting this email.  Is that right?

A    Yes.

Q    Did you personally write this email?

A    I personally wrote it.

Q    Where did you get the language from?  Did you personally draft it, or did you get the language from some source?

A    I got the language from some source.

Q    What source?

A    The Robocalls.cash.

Q    Okay.  Before you sent the letter, did you review it for accuracy?

A    Yes, to the best of my ability.

Q    Okay.  So can you please read out loud the first sentence that begins with I'm contacting you.

A    "I'm contacting you today regarding communications to my phone that are in violation of the TCPA."

Q    Okay.

A    Understood.  Thank you for the clarity.  Okay.

Q    Okay.  So the first sentence reads "I'm contacting you today regarding communications to my phone that are in violation of TCPA."

My question to you was:  Whose phone is "my phone"?

A    I was writing a letter on behalf of my mother.

Q    Eleanora Woods?

A    Yes.

Q    Okay.  So the phone was Eleanora Woods' phone.  Correct?

MR. OLIVER:  Objection to the form of the question.

Go ahead and answer.

THE WITNESS:  And, again, this is where there's the transition around sometime in '21 -- 2021 where that transition was take place.  So I can't tell you without looking, again, going back to the -- the AT&T file at my office.

BY MR. LANDERS:

Q    So let's look at the last sentence of that first paragraph that starts with "The illegal communications."

Would you please read that sentence out loud.

A    "The illegal communications came to my phone

number, ████████, as follows."

Q    Okay.  Who wrote this letter?

A    I -- I wrote -- I wrote this letter from a template.

Q    Mm-hmm.

A    From the Robocalls.cash kit.

Q    Okay.

A    Robocalls.cash site.

Q    Understood.  All right.  But you were not writing this letter for Kimberly Hudson-Bryant; you were writing this letter for Eleanora C. Woods.  Right?

A    I believe it indicates on behalf of the -- her Power of Attorney, yes.

Q    Right.

So you agree that you were informing LoanStream in this letter that you were writing for Eleanora C. Woods as her attorney in fact.  Right?

A    Right.

Q    Okay.  So then when this letter refers to my phone and my phone number, you're informing LoanStream that the phone and the phone number are Eleanora C. Woods.  Right?  That's what you're informing LoanStream?

A    According to the letter.

Q    That's -- right.  The -- the letter that you sent, that you drafted, says Eleanora C. Woods' phone

received illegal phone calls at Eleanora C. Woods' phone number. Right?

A    Correct. And -- and, again --

Q    Is that statement true, or false?

A    True.

Q    Okay. Now, that sentence that we -- that you started reading, "The illegal communications came from my phone number -- came to my phone number, ████████, as follows," and it identifies two phone calls, can you please tell me the dates of those two phone calls.

A    10/12/2021 and 10/19/2021.

Q    So on January 3rd, 2023, you informed LoanStream that it had called -- called Eleanora C. Woods' phone number twice on two separate days. Right? That's what your letter said?

A    Right.

Q    Okay. But the first amended complaint and the original complaint both allege those two phone calls were made on the same day. That's what they allege. Correct?

A    Correct. We have a typo.

Q    Okay. So -- so -- so which documents -- which document has the false statement? The complaint and the first amended complaint, or your January 3rd, 2023

Kimberly Hudson-Bryant

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript (X) was ( ) was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed by name.

Dated:  04/08/2026

_____

Margaret A. Smith

RPR, CRR, CSR No. 9733

Kimberly Hudson-Bryant

Kimberly Hudson-Bryant vs.
OCMBC, Inc. dba Loanstream

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Kimberly Hudson-Bryant
        vs. OCMBC, Inc. dba Loanstream
Date of Deposition: 03/26/2026

Job No.: 10186005


        I, KIMBERLY HUDSON-BRYANT, hereby certify

under penalty of perjury under the laws of the State of

_____ that the foregoing is true and correct.

        Executed this _____ day of

_____, 2026, at _____.




                        _____

                        KIMBERLY HUDSON-BRYANT


NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on

this _____ day of _____, 20___,

by_____,    proved to me on the

basis of satisfactory evidence to be the person

who appeared before me.

Signature: _____ (Seal)

**Kimberly Hudson-Bryant**

DEPOSITION ERRATA SHEET
Case Name: Kimberly Hudson-Bryant
        vs. OCMBC, Inc. dba Loanstream
Name of Witness: Kimberly Hudson-Bryant
Date of Deposition: 03/26/2026
Job No.: 10186005
Reason Codes:  1. To clarify the record.
               2. To conform to the facts.
               3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

**Page 246**

**Kimberly Hudson-Bryant**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript  is true and correct.

_____

KIMBERLY HUDSON-BRYANT

**Page 247**