# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

|  |  |
|---|---|
| KIMBERLY HUDSON-BRYANT, individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br>v.<br><br>OCMBC, INC. dba LOANSTREAM,<br><br>     Defendant. | Case No. 8:24-cv-00067-FWS-JDE |

## EXPERT REPORT OF MADELYN MORAN

### I.  DESCRIPTION OF ENGAGEMENT

1.     Plaintiff has brought a class action against OCMBC, INC. d/b/a LoanStream (hereinafter "LoanStream") alleging that LoanStream initiated, or is vicariously liable for, calls to Plaintiff and others whose telephone numbers were on the National Do Not Call Registry ("NDNCR") in violation of the Telephone Consumer Protection Act ("TCPA").

2.     I was retained by counsel for LoanStream to review, analyze and respond to the claims made by Plaintiff's expert, as set forth in the Declaration of Aaron Woolfson filed April 13, 2026, as well as any later amendments or rebuttal reports that may be provided by Mr. Woolfson.

3.     I was also retained to provide an opinion as to whether the calls referenced in the Complaint made to telephone numbers appearing on the NDNCR can be accurately identified, and if so, whether the recipients of these calls can also be accurately identified as it relates to, and in response to, Mr. Woolfson's opinions in this regard.

1

4.      In conjunction with my retention in this case, I, and the members of the team of analysts assisting me, have reviewed and agree to comply with the terms of the Court's protective order.

## II.    SUMMARY OF OPINIONS

Opinion No. 1: The LizDev Data Relied Upon By Mr. Woolfson Is Not A Historical Call Detail Record And Is Missing Critical Information Preventing It From Identifying The Calls At Issue.

Opinion No. 2: Plaintiff Cannot Reliably Determine Which Telephone Numbers Are Associated with Businesses.

Opinion No. 3: The List Of Telephone Numbers Plaintiff's Expert Aaron Woolfson Identified In His Analysis Contains Telephone Numbers Registered To The NDNCR By Persons Other Than The Current User Of The Telephone Number.

Opinion No. 4: Mr. Woolfson's Use of Restricted Number Portability Administration Center ("NPAC") Data For Litigation Purposes Is Likely Not A Permissible Use And The Court May Need To Determine If His Proposed Process Is Violating NPAC Licensing Restrictions.

Opinion No. 5: Mr. Woolfson Purports To Be Able To Accurately And Reliably Identify Putative Class Members, Yet He Historically Has Been Unable To Do So.

## III.   QUALIFICATIONS

5.      I am an Associate Principal in the Forensic Services practice at Charles River Associates ("CRA"). CRA is a global management consulting and expert services firm that provides independent expert testimony, litigation and regulatory support, financial, economic, and strategic expertise, and data analytics to law firms, Fortune 500 corporations, government agencies, and regulatory bodies.[1]

6.      In the last five years, in conjunction with my team members at Charles River Associates, I have provided various types of litigation support, including conducting data analytics and assessing internal TCPA compliance efforts in over 150 TCPA related matters.

---

[1] My most recent curriculum vitae is attached as Exhibit 1.

2

7.      In the last three years I have been retained as a data analytics and subject matter expert witness in the following cases:

a)  *The People of the State of California v. MV Realty PBC, LLC, et al.,* 23STCV30464 (Superior Court of the State of California, County of Los Angeles) (California Do Not Call – Declaration filed April 8, 2026)

b)  *Espanol v. Capital Vision Services, LLC d/b/a MyEyeDr*, No. 6:24-cv-01024-PGB-DCI (M.D. Fla.) (TCPA class action – Report filed January 26, 2026)

c)  *Brockington v. Yoli, LLC.*, No. 3:25-cv-00159-KAC-JEM (E.D.Tn.) (TCPA class action – Report filed January 23, 2026)

d)  *Rivera v. Cabela's, LLC.*, No. 1:25-cv-00290-NYW-KAS (D. Co.) (TCPA class action – Report filed January 14, 2026)

e)  *Teman v. Select Justice*, *LLC.*, No. 1:24-cv-12656-LTS (D. Ma.) (TCPA class action – Report filed December 12, 2025)

f)  *Wilson v. Southern Oregon Credit Service*, No. 1:24-cv-2087-MTK (D. Or.) (TCPA class action – Report filed October 13, 2025)

g)  *Smith v. Examworks, LLC. And Government Employees Insurance Company (GEICO)*, No. 8:21-cv-2746-PX (D. MD.) (TCPA class action – Report filed July 24, 2025).

h)  *Lazo v. TOHVT,* No. 8:24-cv-00127-JFB (D. Neb.) (TCPA class action – Report filed April 1, 2025).

i)  *Sapan v. The Federal Savings Bank*, No. 8:23-CV-00075-cv-ADS (C.D. Cal.) (TCPA class action – Report filed November 22, 2024).

j)  *Abboud v. Circle K, Inc.*, No. 2:23-cv-01683-DWL (D. Az.) (TCPA class action – Report filed November 19, 2024).

k)  *Clark v. Spark Energy*, No. 3:24-cv-00568-JSC (N.D. Cal.) (TCPA class action – Report filed November 15, 2024).

l)  *Tobajian v. Allstate Insurance Company*, No. 2:23-cv-00753-DMG-PD (C.D. Cal.) (CIPA class action – Report filed May 21, 2024).

8.      I am an expert in TCPA compliance and have led teams assessing the dialing operations of businesses in various industries to enhance their efforts to comply with the TCPA, the

3

Telemarketing Sales Rule, and applicable state telemarketing laws. As part of this work I have, among other things, performed the following tasks:

a) Performed audits of corporate TCPA policies and procedures.

b) Reviewed the technical operations of corporate dialing systems, Customer Relationship Management systems, customer service notation systems and audio recording systems.

c) Identified the nature of the consent which companies relied upon to communicate with consumers via their cellular telephone numbers.

d) Reviewed the manner in which consumer consent to be contacted was documented and maintained.

e) Reviewed the consent and privacy language contained on webforms and other types of requests for contact filled out by consumers.

f) Reviewed the processes for collecting, handling, calling, and reallocation of webforms and other requests for contact by consumers

g) Examined opt-out protocols and performed tests to determine if such protocols were followed.

h) Identified potential areas of improvement related to the handling of opt-out requests

i) Identified the way wrong numbers, "bad numbers," disconnected and failed calls were documented, including examining the codes used by the dialer system to identify call dates, times, durations and call outcomes.

j) Reviewed NDNCR and Reassigned Number Database ("RND") scrubbing procedures performed by the company, if any, prior to placing calls and texts.

k) Provided written assessments of the compliance procedures which included suggestions for process improvement where applicable.

l) Reviewed contract language with lead generation vendors and assessed the documentation and consent provided by such vendors

4

9.    In the last ten years, I have been the lead data analyst supporting the expert testimony of other CRA experts in more than 10 consumer class actions alleging violations of the TCPA or violations of similar state consumer protection statutes:

a)  *Smith v. Examworks, LLC. And Government Employees Insurance Company (GEICO)*, No 21-2746 (D. MD.).

b)  *Mitchell v. Toyota of Dallas*, No: 3:23-cv-1278-N (N.D. Tex.).

c)  *Elliot v. Humana, Inc.*, No. 3:22-cv-329-RGJ (W.D. Ky.).

d)  *Usanovic v. eXp Realty, LLC.*, No. 2:23-cv-00687-JLR (W.D. Wash.).

e)  *Brian J. Lyngass, D.D.S. P.L.L.C. v. Solstice Benefits, Inc.*, No. 2:22-cv-10830 (E.D. Mich.).

f)  *Williams v. Pillpack, LLC.*, No. 3:19-cv-05282-DGE (W.D. Wash.).

g)  *Sabatier v. American Health Reform Solutions, LLC. et al.*, No. 1:23-cv-22203-RKA (S.D. Fla.).

h)  *Bayles v. The Hertz Corporation*, No. 1:22-cv-01092-JRS-MKK (S.D. Ind.).

i)  *Powell v. H&R Accounts, Inc. D/B/A Avadyne Health, et al.*, No. 7:22-cv-01052-TMC (S.D.S.C).

j)  *Doup v. Van Tuyl Group, LLC et al.*, No. 3:20-cv-02742-x (N.D. Tex.).

k)  *Nightingale v. National Grid USA Service Company, Inc. et al.*, No. 1:19-12341-NMG (D. Mass.).

l)  *Perrong v. Victory Phones*, No. 2:20-cv-05317 (E.D. Pa.).

m) *Vance v. Microsoft Corporation*, No. 2:20-cv-01082-JLR (W.D. Wash.) and *Vance v. Amazon.com, Inc.*, No. 2:20-cv-01084-JLR (W.D. Wash.).

n)  *Walker v. CRME Financial Services*, No. 3:20-cv-02218-BEN-JLB (S.D. Cal.).

o)  *Chinitz et al., v. Realogy Holdings Corp.*, No. 3:19-cv-03309-JD (N.D. Cal.).

p)  *Head v. Citibank, N.A.*, No. 3:18-cv-08189-MHB (D. Ariz.).

10.   I have degrees in Economics and Political Science from Indiana University, and I have worked as a data scientist and litigation consultant for the past ten years.

11.   I work with complex datasets commonly referred to as "Big Data," which are used in expert witness testimony in a variety of industries including telecommunications, healthcare, securities,

5

and forensic accounting. I specialize in creating and producing data analytics while providing unbiased and impartial findings pertaining to consumer class actions.

12.     I have served as a moderator and speaker at conferences and webinars regarding topics related to the analysis of consumer data, including the analysis of call and text message records in TCPA litigation.

13.     I primarily use Microsoft's SQL Server (a relational database management system) to perform data analytics related to TCPA class actions, amongst other types of consumer class actions. I have been working in Microsoft's SQL Server Management Studio conducting "Big Data" analytics for over ten years.

14.     I have been retained by counsel for Defendant LoanStream and am being compensated at the hourly rate of $725. I have been retained to review Mr. Woolfson's declaration and opine on whether members of the putative class can be reliably identified using the methodologies he proposes.

15.     My understanding of the factual matters at issue in this litigation is based on my review of the pleadings, written discovery responses, and other documents produced in discovery.[2] I understand that additional information relevant to my opinions may be disclosed in subsequent reports, document productions, and depositions. I reserve the right to amend my findings based upon additional information.

## IV.  DOCUMENTS REVIEWED

16.     My understanding of the factual matters at issue is based upon my review of the documents and data appended to this report as Exhibit 2.

---

[2] Throughout this report, when I use the first person to describe my analysis, I am referring to work conducted by me or by my staff under my direction.

## V.    FACTUAL BACKGROUND

### *Business Operations of Defendant LoanStream*

17.    Defendant LoanStream is a mortgage and wholesale lending organization offering a variety of products including mortgage refinancing.[3]

### *Resmo*

18.    Premier Financial Marketing d/b/a Resmo (herein referred to as "Resmo") was a marketing company operating out of California that funded mortgage loans as an independent contractor from July 2018 through approximately April of 2024.[4] In its operations, Resmo purchased leads from lead vendors to obtain contact information for individuals that opted-in to receive information about refinancing their mortgage.[5] Upon receiving leads from lead vendors, Resmo provided the contact information to a call center called Global Experts Limited to place calls to the telephone numbers contained within the leads.[6] If an individual that received a call was interested in refinancing their mortgage, they would be transferred to a representative at Resmo to complete the refinancing process.[7]

19.    Resmo placed calls through Global Experts Group with the objective of servicing loans through three different providers including LoanStream, LendingThree and AFN.[8] However, as Resmo representative Sean Roberts stated in his deposition, Resmo "never had a relationship with LoanStream, period."[9]

---

[3] *See* https://www.lsmortgage.com/about/, access May 8, 2026.
[4] Deposition of Sean Roberts, 16:24-18:7, 19:1-4.
[5] Deposition of Sean Roberts, 21:1-9.
[6] *Id.*
[7] Deposition of Sean Roberts, 21:10-22:6.
[8] Deposition of Sean Roberts, 31:13-20.
[9] Deposition of Sean Roberts, 31:11-13.

7

### *LizDev*

20.    LizDev is a marketing company that provides leads to its clients.[10] According to the Declaration of LizDev CEO Elizabeth Stone, LizDev sold leads to Resmo beginning in 2021.[11] Resmo representative Sean Roberts states in his deposition that Resmo purchased leads from LizDev on two occasions in October of 2022 and January of 2023.[12]

### *Global Experts Limited*

21.    Global Experts Limited is a call center based out of the country of Jamaica that Elizabeth Stone invested in.[13] Resmo hired Global Experts Limited to place calls on its behalf in their marketing efforts to sell loan products for LendingThree, AFN and LoanStream.[14]

### *Calls to the 1729 Number*

22.    Plaintiff Kimberly Hudson-Bryant alleges to have received two calls on the telephone number ████ 1729 (the "1729 Number"), both occurring on October 12, 2021.[15] ████████

████████████████████████████████████████████████████

████████████████████████████████████████ .[16] ████████████

████████████████████████████████████████ .[17]

23.    I performed a search of the NDNCR to identify the date on which the 1729 Number was registered. The search returned a registration date of June 1, 2003.

---

[10] Declaration of Elizabeth Stone, ¶4.
[11] *Id.*
[12] Deposition of Sean Roberts, 23: 9-15.
[13] Deposition of Sean Roberts, 19:21-20:15, 23:22-24:1.
[14] Deposition of Sean Roberts, 31:13-20.
[15] First Amended Class Action Complaint, ¶17.
[16] Deposition of Kimberly Hudson-Bryant, 106:15-108:10.
[17] Deposition of Kimberly Hudson-Bryant, 112:11-13.

*A Brief Introduction To Call Detail Records*

24.      When a telephone dialing system is engaged, the software used to operate the telephone system automatically writes a log of activity. These logs document each call placed by the telephone system from the time it is initially placed to the time it is terminated. These logs are referred to as call detail records ("CDRs"). Below is an example of a CDR export (a collection of call detail records):[18]



25.      CDRs typically record the following information about a call:

   a.   The originating (dialing) telephone number.

   b.   The terminating (dialed) telephone number.

   c.   The outbound or inbound nature of calls placed or received.

   d.   Campaign information which may identify the purpose of the call.

   e.   The date and time at which the call took place.

---

[18] *See* https://www.gl.com/call-data-recording-and-analysis.html, accessed May 8, 2026. Herein, I use "CDR" to refer to call detail reports and call detail records interchangeably.

    f.   The length of the call, also known as call "duration."

    g.   The "disposition" of the call, which details whether a call was placed, received and if received, the outcome of a call. Some common dispositions are "busy," "answered," or "voicemail."

26.    All these components are necessary to determine if a call was placed or received, whether it connected, and if so, what the nature of the connection was, such as whether a voicemail was reached, a recipient answered or hung up, and how long the call lasted. Dispositions, for example, are integral to delineating between successful and failed call outcomes. For example, if a CDR is associated with a disposition of "SIT-TONE," the associated call attempt was not successful because the telephone number dialed was not in service, the call could not be routed, or the number dialed did not contain the complete digits, amongst other reasons.[19] The fact that a telephone number was dialed does not mean that it connected or a call was received.  Calls that do not connect or go unanswered represent a significant number of calls placed in call centers, CDRs record these connections and telephone dialing systems software often tracks these instances to understand when they are dialing disconnected numbers or whether the systems are operating over capacity and calls can no longer be successfully placed.

27.    CDRs may also indicate the occurrence of a call transfer (e.g., a transfer required to initiate a conference call). Often, when CDRs are associated with transfers, there will be multiple rows of data representing a single call event. The "parent leg" will record the call placed by a Lead

---

[19] A Special Information Tone ("SIT") is an international standard signal consisting of three rising tones that indicate that a call has failed. *See* https://help.genesys.com/pureconnect/mergedprojects/wh_dlr/mergedprojects/dialer_manager_help2/desktop/sit_codes.htm#:~:text=SIT%20stands%20for%20Special%20Information,indicate%20that%20the%20call%20failed. and https://help.mypurecloud.com/glossary/special-information-tones-sit/, accessed May 8, 2026.

Generator to a consumer. A second row of data, or "child leg," will record the result of a warm-transfer: the connection between the consumer lead and the Lead Generator's client.



28.    CDRs record each instance of a new parent/child connection attempt as a unique row of data, along with the telephone number placing the call, the telephone number called, duration, disposition, date, and time information.

### *Data Produced In This Case*

29.    I received Plaintiff's Expert Aaron Woolfson's Declaration and exhibits which included the following:

a)  Expert Declaration of Aaron Woolfson[20]

b)  EXHIBIT PACKET – LoanStream – Exhibits 1-9.pdf

c)  EXH 9-272,092 calls to 53,726 unique nos.xlsx

---

[20] The Expert Declaration of Aaron Woolfson was provided to me as Exhibit H to Plaintiff's Notice of Motion and Motion for Class Certification.

30.     In addition, I received a series of text files produced by Elizabeth Stone of LizDev (the

"LizDev Data"):

    a) Liz Dev_0001 - Confidential.TXT

    b) Liz Dev_0002 - Confidential.TXT

    c) Liz Dev_0003 - Confidential.TXT

    d) Liz Dev_0004 - Confidential.TXT

    e) Liz Dev_0005 - Confidential.TXT

    f) Liz Dev_0006 - Confidential.TXT

    g) Liz Dev_0007 - Confidential.TXT

    h) Liz Dev_0008 - Confidential.TXT

    i) Liz Dev_0009 - Confidential.TXT

    j) Liz Dev_0010 - Confidential.TXT

    k) Liz Dev_0011 - Confidential.TXT

    l) Liz Dev_0012 - Confidential.TXT

31.     LizDev CEO, Elizabeth Stone states in her Declaration that she understands the data to

contain outbound call logs related to calls placed by Global Experts LTD in connection with a

LoanStream campaign.[21] Aside from the fact that Ms. Stone has produced the data, it is unclear

from which system this data was derived or how it was obtained. I have not observed in the data

any record indicating from what system(s) this data originated, who was using the system(s) during

the period at issue and for what purpose, or who generated the files.

---

[21] Declaration of Elizabeth Stone, ¶7.

12

32.     The LizDev Data contains thirty-five unique fields including the following:[22]

a) Lead_id

b) Entry_date

c) Modify_date

d) Phone_number

e) Alt_phone

f) Called_count

g) Last_local_call_time

33.     In addition to these fields, the LizDev Data contains data elements that appear to identify the individual associated with each lead such as name and address, gender, email and date of birth.[23]

34.     The LizDev Data does ***not*** contain the following:

a) The directionality (inbound or outbound) of any call placed or received.

b) The "disposition" of a call, such as "answered," "busy," or "voicemail," indicating the outcome of any call and whether it connected.

c) Campaign information indicating the purpose of a call or on whose behalf a call was placed.

d) The date and time any call that took place aside from the "last_local_call_time."

e) The length or duration of any call.

f) An originating (dialing) telephone number.

---

[22] A complete listing of the fields contained in the LizDev Data: lead_id, entry_date, modify_date, status, user, vendor_lead_code, source_id, list_id, gmt_offset_now, called_since_last_reset, phone_code, phone_number, title, first_name, middle_initial, last_name, address1, address2, address3, city, state, province, postal_code, country_code, gender, date_of_birth, alt_phone, email, security_phrase, comments, called_count, last_local_call_time, rank, owner, entry_list_id.

[23] The fields that can help identify the individual associated are as follows: first_name, middle_initial, last_name, address1, address2, address3, city, state, province, postal_code, country_code, gender, date_of_birth.

13

*The LizDev Data Does Not Contain Call Directionality*

35.    Within the LizDev Data, there are only two fields indicating that a call may have transpired. There is a "called_count" that contains a numerical value and there is a "last_local_call_time" that contains a datetime value. There is no field or data value indicating whether a call was inbound or outbound.

*The LizDev Data Does Not Contain Call Dates, Times Or Dispositions*

36.    Typically, within a CDR, at a minimum, each call has its own unique record containing both a call date, time and a disposition indicating whether a call connected. If a call resulted in a transfer, that call may have multiple records containing the exact date and time of each leg of the call and a disposition associated with each leg of the call. While the LizDev Data contains a field indicating a count of calls that may have been placed associated with a number in the "called_count" field, the LizDev Data does not have unique records associated with any particular call and it does ***not*** contain any field indicating (1) a date and time when those calls took place or (2) whether any of the calls contained within that count connected. Instead, it simply counts the number of times a call may have occurred.

37.    The only apparent call date and time present within the LizDev Data is contained in the field "last_local_call_time," which may provide a date and time for one call, but there is still not a disposition present for ***any*** call within the LizDev Data. To be clear, there is nothing in the data relied upon by Mr. Woolfson that indicates whether any of the calls connected. It is not possible to identify calls that failed to connect due to technical issues, calls that reached busy signals, calls that did not ring, and calls that reached disconnected numbers.

38.    In the absence of the call disposition, in some instances a call duration might shed light on whether a call connected, but call duration is also not recorded for any record contained within the

14

LizDev Data. Therefore, it is indeterminable when the calls contained in "called_count" took place and connected calls can neither be identified nor quantified.

### The LizDev Data Does Not Indicate That Calls Were Placed On Behalf of LoanStream

39.     While the LizDev Data contains over thirty fields populated with various information, there is no field contained within the data that indicates whether any lead, call or any record contained within the LizDev Data is associated with LoanStream. Within a historical CDR, it is standard to record a call campaign or purpose for which any outbound call was placed. A campaign or reason for any outbound communications is not present for any record contained within the LizDev Data and as such, it is indeterminable whether any call was placed on behalf of LoanStream or any of the other loan providers.

### The LizDev Data Does Not Identify The Specific Calls Alleged By The Named Plaintiff

40.     The LizDev Data contains one record populated with the 1729 Number in the "phone_number" field. This record is associated with Eleanora Woods of Moreno Valley, California with an email address of ███████████████. The "last_local_call_time" contains a datetime of October 19, 2021 at 14:17:57 and the "called_count" contains a value of "3." Neither this date, nor the time corresponds with the calls alleged by Plaintiff to have taken place on October 12, 2021.[24]

41.     Plaintiff alleges in the First Amended Complaint that she received two calls, yet that does not correspond with the "called_count" value of "3." It is possible that one call placed to the 1729 Number did not connected, but because there is no disposition data, there is no way to know. The LizDev Data does not indicate a date or time for any of the calls aside from the date and time populated in "last_local_call_time" which, again, does not correspond to any calls alleged by

---

[24] First Amended Class Action Complaint, ¶17.

15

Plaintiff. There is no record contained within the LizDev Data indicating that a call was placed or completed to Plaintiff on October 12, 2021 at 1:07 PM and there is no record contained within the LizDev Data indicating that a call was placed or completed to Plaintiff on October 12, 2021 at 2:18 PM.

### *The Purported Class*

42.    Plaintiff Kimberly Hudson-Bryant, seeks to certify the following class:[25]

**Telephone Consumer Protection Act Do Not Call Registry Class:**

All persons in the United States who, from August 2021 through June 2022, (1) were on the National Do Not Call Registry for at least thirty days, (2) who received more than one telephone call from the LoanStream calling campaign, as evidenced in the calling data produced by LizDev in this lawsuit, (3) within any 12-month period (4) as identified in the Expert Report of Aaron Woolfson.

## VI.   THIRD-PARTY DATA SOURCES

### *The Reassigned Number Database*

43.    The Reassigned Number Database was established by the Federal Communications Commission ("FCC") in 2021 with the objective of preventing consumers from getting unwanted calls intended for someone that previously used their telephone number.[26] To do this, the FCC began requiring major carriers to report permanent disconnections each month beginning on April 15, 2021, with all carriers eventually reporting by October 15, 2021.[27] The database containing the record of permanent telephone number disconnections was made available to paid subscribers on November 1, 2021 and is regularly updated as carriers continue to fulfill their requirement to report monthly. Callers use the database to determine whether a telephone number may have been

---

[25] Plaintiff's Notice of Motion and Motion for Class Certification, p. 15.
[26] *See* https://www.fcc.gov/reassigned-numbers-database, accessed May 8, 2026.
[27] *See* DA-21-134A1_Rcd.pdf, Reporting requirement under For Service Providers at https://www.fcc.gov/reassigned-numbers-database, accessed May 8, 2026.

16

reassigned and thus potentially avoid making inadvertent calls to consumers that did not give consent to be called.

44.     The RND is not designed to and does not provide the specific date that a telephone number was disconnected. It also does not report a timeline of the historic disconnections associated with a particular number. Instead, to query the RND, a user must provide a telephone number and an associated date ("Associated Date") from which a search should commence. The user then receives an output containing a binary code with a value of '0' or '1' for each telephone number and Associated Date combination submitted.[28] A value of '0' indicates the telephone number was *not* permanently disconnected *after the Associated Date provided*. The RND may also return a value of '1,' indicating the telephone number was permanently disconnected on an unknown date *on or after the Associated Date provided*.[29] The specific date of any permanent disconnection or reassignment is not provided.

45.     Based on the FCC's reporting requirements, service providers are "required to maintain records of the *most recent* date that each phone number assigned to one of their subscribers was permanently disconnected," with this data collection beginning on July 27, 2020.[30] Given the time constraints and relative newness of the RND, this leaves some categories of numbers that cannot be reported on including, (1) numbers that have been active since prior to the advent of the RND and never permanently disconnected during the lifetime of the RND and (2) numbers that have become active during the lifetime of the RND and have not yet been permanently disconnected.

---

[28] FCC documentation also refers to these codes as "Yes" and "No" in some reporting— "Yes" meaning the number *has* been permanently disconnected and "no" meaning it has *not* been permanently disconnected.

[29] *See* DA-21-1649A1_Rcd.pdf under Announcements – Supplemental Guidelines Published (12/29/21) at https://www.fcc.gov/reassigned-numbers-database, accessed May 8, 2026.

[30] *See* DA-20-706A1_Rcd.pdf, Aging requirement under For Service Providers at https://www.fcc.gov/reassigned-numbers-database, accessed May 8, 2026.

17

46.    Finally, the RND also contains no information identifying any current or prior subscriber of the telephone numbers upon which it reports.

### *National Do-Not-Call Registry*

47.    As a result of the Do-Not-Call Implementation Act of 2003 and to facilitate compliance with the TCPA, the FCC and FTC established the National Do Not Call Registry ("NDNCR"), which commenced in 2003.[31] People can register their telephone numbers on the registry by calling in or going online to DoNotCall.gov.[32]

48.    Once registered, there is a 30-day grace period provided to callers to cease communications. Per the FTC website, registered telephone numbers will only be removed from the registry if they have been disconnected or reassigned.[33]

### *NPAC Porting Data*

49.    The Number Portability Administration Center ("NPAC") is an extension of the Federal Communications Commission ("FCC") handling the routing of telephone calls and text messages as well as the facilitation of the local number portability ("LNP") or the porting of telephone numbers from landline to cellular or vice versa. In its capacity, NPAC generates a large volume of User Data logging the porting of telephone numbers and their associated carriers. iconectiv is the federally appointed administrator of NPAC data. The data which iconectiv maintains and administers is made available for purchase by qualified third parties. One of the products offered by iconectiv which contains NPAC User Data is called Wireless Do Not Call ("WDNC").[34]

---

[31] *See* https://consumer.ftc.gov/national-do-not-call-registry-faqs; https://www.fcc.gov/general/do-not-call.
[32] *See* https://consumer.ftc.gov/national-do-not-call-registry-faqs, accessed May 8, 2026.
[33] *Id.*
[34] *See* https://numberportability.com/portdata-comply-service, accessed May 8, 2026.

18

50.     To qualify to purchase certain NPAC User Data from iconectiv, the purchaser must be an authorized service provider of telecom-related services and maintain a PTRS (Providers of Telecom-Related Services) Certification.[35]

## VII.   THE DECLARATION OF AARON WOOLFSON

### *The Opinions In Mr. Woolfson's Declaration*

51.     Mr. Woolfson's Declaration contains two opinions. First, he opines that there is a "reliable method to identify" calls to numbers that were registered to the National Do Not Call List for more than thirty days using the data produced in this matter.[36] Second, he opines that using this data, there is a "reliable method to identify…where there are two (2) or more calls to that number within 365 days."[37]

### *Data And Documents Produced By Mr. Woolfson*

52.     Exhibit 8 to his declaration is a script containing SQL queries that he states he used to perform his analysis. Exhibit 9 to his declaration is an excel document containing a list of 53,726 unique telephone numbers as well as a count of calls labeled "call_count" and a datetime stamp labeled "last_local_call_time."

[INTENTIONALLY LEFT BLANK – SEE NEXT PAGE]

---

[35] *See* https://numberportability.com/about/permitted-use, accessed May 8, 2026.
[36] Declaration of Aaron Woolfson, ¶3.
[37] *Id.*

19

*Mr. Woolfson's Proposed Analysis*

53.    Mr. Woolfson states that to formulate his methodology and the basis of his opinions he relied exclusively on the LizDev Data and the Plaintiff's complaint:[38]

    a)  "First Amended Complaint (ECF No. 37)"
    b)  "Liz Dev_0001 – Confidential"
    c)  "Liz Dev_0002 – Confidential"
    d)  "Liz Dev_0003 – Confidential"
    e)  "Liz Dev_0004 – Confidential"
    f)  "Liz Dev_0005 – Confidential"
    g)  "Liz Dev_0006 – Confidential"
    h)  "Liz Dev_0007 – Confidential"
    i)  "Liz Dev_0008 – Confidential"
    j)  "Liz Dev_0009 – Confidential"
    k)  "Liz Dev_0010 – Confidential"
    l)  "Liz Dev_0011 – Confidential"
    m)  "Liz Dev_0012 – Confidential"

54.    In addition to the LizDev Data and the operative complaint, Mr. Woolfson states that available to him are the following databases:[39]

    a)  "The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database."
    b)  **"iConectiv's WDNC for use in identifying the type of line (and the carrier)"**
    c)  "the Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC" (Emphasis added)

---

[38] Declaration of Aaron Woolfson, ¶23.
[39] *Id.*

55.     Mr. Woolfson states that to perform his analysis of the records contained within the LizDev Data, he created a SQL database (hereinafter referred to as the "Woolfson Database") and applied a series of filters to identify records that meet the following criteria:[40]

a)  The telephone number contained ten digits

b)  The telephone number started with a 2 through 9

c)  "Were contained within structurable data"

d)  "Had an associated date"

e)  The telephone number contained an area code that is subject to the TCPA

f)  The telephone number "was on the national DNC list for more than thirty (30) days; and the number to which the call was placed received two (2) or more calls within a 365 day period."

56.     Mr. Woolfson states that to perform his analysis, he started with 663,537 calls to 211,596 unique telephone numbers he identified within the LizDev Data.[41] This statement is misleading as (1) there are only 211,661 records within the LizDev Data and (2) the LizDev Data does not contain the critical data elements required to constitute a CDR that would indicate that a call was placed and successfully connected. Because this data is missing, Mr. Woolfson has apparently assumed, without specifically disclosing this assumption, that every call placed was successfully connected. As noted above, each record contained within the LizDev Data contains only a date and time that appears to be associated only with the most recent call related to that telephone number. The records do not contain any data indicating whether that call was inbound or outbound, nor does it contain a disposition code which details whether the call successfully connected.

57.     Instead, the LizDev Data contains a field, "called_count" that contains a numerical value. Based on my review of the script Mr. Woolfson has produced as Exhibit 8 to his report, to arrive

---

[40] Declaration of Aaron Woolfson, ¶27.
[41] Declaration of Aaron Woolfson, ¶39.

21

at a call total of 663,537 calls, he simply took the sum of the "called_count" and considered all values contained within this field to be completed outbound calls despite not having any data whatsoever regarding 451,941 (68%) of these alleged calls. Nowhere in his report does he disclose this lack of data.

58.     Next, Mr. Woolfson states that he removed 303 calls to telephone numbers that "were either not precisely ten (10) digits, or to numbers that were not contained on the FTC's list of United States area codes that are subject to the TCPA."[42]

59.     Following this step, Mr. Woolfson states that he "removed 110 calls that were duplicative."[43] Mr. Woolfson does not state in his declaration how he identified records within the LizDev Data that he determined to be duplicative. However, a review of the code contained in Exhibit 8 indicates that he relied solely on records where the telephone number contained in each record was the same and randomly selected one record associated with the telephone number to keep.

60.     This is a fundamentally flawed methodology for determining whether a record is duplicative as Mr. Woolfson simply ignores every characteristic associated with each record except for the telephone number. For example, within the LizDev Data, there are 65 telephone numbers for which there are multiple records.[44] These telephone numbers with multiple records have varying characteristics indicating the lead the telephone number was associated with, the individual associated with the lead and even the "called_count" upon which Mr. Woolfson relies to generate a total number of calls in his analysis may differ across the records.

---

[42] Declaration of Aaron Woolfson, ¶40.
[43] Declaration of Aaron Woolfson, ¶40.
[44] 17 telephone numbers for which there are multiple records are contained in the population of telephone numbers identified in Exhibit 9 to Mr. Woolfson's declaration.

22

61.     The telephone number ████-2076 (the "2076 Number") is listed for two separate records in the LizDev Data, each of which has its own "called_count." One record has a "called_count" of 3, and the other record has a "called_count" of 1. For inclusion in his final population, Mr. Woolfson has arbitrarily selected the record with a "called_count" value of 3.

62.     Similarly, telephone number ████-9398 (the "9398" Number) is also listed for two separate records with different "called_count" values in the LizDev Data. One record has a "called_count" of 4, and the other record has a "called_count" of 2. In his final population, Woolfson selected the record for the 9398 Number with the "called_count" value of 2.

63.     Each of these examples is demonstrative of the fact that Mr. Woolfson arbitrarily chose which records to include and exclude from consideration in his analysis, regardless of the data contained in the records.

64.     Next, with the remaining records in the population, Mr. Woolfson states that he removed from consideration in his analysis "364,784 calls to numbers that were not on the national DNC list as of the date when called, or *were* on the national DNC list but less than thirty (30) days."[45] As stated above, the records contained within the LizDev Data do not contain a date or time for any of the calls contained in the field "called_count," each record only contains a date and time for "last_local_call_time", and none of the records constitute a valid CDR as they do not indicate whether any call connected. According to his declaration, Mr. Woolfson disregards (1) the date and time that may have been associated with any call contained within the "called_count" and (2) whether any of the calls connected and instead, relies only on "the most recent call date field."[46]

65.     In my review of the telephone numbers identified in Exhibit 9, I performed a search of the NDNCR for the full population of 53,726 telephone numbers. Using this search, I sought to

---

[45] Declaration of Aaron Woolfson, ¶41.
[46] Declaration of Aaron Woolfson, ¶43.

23

recreate the date calculation he states he performed to determine whether a telephone number was on the NDNCR for more than 30 days at the time of the "last_local_call_time." In doing so, I found that Mr. Woolfson failed to accurately perform this analysis as there are 39 telephone numbers contained within his population that are not registered to the NDNCR at all. Further, there are nine telephone numbers that he identified in Exhibit 9 to his report that were on the NDNCR for less than 31 days as of the "last_local_call_time." There was also one telephone number that was registered to the NDNCR *after* the "last_local_call_time" contained within the LizDev record.[47]

66.    Ultimately, although Mr. Woolfson has opined in his declaration that there is a reliable and accurate method to identify telephone numbers that are on the NDNCR for 30 days or more at the time of the calls, he has failed to do so.

67.    Next in his analysis, Mr. Woolfson states that to determine whether a telephone number received more than one call within a 12-month period, he removed from consideration in his analysis any records with a "called_count" less than two or "where more than 365 days had elapsed between the entry_date and the last_local_call_time field."[48] Mr. Woolfson gives no explanation as to what he understands the "entry_date" to represent and no explanation as to why this methodology is applicable or effective in determining whether the telephone number contained within the record received more than one call within a 12-month period, nor can he because the data does not contain any indication as to when the calls contained within the "called_count" took place. Whether there are two or more calls in *any* period is indeterminable based on the LizDev Data.

---

[47] These numbers and their associated registration dates for the NDNCR are attached as Exhibit 3.
[48] Declaration of Aaron Woolfson, ¶43.

24

68.     This final step results in a population of 53,726 unique telephone numbers for which Mr. Woolfson states there are 272,092 calls.[49] Within this population, Mr. Woolfson states that he identified three calls placed to Plaintiff.[50] It is important to note that Plaintiff alleged that she only received two calls, meaning that it is likely that one of the calls Mr. Woolfson counts as received, and presumably compensable, never connected.[51]

### *Identification of Calls Placed on Behalf of LoanStream*

69.     In his analysis, Mr. Woolfson performs no filtering to determine whether a call was dialed on behalf of LoanStream. As stated in the deposition of Sean Roberts, Global Experts Limited was placing calls on behalf of three different entities—LoanStream, LendingThree and AFN.[52] Mr. Woolfson has made no attempt to determine which records in the LizDev Data are associated with calls made on behalf of LoanStream, nor can he because the LizDev Data contains no such field or value indicating on whose behalf a call was placed.

### *Identification of Potential Class Members*

70.     In addition to his analysis of the LizDev Data, Mr. Woolfson spends three pages of his declaration explaining that by relying on iconectiv's WDNC database, he is able to determine (1) whether a telephone number was wireless on a given date, (2) when a telephone number was ported and (3) the carrier servicing that telephone number at any given time.[53] Mr. Woolfson states that using this data, he can generate files that can be used in "subpoenas to carriers to determine contact information, and/or any other information desired from the carrier."[54]

---

[49] Declaration of Aaron Woolfson, ¶45.
[50] Declaration of Aaron Woolfson, ¶47.
[51] First Amended Class Action Complaint, ¶17.
[52] Deposition of Sean Roberts, 31:13-20.
[53] Declaration of Aaron Woolfson, ¶¶29-38.
[54] Declaration of Aaron Woolfson, ¶38.

71.     WDNC data is a product of the NPAC porting database administered through iconectiv. As stated above, access to this data is restricted and can only be used for purposes relating to telecommunications operations. It is inappropriate to use in the context of litigation.

## VIII.   ANALYSIS AND OPINIONS

**Opinion No. 1: The LizDev Data Relied Upon By Mr. Woolfson Is Not A Historical Call Detail Record And Is Missing Critical Information Preventing It From Identifying The Calls At Issue**

72.     It is my opinion, to a reasonable degree of professional certainty, that the LizDev Data does not constitute historical CDRs generated by a dialer system and therefore no data capable of identifying the calls at issue has been produced. Based on my experience handling CDRs, lead generation data and customer relationship management ("CRM") data in over 150 cases, it is my opinion that the data contained within the LizDev Data is not call detail records rather it is some bespoke combination of CRM and lead data which omits critical information relating to the calls placed to the telephone numbers contained in the CRM database.

73.     The LizDev Data is not a historical CDR because it does **not** contain the following:

a)  The directionality (inbound or outbound) of any call placed or received.

b)  The date and time any call took place aside from the "last_local_call_time"

c)  The "disposition" of a call, such as "answered," "busy," or "voicemail," indicating the outcome of any call and whether it connected.

d)  Campaign information indicating the purpose of a call or on whose behalf a call was placed.

e)  An originating (dialing) telephone number.

f)  The length or duration of any call.

***The Calls At Issue Cannot Be Identified Without Call Detail Records***

74.    The origin of the LizDev Data is not entirely known and therefore it is not possible to determine whether this data came from a dialer platform, a CRM, a lead generation software or any other platform.

75.    The Complaint defines potential class members as "persons… who received ***more than one*** telephone call... within any 12-month period" (***emphasis added***).[55] While the LizDev Data contains a date and time that could be used to potentially identify a single call, it cannot be used to identify *two* calls within a calendar year as it contains no record of any dates or times of multiple call attempts. Only the last call associated with any telephone number is documented and those records are incomplete.

76.    For example, in the case of Plaintiff Kimberly Hudson-Bryant, there is one record within the LizDev Data that contains the 1729 Number and a "last_local_call_time" of October 19, 2021 at 14:17:57. The "called_count" contains a value of "3" for this record indicating that there may have been three calls associated with this number. However, because the records are not CDRs, it is impossible to definitively identify even a single outbound connected call that took place to the 1729 Number that is potentially violative of the NDNCR.

77.    Although there is a date and time present that appears to be associated with a call occurring on October 19, 2021 more than 30 days after the 1729 Number was registered to the NDNCR, nothing in the data indicates whether (1) the call was outbound or inbound, (2) the call connected, or (3) the call was placed on behalf of LoanStream. Given Plaintiff does not allege an October 19, 2021 call in the complaint, it is possible that this call never connected, but, again, there is nothing

---

[55] Plaintiff's Notice of Motion and Motion for Class Certification, p. 15.

27

in the record that would indicate that because the records contained in the LizDev Data are not CDRs.

78.     The same is true of the quantity of calls contained within the "called_count" field, yet there is even less data available in the LizDev Data because dates and times of these alleged calls do not exist. It is impossible to determine from the records within the LizDev Data whether these calls (1) occurred at least 31-days after the 1729 Number was registered to the NDNCR, (2) occurred within 12-months of the "last_local_call_time," (3) were inbound or outbound, (4) were connected calls, (5) were placed on behalf of LoanStream because the records contained within the LizDev Data do not contain this information and the records themselves do not constitute a valid CDR.

### *Without Call Dates It Is Impossible To Identify Violations Of The National Do-Not-Call Registry*

79.     While it is possible to query the NDNCR to determine whether a telephone number is registered and if so, when that telephone number was registered, it is not possible to determine whether a telephone number was on the NDNCR for more than 30 days at the time of a call if the call date is unknown. It is impossible to determine which telephone numbers could have received violative calls because the LizDev Data does not contain the dates on which all calls were placed.

80.     Mr. Woolfson includes in Exhibit 9 to his declaration a total of 218,366 (80%) calls that he identified in his analysis by taking the sum of the value contained in the field "called_count" for which there is no call date, call time or disposition present in the LizDev Data.[56] Not only is it indeterminable whether these calls connected and were received by any individual, but even if they had connected, it is impossible to determine whether they were violative of the NDNCR because the dates of these calls are not recorded in the LizDev Data. For a completed call to be violative of

---

[56] This quantity was determined through a conservative approach of subtracting one from the "called_count" for each telephone number included in his population where a last_local_call_time was recorded, leaving only the quantity that resulted from his exercise of adding all the values contained within the field "called_count."

28

the NDNCR provisions of the TCPA a date calculation must be performed to determine whether that call took place more than 30 days after that number had been registered to the NDNCR and *that calculation cannot be performed because half of the equation is missing.*

81.     To arrive at his conclusions regarding the number of calls that potentially violated the NDNCR, Mr. Woolfson assumes for all calls contained within the "called_count" a call date that occurs within 365 days of the "last_local_call_time" without any data contained within the LizDev Data to support this assumption. This means that Mr. Woolfson has effectively made up a date for over 80% of the calls he includes in his findings where one does not exist in the LizDev Data.

### Opinion No. 2: Plaintiff Cannot Reliably Determine Which Telephone Numbers Are Associated With Businesses

82.     Under the TCPA, establishment and use of the NDNCR is described as, "a list of telephone numbers of *residential* subscribers who object to receiving telephone solicitations" (emphasis added).[57]

83.     In my experience, Plaintiff's TCPA experts have typically proposed a methodology for determining which telephone numbers contained in the records are business or residential lines with the objective of removing from consideration telephone numbers that are identified as being associated with businesses. Plaintiff's expert Aaron Woolfson provides no methodology for identifying business telephone numbers and as such his proposed list of class members will be littered with telephone numbers associated with businesses which cannot be claimants.

### *Third-Party Vendor Business Line Data Is Unreliable And Incomplete*

84.     Plaintiff's TCPA experts frequently suggest the use of third-party reverse phone lookup data to identify business lines that should be removed from class notice lists. This is a highly

---

[57] Telephone Consumer Protection Act (47 U.S.C. § 227), Section (c)(3).

29

inaccurate and inadequate strategy for identification of business lines that must be supplemented with extensive individualized and manual investigation.

85.    For example, in my analysis for this case, I submitted Plaintiff's counsel's telephone number for business line identification to data vendor PacificEast. From the First Amended Class Action Complaint in this case filed September 10, 2024, I observed the following telephone numbers associated with the firm representing Plaintiff in this case:

| Attorney | Firm | Telephone Number |
|---|---|---|
| Anthony Paronich | Paronich Law, P.C. | (508) 221-1510 |

86.    I submitted to third-party data vendor PacificEast a file containing this number and requested an output that contained (1) a reverse phone search which identifies individuals and business names associated with the telephone number including date associations as well as (2) the business line identification product offered by PacificEast which returns a coding of 'B' or 'R' indicating whether a line is associated with a business or a residence.

87.    Although Mr. Paronich lists his telephone number with his business details in the complaint for this matter, PacificEast does not return an associated business name, and has a coding of 'R' indicating a residential line.

88.    I also submitted to PacificEast Plaintiff's 1729 Number which she claims is used exclusively for residential purposes. PacificEast identifies seven unique names associated with the 1729 Number, none of which are Plaintiff. PacificEast does not identify a business name, however the business line identification search returns a coding of 'B' indicating that the 1729 number is used for business purposes.

30

89.    I also submitted to PacificEast numbers belonging to me personally and numbers belonging to my colleagues at Charles River Associates. Below is a list of these seven numbers:

| Name | Firm | Telephone Number | Description |
|---|---|---|---|
| Madelyn Moran | CRA | (330) 419-1285 | Cell Phone |
| Madelyn Moran | CRA | (312) 619-3346 | Business Phone |
| Lance Mathews | CRA | (317) 727-2052 | Cell Phone |
| Lance Mathews | CRA | (312) 377-2337 | Business Phone |
| Peggy Daley | CRA | (312) 933-3609 | Cell Phone |
| Peggy Daley | CRA | (312) 577-4160 | Business Phone |
| Peggy Daley | CRA | (312) 619-3387 | Fax Line |

90.    I have had my cell phone number since 2007, but PacificEast only associated me with it from June 9, 2020 to July 1, 2022. I have used my cell phone for business purposes for over ten years, but PacificEast does not identify it as a business line. My colleague, Peggy Daley, has used her cell phone number for business purposes for over 20 years, yet PacificEast still identifies it as a residential number. While PacificEast did identify her as the name associated with the record, the address associated, 2200 Powell St., Emeryville, California does not belong to her. In fact, she has never resided in California. This is the business address of her prior employer, Berkeley Research Group.

91.    Of these seven numbers, all of which are used for business purposes, PacificEast only identified two (28.6%) as business lines.

92.    I undertook a manual internet search for the remaining five numbers and was unable to locate business associations for any of them although I am personally aware of their everyday business use.

93.    Despite my experience working on cases alleging violations of the National Do Not Call Registry and Internal Do Not Call lists, I am unaware of any method that can reliably identify

31

which telephone numbers were business lines at the time calls were made or text messages were sent absent an individualized, highly manual investigation.

### Business And Residential Telephone Status Analysis

94.     To examine whether telephone numbers identified by Mr. Woolfson as potential class claimants were associated with businesses, I sought to review a statistically significant random sample of the telephone numbers contained within Exhibit 9 to his declaration. From the 53,726 unique numbers contained within Exhibit 9, I extracted a statistically significant random sample of 400 unique telephone numbers which exceeds a confidence of 95% with a margin of error of +/- 5%.[58]

95.     With my sample of 400 telephone numbers I analyzed whether they belonged to individuals or businesses by comparing them to both (a) third-party data vendors results and (b) individualized internet research.

96.     I first submitted the telephone numbers to PacificEast for a reverse phone search which identifies individuals and business names associated with the telephone number. I also obtained the dates these names were associated with the telephone number as well as "business line" identification from PacificEast. This service returns a coding of 'B' or 'R' indicating whether a line is associated with a business or a residence.[59]

97.     Of the sample of 400 unique numbers, PacificEast identified 54 (13.5%) telephone numbers as business lines.[60] Some of the numbers identified by PacificEast as business lines did

---

[58] The sample was pulled using R, a statistical programming language. Combining R's set.seed() and sample() functions allows for pulling a seeded random sample, which in turn lets any user recreate the exact sample if they use the same population. The seed used for this sample was 20260430, which represents the day on which the sample was extracted. The resulting sample of 400 unique numbers is attached as Exhibit 4.

[59] If PacificEast cannot make a determination as to whether the telephone number is a business or residence, it will not return a value.

[60] PacificEast output attached as Exhibit 5.

32

not return the businesses name. Below are some examples of the identifications returned by PacificEast:

| Telephone Number | BusinessName | BizRes |
|---|---|---|
| 3866237509 | CRAWFORD TRUCKING INC | B |
| 6023235555 | AMERIMEX INSURANCE | B |
| 6235946015 | AUSTIN CLINICAL RESEARCH INC | B |
| 4072305806 | JOHNSON THOMAS LAW OFFICES OF | B |
| 5867266391 | D & M CONTRACTING INC | B |
| 3102165754 | WESTCHESTER PEDIATRIC DENTISTRY DENTISTS | B |
| 6025954663 | GENERATIONS HOME CARE | B |
| 9545636225 | MCDONALD ROBERT & ASSOCIATES | B |
| 4158063432 | SANCHEZ MAINTENANCE & HOME REPAIR | B |
| 4809663304 | VISTA PAPER | B |

98.     I further manually researched the remaining 346 telephone numbers. Using internet resources, I was able to locate 38 additional telephone numbers from my sample that are associated with businesses, resulting in a total of at least 92 (23.0%) of the sample of 400 unique telephone numbers that appear to be used for business purposes.[61]


[INTENTIONALLY LEFT BLANK – SEE NEXT PAGE]

---

[61] *See* a listing of these telephone numbers and accompanying workpapers attached as Exhibit 6.

33

99.     Below are some examples of telephone numbers from the sample of 400 that through individualized research revealed an association to a business:

*Telephone Number* ▮▮▮▮▮▮-*0971*

According to the LizDev Data, telephone number ▮▮▮▮▮▮-0971 (the "0971 Number") this number belongs to an ▮▮▮▮▮▮▮ in Mesa, Arizona. When researching the number through a manual internet search, I observed that this phone number is associated with a tattooer and piercer named Giselle, or giselletat2, based in Gilbert, Arizona. The description states that the business has been active since 2020.[62]



---

[62] *See* https://giselletat2.glossgenius.com/about

*Telephone Number* ███████*-1132*

Telephone number ███████-1132 (the "1132 Number") was also contained in my random sample. I conducted a manual internet search and found that the 1132 Number is associated with home building company Charleston Properties, located in Arizona. The company's website states it has been in business since 2014, and their blog is active as recently as August 2025.[63]



*Telephone Number* ███████*-2590*

Telephone number ███████-2590 (the "2590 Number") is associated with ███████ ██████ with an email address of ████████████████ within the LizDev Data. When I manually researched the 2590 Number, I found that the number was associated with a realtor named Tyus Foster. [64]

[63] *See* https://charlestonproperties.com/
[64] *See* https://tyusfoster.kw.com/

*Telephone Number* ████████-*8110*

In my random sample, I identified telephone number ████████-8110 (the "8110 Number"). The LizDev Data associates the 8110 Number with ████████ in San Mateo, California. Using a manual internet search, I found that the 8110 Number is associated with David Zigal who appears to be a commercial broker in the San Mateo, California, area according to his profile on LoopNet.[65]



*Telephone Number* ████████-*0016*

Telephone number ████████-0016 (the "0016 Number") is listed with email address ████████████████ within the LizDev Data. Manual internet research revealed that the 0016 Number is publicly listed as the contact number for EpicEvent Design, a party and event planning service in Carson, CA. [66]



---

[65] *See* https://www.loopnet.com/commercial-real-estate-brokers/profile/david-zigal/k2ve9r9b
[66] *See* https://www.yelp.com/biz/epicevent-design-carson

*Telephone Number* ████-3906

Telephone number ████-3906 (the "3906 Number") is associated with the name ████ within the LizDev Data. Manual internet research showed that the 3906 Number is listed as the contact number for Sublyme Art by Sherry Shefts.[67] Works of art are for sale on the Sublyme Art website, as well as mention of commission work.[68]



*Telephone Number* ████-2667

Telephone number ████-2667 (the "2667 Number") is included in the LizDev Data with the name ████. Using a manual internet search, I found the 2667 Number to be associated with Debra Fisk, an agent at Healthcare Solutions Team.[69]



---

[67] *See* https://cm.fhchamber.com/list/member/sublyme-art-by-sherry-shefts-329713
[68] *See* https://www.sublymeartbysherryshefts.com/
[69] *See* https://myhst.com/agent/debra-fisk/

37

*Telephone Number* ▉▉▉▉-*0330*

The LizDev Data associates telephone number ▉▉▉▉-0330 (the "0330 Number") to a ▉▉▉▉▉. To determine whether the number had an identifiable business association, I conducted a manual internet search. The search indicated that the 0330 Number is the preferred contact number for Rick Cannon, a real estate agent in California.[70]



*Telephone Number* ▉▉▉▉-*7685*

Telephone number ▉▉▉▉-7685 (the "7685 Number") was also selected as part of my random sample. I conducted a manual internet search for the 7685 Number and the search results indicated it was associated with Little Gems Ivy School, a home daycare company. According to their profile on the Berkeley Parents Network website, the business has been active from at least 2019 through 2023.[71]



---

[70] *See* https://www.homesnap.com/Rick-Cannon-1/gmb
[71] *See* https://www.berkeleyparentsnetwork.org/recommend/preschool/little-gems-ivy-school

*Telephone Number* ██████-*8854*

Telephone number ██████-8854 (the "8854 Number") is listed with the name ████████████ within the LizDev Data. When researching the 8854 Number through a manual internet search, I found it to be associated with Arlen Ayojiak, the President of the Alaska Blades hockey team.[72]



**Opinion No. 3: The List Of Telephone Numbers Plaintiff's Expert Aaron Woolfson Identified In His Analysis Contains Telephone Numbers Registered To The NDNCR By Someone Other Than The Current User Of The Telephone Number**

100.    In his analysis, Mr. Woolfson does not address whether the individual that registered a telephone number to the NDNCR is the individual that may have been in receipt of any calls at issue and as such, if such a requirement is applied, his methodology will substantially overcount the number of potential class claimants.

---

[72] *See* https://www.alaskabladeshockey.com/about/board-and-staff/1417

101.    Further, the difference between current owners of telephone lines and those who registered telephone numbers to the NDNCR is largely indeterminable, requiring extensive and highly manual individualized investigation.

102.    Due to restrictions placed on the data that is available for searching as well as methods by which the data is maintained, third-party data vendors with access to NDNCR data can only provide the date a telephone number was *first* registered to the NDNCR. Per a May 2020 email from Ryan Thurman of Contact Center Compliance, a third-party data vendor providing such searching capabilities:

> The FTC only removes disconnected and reassigned numbers if their service provider that they hired deems them as such. ***In looking at the data over all these years, we don't see a lot of numbers that actually come off the DNC***, however there are some amounts that do you get delisted but it is up to the FTC to remove these numbers from the national DNC itself… Early on in the do not call list when numbers are set to expire after five years in ***the FTC then made the numbers permanent on the DNC*** (***emphasis added***).[73]

103.    This means that if a telephone number was reassigned after the number was *first* placed on the NDNCR, there is often no mechanism to (a) determine if any additional NDNCR registrations occurred after the initial registration of a telephone number or (b) determine if a reassigned subscriber or user of a telephone number registered their telephone number to the NDNCR at all. This is especially pertinent to the examination of call and text message records in the context of establishing potential class claimants considering the FCC states that *millions* of numbers are reassigned every single year.[74]

104.    Nonetheless, to further analyze my random sample of 400 unique numbers contained in Mr. Woolfson's final list of telephone numbers, I submitted the entire sample to Contact Center Compliance and requested data indicating (1) the date on record on which the telephone number

---

[73] *See* email from Ryan Thurman attached as Exhibit 7.
[74] *See* https://docs.fcc.gov/public/attachments/DOC-355526A1.pdf, attached as Exhibit 8.

40

was registered to the NDNCR and (2) whether the telephone number had been permanently disconnected *after* the date on which it had been registered.[75]

105.    Contained within my sample, I found that 2 telephone numbers were not registered to the NDNCR at all, despite being included in the population identified in Exhibit 9 to Mr. Woolfson's declaration. From the remaining population of 306 telephone numbers that were registered to the NDNCR and were not identified as businesses, 63 were permanently disconnected after having been registered to the NDNCR. In total, I found that 74 (18.5%) of the 400 telephone numbers sampled had been registered to the NDNCR and subsequently permanently disconnected indicating that the individual that registered the telephone number is likely not the individual who received calls.[76,77]

**Opinion No. 4: Mr. Woolfson's Use of Restricted Number Portability Administration Center ("NPAC") Data For Litigation Purposes Is Likely Not A Permissible Use And The Court May Need To Determine If His Proposed Process Is Violating NPAC Licensing Restrictions**

106.    Mr. Woolfson states in his declaration that to identify line types and carrier information, he will rely on NPAC WDNC data provided by iconectiv.[78] As explained above, to access and use NPAC User Data provided by iconectiv the user must (1) have a PTRS certification and (2) have a permissible purpose to use this restricted data.[79]

107.    The legality of Mr. Woolfson's proposed use of this data has been raised in numerous cases including matters where I have served as an expert witness or as the lead data analyst supporting

---

[75] For telephone numbers contained within my sample that were registered to the NDNCR prior to April 15, 2021, the date on which major carriers began reporting to the RND, I requested that Contact Center Compliance search the RND from April 15, 2021.

[76] There are an additional two records that returned a disconnected status in this search. Despite featuring in Woolfson's final population, both numbers are not on the NDNCR. These numbers were reassigned since their "entry_date" in the LizDev Data.

[77] The output of this search is attached as Exhibit 9.

[78] Declaration of Aaron Woolfson, ¶34.

[79] *See* https://numberportability.com/about/permitted-use, accessed on May 8, 2026.

another expert witness, including *Smith v. Examworks, LLC et al.* No. 8:21-cv-02746 (D. Md), *Bayles v. The Hertz Corporation,* No. 1:22-cv-01092 (S.D. Ind.) and *Perrong v. Victory Phones*, No. 2:20-cv-05317-GEKP (D. Pa.). The issue of Mr. Woolfson's use of the data in the *Smith v. Examworks* case remains unresolved, but an iconectiv representative was deposed in fall of 2025. The *Bayles v. The Hertz Corporation* and *Perrong v. Victory Phones* matters settled prior to any adjudication regarding this issue. I note that Mr. Woolfson had been a certified reseller prior to the deposition of the iconectiv representative and that he no longer appears to have that status as his company's name has been removed from the list of resellers on the iconectiv website and it is no longer mentioned on his company website.

108.     In *Bayles v. The Hertz Corporation*, where I served as a lead analyst, Mr. Woolfson attempted to use NPAC User Data sold to him by a third-party data vendor with the purpose of identifying class members. Mr. Woolfson did not, and as far as I know, has never had a PTRS certification. When informed of this violation, Tel-Lingua CEO, Andrew Mangold, issued a letter suspending Mr. Woolfson's use of Tel-Lingua data on the day of his scheduled deposition. The suspension letter stated that Mr. Woolfson had accessed NPAC User Data without a PTRS certification.[80]

109.     In addition to these three cases, on October 7, 2025, Defendants in *Anthony v. Federal Savings Bank, et al,* 2025 WL 2712172 (N.D. Ill), a matter where I am not involved, filed a Motion for Reconsideration (ECF 177) stating that Mr. Woolfson's use of the iconectiv data was impermissible and that they intended to file a motion to decertify the class based on Mr. Woolfson's use of this data.[81] Mr. Woolfson filed a declaration in the *Federal Savings* case

---

[80] Copy of suspension letter attached as Exhibit 10.
[81] Declaration Of Plaintiff's Expert Aaron Woolfson In Support Of Plaintiff's Opposition To Defendants' Motion For Reconsideration, ¶14.  A copy of this affidavit is attached as Exhibit 11.

42

wherein he attempted to justify his use of this data.[82] In that declaration he claims he has not and will not produce any of this data to third-parties, such as opposing experts, per the restrictions set forth in its use:[83]

> My use of the WDNC data does not entail any disclosure to third parties. My use is purely for internal use to match phone numbers to the line types (wireless or wireline) and to identify the OCN, from which I tag the relevant carriers of record for purposes of issuing subpoenas.

110. It is important to note that his proposed class identification methodology is dependent upon his use of data which he is legally prohibited from disclosing to defendants. His determination of whether a telephone number that was contacted by a TCPA defendant is cellular means that number is potentially eligible under the TCPA for compensation, but this conclusion is not subject to authentication or verification because he cannot produce the source data relied upon to arrive at it. Without the production of the underlying data upon which his class identification methodology relies, no opposing expert can examine his work and attempt to replicate it. Presumably the court must take his word for it.

111. I note that Mr. Woolfson's statement in this declaration that he does not disclose this data to third parties is untrue. Mr. Woolfson produced this data to defendants in the *Victory Phones* case and I personally examined it. It was from this examination that I learned that he was using this restricted data. Margaret Daley, the expert in that case, discussed this issue at great length in her expert report, which was issued on June 3, 2022. This date is significant as Mr. Woolfson's declaration claims that the first time that he learned of any objections to his use of this data was when a data vendor Tel-Lingua suspended him from using their data because of his lack of a PTRS certification. That suspension occurred on August 22, 2023, one year *after* Ms. Daley's expert

---

[82] *See* Exhibit 11.
[83] Declaration Of Plaintiff's Expert Aaron Woolfson In Support Of Plaintiff's Opposition To Defendants' Motion For Reconsideration, ¶5.

43

report in Victory Phones was filed. This report included a detailed discussion of his use of this data and specifically stated that Mr. Woolfson's use of it appeared to be impermissible.

112.    In his declaration in this matter, Mr. Woolfson states that he has become a reseller of this restricted iconectiv data.[84] That also appears to be untrue. If he lost his reseller status since the date of this report, he has failed to amend his report to ensure its accuracy.

113.    Mr. Woolfson's affidavit in the *Anthony v. Federal Savings Bank* matter appears claim that he may use the restricted data for "compliance" purposes, which is a limited exception to the restrictions. Mr. Woolfson is employed by Plaintiff's counsel and he makes no claim that he is using the data prior to making calls to ensure they are compliant with the TCPA, which I understand to be the purpose of the exception. Mr. Woolfson's apparent loss of his reseller status may provide an answer to this claim.

114.    To be clear, I am not providing a legal opinion that Mr. Woolfson is violating the licensing restrictions of the NPAC data, as that must be determined iconectiv and the court. It is however my opinion that such a determination must be made prior to Mr. Woolfson using this data as it appears his reseller status is no longer active and that he may have been violating the iconectiv licensing restrictions he agreed to by inappropriately using protected consumer data, making his proposed class identification dependent on accessing data to which he has no right to use.

**Opinion No. 5: Mr. Woolfson Purports To Be Able To Accurately And Reliably Identify Putative Class Members, Yet He Historically Has Been Unable To Do So.**

115.    Mr. Woolfson spends over four pages of his report discussing past case work where he claims courts in prior cases have approved of his proposed methodologies and findings and

---

[84] Declaration of Aaron Woolfson, ¶23.

44

certified classes of TCPA claimants.[85] I have worked on over a dozen TCPA cases opposed to Mr. Woolfson during the last four years, and I have studied his expert reports and underlying analysis in depth. I have attended his deposition in one other matter and am aware of his standard analytical procedures with respect to his analysis of dialer data, NPAC, NDNCR, iconectiv data and other data he receives from third-party sources which he uses in his TCPA work.

116. Similar to this case, where Mr. Woolfson has erroneously identified at least 39 telephone numbers as having been registered to the NDNCR when they are not, in every matter in which I have analyzed Mr. Woolfson's analytical work he has failed to produce with his report all of the data he used to conduct his analysis and which supports his findings. In some matters he produces nothing and in others, like here, he produces incomplete or inaccurate scripts making replication of his work impossible. I found that in at least one instance he manually altered raw data received from third-party sources because of his subjective (and incorrect) opinion although he reported that the data was accurate.

117. Analytical errors are a hallmark of Mr. Woolfson's work:

a) In *Rivera v. Cabela's*, Mr. Woolfson inaccurately identified the date on which Plaintiff's telephone number was registered to the NDNCR for thirty days or more, adding an additional two months of TCPA eligibility that did not exist.

b) In *Smith v. Examworks, LLC et al.*, his work was irreconcilable because he did not produce the data upon which he relied in his analysis and he failed to produce call data relating to over 20,000 calls he claimed may have violated the TCPA. Despite his failure to produce the relevant data, Mr. Woolfson did produce some scripting wherein more inconsistencies and errors were revealed. For example, his scripting indicated that he likely did not deduplicate the records correctly, erroneously eliminating numerous potentially violative call records from consideration. Mr. Woolfson also stated in this report that he was a certified reseller of the porting data upon which he relied, when he

---

[85] Although Mr. Woolfson states in paragraph 6 to his report that he has been qualified by both Federal and State courts, he fails to disclose that he has been disqualified by at least two federal courts. In the Central District of California, a motion excluding Mr. Woolfson's testimony in *Dueker v. Crst Expedited Inc,* No. 2:18-cv-08751-MCS-FFM and class certification was denied. Mr. Woolfson's declaration was also stricken in the Eastern District of California in the matter *Rojas et al. v. Zaninovich, Inc., et al.,* No. 1:09-cv-00705 AWI JLT for providing inaccurate analysis and his willingness to offer conclusions about ultimate issues without adequate foundation. The court concluded that it lacked "any confidence in the reliability of his findings." Opinion excluding Mr. Woolfson's testimony in *Rojas et al. v. Zaninovich, Inc., et al.* at p. 15, attached as Exhibit 12.

45

referenced this data in his scripting, the naming convention for that data referred to a vendor named "TelLingua." As noted above, Mr. Woolfson was previously suspended from using this exact type of data from Tel-Lingua.[86] His expert report did not disclose that he was using data from Tel-Lingua.

c) In *Perrong v. Victory Phones*, No. 2:20-cv-0517 (E.D. Pa.), Mr. Woolfson manually altered data he received from a third-party data reseller based on his personal judgment, using a mass update to designate all numbers attributed to carriers of his choosing as VOIP lines. His written report failed to disclose this alteration. Research I conducted revealed his categorization was incorrect and the data he changed was accurate.

d) In another case, *Bayles v. Hertz*, No. 1:22-cv-01092-JRS-MKK (S.D. Ind.), Mr. Woolfson claimed to have developed an automated name matching methodology for identifying recipients of calls using PacificEast reverse lookup data. A thorough review of the data and scripts which he finally produced revealed that Mr. Woolfson had devised no such methodology and had, in fact, personally reviewed over 10,000 unique combinations of names and determined based on his own subjective opinion whether the names "matched." He failed to produce any complete workpapers or SQL scripts associated with any of these identifications and instead produced a class list that contained thousands of Hertz customers who could not have been class members.

118.    As a result of this documented lack of analytical rigor, it is my opinion that any claims made by Mr. Woolfson that he can accurately or reliably identify potential class members in the present case are untrue.

[INTENTIONALLY LEFT BLANK – SEE NEXT PAGE]

---

[86] *See* Exhibit 10.

## IX.   CONCLUSION

119.    Based upon my findings as set forth above, it is my opinion that there is no reliable method by which calls violative of the NDNCR provisions of the TCPA can be identified with the LizDev Data because it does not constitute a historical CDR. Further, the methodology set forth by Mr. Woolfson is insufficient as it is grossly overinclusive of calls for which there is no data indicating a date or time on which they occurred or whether they have connected.

Respectfully submitted,

_____

DATED: May 8, 2026

# EXHIBIT 1



**Curriculum Vitae**

**Madelyn Moran**
Associate Principal
CHARLES RIVER ASSOCIATES
One South Wacker Drive
Chicago, IL 60611
Cell: (330) 419-1285
mmoran@crai.com | https://www.linkedin.com/in/madelynmoran/

## SUMMARY

Madelyn Moran is an Associate Principal in the Forensic Services practice at Charles River Associates with over ten years of experience in Forensics, Disputes and Investigations handling in-depth data analytics involving consumer class actions and data privacy matters. Madelyn provides expert witness testimony in class actions involving the analysis of consumer communications including cases alleging TCPA violations. Madelyn's work in Consumer Class Actions includes handling and leading the analysis in TCPA, BIPA, CIPA, GDPR compliance and data privacy litigation. She has managed and performed analytics in over thirty TCPA class actions and has completed over fifteen client TCPA compliance audits.

Madelyn leverages her ability to manage, manipulate, process, and analyze unstructured and structured data to provide customized solutions to data-based problems. She has assisted clients across a breadth of industries including Financial Services, Consumer Marketing, Lead Generation, Debt Collection, Insurance and Healthcare as well as many others. Through her experience, she has mastered the ability to communicate complex data-related issues and concepts in easily understandable, non-technical terms.

## TESTIMONIAL EXPERIENCE

1. The People of the State of California v. MV Realty PBC, LLC, et al., No. 23STCV30464 (Superior Court of The State of California, County of Los Angeles, Declaration filed April 8, 2026)
2. Espanol v. Capital Vision Services, LLC d/b/a MyEyeDr., No. 6:24-cv-01024-PGB-DCI (M.D. Fla., Expert Report filed January 26, 2026)
3. Brockington v. Yoli, LLC., No. 3:25-cv-00159-KAC-JEM (E.D. Tenn., Expert Report filed January 23, 2026)
4. Rivera v. Cabela's, LLC., No. 1:25-cv-00290-NYW (D. Colo., Expert Report filed January 14, 2026)
5. Teman v. Select Justice, LLC., No. 1:24-cv-12656-LTS (D. Ma.) (TCPA class action – Report filed December 12, 2025)
6. Wilson v. Southern Oregon Credit Service, Inc. d/b/a Collect Northwest, No. 1:24-CV-2087-MTK, (D. Or., Expert Report filed October 13, 2025)
7. Smith v. Examworks, LLC. And Government Employees Insurance Company (GEICO), No. 21-2746, (D. Md., Expert Report filed July 24, 2025)
8. Lazo v. TOHVT, LLC., No. 8:24-CV-00127-BCB-RCC, (D. Neb., Expert Report filed April 1, 2025)
9. Sapan v. The Federal Savings Bank, No. 8:23-CV-000075-CJC-ADS, (C.D. Cal., Expert Report filed November 22, 2024)
10. Abboud v. Circle K, Inc., No. 2:23-CV-01683-DWL, (D. Ariz., Expert Report filed November 19, 2024)

P a g e | **2**
Madelyn Moran

11. Clark v. Spark Energy, No. 3:24-CV-00568-JSC, (N.D. Cal., Expert Report filed November 15, 2024)
12. Tobajian v. The Allstate Corporation, No. 2:23-cv-00753-DMG-PD (C.D. Cal., Declaration filed May 21, 2024)

## EXPERIENCE

*TCPA Disputes*
- Prepare Affidavits, Declarations and Provide Testimony pertaining to analytics in TCPA cases
- Organize and compose reports with specific focus on call/dialer analytics
- Determine or verify class content, membership and/or size
- Develop mediation and/or settlement analytics identifying purported members for settlement
- Review and evaluate opposing expert reports, opinions and analytics for rebuttal responses
- Assist in preparation for deposition of opposing experts
- Upload, cleanse and summarize data received from CRM, dialer and other relevant systems
- Use third party vendors LexisNexis, Pacific East and TLO to conduct research on current and historical phone number associations
- Create transcripts of recorded call evidence and conduct transcript error analyses

*TCPA Compliance Audits & Verification*
- Review third-party dialer systems used for marketing/sales purposes
- Audit all systems leveraged for customer contact management and data storage
- Implement relevant cross-checks using data such as porting data, Reassigned Number Database (RND) analysis, the National Do-Not-Call Registry (NDNCR), etc.
- Examine all current policies and procedures in place surrounding customer intake, record maintenance, contact cadence and scripting
- Review historical call records and current call data to monitor compliance progress

*Investigative Due Diligence*
- Coordinate research results from public documents and electronic sources to perform comprehensive due diligence background investigations
- Use online databases including, but not limited to, Westlaw, Pacer, LexisNexis, BloombergLaw, National Student Clearinghouse
- Write reports with a focus on client needs including verification of expert witness credentials, individual and company asset investigations, board-member research, and fact witness investigations

## TCPA ANALYTICS & CASE MANAGEMENT EXPERIENCE

Madelyn has served as the case manager and/or analytics lead in support of an expert testifier in the following cases:

1. Smith v. Examworks, LLC. And Government Employees Insurance Company (GEICO), No. 8:21-cv-2746-PX (D. MD., Report filed July 24, 2025)(TCPA Class Action)
2. Federal Trade Commission v. Doxo, Inc., et al., No. 2:24-cv-00569 (W.D. Wash., Report filed July 2, 2025)(Deceptive Trade Practices)
3. Mitchell v. Toyota of Dallas, No. 3:23-cv-01278-N (N.D. Tex., Report filed December 16, 2024)(TCPA Class Action)

4.  Elliot v. Humana, Inc., No. 3:22-cv-329-RGJ (W.D. Ky., Report filed October 4, 2024) (TCPA Class Action)

5.  Usanovic v. eXp Realty, LLC., No. 2:23-cv-00687-JLR (W.D. Wash., Report filed September 9, 2024) (TCPA Class Action)

6.  Hogan v. Amazon.com, Inc., No. 1:21-cv-03169 (N.D. Ill., Report filed June 13, 2024) (BIPA Class Action)

7.  Brian J. Lyngass, D.D.S. P.L.L.C. v. Solstice Benefits, Inc. and John Does 1-5, No. 2:22-cv-10830 (E.D. Mich. Report filed May 24, 2024) (TCPA Class Action)

8.  Williams v. Pillpack, LLC., No. 3:19-cv-05282-DGE (W.D. Wash., Report filed February 26, 2024) (TCPA Class Action)

9.  Sabatier v. American Health Reform Solutions, LLC. et al., No. 1:23-cv-22203-RKA (S.D. Fla., Report filed January 9, 2024) (TCPA Class Action)

10. Bayles v. The Hertz Corporation, No. 1:22-cv-01092-JRS-MKK (S.D. Ind., Report filed September 25, 2023) (TCPA Class Action)

11. Federal Trade Commission and Commonwealth of Pennsylvania by Attorney General Josh Shapiro v. American Future Systems, Inc., et al., No. 2:20-cv-02266 (E.D. Pa., Report filed April 7, 2023) (Deceptive Trade Practices)

12. Powell v. H&R Accounts, Inc. D/B/A Avadyne Health, et al., No. 7:22-cv-01052-TMC (S.D.S.C, Report filed February 10, 2023) (TCPA Class Action)

13. Doup v. Van Tuyl Group, LLC et al., No. 3:20-cv-02742-X (N.D. Tex., Report filed January 9,2023) (TCPA Class Action)

14. Nightingale v. National Grid USA Service Company, Inc. et al., No. 1:19-cv-12341-NMG (D. Mass., Report filed October 2022) (TCPA Class Action)

15. Perrong v. Victory Phones, No. 2:20-cv-05317-GEKP (E.D. Pa., Report filed June 2022) (TCPA Class Action)

16. Gregory Katopodis, et al./MGM Springfield Mediation-JAMS Ref No. 1400019557 (FCRA)

17. Vance v. Microsoft Corporation, No. 2:20-cv-01082-JLR (W.D. Wash.) and Vance v. Amazon.com, Inc., No. 2:20-cv-01084-JLR (W.D. Wash., Report filed December 2021) (TCPA Class Action)

18. Walker v. CRME Financial Services, No. 3:20-cv-02218-BEN-JLB (S.D. Cal., Report filed December 2021) (TCPA Class Action)

19. Chinitz et al., v. Realogy Holdings Corp., No. 3:19-cv-03309-JD (N.D. Cal., Report filed May 2021) (TCPA Class Action)

20. Head v. Citibank, N.A., No. 3:18-cv-08189-MHB (D. Ariz., Report filed August 2020) (TCPA Class Action)

## EDUCATION

**Indiana University, College of Arts & Science**s, Bloomington, IN
*Bachelor of Arts*, Economics                                                                            May 2016
*Bachelor of Arts,* Political Science                                                                    May 2016

## PROFESSIONAL HISTORY

**Charles River Associates** Chicago, IL                                              January 2021 – Present
*Associate Principal – Forensic Services*

**Ankura Consulting** Chicago, IL                                                    August 2018 – January 2021
*Senior Associate – Analytics and Data Strategy / eDiscovery*

**Navigant Consulting** Chicago, IL                                                   August 2015 – August 2018

Madelyn Moran

*Consultant – Global Legal Technology Solutions*

**Capita** Dublin, Ireland                                          May 2014 – August 2014
*Intern – Finance & Investment Management*

# EXHIBIT 2

# Produced in Native Format

Exhibit 3 is not filed because it contains personal identifying information; thus, implicates privacy rights of third-parties. Available upon the Court's request.

# EXHIBIT 3

Exhibit 3 is not filed because it contains personal identifying information; thus, implicates privacy rights of third-parties. Available upon the Court's request.

# Produced in Native Format

Exhibit 4 is not filed because it contains personal identifying information; thus, implicates privacy rights of third-parties. Available upon the Court's request.

# EXHIBIT 4

Exhibit 4 is not filed because it contains personal identifying information; thus, implicates privacy rights of third-parties. Available upon the Court's request.

# Produced in Native Format

Exhibit 5 is not filed because it contains personal identifying information; thus, implicates privacy rights of third-parties. Available upon the Court's request.

# EXHIBIT 5

Exhibit 5 is not filed because it contains personal identifying information; thus, implicates privacy rights of third-parties. Available upon the Court's request.

# Produced in Native Format

# EXHIBIT 6

# Produced in Native Format

# EXHIBIT 7

**Elaine Smith**

| | |
|---|---|
| **From:** | Ryan Thurman <ryan@dnc.com> |
| **Sent:** | Monday, May 4, 2020 3:11 PM |
| **To:** | Elaine Smith |
| **Cc:** | Peggy Daley; David Kalat |
| **Subject:** | [EXT]Re: Question about Reassignment |

Hi Elaine

Good question. The way I understand it is that the FTC only removes disconnected and reassigned numbers if their service provider that they hired deems them as such. In looking at the data over all these years, we don't see a lot of numbers that actually come off the DNC, however there are some amounts that do you get delisted but it is up to the FTC to remove these numbers from the national DNC itself. We do have a separate service to remove disconnects and reassigned from a clients internal do not call list, which is allowed under the FTC's rules whereby we can cleanse an internal do not call list to remove disconnects and reassigns and optionally append current information.

Early on in the do not call list when numbers are set to expire after five years in the FTC then made the numbers permanent on the DNC, The FTC came to the industry to require the FTC to scrub for disconnect numbers but they seem very lucked and in conservative in the way in which they actually remove numbers. I've only seen the list grow to a substantial size which I think right now so it's somewhere around 270 million numbers.

We currently have a reassign phone number scrub that we can run as an additional service where we can look at the phone number name address an optional last contact or consent date to run a reassign analysis and right party verification we currently have a reassign phone number scrub that we can run as an additional service where we can look at the phone number name address an optional last contact or consent date to run a reassign analysis and write party verification on a list or as an API.

**Schedule a Meeting Now. <u>Click here to book a time directly on my calendar.</u>**

**Regards,**

**Ryan Thurman**
Director of Sales & Marketing
Contact Center Compliance
<u>707-303-4844</u> office

707-480-5920 mobile
<u>ryan@dnc.com</u>

1

On May 4, 2020, at 11:21 AM, Elaine Smith <esmith@thinkbrg.com> wrote:

Hey Ryan!


Peggy and I were chatting about NDNC scrubbing and Peggy asked a question I did not have an answer for.


I understand that the CCC scrub returns the earliest date a number was added to the NDNC. Does the NDNC or CCC consider what happens when these numbers are reassigned to new users? Does the number simply stay on the NDNC? Or does the NDNC get cleansed for reassignments and those numbers are removed until/if the new owner re-adds?


Thanks!

Lain


**Elaine Smith |** Senior Managing Consultant


**Berkeley Research Group, LLC**

70 W. Madison, Suite 5000 **|** Chicago, IL 60602

D 312.429.7928 **|** O 312.429.7900 **|** M 602.292.0189 **|** F 312.637.8004

esmith@thinkbrg.com **|** thinkbrg.com


<image001.png>

BERKELEY RESEARCH GROUP, LLC (TOGETHER WITH ITS AFFILIATES, "BRG") - NOTICE
THIS EMAIL TRANSMISSION AND ANY ATTACHMENTS HERETO CONTAIN INFORMATION FROM BRG WHICH MAY BE CONFIDENTIAL AND PRIVILEGED. THE INFORMATION IS INTENDED FOR THE SOLE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, YOUR USE, DISSEMINATION, FORWARDING, PRINTING OR COPYING OF THIS INFORMATION IS PROHIBITED.


TAX ADVICE DISCLOSURE
ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

BRG IS (I) NOT A LAW FIRM AND DOES NOT PROVIDE LEGAL ADVICE AND (II) NOT A CPA FIRM AND DOES NOT PROVIDE AUDIT, ATTEST OR PUBLIC ACCOUNTING SERVICES.

2

# EXHIBIT 8

**FC NEWS** from the Federal Communications Commission

**Media Contact:**
Mike Snyder, (202) 418-0997
michael.snyder@fcc.gov

**For Immediate Release**

## FCC ESTABLISHES REASSIGNED PHONE NUMBERS DATABASE TO HELP REDUCE UNWANTED CALLS TO CONSUMERS

WASHINGTON, December 12, 2018—The Federal Communications Commission today adopted new rules to establish a reassigned numbers database that will reduce the number of unwanted phone calls Americans receive.

Millions of phone numbers are reassigned each year. When a consumer gets a new phone number that was previously assigned to another consumer, businesses and other callers frequently do not learn of the reassignment right away and may inadvertently call the new consumer rather than the prior holder of the number. This results in the new consumer receiving unwanted calls and the prior number holder not receiving calls he or she expects, like notifications from a doctor's office, financial institution, or school.

The new rules establish a single, comprehensive database with information provided by phone companies that callers will be able to use to avoid calling reassigned numbers. Callers using the database will be able to find out if telephone numbers assigned to consumers who want their calls have been disconnected and made eligible for reassignment. Any such numbers can then be purged from their call lists, thereby decreasing the number of unwanted calls to consumers. To further encourage callers to use the database, the Commission is providing callers a safe harbor from liability for any calls to reassigned numbers caused by database error.

The rules respond to consumer groups, trade associations, and state and federal authorities that asked the Commission to establish a single, comprehensive database as the best solution to reducing calls to reassigned numbers while minimizing burdens on both callers and providers.

Action by the Commission December 12, 2018 by Second Report and Order (FCC 18-177). Chairman Pai, Commissioners O'Rielly, Carr, and Rosenworcel approving and issuing separate statements.

CG Docket No. 17-59

###

**Office of Media Relations: (202) 418-0500**
**ASL Videophone: (844) 432-2275**
**TTY: (888) 835-5322**
**Twitter: @FCC**
**www.fcc.gov/office-media-relations**

*This is an unofficial announcement of Commission action. Release of the full text of a Commission order constitutes official action. See MCI v. FCC, 515 F.2d 385 (D.C. Cir. 1974).*

Exhibit 9 is not filed because it contains personal identifying information; thus, implicates privacy rights of third-parties. Available upon the Court's request.

# EXHIBIT 9

Exhibit 9 is not filed because it contains personal identifying information; thus, implicates privacy rights of third-parties. Available upon the Court's request.

# Produced in Native Format

# EXHIBIT 10

# tel-Lingua ™

28255 Steeplechase Lane * Fair Oaks Ranch, TX 78015 * Voice (210) 380-0458 * Fax (210) 698-7150

August 22, 2023

Aaron Woolfson                                          +
TelSwitch Inc. d/b/a Tel-One Network Services
1937 Oak Park Blvd, Suite D
Pleasant Hill, CA 94523

Dear TelSwitch Inc.,

Tel-Lingua LLC has become aware that Telswitch Inc. has not achieved all of the steps necessary for PTRS certification with iConectiv.

We are suspending services to your organization.

Regards,

Andrew W Mangold
President and CEO

This document contains confidential and proprietary information from Tel-Lingua LLC. Acceptance of this document signifies the intent of the recipient, and the company represented, to hold and protect this information to the same extent as would be afforded to the recipient's own proprietary and confidential information.

# EXHIBIT 11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL ANTHONY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE FEDERAL SAVINGS BANK, an Illinois Federal Savings Association, and NATIONAL BANCORP HOLDINGS, INC., a Delaware Corporation, and FDE MARKETING GROUP LLC, a Florida Limited Liability Corporation,<br><br>Defendants. | Case No. 1:21-cv-02509<br><br>Hon. LaShonda A. Hunt<br><br>**DECLARATION OF PLAINTIFF'S EXPERT AARON WOOLFSON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION** |

## INTRODUCTION

1.      My name is Aaron Woolfson.  I am the founder of TelSwitch, Inc. which I started in 1994. I am over the age of eighteen years old.  I am personally familiar with the matters set forth in this declaration and, if called as a witness, I could and would readily and competently testify as to them.

2.      On October 26, 2022, I proffered my Declaration in Support of Class Certification in this matter. ("Woolfson Decl." ECF 128-2). In that Declaration, I outlined a methodology I have successfully applied on behalf of plaintiffs and defendants to: (a) identify the quantity of phone calls contained in the Ytel CDRs that were connected within a certain number of days to other calls and that were to phone numbers listed on the National DNC list for more than thirty days at the time; (b) identify the quantity of live transfer calls that were connected; and (c) identify the telephone carriers (by way of their Operating Company Numbers, or "OCNs") to which those telephone numbers were assigned at the time of the calls so that, should a class be certified, the phone carriers servicing the phone numbers could be contacted to obtain class members' contact information for purposes of directing notice to the class members and identifying line classification (*i.e.*, whether the phone number was business or residential).

3.      As I explained in the Woolfson Decl. (ECF 128-2, ¶ 26, II(c)), for part of my analysis, I had utilized TelLingua's data because TelLingua maintains a copy of the entire historical inventory of ported numbers which it has gathered from publicly available data, including NeuStar and Telcordia (d/b/a "iConectiv"). ECF 128-2, ¶ 26, n.13. TelLingua is also optimized with special indexing for tagging large quantities of records.

4.      The TelLingua data is an accumulation of publicly available data. It includes National Exchange Carrier Association ("NECA") numbering assignments, NeuStar and TelCordia (a/k/a iConectiv) historical ported data assignments, and iConectiv's predecessor, NeuStar, historical Number Portability change records. *See* Woolfson Decl. ¶ 26, n.13. I explained that by using data compiled by TelLingua, I was able to append certain information to each call on the Ytel CDRs with the following data*: is Wireless, isPorted, is PortedDate, Carrier of Record* and *Operating Company Number* ("OCN"). Woolfson Decl. ¶¶ 34–35, n.20. I will refer to this data hereinafter as "WDNC" data because these are data fields used by telemarketers to determine whether a particular phone number to be called is wireless or wireline for purposes of complying with the TCPA.

5.      My use of the WDNC data does not entail any disclosure to third parties. My use is purely for internal use to match phone numbers to the line types (wireless or wireline) and to identify the OCN, from which I tag the relevant carriers of record for purposes of issuing subpoenas. The subpoenas themselves do not disclose any new data to the carriers of record that they do not already maintain. This process facilitates a siloed approach, wherein the subpoena recipient does not obtain any information regarding phone numbers that are served by different carriers. A far less preferable alternative would be to send the entire Class List to every subpoena recipient and require them to perform this filtering process to identify the phone numbers that they serviced at the time, and provide requested information on their subscribers.

6.      The historical wireless or wireline information (*i.e., isWireless, isPorted, is PortedDate*) upon which I had relied for purposes of my analysis contained only *historical* information that is publicly available through an iConectiv product called PortData Comply. An additional product is available to me called PortData Validate, which appends the telephone

2

company name onto the historical wireless or wireline information directly.

7.  I am approved to access and use PortData Comply and PortData Validate.

8.  I have used the WDNC data in this way in hundreds of matters involving the TCPA on behalf of plaintiffs and defendants (as a disclosed expert and as a consulting expert), including the matters that I have attached hereto as <u>Exhibit 1</u> in which I have testified or been deposed.[1]

9.  Regardless of whether I am working on behalf of defendants, such as in *Taylor Carroll, et al. v. SGS N. Am., Inc.,* Case No. 16-537-SDD-SDJ (M.D. La.), or *Albert Pietersen v. Wells Fargo Bank,* Case No. 3:17-cv-02306-JCS (N.D. Cal.),[2] or plaintiffs, such as in this matter, I use the same data sources and methodology. The only difference is that defendants use the data to eliminate false positives, whereas plaintiffs use the data to demonstrate to the court that the subscribership of the numbers can be determined where there is otherwise no access to personally identifying information before class certification (such as where defendants fail to maintain or have destroyed adequate records of their calling activities themselves).[3]

10.  None of the WDNC data was used to determine whether a call on the Ytel CDRs was to a phone number qualifying for National DNC Class membership or Transfer Subclass membership. I did not use TelLingua's database to determine whether telephone numbers belonged to a certain individual, or whether two (or more than one) calls were placed to a telephone number on the Ytel CDRs within a twelve-month period while it was on the National DNC list for more than thirty days.

11.  The FCC makes the WDNC database available as a *historical* set of data. This data contains a de minimis amount of information which is available for all purposes related to

---

[1] Some of the matters contained within the list of TCPA matters in which I was deposed also included other experts, such as Peggy Daley and/or David Kalat, with whom I would regularly co-expert and who were aware that I had access to the WDNC data.

[2] I was defendants' co-expert alongside Peggy Daley and David Kalat from Berkeley Research Group in *Pietersen v. Wells Fargo Bank,* Case No. 3:17-cv-02306-JCS (N.D., Cal.).

[3] In my experience, this carrier-provided data is typically sent to the court-appointed notice provider and claims administrator directly from the carriers.

the TCPA. This data can be used to tag, or append, call logs or dialing logs with flags related to the wireless or wireline, and port date, associated with the number, either to be called, or that had been called.

12.     IConectiv administers the WDNC data on behalf of the FCC, and the FCC requires that the WDNC data be made available for purposes of the TCPA. *See* FCC 15-35, ¶ 142, attached hereto as Exhibit 2. In FCC 15-35, the FCC appointed iConectiv to be the "Local Number Portability Administrator" ("LNPA"), which as an incident to its duties, maintains the WDNC data on the FCC's behalf. Paragraph 142 of the appointment order (Exhibit 2) states:

> In addition, we address an inquiry regarding compliance with Telephone Consumer Protection Act (TCPA) regulations from the Professional Association for Customer Engagement (PACE). PACE educates its members on TCPA regulations to promote regulatory compliance, and does so by utilizing a service offered by the current LNPA [Neustar] that verifies which numbers are ported from a wireline to wireless service provider. PACE wants to ensure that this service will continue to be available. The RFP [Request for Proposal] section 11.1 states that the LNPA must provide the service discussed above (Intermodal TN ID Service), as well as other requirements stemming from TCPA.

13.     Thus, when the FCC selected iConectiv to be the LPNA, the FCC made clear that iConectiv must make the WDNC data available for purposes related to the TCPA.

**DEFENDANTS' MOTION FOR RECONSIDERATION**

14.     On October 7, 2025, Defendants filed a Motion for Reconsideration (ECF 177) stating that certain data that I used during the construction of my analysis—in particular, from iConectiv—was not permissible. The basis for their belief that I had used the data for an impermissible purpose was a memo that TelLingua had sent to me indicating they were suspending services for the stated reason that TelSwitch, Inc. (my company) had not achieved full certification to qualify as a Provider of Telephone Related Services ("PTRS"). ECF 177-1, Exhibit A.

15.     The letter from TelLingua was prompted when a party in another matter in which I served as an expert issued a subpoena to TelLingua. This was the first time anybody challenged my use of the iConectiv data in my expert analysis.

4

16.     As soon as I learned that my use of the WDNC data was challenged, I immediately reached out to iConectiv and the FCC to seek clarification.  I was informed by the FCC that the WDNC data was made available through iConectiv and that I was entitled to use the data pursuant to FCC 15-35, ¶ 142. This was corroborated by iConectiv. I then informed TelLingua that I was allowed to use the WDNC data, and my access was restored to our virtualized servers.[4]

17.     Although there are no specific rules indicated within FCC 15-35, ¶ 142 as to the methods of obtaining and using the FCC's data, nor the contractors with whom TelSwitch could engage for purposes of processing, I nonetheless wanted to more closely ally ourselves with the stewards of this data—iConectiv—and make sure there was no doubt that we were using the data in a manner that was not prohibited by the FCC.  To achieve this, I undertook the following steps:

   a.     I started by reaching out to my congressperson's constituent services manager's office to identify whether there was any prohibition against using the FCC's data for identifying calls.  I was directed to the office of special counsel to the FCC, and they directed me to the Wireline Competition Bureau.

   b.     I then reached out to the Wireline Competition Bureau at the FCC for clarification on whether I could use the data for purposes related to the TCPA in the way I explained in the Woolfson Decl. (ECF 128-2)

   c.     I received a call from the FCC, and the FCC's Wireline Competition Bureau directed me to FCC 15-35, ¶ 142, which states that I could use the data for purposes related to the TCPA.

   d.     I then reached out to iConectiv to obtain a formal permission to use the PortData Validate and PortData Comply products.

---

[4] Because I had understood that I was allowed to use the data per the FCC and iConectiv, I was not aware that there was any continuing dispute as to whether I could use the data. Therefore, I did not inform Plaintiff's counsel.

5

  e.  I then identified and pursued those steps that were requisite to become an authorized reseller of iConectiv's products. TelSwitch's use of the data was verified by iConectiv, and I was placed on the iConectiv Authorized Reseller website. I continue to enjoy a close working relationship with iConectiv as an authorized reseller.

18. There are other companies, such as IMS, Compliance Point a/k/a PossibleNOW, and DataEast, that use WDNC data to offer wireless tagging as part of their integrated solutions.[5]

19. iConectiv knows that experts subscribe to its services for the purpose of conducting analysis of call data in connection with drafting and submitting expert reports in TCPA litigation, and is aware that we have used the data in the past for expert matters where historical information was necessary. They are also aware that these services are provided by its resellers, including resellers IMS, PossibleNOW, and TelSwitch, Inc.

20. PossibleNOW states on its website that "We can compile and maintain all phone numbers in Do Not Call lists that you licensed based on your specifications and calling requirements—including optional lists such as the iConectiv Wireless Portability list or your own company-specific internal DC list."[6] Ken Sponsler prepares his expert reports using PossibleNOW's access to iConectiv's data. *See Pascal v. Concentra, Inc.*, Case No. 3:19-cv-02559-JCS (ECF No. 114-5, ¶¶ 143–144).

21. According to David Kalat, from Berkeley Research Group, "PacificEast's Telified (sic) is a searchable repository of individual information compiled from restricted-use databases of landline, VoIP, and wireless telephone service providers. I have used this database in numerous investigations on behalf of clients involved in TCPA litigation." (¶ 35) (Decl. David

---

[5] My understanding is that the data used by Berkeley Research Group (which Peggy Daley used to be part of), comes from DataEast. I believe that DataEast's information originated from iConectiv, as well.

[6] https://www.possiblenow.com/services/do-not-call-managed-services

Kalat, *Powell v. Success Systems LLC*, Case No. 1:23-cv-00291, S.D., Ala.).[7,8] I believe the data that Mr. Kalat used in his investigation included data from iConectiv.

22.     Additionally, I have referenced the WDNC data in numerous cases, including those in which I had served as co-expert with David Kalat and Peggy Daley from Berkeley Research Group on behalf of defendants, including *Pietersen v. Wells Fargo Bank*, Case No. 3:17-cv-02306-JCS (N.D. Cal.), *Taylor Carroll v. SGS N. Am., Inc.,* Case No. 16-537-SDD-RLB (M.D. La.), and numerous other matters.

23.     Most recently, I used the WDNC data on behalf of defendant Athena Bitcoin in *Jackson, et al. v. Athena Bitcoin, Inc.*, Case No. 4:24-cv-00331-MW-MJF (Fla. Dist. Ct.), in support of the defendant's motion opposing class certification.

24.     Notably, I also used the WDNC data in connection with my analysis and report in support of the plaintiffs' motion for class certification in *Moore v. Club Exploria, LLC*, Case No. 1:19-cv-02504 (N.D. Ill.).  Following class certification, I assisted in developing a class notice strategy using the WDNC data to issue subpoenas to carriers for purposes of directing notice to class members. I understand that the court adopted my strategy and approved the notice plan.

25.     TelSwitch, Inc. also continues to integrate this data into our work flow, and make this integrated product available to our clients. iConectiv is aware of the manner in which we use the data, as is the FCC.  They do not object to it, and they have not prohibited it.  Furthermore, on August 28, 2023, iConectiv qualified us as resellers, and on September 13, 2023, we were qualified for the use of PortData Validate.  Neither iConectiv nor the FCC has taken any action to stop my access to the data or restrict my use of it in any way.

26.     Defendants infer from the TelLingua memo that my non-completion of the "PTRS" certification somehow makes me ineligible to use the FCC's data in connection with my work in TCPA litigation.  Their assertion that I lacked the authority to access and use the

---

[7] TelSwitch, Inc. does not employ restricted-use data in its analysis.

[8] It is my understanding that Berkeley Research Group still retains access to the iConectiv data via PacificEast's Telefied product.

data—the same data that I used in this matter in support of my declaration in support of Plaintiffs' motion for class certification—is wrong. I used the data made available from the FCC in my analysis and declarations submitted in this case in the manner that the FCC intended.

27. The privileged parts of the iConectiv data that I do not have access to are under a very tight set of controls concerning who can access that data, and includes the full range of NPAC data used by telecommunications services companies. Access to the privileged information, such as *in-or-out-of-service* data, Caller Name ("CNAM") and E911 service center information, are items that I do not have access to. I also do not have any of the electronic facilities that are requisite to access those data, including those specifically-dedicated types of data circuits that are necessary to obtain the information contained within iConectiv's seven regional data centers where the information is regionally stored.

28. In other words, iConectiv does not leave access points to the data open. I only have access to the very limited set of WDNC data—data that has no personally-identifying information—for purposes of the TCPA.

29. Those limited items that I have access to require specific permissions to be granted to access the WDNC data. iConectiv requires me to register digital fingerprints (such as IP addresses), and to incorporate certain security characteristics into the SFTP programs that I use in order to obtain the information and/or process files. All access has to be explicitly granted by iConectiv and I have the authority to use that data in my regular course of business related to the tagging of calls in connection with the TCPA.

30. In summary, I do not have access to the restricted types of data that a PTRS would quality for. The PTRS is real-time data that allows telephone companies, E911 Centers, and network providers to route calls *in real time*. Conversely, the WDNC data is not useful for purposes of routing or rating, because it is exclusively *historical* in nature.

### CONCLUSION

31. Defendants' statement that I accessed the WDNC data, or any other data, without permission or authorization is false.

32.     TelSwitch, Inc. and I are presently authorized to use the WDNC data elements in the way I explain in my declarations submitted in this case.  iConectiv knows that I have access to the data, and both the FCC and iConectiv are familiar with my use of the data for purposes related to the TCPA, because iConectiv granted it.

33.     My use of the data which is being challenged in Defendants' Motion for Reconsideration has no bearing on my conclusions that:

a.      The Ytel CDRS are reliable records to determine class membership;

b.      My analysis of the Ytel CDRs determined that there were 34,363,756 calls placed to 2,294,457 unique numbers that receive two or more calls within 365 days and the number was on the FTC's DNC list for more than 30 days. ECF 128-3 ¶ 10.

c.      My analysis of the Ytel CDRS and the transfer files determined that there were 32,889 live transfer telephone calls to 27,088 unique telephone numbers where the numbers were first called by Defendant FDE, and the number to which the call was placed was on the DNC list for more than 30 days and the number had been called two or more times in 365 days besides being transferred. ECF 128-3 ¶ 10.

34.     TelSwitch, Inc. would not (a) advertise itself as a reseller of the iConectiv WDNC data, (b) be listed on the iConectiv website as an authorized reseller, (c) pay license fees to use the data, (d) submit position papers to the FCC that indicate we are using the data in the manner in which I used it here, and (e) proffer expert reports and declarations under the penalty of perjury in connection with the data if we did not have legitimate access to use the data in the manner in which I use it in TCPA litigation.

35.     Access to the iConectiv data for purposes of TCPA litigation, both prosecution and defense, is essential. The use of the iConectiv data is not just necessary for scrubbing a list of phone numbers to call for a calling campaign. The iConectiv data is the authoritative source of information to affirmatively establish whether a telephone number was wireline or wireless, and whether a number had been ported. This data must be made equivalently available *to all*

*parties* so those who are making calls are able to comply, and also to prove in a lawsuit that they comply, with the TCPA. Businesses that comply with the law need this information to prove they are complying with the TCPA.

36.     Finally, on October 10, 2023, the FCC initiated a selection process to identify candidates to act as the successor LNPA to iConectiv.  TelSwitch, Inc. was one of a handful of companies the FCC invited to apply to be considered to take over the duties of iConectiv as LNPA.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on the 21st of October, 2025 in Oxon Hill, Maryland.

Aaron Woolfson

**Aaron Woolfson's List of Cases in which I was had my deposition taken, or in which I had attended trial, in which I had relied upon, or had access to, elements of the WDNC data.**

- *Ashlee Stein v Monterey Financial Services*
  Case No. 13-cv-1336 (ND, Alabama, Southern Division)

- *Lofton v. Verizon Wireless*
  Case No. 4:13-cv-05665-YGR (Northern District, California)

- *Barnes v. Conns Appliances, Inc.*
  Case No. 3:16-cv-00413-HTW -LRA (SD, Michigan)

- *Frederick Luster And Narval Mangal et al v Green Tree Servicing, LLC*
  Case No. 1:14-cv-01763-ELR (Northern District, Ga – Atlanta Division)

- *Phillip Gilmore, on behalf of himself and all others similarly situated, v.USCB Corp.*
  Case No. 5:17-cv-00119-MTT (Middle District, Ga, Macon Division).

- *Christina Kinnamon et.al. v Ditech Financial LLC.*
  Case No. 4:16-cv-646 (ED, MO, Eastern Division

- *Susan Embree v. Ocwen Loan Servicing, LLC.*
  Case NO. 2:17-cv-000156, WA, Eastern District

- *Karen and Steve Bartolone v. Ocwen Loan Servicing, L.L.C.*
  Case No. 8:17-cv-00821, CD CA

- *Albert Pieterson, on behalf of himself and all others similarly situated, Plaintiff, v. Wells Fargo Bank, N.A., Defendant and John Hastings, on behalf of himself and all others similarly situated, Plaintiff v Wells Fargo Bank, N.A., Defendant* (Case Nos..3:17-cv-02306-EDL and Case No. 3:17-cv-03633-EDL, ND Ca, San Francisco Div)

- *Taylor Carroll et.al. v SGS Automotive Services, Inc.* (Case No. 16-537-SDD-RLB (MD, La)

- *Bruce Wright, Jorges Valdes, Edwin Diaz, individually and on behalf of himself and all others similarly situated, v. eXp Realty, LLC, a Washington Limited Liability Company* (Case No. 6:18-CV-01851-PGB-TBS MD Fl)

- *Robert Fischer et al v. Trivita, Inc.*
  (Case No. 6:19-cv-02333-CEM-EJK, MD Fl, Orlando Division)

**EXHIBIT 1**

- *Austin and Marrero et al v Public Reputation Management*
(Case No. 9:20-CV-80161-RS, SD Fl.)

- *Deanna Hicks et al v Houston Baptist University*
(Case No. 5:17-cv-00629-FL, E.D., NC, Western Div.)

- *Paramjit Lalli et al v. First Team Real Estate Orange County*
(Case No. 8:20-cv-000270-JLS-ADS, C.D. Cal., Southern Division)

- *Jodi Judson et al v. Goldco Direct, LLC*
(Case No. 2:19-cv-06798-PSG-PLA, CD, Ca)

- *Kenneth Johansen, et al. v. Bluegreen Vacations Unlimited, Inc.*
(Case No. 9:20-cv-81076-SMITH, S.D. Fla.)

- *Amanda Boardman et al v Green Dot Corporation*
 (Case No. 21-cv-00174-FDW-DSC, W.D., Nc, Charlotte Div.)

- *Annette Barnes et al v. Allsup Employment Services, LLC.*
(Case No. 1:21-cv-21121, S.D. Fl,, Miami Div.)

- *Andrew Perrong et al. v Victory Phones LLC.*
(Case No. 2:20-cv-05317-GEKP, E.D. PA)

- *Floyd Steve Bales et al v. Bright Solar Marketing, LLC*
Case No. 5:21-cv-00496-JSM-PRL, M.D. Fl, Ocala Div.

- *George Moore et al v. Club Exploria, LLC*
Case No.1:19-cv-02504, ND. Illinois, Eastern Div.

- *Eric Laguardia, Sophia Wingate, Lindsay Rucker and Nicole R. Austin v Designer Brands Inc., F/K/A DSW, Inc., an Ohio Corporation; and DSW Shoe Warehouse, Inc., a Missouri Corporation.* (Case No. 2:20-cv-02311-SDM-EPD, SD OH, Eastern Div.

- *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC*  (Case No. 1:21-cv-02509, ND, Il, Eastern Div.)

- *Mark Fitzhenry v Brokers Data, Inc.* (Case No 2:21-cv-04043-RMG, DC, Sc)

- *Nathan Rowan v Brock Pierce* (Case No 2:21-cv-04043-RMG, DC, PR)

- *Samantha Doup v Van Tuyl Group LLC et al* (Case No. 3:20-cv-02742-X, ND, TX)

- *Annette Bayles v Hertz Corporation* (Case No. 1:22-cv-01092-JRS-MKK, SD, IN, Indianapolis Div.)

- *Faucett et al v. Move.com et al* (Case No. 2:22-cv-04948-ODW-AS, CD, Ca, Western Div.)

- *Mackey et al v. Bankers Life & Casualty et al.* (Case No. JCCP No. 4954, Superior Court of California for the County of San Diego)

- *Julie Campbell, Diana Bickford And Kerrie Mulholland, Et Al V. Sirius Xm Radio, Inc.* (Case No. 2:22-cv-02261-CSB-EIL, CD, Il, Urbana Division)

- *Dan L. Boger v. The Maids International, LLC* (Case No. 8:24-cv-01466-TDC, DC, Md.)

- *Robert Hubble v. Loan Depot.com LLC* (Case No. 1:24-cv-11173-TLL-PTM, ED, Mi.)

- *Michael Smith et al v. Examworks, LLC and GEICO et al.* (Case No. 8:21-cv-02746-PX, DC, Md)

- *Byron Espanol et al v. Capital Vision Services, LLC, d/b/a myEye Dr. Optometry of Florida, LLC* (Case No. 6:24-cv-01024-PGB-DCI, MD. Fl)

- *Michael Osborn et al v. Hogarth California LLC et al* (Case No. CGC-22-598537, State of California, County of San Francisco)

- *Lee Abraham et al v. Loan Depot LLC* (Case No. 2:23-cv-00728-SMB, DC, Az)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matters of | ) | |
| | ) | |
| Telcordia Technologies, Inc. Petition to Reform | ) | WC Docket No. 07-149 |
| Amendment 57 and to Order a Competitive | ) | |
| Bidding Process for Number Portability | ) | |
| Administration | ) | |
| | ) | |
| Petition of Telcordia Technologies, Inc. to Reform | ) | WC Docket No. 09-109 |
| or Strike Amendment 70, to Institute Competitive | ) | |
| Bidding for Number Portability | ) | |
| Administration, and to End the NAPM LLC's | ) | |
| Interim Role in Number Portability | ) | |
| Administration Contract Management | ) | |
| | ) | |
| Telephone Number Portability | ) | CC Docket No. 95-116 |
| | ) | |

**ORDER**

**Adopted:  March 26, 2015**                **Released:  March 27, 2015**

By the Commission:  Chairman Wheeler and Commissioners Clyburn and Pai issuing separate
statements; Commissioner O'Rielly approving in part, concurring in part, and
issuing a statement.

**TABLE OF CONTENTS**

Heading                            Paragraph #

I.   INTRODUCTION ................................................................................................................. 1
II.   BACKGROUND ................................................................................................................... 4
    A.   First LNPA Selection .................................................................................................... 5
    B.   Current LNPA Selection ............................................................................................... 8
III. DISCUSSION ...................................................................................................................... 14
    A.   Process and Procedural Issues ...................................................................................... 14
       1.   The LNPA Selection Does Not Require Notice and Comment Rulemaking ......................... 15
       2.   The LNPA Selection Process Involves No Unlawful Delegation of FCC Authority ............. 31
       3.   The Decisions to Extend the Bid Submission Deadline and to Decline to Request a
          Second "Best and Final Offer" Were Proper .......................................................... 35
       4.   Neustar's Claims Regarding the Bid Document Development and Process Are
          Untimely and Barred by Principles of Waiver and Estoppel ..................................... 47
       5.   The Role Played By the SWG in the LNPA Selection Process Is Consistent With the
          Federal Advisory Committee Act ........................................................................... 55
    B.   Bidders' Technical and Management Qualifications ...................................................... 65
       1.   Bid Review Methodology .................................................................................... 66
       2.   NANC and NAPM Review Process ......................................................................... 70
       3.   Evaluation of Bidders' Technical and Management Qualifications .................................. 72
          a.   Evaluation of Technical and Management Qualifications Generally ............................ 73
          b.   Evaluation of Security and Reliability .................................................................. 82
             (i) Business Continuity .................................................................................... 87

**EXHIBIT 2**

(ii) Enhanced Law Enforcement Platform.........................................................................95
(iii) Cybersecurity Requirements ...................................................................................101
(iv) Public Safety ............................................................................................................118
(v) Other Comments and Concerns...............................................................................119
C. Cost Aspects of Bids.............................................................................................................134
D. Transition Risks and Costs....................................................................................................146
E. Neutrality Considerations .....................................................................................................160
F. IP Transition Issues...............................................................................................................189
G. Contract Negotiation and Ongoing Oversight of the LNPA.................................................193
H. Pending Telcordia Petitions .................................................................................................197
IV. ORDERING CLAUSES...........................................................................................................199
APPENDIX:  CONDITIONS ON IMPARTILTY/NEUTRALITY

## I.    INTRODUCTION

1.      Today, the Federal Communications Commission (Commission) approves the recommendation of the North American Numbering Council (NANC) that Telcordia Technologies, Inc. d/b/a iconectiv (Telcordia) serve as the next local number portability administrator (LNPA).[1]  As administrator of the system that allows consumers to keep their phone numbers when they switch service providers, the LNPA plays a crucial role in promoting consumer choice and competition among communications service providers.  After a rigorous process—one that involved extensive input from the industry, government entities, and consumer groups, and was overseen by the Commission—we approve the recommendation of an experienced and qualified company to administer and keep secure this vital system.  We recognize that since the inception of LNP service, law enforcement, public safety, and consumer protection capabilities have been built around the LNP service, and while some of these are not governed under the LNPA contract, each will be affected.  In this Order, the Commission establishes a transparent process and schedule to ensure the effective, seamless, and timely transition of the LNPA.

2.      This Order represents an important milestone, but not the final one.  We establish a process for negotiating a contract with Telcordia, which will include close coordination with other governmental entities dedicated to ensuring a secure and reliable database that is vital to the functioning of the nation's critical communications infrastructure, public safety, and the national security.  We will ensure that parties that use the LNP database have an opportunity to conduct advance testing of the new system.  And we will ensure that the transition to a new LNPA does not disrupt service to public safety, industry, the law enforcement community, or the public.

3.      The LNPA contract[2] is currently managed by a consortium of industry participants called the North American Portability Management, LLC (NAPM).  In this Order, we authorize the NAPM to negotiate a proposed contract with the next LNPA, which the Commission will review for consistency with this Order.

## II.   BACKGROUND

4.      The Commission is responsible for the administration of telephone numbers, pursuant to section 251(e)(1) of the Communications Act of 1934, as amended (Act).[3]  Congress directed the Commission to "create or designate one or more impartial entities to administer telecommunications

---

[1] Number portability is "the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another."  47 U.S.C. § 153(37).

[2] The LNPA contract will consist of seven substantially similar contracts, each dealing with a separate region of the country.

[3] 47 U.S.C. § 251(e)(1).

2

numbering and to make such numbers available on an equitable basis."[4]  In 1996, the Commission established rules to enable a customer to keep the same telephone number even when the customer switches service providers.[5]  The Commission concluded that the ability to port telephone numbers would be instrumental in encouraging competition among telephone providers.[6]  In fact, the ability to port telephone numbers has become an integral part of our lives:  on average, more than 100,000 telephone numbers are ported each day.[7]  The Commission has established rules to govern porting, such as how long a provider may take to port numbers and what information must be provided to the porting service provider.[8]  In addition, as discussed below, the Commission designated a third party, the LNPA, to administer the database used to ensure that number porting occurs in accordance with Commission rules.  The LNPA administers number porting and also maintains additional systems and services based on the information it has about the assignment of numbers:  the Interactive Voice Response (IVR) System,[9] the Enhanced Law Enforcement Platform (ELEP) Service,[10] and the Intermodal Ported Telephone Number Identification Service, also known as "Wireless Do Not Call."  ELEP and IVR services are used by U.S. law enforcement agencies and public safety answering points to identify the current facilities-based service provider of ported and pooled telephone numbers.  ELEP is a subscription-based, online batch service with more functionality and capabilities than the free, phone-based interactive IVR service.  Wireless Do Not Call is used by U.S. telemarketers to identify telephone numbers that have been ported from wireline to wireless service to avoid violations of laws and rules against auto-dialing telephone numbers.

### A.        First LNPA Selection

5.        In 1996, the Commission asked the NANC, its Federal Advisory Committee for North American Numbering Plan (NANP) administration, to implement a process for selecting and recommending to the Commission one or more independent entities to serve as the LNPA.  In the *First LNP Order*, the Commission concluded that it is in the public interest to manage the porting of local numbers through regional databases administered by one or more neutral third parties.[11]  Also in that Order, the Commission directed the NANC to recommend one or more independent, non-governmental entities, not aligned with any particular telecommunications segment, to serve as LNPA(s).[12]  The NANC

---

[4] *Id.*

[5] *See generally Telephone Number Portability*, CC Docket No. 95-116, RM-8535, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352 (1996) (*First LNP Order*) (subsequent history omitted).

[6] *Id.* at 8401-05, paras. 93-102.

[7] *See* Numbering Resource Utilization in the United States as of June 30, 2010 at 33, Table 14 (showing that 9,403,000 telephone numbers were ported during the third quarter of 2010) (Apr. 2013), https://apps.fcc.gov/edocs_public/attachmatch/DOC-319997A1.pdf.

[8] *See* 47 C.F.R. § 52.20 *et seq.*

[9] *See generally Wireline Competition Bureau Seeks Comment on Procurement Documents for the Local Number Portability (LNP) Administration Contract*, Public Notice, 27 FCC Rcd 11771 (2012) (*Bid Documents Comments PN*); *see also See Wireline Competition Bureau Announces Release of Procurement Documents for the Local Number Portability (LNP) Administration Contract*, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, Public Notice, 28 FCC Rcd 1003 (2013) (*Bid Documents Release PN*) (bid documents provided by web links demonstrate discussed and implemented revisions to the Request for Proposals (RFP), Technical Requirements Document (TRD), and Vendor Qualification Survey (VQS)); *see also* RFP § 6.9.

[10] *See* RFP § 11.2.  Neustar calls this program the LNP's Enhanced Analytical Platform (LEAP).

[11] *First LNP Order*, 11 FCC Rcd at 8399-8400, paras. 91-92.

[12] 47 C.F.R. § 52.25(c).  The Commission directed the NANC to recommend LNPA(s) within seven months. The Commission also directed the NANC to recommend the administrator selection process, the duties of the LNPA(s), the location of regional databases, the overall national architecture, and technical specifications for the regional

(continued….)

3

established the LNPA Selection Working Group (1997 Working Group) to review and give advice on LNP administration issues.  In its April 25, 1997 report,[13] the 1997 Working Group first recommended a process for selecting the LNPA(s)[14] and later recommended that Lockheed Martin and Perot Systems be the LNPAs.[15]

6.        In its 1997 *Second LNP Order*, the Commission adopted the NANC's recommendation for an administrative structure that allowed non-profit industry regional limited liability companies (LLCs) to manage and oversee porting contractors.[16]  The LLC structure ultimately resulted in the creation of the NAPM, an industry consortium,[17] which negotiated the contract for an entity, the LNPA, to administer the Number Portability Administration Center/Service Management System (NPAC/SMS).[18]  The NPAC/SMS consists of hardware and software platforms that host a national information database and serve as the central coordination point of LNP activity.  In this Order, we refer to this system simply as the NPAC.

7.        Also in the *Second LNP Order*, the Commission approved the NANC's recommendation to select Lockheed Martin and Perot Systems as the LNPAs, subject to a successful contract negotiation.[19]  Subsequently, Lockheed Martin became the sole LNPA.[20]  In 1999, the Commission concluded that certain acquisitions by Lockheed Martin caused it to become a telecommunications service provider.[21]  As such, it no longer qualified as an impartial entity that could administer telecommunications numbering consistent with section 251(e)(1), which requires that numbering administrators be "impartial."[22]  Therefore, the Commission approved the transfer of Lockheed Martin's communications business unit to an affiliate of Warburg, Pincus & Company (Warburg), a private equity firm.  That affiliate was Neustar, Inc. (Neustar).[23]  The original LNPA contract was for the term of five years, set to expire in 2002, but was

(Continued from previous page) ————————————————

databases.  *First LNP Order*, 11 FCC Rcd at 8401, para. 93.  This direction to the NANC was for a limited duration and has since expired.  *Petition of Telcordia Technologies Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract,* WC Docket No. 09-109, Order, 26 FCC Rcd 6839, para. 5 (Wireline Comp. Bur. 2011) (*May 2011 Order*).

[13] *See* Letter from Alan C. Hasselwander, Chairman, NANC, to Reed Hundt, Chairman, FCC, CC Docket No. 95-116 (May 1, 1997) (transmitting the report from the NANC's Local Number Portability Administrator Selection Working Group, dated Apr. 25, 1997, including Appxs. A-E) (1997 Working Group Report).

[14] 1997 Working Group Report at 4.1-4.6.

[15] *Id.* at 6.2.4

[16] *Telephone Number Portability*, CC Docket No. 95-116, RM-8535, Second Report and Order, 12 FCC Rcd 12281, 12297-98 (1997) (*Second LNP Order*) (subsequent history omitted).

[17] Initially, there were seven separate LLCs, one for each of the seven Bell Operating Company regions. In 1999, the seven LLCs consolidated into one and became the NAPM LLC.

[18] *Second LNP Order*, 12 FCC Rcd at 12303, para. 33.

[19] *Id.* at 12283, para. 3.

[20] Due to significant performance issues, in 1998 Lockheed Martin took over for Perot Systems.

[21] In 1999, Lockheed Martin acquired Comsat Government Services, Inc. and a 49 percent interest in Comsat Corporation**,** thereby making Lockheed Martin an affiliate of a telecommunications service provider.  *See generally Request of Lockheed Martin Corporation and Warburg, Pincus & Co. for Review of the Transfer of the Lockheed Martin Communications Industry Services Business*, CC Docket No. 92-237, NSD File No. 98-151, Order, 14 FCC Rcd 19792 (1999) (*Warburg Transfer Order*) (subsequent history omitted).

[22] 47 U.S.C. § 251(e)(1).

[23] On November 30, 1999, a transaction agreement between Lockheed Martin Corporation and Warburg, Pincus was finalized, approving the transfer of Lockheed Martin's Communications Industry Services (CIS) group from Lockheed Martin Corporation to Neustar, Inc.  *See* North American Numbering Plan Administration (NANPA)

(continued….)

4

extended three times.  Neustar (or its predecessor-in-interest) has therefore remained the administrator since 1997.  Neustar's contract as the LNPA expires on June 30, 2015.  Under its terms, the contract will automatically renew for one year if NAPM does not issue a notice of non-renewal 90 days prior to expiration of the current term.

### B.    Current LNPA Selection

8.    Over several years, and after providing multiple opportunities for notice and comment, the Commission laid the groundwork for a competitive bid process that would lead to a new LNPA contract.  In May 2009, Telcordia petitioned the Commission to institute a competitive bid process for the LNPA contract.[24]  The Bureau sought comment on Telcordia's petition.[25]  In March 2010, the NAPM stated its intention to begin a competitive process to select a new LNPA, in anticipation of Neustar's contract ending in 2015.[26]  In September 2010, the Bureau announced that the NAPM was developing a Request for Proposals (RFP) and encouraged participation by all interested parties.[27]

9.    In February 2011, the NANC and the NAPM proposed to the Commission a process for selecting the next LNPA(s).[28]  As part of that proposal, the NANC would establish the LNPA Selection Working Group (Selection Working Group or SWG) and the NAPM would utilize its Future of Number

---

(Continued from previous page) ───────────────

Numbering News, Dec. 1999/Jan. 2000.  This followed the Commission's November 17, 1999 Order allowing the transfer of the NANPA from Lockheed Martin CIS to Neustar, Inc.  *See* NANPA, *NANPA Numbering News*, http://www.nanpa.com/pdf/newsletters/nanpa_dec_jan.pdf (last visited Mar. 27, 2015); *see also Warburg Transfer Order*, 14 FCC Rcd 19792.

[24] Petition of Telcordia Technologies Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration and to End the NAPM LLC's Interim Role in Number Portability Administration Contract, WC Docket No. 09-109 (filed May 20, 2009) (Telcordia 2009 Petition).  Telcordia raised in its petition other matters not related to the selection of a new LNPA through a competitive process.  Telcordia also filed an earlier, related petition in 2007.  Petition of Telcordia Technologies, Inc. to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration, WC Docket No. 07-149 (filed June 13, 2007) (Telcordia 2007 Petition) (asking the Commission to reform Amendment 57 to the current LNPA contract by eliminating the financial penalty provisions and to initiate an open competitive bidding process for number portability administration services); *see also Wireline Competition Bureau Seeks Comment on Telcordia  Technologies, Inc.'s Petition Regarding Number Portability Administrative Services*, WC Docket No. 07-149, Public Notice 22 FCC Rcd 13572 (Wireline Comp. Bur. 2007).

[25] *Wireline Competition Bureau Seeks Comment on Telcordia Petition to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract Management*, WC Docket No. 09-109, Public Notice, 24 FCC Rcd 10271 (Wireline Comp. Bur. 2009).  Neustar filed an opposition to the Telcordia petition, while the following parties filed comments and/or reply comments: COMPTEL; AT&T, Inc. (AT&T); XO Communications; Qwest; NAPM (comments and reply comments);Verizon; Sprint Nextel Corporation; Comcast Corporation; OPASTCO; T-Mobile USA, Inc.; Telcordia (reply comments), PaeTec Communications, Inc. (reply comments) and TW Telecom (reply comments).

[26] Letter from Todd D. Daubert, Counsel to NAPM LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109 (filed Mar. 22, 2010); *see also* Letter from Todd D. Daubert, Counsel to NAPM LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109 (filed Aug. 27, 2010).

[27] *NAPM LLC Announces Request for Information from Vendors on Upcoming Request for Proposals for LNP Database Platforms and Services*, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, Public Notice, 25 FCC Rcd 13379 (Wireline Comp. Bur. 2010) (*2010 Request for Information PN*).

[28] As both the NAPM and the NANC were aware that the current contract term was ending in 2015, jointly they suggested a process in February 2011, and in the *March 2011 Order*, the Bureau confirmed the general framework for the NANC's and the NAPM's involvement.  *See* NANC/NAPM LLC Consensus Proposal for Clarification of the FCC's Rules Regarding the LNPA Selection Process, WC Docket No. 09-109, dated Feb. 14, 2011 (NANC/NAPM Proposal); *see also Telephone Number Portability*, WC Docket No. 09-109, Order and Request for Comment, 26 FCC Rcd 3685, 3691-97, Attach. A (Wireline Comp. Bur. 2011) (*March 2011 Order*).

5

Portability Administration Center (FoNPAC) subcommittee in order to facilitate the selection process.[29] In March 2011, the Bureau issued an Order and Request for Comment[30] that: (1) stated that the NANC, working in consultation with the NAPM, should recommend and, after approval, implement a process for selecting the next LNPA(s),[31] (2) directed the NANC to recommend to the Commission the next LNPA(s),[32] (3) established a framework to ensure Bureau oversight of the LNPA selection process,[33] and (4) sought comment on the NANC/NAPM Proposal regarding the LNPA selection process.[34] After reviewing the record, in May 2011 the Bureau issued an Order detailing the procedures that the NANC and the NAPM were to follow in the LNPA selection process.[35] In that Order, in response to comments, the Bureau made some modifications to the NANC/NAPM Proposal.[36] For example, NASUCA expressed concern that the proposal appeared to provide the NAPM with the final authority to negotiate, approve, and make the final decision about the LNPA contract award.[37] The Bureau modified the NANC/NAPM Proposal to clarify that it is the Commission, or the Bureau acting on delegated authority, that has the final authority to select the LNPA(s), and that the NANC/NAPM Proposal does not delegate that authority to the NANC or the NAPM.[38] The Bureau also confirmed that the Commission, or the

---

[29] Members of the Selection Working Group were representatives of the Massachusetts Department of Telecommunications and Cable, the D.C. Public Service Commission, XO Communications, Verizon, AT&T, CenturyLink, Comcast, Cox, T-Mobile, and USTelecom. *See* Report of the Selection Working Group, presented at March 29, 2012 NANC meeting, for list of the Selection Working Group members, http://www.nanc-chair.org/docs/documents15-2012.html (last visited Mar. 27, 2015). Members of the NAPM were representatives of AT&T, Comcast, Level 3, Qwest/CenturyLink, Sprint Nextel, Time Warner Cable, T-Mobile, Vonage, Verizon, and XO Communications. *See* North American Portability Management LLC, *Open Meeting and Minutes, NAPM LLC Open Portion Meeting Notice and Minutes August 22, 2012*, https://www.napmllc.org/pages/openmeeting/ openmeeting_minutes.aspx (last visited Mar. 27, 2015). With the exception of Vonage, each member company of the NAPM had an individual employee who served on the FoNPAC. *See also* Letter from Dan A. Sciullo, Counsel to NAPM LLC, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 (filed Mar. 4, 2015) (listing the members of the NAPM LLC currently and also those who comprised the FoNPAC from October 2013 through January 2014).

[30] The following parties filed comments and replies in response to the request for comment: AT&T Reply (generally supporting the NANC/NAPM Proposal and LNPA Selection Process); Connecticut Department of Public Utility Control Reply (same); Massachusetts Department of Telecommunications and Cable Comments (same); NAPM Reply (same); Neustar Comments and Reply (same) (Neustar March 2011 Comments and Neustar 2011 Reply); National Association of State Utility and Consumer Advocates (NASUCA) Comments (requesting modifications) (NASUCA March 2011 Comments); and Telcordia Comments and Reply (also requesting modifications).

[31] *See March 2011 Order*, 26 FCC Rcd at 3687, para. 5 ("We find that the delegation to the NANC, with assistance from the NAPM, will allow the Commission and interested parties to get the benefit of the NANC's and the NAPM's significant experience with the LNP process.").

[32] *Id*. at 3686, para. 5

[33] *Id*. at 3687-88, para. 8 (requiring the NANC/NAPM to: (1) provide the Bureau a timeline for the LNPA selection process and inform the Bureau of its progress; (2) obtain Bureau authorization before issuing any bid documents; (3) provide any requested information on selection process; and (4) submit a recommendation to the Bureau, after evaluating the bidders, which includes a ranked evaluation of the bidders that relies on criteria established in the RFP).

[34] *Id*. at 3687, para. 7.

[35] *See generally Petition of Telcordia Technologies Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration and to End the NAPM LLC's Interim Role in Number Portability Administration Contract; Telephone Number Portability,* WC Docket No. 09-109, CC Docket No. 95-116, Order, 26 FCC Rcd 6839 (Wireline Comp. Bur. 2011) (*May 2011 Order*).

[36] *Id*. at 6841-43, paras. 7-16, 3845-47 (Attach. A).

[37] NASUCA March 2011 Comments at 7.

[38] *May 2011 Order*, 26 FCC Rcd at 6841, paras. 8, 19.

Bureau, acting on delegated authority, must make a final decision about the contract award.[39]  In response to Telcordia's concerns about the transparency of the bidding process, the Bureau modified the NANC/NAPM Proposal to specify an enhanced role for the SWG in reviewing all bid documents: the RFP; the Technical Requirements Document (TRD); and the Vendor Qualification Survey (VQS)) (collectively, bid documents) submitted by the FoNPAC.[40]  In addition, the Order further outlined the Bureau's role in overseeing the LNPA selection process.[41]  No party sought reconsideration or full Commission review of the Bureau's Order establishing the LNPA selection process.  To the contrary, many parties, including Neustar, affirmatively stated their support for the process the Order established.[42]

10.     In 2012, the NANC and the NAPM prepared draft bid documents and the Bureau issued a Public Notice in August 2012 seeking comment on those documents.[43]  Over the next six months, interested parties commented on and proposed changes to the bid documents.  In particular, Neustar and

---

[39] *Id*.at 6844, para. 19 ("[T]he Commission or the Bureau, acting on delegated authority, must review and approve the procurement process, including the procurement documents, and make a final decision about the contract award. In addition, once the LNPA contract is in place, the Commission or the Bureau will retain ultimate oversight and control over the contract.").

[40] *Id*. at 6842-43, para. 13; *id.*, Attach. A, para. 5.i.  The Bureau declined to implement Telcordia's request to keep the SWG in place until the contract was implemented and to impose a specific directive about the composition of the SWG Chairs.  *See id*. at 6842, paras. 11-12; *see supra* note 9.

[41] *See id.* at 6844, paras. 19-20 (clarifying that "the Commission or the Bureau, acting on delegated authority, must review and approve the procurement process, including the procurement documents, and make a final decision about the contract award").  The Bureau further noted that the *May 2011 Order* "is one of several actions that the agency will take to implement the LNPA contract(s)." *Id.*

[42] *See, e.g.*, *id*. at 6841, para. 7, n.18 (listing commenters in support of the process established in the *March 2011 Order*); *see also* Letter from Aaron M. Panner, Counsel to Neustar, Inc., WC Docket Nos. 09-109, 07-149, CC Docket No. 95-116, at 1 (filed Nov. 22, 2011) ("Neustar supports the LNPA selection process set forth by the Commission in its May 16, 2011 Order.") (Neustar Nov. 22, 2011 *Ex Parte* Letter).  Seven parties filed favorable comments and/or replies with respect to the LNPA Selection Process in 2011, including Neustar.  Only two requested substantive changes (Telcordia and NASUCA), which were addressed.  *See May 2011 Order* at 3; *see also supra* note 30.  Recently more parties have filed in support of the process.  *See* Letter from Peter Karanjia, Counsel to CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 09-109, 07-149, CC Docket No. 95-116 at 1-2 (Nov. 20, 2014) (CTIA et al. Nov. 20, 2014 *Ex Parte* Letter) (requesting the Commission to expeditiously approve the NANC recommendation of the new LNPA and stressing the transparency and integrity of the LNPA selection process); Letter from Lynn Follansbee, Vice President, Law & Policy, USTelecom, to Marlene H. Dortch, Secretary, WC Docket No. 09-109, CC Docket No. 95-116 at 1-2 (filed Feb. 4, 2014) (seeking approval of NANC's recommendation of the new LNPA and urging the Commission to begin the transition process); Letter from Tiki Gaugler, XO Communications, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 07-149 at 1 (filed Dec. 24, 2014) (XO Dec. 24, 2014 *Ex Parte* Letter) ("XO vigorously refutes arguments that the LNPA Selection Process, as established or conducted, was inherently biased or disadvantaged any industry segment.");  *see also* Letter from B. Lynn Follansbee, Vice President, Law & Policy, USTelecom, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 95-116, at 1-3, Attach. (filed Mar. 19, 2015) (USTelecom Mar. 19, 2015 *Ex Parte* Letter) at 1-3 (refuting LNP Alliance's arguments that small and medium carriers were excluded and it was over burdensome for smaller carriers to participate and attaching XO's Dec. 24, 2014 *Ex Parte* Letter); *see also* Letter from James C. Falvey, Counsel to LNP Alliance, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket. No. 95-116 at 1, 3 (filed Mar. 23, 2015) (LNP Alliance Mar. 23, 2015 *Ex Parte* Letter) (stating that the USTelecom Group and XO do not represent small carriers and all of the major organizations that do represent small incumbent and wireless carriers—National Telephone Cooperative Association (NCTA), the Rural Broadband Alliance, the Competitive Carriers association and the Western Telecommunications Alliance (WTA)—have all weighed in requesting the FCC to extend the time before selection and conduct a Regulatory Flexibility Analysis).

[43] *See Bid Documents Comments PN*.  The following parties filed comments in response to the Public Notice:  Idaho Public Utilities Commission; Neustar; Telcordia; Public Knowledge; Vermont Public Service Board; NAPM; Comcast; and AT&T, CTIA, CenturyLink, Level 3, Verizon, USTelecom, and XO (filing joint comments).

7

Telcordia commented on how to ensure that the LNPA(s) would be neutral and impartial, and discussed whether bidders should be required to submit regional bids (*i.e.*, separate bids to serve various regions of the country), nationwide bids, or some combination thereof.[44] From the release of the *Bid Documents Comments PN* in August 2012 until the release of the bid documents in February 2013, Neustar and Telcordia each submitted 11 filings in the docket about the bid process. In response, and following extensive on-the-record communications, the Bureau directed the NAPM and the NANC to make certain modifications to the draft bid documents. In particular, the Bureau determined that bidders should have flexibility regarding whether to submit regional or national bids, or both, and developed a process under which the Commission, rather than the NANC and NAPM, would evaluate in the first instance whether a bidder met the neutrality requirements of the statute.[45] In light of those modifications, both Neustar and Telcordia urged the Bureau to direct the NANC and NAPM to proceed expeditiously with the selection process.[46] Notwithstanding the extensive communications by the parties about modifications to the draft bid documents, neither party suggested that the bid documents were deficient with regard either to network security or accommodating the Internet Protocol (IP) transition.

11.     In February 2013, the Bureau announced the release of the bid documents to solicit bids for a new contract for the LNPA.[47] Responses to the bid documents were originally due on April 5, 2013,

---

[44] *See*, *e.g.*, Letter from Aaron M. Panner, Counsel to Neustar, Inc. to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 at 5-6 (filed Sept. 11, 2012) (claiming "procurement designs that require awards to more than one vendor would likely increase rather than decrease the cost of NPAC services relative to a sole- source, winner-takes-all procurement"); Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 at 3 (filed Oct. 18, 2012) (Neustar Oct. 18, 2012 *Ex Parte* Letter) ("Given the legal requirement of public disclosure, the Commission can and should evaluate any potential concerns about bidders' neutrality *after* the NANC has made its recommendation."); Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 (filed Nov. 6, 2012) (Neustar Nov. 6, 2012 *Ex Parte* Letter). *But see* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 1 (filed Nov. 13, 2012) (stating "[c]ontrary to Neustar's suggestion, requiring regional bids does not undermine the competitive bidding process nor does it bind the FoNPAC, SWG or Commission to awarding the NPAC contract on a regional basis."); *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 1 (filed Nov. 16, 2012)  ("Telcordia believes that the neutrality review must address both (1) certain universally applicable neutrality principles, to which all Respondents may be required to agree, and also (2) the specific, individual circumstances of each LNPA.").

[45] *See Bid Documents Comments PN*; *see also Bid Documents Release PN*.

[46] *See*, *e.g.,* Letter from Aaron M. Panner, Counsel to Neustar, Inc. to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 at 3-4 (filed Sept. 13, 2013) (Neustar Sept. 13, 2013 *Ex Parte* Letter) ("The RFP process established by the Federal Communications Commission ('Commission'), with important input from state regulators, and implemented by the industry, is generally well designed to achieve those goals; with a limited number of clarifications to the *RFP documents* ,the process should go forward as planned without delay."); *see also* Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 at 1 (filed Oct. 23, 2012) (Neustar Oct. 23, 2012 *Ex Parte* Letter) ("[T]he Commission should allow the RFP process to move forward as soon as possible . . . . That process has the strong support of all aspects of the industry, state regulators, and consumers. . . ."); Neustar Nov. 6, 2012 *Ex Parte* Letter at 1 (stating that all parties, including Telcordia, urge that the procurement documents be finalized and issued expeditiously); Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109 at 3 (filed Apr. 12, 2011) ("Telcordia supports NAPM's request that the selection process be determined expeditiously"); Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109 at 4 (filed Aug. 30, 2012) (supporting the expeditious completion of the LNPA bid documents).

[47] *See Wireline Competition Bureau Announces Release of Procurement Documents for the Local Number Portability (LNP) Administration Contract*, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, Public Notice, 28 FCC Rcd 1003 (Wireline Comp. Bur. 2013) (*Bid Documents Release PN*).

but the NAPM extended the deadline to April 22, 2013.[48]  Two companies submitted bids:  Neustar and Telcordia.  The FoNPAC prepared and released the bid documents and reviewed the responses to the bid documents on behalf of the entire NAPM. The Selection Working Group, or SWG, reviewed the FoNPAC's analysis of the bid documents in order to provide a preliminary evaluation that could be shared with the NANC.  Over the next six months, the NAPM reviewed the responses to the bid documents and conducted interviews with the two bidders.  The NAPM, on August 15, 2013, solicited a "Best and Final Offer" (BAFO) from the two bidders; both responded on September 18, 2013.[49]  On October 21, 2013, Neustar submitted a second, unsolicited BAFO, along with a cover letter requesting that the bid be considered.[50]  On January 15, 2014, the NAPM rejected the second BAFO, without considering it.[51]  On February 11, 2014, the Chief of the Wireline Competition Bureau sent a letter to the NANC Chair stating that filings in the record "raise concerns over the fairness of this proceeding thus far" and directed the NANC to include in its ultimate recommendation an evaluation of those matters.[52]

12.     On February 26, 2014 and March 20, 2014, the SWG and the NAPM respectively forwarded their recommendations for the next LNPA to the NANC.[53]  On March 26, 2014, the NANC met in a closed session to vote on which vendor(s) to recommend to the Commission.[54]  After presentations by the NAPM's FoNPAC and the NANC's SWG subcommittees, the full NANC membership unanimously (with two abstentions) recommended the selection of Telcordia as the sole LNPA for a period of five years, with the option for two one-year extensions.[55]  The NANC Chair filed

---

[48] Details about that extension are discussed below in section III.A.3**.**

[49] Report of the North American Portability Management LLC In Response to the Wireline Competition Bureau Letter dated Feb. 11, 2014, with Attachs. 1-4, at 43-44 (filed Apr. 25, 2014) (NAPM Process Report).

[50] NAPM Process Report at 45-47; *see infra* note 57.

[51] NAPM Process Report at 63 **[BEGIN CONFIDENTIAL]** ███████████
████████████████████████████████████████
████████████████████ **[END CONFIDENTIAL]**  Details of this decision are discussed below in section III.A.3.  *See also* Neustar, Inc. 2014 Recommendation Reply, WC Docket No. 09-109, CC Docket No. 95-116 at 34 (filed Aug. 22, 2014) (Neustar 2014 Recommendation Reply); Neustar Process Petition Concerning the Local Number Portability Administration Selection Process, WC Docket No. 09-109, CC Docket No. 95-116 (filed Feb. 12, 2014) (Neustar Process Petition).  Telcordia filed an opposition to the Neustar petition.  Opposition of Telcordia Technologies, d/b/a iconectiv to Neustar's Petition for a Declaratory Ruling, WC Docket Nos. 09-109, 07-149, CC Docket No. 95-116 (filed Feb. 24, 2014) (Telcordia Opposition to Neustar's Process Petition).  Neustar replied to Telcordia's opposition on March 4, 2014.  Reply of Neustar in Support of its Petition of Declaratory Ruling, WC Docket No. 09-109, CC Docket No. 95-116 (filed Mar. 4, 2014).

[52] *See* Letter from Julie A. Veach, Chief, Wireline Competition Bureau, FCC, to Hon. Betty Ann Kane, Chairman, North American Numbering Council, WC Docket No. 09-109, CC Docket No. 95-116 (dated Feb. 11, 2014) (WCB Feb. 11, 2014 Letter).

[53] *See* Letter from Hon. Betty A. Kane, Chairman, North American Numbering Council,  to Julie A. Veach, Chief, Wireline Competition Bureau, FCC, WC Docket No. 09-109, CC Docket No. 95-116 (dated Apr. 24, 2014 and filed Apr. 25, 2014) (NANC Recommendation).

[54] *FCC Announces a Closed Meeting of the North American Numbering Council*, Public Notice, CC Docket No. 92-237, 29 FCC Rcd 10045 (Wireline Comp. Bur. 2014).

[55] *Commission Seeks Comment on the North American Numbering Council Recommendation of a Vendor to Serve as Local Number Portability Administrator*, WC Docket No. 09-109, CC Docket No. 95-116, Public Notice, 29 FCC Rcd 6013 (Wireline Comp. Bur. 2014) (*2014 Recommendation PN*); *see also* NANC Recommendation at 1 (Confidential Version); *id.* at 2 **[BEGIN CONFIDENTIAL]** ██████████████████
████████████████████████████████████████████
█████████████████████████████████████ [**END CONFIDENTIAL**] *see also* Letter from Sanford S. Williams, WCB, FCC, to Marlene Dortch, Secretary, FCC, CC Docket 95-116, WC Docket Nos. 07-149, 09-109 at 177 (filed Mar. 3, 2015) (attaching transcript of March 26, 2014

(continued….)

Case 8:24-cv-00609-DOC-JDE   Document 31-2   Filed 11/21/25   Page 96 of 196   Page ID #:1345
Page ID #:2462
**Federal Communications Commission**      **FCC 15-35**

the NANC's recommendation with the Commission on April 25, 2014.[56]  Included with the recommendation letter were four separate confidential reports: a report each from the SWG and the FoNPAC to the NANC detailing the selection of the next LNPA, and an investigative report to the NANC from each entity prepared in response to the Bureau's request to address allegations of possible process shortcomings in connection with the LNPA selection.[57]

13.     On June 9, 2014, the Bureau released a Public Notice requesting comment on the NANC's recommendation of Telcordia as the next LNPA.[58]  The Bureau also released a Second Level Protective Order adopting procedures to address access to certain particularly competitively sensitive information filed or to be filed in the proceeding.[59]  On June 24, 2014, the Bureau, on its own motion, released a Revised Protective Order to allow greater access to materials that, while confidential or competitively sensitive, are not among the parties' most sensitive materials.[60]  In response to the *2014 Recommendation PN*, parties filed comments and reply comments.[61]

(Continued from previous page) ──────────────

NANC Closed Meeting) (NANC Meeting Transcript) (noting there were actually two abstentions, not one as previously noted in the NANC Recommendation).

[56] *See* Letter from Hon. Betty A. Kane, Chairman, North American Numbering Council,  to Julie A. Veach, Chief, Wireline Competition Bureau, FCC, WC Docket No. 09-109, CC Docket No. 95-116 (dated Apr. 24, 2014 and filed Apr. 25, 2014) (NANC Recommendation).

[57] *See id.* attaching the following reports: (1) LNPA Selection Working Group (SWG) Report to the NANC on LNPA Vendor Selection Recommendation of the Future of the NPAC Subcommittee (FoNPAC), dated Feb. 26, 2014, and filed Apr. 25, 2014 (NANC Selection Report); (2) Future of NPAC Subcommittee (FoNPAC) Local Number Portability Administration Request for Proposal Evaluation Summary and Selection Report, filed Apr. 25, 2014 (NAPM Selection Report); (3) LNPA SWG Selection Process Report, dated Apr. 14, 2014, and filed Apr. 25, 2014 (NANC/SWG Process Report); and (4) NAPM Process Report; *see supra* note 52.

[58] *2014 Recommendation PN; see also Commission Extends Comment Deadlines for Public Notice Seeking Comment on the North American Numbering Council Recommendation of a Vendor to Serve as Local Number Portability Administrator*, WC Docket No. 09-109, CC Docket No. 95-116, Public Notice, 29 FCC Rcd 7967 (Wireline Comp. Bur. 2014) (extending the comment date until July 25, 2014 and the reply comment date until August 8, 2014)*; Commission Further Extends Reply Comment Deadline for Public Notice Seeking Comment on the North American Numbering Council Recommendation of a Vendor to Serve as Local Number Portability Administrator*, WC Docket No. 09-109, CC Docket No. 95-116, Public Notice, 29 FCC Rcd 9597 (Wireline Comp. Bur. 2014) (extending the reply comment date until August 22, 2014).

[59] *Petition of Telcordia Technologies, Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration and to End the NAPM LLC's Interim Role in Number Portability Administration Contract; Telephone Number Portability*, WC Docket No. 09-109, CC Docket No. 95-116, Second Level Protective Order, 29 FCC Rcd 6022 (Wireline Comp. Bur. 2014).

[60] *Petition of Telcordia Technologies, Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration and to End the NAPM LLC's Interim Role in Number Portability Administration Contract; Telephone Number Portability*, WC Docket No. 09-109, CC Docket No. 95-116, Revised Protective Order, 29 FCC Rcd 7592 (Wireline Comp. Bur. 2014).

[61] The following parties filed comments:  Cequel Communications, LLC d/b/a Suddenlink Communications (Suddenlink); CTIA – The Wireless Association/ United States Telecom Association (CTIA/USTelecom); Intrado Inc.; LNP Alliance; NAPM; Neustar; Telcordia; TeleCommunication Systems, Inc. (TCS); and U.S. TelePacific Communications/Hypercube Telecom, LLC (TelePacific/Hypercube).  The following parties filed reply comments: CTIA/USTelecom (CTIA/USTelecom); Federal Bureau of Investigations, Drug Enforcement Administration, United States Secret Service, and U.S. Immigration and Customs Enforcement (FBI *et. al.*); International Association of Chiefs of Police/National Sheriffs' Association (IACP/NSA); LNP Alliance; National Emergency Number Association: The 9-1-1 Association (NENA); Neustar; Public Utility Division of Oklahoma Corporation Commission (OK Corp. Comm.); Telcordia; and TCS.

## III. DISCUSSION

### A. Process and Procedural Issues

14.     Neustar and some commenters raise a number of procedural objections to the Commission's LNPA selection process.  They contend that the Commission was required to conduct a notice and comment rulemaking to select a new LNPA; that the Commission has unlawfully delegated its role in selecting the LNPA to the NANC; that the selection process was tainted by certain decisions that favored Telcordia and handicapped Neustar; that the bid documents (the RFP, TRD, and VQS) were developed without adequate participation by relevant constituencies; and that the conduct of the SWG and the NANC in the selection process violated the Federal Advisory Committed Act (FACA).  As detailed below we conclude that most of these claims are untimely and have been waived and, in any event, that none has merit.[62]

#### 1. The LNPA Selection Does Not Require Notice and Comment Rulemaking

15.     ***Position of the Parties.***  Neustar contends that the Commission must conduct a notice and comment rulemaking proceeding, initiated with a notice of proposed rulemaking (NPRM), in order to select a new LNPA.[63]  That is so, according to Neustar, because (1) the designation of a LNPA meets the Administrative Procedure Act's (APA's) definition of a "rule,"[64] (2) the 1996 Act requires the

---

[62] We note that a recent ex parte filed by a Czech Republic investment firm argued that its investment in Neustar is subject to special protections stemming from a 1992 treaty between the United States and the Czech Republic governing the fair, equitable and non-discriminatory treatment of foreign investment into US companies.  *See* Letter from Sanford S. Williams, WCB, FCC, to Marlene H. Dortch, Secretary, FCC, CC Docket 95-116, WC Docket Nos. 07-149, 09-109 (filed Mar. 20, 2015) (attaching Letter from Jan Martinek, Partner, Central European Capital Partners, to Commissioner Mignon Clyburn, FCC (dated March 20, 2015) (Martinek Letter)).  The Martinek Letter states that awarding the next LNPA contract to Telcordia "would culminate a series of violations of the clear procedural requirements governing the … [LNPA contract] award process," would impair its investment in Neustar, and therefore would violate the treaty.  *See id.*  Since we determine herein that none of the issues raised in the Martinek Letter have merit, there is no concern about a potential treaty violation.  Furthermore, we also disagree with the Martinek Letter's interpretation of the relevant treaty.  The referenced treaty is a bilateral investment treaty (BIT) that contains "national treatment" provisions.  National treatment provisions of treaties ensure that foreign-owned companies receive similar treatment to U.S.-owned companies.  Because there is no national treatment issue in this proceeding, the concerns raised in the Martinek Letter have no bearing on our conditional selection of Telcordia to be the next LNPA.

[63] Neustar, Inc. 2014 Recommendation Comments, WC Docket No. 09-109, CC Docket No. 95-116 at 50-62 (filed Aug. 6, 2014) (Neustar 2014 Recommendation Comments) (Neustar originally filed comments on July 25, 2014 that were corrected by an Errata and corrected comments filed Aug. 6, 2014); *see also* Neustar 2014 Recommendation Reply at 30-33; *see also* Letter from Michael Calabrese, Director, Wireless Future Project, New America, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, GN Docket No. 13-5, Attach. at 2 (filed Mar. 9, 2015) (New America Mar. 9, 2015 *Ex Parte* Letter) (requesting that the Commission review and clarify the future role of the number portability system and LNPA through a rulemaking).  New America also urges the Commission to address policy issues surrounding non-geographic numbering.  The Commission is considering these issues in the Direct Access Notice of Inquiry, Technology Transitions and Numbering Testbed proceedings.  They are important issues regardless of who serves as the next LNPA.  *See Numbering Policies for Modern Communications et al.*, WC Docket No. 13-97 et al., Notice of Proposed Rulemaking, Order, and Notice of Inquiry, 28 FCC Rcd 5842, 5890 (2013); *see also* Technology Transitions et al., GN Docket No. 13-5 et al., Order, Report and Order and Further Notice of Proposed Rulemaking, Report and Order, Order and Further Notice of Proposed Rulemaking, Proposal for Ongoing Data Initiative, 29 FCC Rcd 1433 (2014); *see also Chief Technologist to Host Numbering Testbed Workshop*, WC Docket No. 13-97, Public Notice, 29 FCC Rcd 2115 (Wireline Comp. Bur. 2015); *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, at 1 (filed Mar. 19, 2015) (Telcordia Mar. 19, 2015 Response to New America *Ex Parte* Letter) (stating that the paper shows no sign of independent investigation or evaluation, but merely "cherry-picks" comments that most favor Neustar's arguments).

[64] Neustar 2014 Recommendation Comments at 51-52 (citing 5 U.S.C. § 551(4) (definition of a "rule")).

11

Commission to employ its rulemaking authority when selecting a LNPA,[65] and (3) the current LNPA was designated by legislative rule and, once adopted, such a rule may be modified only through notice and comment rulemaking procedures.[66]  In Neustar's view, therefore, the current proceeding—which was not commenced with an NPRM—does not present a lawful basis on which to select a new LNPA.

16.      Telcordia and others, by contrast, contend that this LNPA selection proceeding properly is viewed as an informal adjudication to which the APA's rulemaking procedures do not apply.[67]

17.      ***Discussion.***  We find, as an initial matter, that Neustar's rulemaking claim is untimely. The Wireline Competition Bureau established the process for selecting the next LNPA in the *May 2011 Order*, which did not provide for notice and comment rulemaking procedures.[68]  Although the Commission's rules require parties aggrieved by staff action taken on delegated authority to seek reconsideration or Commission review within 30 days,[69] neither Neustar nor any other party argued that notice and comment rulemaking procedures were required until April 2014,[70] long after the selection process had been established and the bids submitted.  Accordingly, Neustar has waived its rulemaking claim.[71]

18.      The claim is baseless in any event.  For the reasons discussed below we find that this proceeding is properly viewed as an informal adjudication and that the Commission satisfied all applicable procedural requirements.  In general, "the choice . . . between proceeding by general rule or by individual, *ad hoc* litigation" lies "primarily in the informed discretion of the administrative agency."[72] The Commission opted to conduct the LNPA selection process as an informal adjudication, and it had discretion to do so.  Furthermore, the Commission satisfied all applicable procedural requirements associated with such a proceeding.  We reject Neustar's argument that we are required by law to select the next LNPA through notice and comment rulemaking.

19.      Contrary to Neustar's assertions,[73] there is nothing inherently legislative in selecting an LNPA that forecloses acting through adjudication.  The agency had already established a *process* for

---

[65] Neustar 2014 Recommendation Comments at 53-54 (citing 47 U.S.C. §§ 251(b)(2) & 251(e)(1)).

[66] Neustar 2014 Recommendation Comments at 55-61 (citing, *e.g.*, *Sprint Corp. v. FCC*, 315 F.3d 369, 374 (D.C. Cir. 2003)).

[67] Telcordia Technologies, Inc. d/b/a iconectiv 2014 Recommendation Reply, WC Docket No. 09-109, CC Docket No. 95-116 at 50-61 (filed Aug. 22, 2014) (Telcordia 2014 Recommendation Reply); CTIA-the Wireless Association and United States Telecom Association 2014 Recommendation Comments, WC Docket No. 09-109, CC Docket No. 95-116 at 8-9 (filed July 25, 2014) (CTIA/USTelecom 2014 Recommendation Comments); CTIA- the Wireless Association and United States Telecom Association 2014 Recommendation Reply, WC Docket No. 09-109, CC Docket No. 95-116 at 12-13 (filed Aug. 8, 2014) (CTIA/USTelecom 2014 Recommendation Reply).

[68] *See May 2011 Order*, 26 FCC Rcd at 6845-47, Attach. A.

[69] *See* 47 C.F.R. §§ 1.06(f), 1.115(d).

[70] *See* Letter from Aaron M. Panner, Counsel to Neustar, Inc. to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 (filed Apr. 23, 2014) (Neustar April 23, 2014 *Ex Parte* Letter).

[71] *See*, *e.g.*, *Community Teleplay, Inc., et al.*, 13 FCC Rcd 12426, 12428, para. 5 (Wireless Tel. Bur. 1998) (finding challenge to be "barred by the doctrine of waiver" where "a party with sufficient opportunity to raise a challenge in a timely manner … fails to do so").

[72] *National Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 670 (D.C. Cir. 2009) (quoting *SEC v. Chenery*, 332 U.S. 194, 203 (1947)).  *Accord Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Cir. 2007) (noting the Commission's "very broad discretion whether to proceed by way of adjudication or rulemaking") (internal citation omitted).

[73] Neustar 2014 Recommendation Comments at 51-52.

12

selecting the next LNPA and adopted *rules* governing the LNPA's duties.[74] The remaining task of selecting the LNPA is "a classic case of agency adjudication," because it "involves decision making concerning specific persons, based on a determination of particular facts and the application of general principles to those facts."[75] Specifically, as demonstrated in sections III.B, C, and D of this Order, we are making our selection decision on the basis of the relative merits of the competing bids Telcordia and Neustar submitted, their compliance with the bid documents (the RFP, TRD, and VQS), and the requirements of the Act and our rules.

20. Neustar nevertheless contends that the LNPA selection must be rulemaking because it provides no "retrospective resolution" of a dispute, and instead involves only "a determination with future effect."[76] Nothing in the APA or elsewhere, however, requires all adjudications to have retrospective effect. A key feature of adjudication generally is that it has "an *immediate* effect on specific individuals," in contrast to a rule, which generally has "a definitive effect on individuals only after [it] *subsequently* is applied."[77] Like licensing decisions—which fall within the APA's definition of adjudication[78]—the LNPA selection undertaken in this Order determines *immediately* which entity is authorized to negotiate an LNPA contract with the NAPM.[79] Moreover, although the LNPA selection may have future—as well as immediate—effect, that does not convert it from an adjudication into a rule. "Most norms that emerge from a rulemaking are equally capable of emerging (legitimately) from an adjudication."[80] "The fact that an order rendered in an adjudication 'may affect agency policy and have general prospective application,' . . . does not make it rulemaking subject to APA section 553 notice and comment."[81]

21. Neustar contends, independently, that the Communications Act requires that the selection of an LNPA be accomplished through rulemaking. In particular, Neustar asserts that "the Commission's authority to designate an LNPA derives from a specific delegation of legislative power in the governing statute—namely, Section 251(e)(1), which directs the Commission to designate impartial entities as numbering administrators, and Section 251(b)(2), which directs the Commission to establish requirements

---

[74] *See generally May 2011 Order*, 26 FCC Rcd 6839 (establishing LNPA selection process); 47 C.F.R. Part 52 (rules governing number portability and its administration).

[75] *Harborlite Corp. v. ICC*, 613 F.2d 1088, 1093 n.11 (D.C. Cir. 1979); *see also Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) (stating that adjudications "resolve disputes among specific individuals in specific cases").

[76] Neustar 2014 Recommendation Reply at 31; *see also* Neustar 2014 Recommendation Comments at 51 (stating that LNPA selection is rulemaking because it is "of 'future effect'") (quoting definition of "rule" in 5 U.S.C. § 551(4)).

[77] *Yesler Terrace*, 37 F.3d at 448 (emphasis added).

[78] *See* 5 U.S.C. § 551(7) (defining "*adjudication*" as "agency process for the formulation of an order"); *id.* § 551(6) (defining "*order*" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than the rule making but including licensing"); *id.* § 551(8) (defining "*license*" to include "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission").

[79] Even outside licensing and analogous contexts, adjudications do not necessarily apply retrospectively. A complaint seeking injunctive relief but not damages is no less an adjudication because its requested remedy is prospective, and it is well-settled that an agency may decline to apply an adjudicatory ruling retroactively, even if so requested, in circumstances that would constitute "manifest injustice." *See Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 539-40 (D.C. Cir. 2007) (discussing precedent).

[80] *Qwest Services Corp.*, 509 F.3d at 536 (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294-95 (1974)).

[81] *Conference Group, LLC v. FCC*, 720 F.3d 957, 966 (D.C. Cir. 2013) (internal citation omitted).

governing the provision of number portability."[82] According to Neustar, the Supreme Court has recognized that "[s]ection 251(e) . . . *requires* the Commission to exercise *rulemaking* authority."[83]

22. We disagree. Although section 251(e)(1) directs the Commission to "create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis,"[84] nothing in the language of that provision requires us to do so through notice and comment rulemaking. Where Congress wishes to specify that the Commission take action "by rule" it knows how to do so.[85] Similarly, although section 251(b)(2) imposes on local exchange carriers a "duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission,"[86] we do not read the indirect reference to "requirements prescribed by the Commission"—language that focuses on *local exchange carrier* (rather than Commission) duties—to be an instruction to the Commission that all decisions regarding number portability, including the selection of an LNPA, must be made by rule. Finally, we find that Neustar misreads the Supreme Court's *AT&T Corp. v. Iowa Utils. Bd.* decision in claiming that the Court construed section 251(e) to require the Commission to exercise rulemaking, as opposed to adjudicatory, authority. The quoted language addressed whether agency action—which, in the case before the Court, happened to be rulemaking—was required or discretionary; it did not focus on the separate question of whether that action had to be rulemaking.[87]

23. We also reject Neustar's contention that, because its selection as the current LNPA allegedly was fixed by rule, we must conduct a notice and comment rulemaking proceeding to change the LNPA.[88] Neustar asserts that the identity of the current LNPA is fixed by rule because section 52.26(a) of the Commission's rules allegedly incorporates by reference the NANC's recommended selection of Neustar's predecessor (Lockheed Martin), as set forth in the 1997 Working Group Report.[89] While we agree that APA rules generally may be amended only through APA rulemaking procedures,[90] we do not read our rules to incorporate a particular LNPA or to require amendment when selecting a new one.

24. Rule 52.26(a) states that "[l]ocal number portability *administration* shall comply with the recommendations of the North American Number Council (NANC) as set forth in the [1997 Working

---

[82] Neustar 2014 Recommendation Comments at 53 (internal quotation marks omitted).

[83] Neustar 2014 Recommendation Comments at 53-54 (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 383 n.9 (1999) (second emphasis supplied by Neustar)).

[84] 47 U.S.C. § 251(e)(1).

[85] *See*, *e.g.*, 47 U.S.C. § 251(h)(2) ("The Commission may, *by rule*, provide for the treatment of [certain comparable carriers] . . . as an incumbent local exchange carrier") (emphasis added); *id.* § 220(a)(2) ("The Commission shall, *by rule*, prescribe a uniform system of accounts for use by telephone companies.") (emphasis added); *id.* § 309(b)(2)(F) (authorizing the Commission "*by rule*" to add to the categories of licenses that may not be granted in less than 30 days) (emphasis added); *id.* § 339(c)(3)(A) ("Within 270 days after the date of enactment of the Satellite Television Extension and Localism Act of 2010, the Commission shall develop and prescribe *by rule* a predictive model . . . .") (emphasis added).

[86] 47 U.S.C. § 251(b)(2).

[87] *See AT&T Corp.*, 525 U.S. at 383 n.9 ("Section 251(e), which provides that '[t]he Commission shall create or designate one or more impartial entities to administer telecommunications numbering,' *requires* the Commission to exercise its rulemaking authority, as opposed to § 201(b), which merely authorizes the Commission to promulgate rules if it so chooses."). Notably, while the Court supplied emphasis only to the term "requires," Neustar's discussion of the case attempts to redirect the Court's focus by adding emphasis to the term "rulemaking." *See* Neustar 2014 Recommendation Comments at 53-54.

[88] *See* Neustar 2014 Recommendation Comments at 55-61.

[89] *See* Neustar 2014 Recommendation Comments at 55-61; *see also supra* note 13.

[90] *See, e.g.*, *Sprint Corp. v. FCC*, 315 F.3d at 374.

14

Group Report] and its appendices, which are incorporated by reference [subject to certain exceptions]."[91] Although section 6.2.4 of the 1997 Working Group Report recommended selection of Lockheed Martin and Perot Systems as initial local number portability administrators, we conclude for several reasons that that recommendation falls outside the scope of the incorporation by reference in Rule 52.26(a). First, we read Rule 52.26(a) to limit the incorporation by reference to Working Group recommendations that affect LNP "administration," and find that "administration" in this context refers to the standards and duties of the LNPA with respect to number portability,[92] not the choice of administrator, which is a condition precedent to such administration.

25. We conclude, moreover, that the text of the 1997 Working Group Report's recommendation of Lockheed Martin and Perot Systems as initial LNPAs buttresses our view that the Commission did not intend for Rule 52.26(a) to codify the identity of the LNPA. That recommendation states, "[t]he Working Group recommends that the NANC approve the NPAC vendor selections made by the regional LLCs . . . *subject to final contract negotiation*."[93] The fact that "final contract negotiation" was a condition precedent to ultimate selection indicates that the Commission had discretion to choose administrators that differed from Lockheed Martin (or Perot) and that, accordingly, neither was fixed by the rule's cross-reference. Similarly, another recommendation stated that "[t]he Working Group believes it is unnecessary to make a specific recommendation at this time regarding whether one or multiple LNPA(s) should be selected, since two different vendors were independently selected by the regional LLCs to administer NPAC systems and services."[94] This statement acknowledges that the Commission, contrary to the recommendation, could have selected only a single vendor without the additional notice and comment required in an APA rulemaking.

26. Reading section 52.26(a) as not fixing the identity of the LNPA is consistent with the codified regulatory language and the text of the 1997 Working Group Report discussed above. It also is consistent with the Commission's past practice. Although both Lockheed Martin and Perot Systems had originally been designated as LNPAs in their respective regions,[95] the Commission subsequently replaced Perot Systems with Lockheed Martin—effectuating a single-vendor approach—without engaging in notice and comment rulemaking procedures.[96] Thus, even if the Commission were bound by its past processes, as Neustar suggests, the Commission has a history of modifying the selected LNPAs *without* conducting a rulemaking.

27. Neustar responds that the Commission's prior substitution of Lockheed Martin for Perot Systems without engaging in rulemaking does not support dispensing with rulemaking procedures here, because the 1997 Working Group Report itself – which Neustar views as incorporated, in pertinent part, into Rule 52.25(a)–allegedly provided that one LNPA could be substituted for another in the case of "vendor failure or default."[97] By its own terms, however, the quoted Report language does not purport

---

[91] 47 C.F.R. § 52.26(a) (emphasis added).

[92] *See*, *e.g.*, 1997 Selection Working Group Report § 6.5.4 ("The LNPA Selection Working Group recommends adoption of [certain] duties outline in the Architecture & Administrative Plan for LNP."); *id.* § 6.6.4 ("The LNPA Working Group recommends that the NANC adopt recommendations in the 'Architecture & Administrative Plan for LNP' related to the geographic coverage of regional databases," as set forth in an appendix to the SWG Report.); *id.* § 6.7.4 ("The LNPA Selection Working Group recommends adoption by NANC of" certain LNP standards set forth in the "Technical & Operational Requirements" appendix to the Report).

[93] *Id.* § 6.2.4 (emphasis added).

[94] *Id.* § 6.3.4.

[95] *Second LNP Order*, 12 FCC Rcd at 12303, para. 33.

[96] *Telephone Number Portability*, 13 FCC Rcd 21204, 21208-09, paras. 7-10 (1998).

[97] Letter from Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, at 5 (filed May 6, 2014) (Neustar May 6 *Ex Parte* Letter) (quoting 1997 Working Group Report § 6.3.5).

15

either to *authorize* or *specify the process* for substituting an LNPA.[98]  Rather, it simply explains a benefit of "the selection of multiple vendors" — *i.e.,* that "there will be at least one other vendor *capable* of providing [LNPA] services within a relatively short timeframe" if another incumbent administrator defaults.[99]  The cited Report language thus does not support Neustar's claim that the 1997 Working Group Report allowed the Commission to substitute LNPAs without following notice and comment rulemaking procedures *only* in the event of vendor failure or default.

28.　　　Neustar also argues that, because the proceeding in which its predecessor (Lockheed Martin) was selected began with a notice of proposed rulemaking and because the Commission order making the selection was published in the Federal Register with a "Final Rules" designation, the selection must have been adopted as rulemaking.[100]  We disagree.  Commission documents lawfully may—and frequently do—have both rulemaking and adjudicatory components.[101]  It is the substance of the agency action, rather than its label, that controls.[102]  And, for the reasons stated above, the LNPA selection is "a classic case of agency adjudication."[103]

29.　　　We also find that, even if the LNPA selection in 1997 were read to be a legislative rule, that rule would apply only to the initial selection that expires with the term of the current LNPA contract in 2015; it has no bearing on the process for selecting the new administrator after that date.  The 1997 Working Group Report supports such a reading insofar as it states that "[t]he Working Group recommends that the NANC approve the NPAC vendor selections made by the regional LLCs.  The LLCs selected the following vendors for their respective NPAC regions, *subject to final contract negotiation.*"[104]  By making the approval of Lockheed Martin and Perot Systems contingent on "final contract negotiation," the 1997 Working Group Report established the contractual language (including the term of the contract) as legally relevant.  Because the contracts were for a fixed term, the report's recommendation has no ongoing legal effect after the expiration of the contract, and the Commission rule (if it were read to incorporate the recommendation at all) would similarly have no effect following the expiration date:  In effect, the rule would sunset, and the selection of a new LNPA would not constitute a repeal or amendment of that rule.  By contrast, had the Commission intended to select a permanent LNPA by rule, it could have done so expressly, as it did a year later when appointing the Universal Service Administrative Company (USAC) as the permanent Universal Service Fund administrator.[105]  The

---

[98] 1997 Working Group Report § 6.3.5.

[99] *Id.*

[100] *See* Neustar 2014 Recommendation Comments at 59.

[101] *See, e.g.*, *Qwest Servs. Corp. v. FCC*, 509 F.3d at 536 (affirming Commission decision in which, after issuing an NPRM, the Commission bifurcated the resulting order into an adjudication and a rulemaking, acting "half [by] rulemaking and half [by] adjudication").

[102] *See Goodman v. FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999) (concluding, after reviewing the substance of the Order, that the fact that the Order was issued after notice and comment and was published in the Federal Register with the "Final Rules" label did "not alter the clearly adjudicatory nature of the Order itself").  Indeed, the D.C. Circuit has found that even publication in the Code of Federal Regulations is no more than a "snippet of evidence of agency intent" to issue a legislative rule.  *Health Ins. Ass'n of America, Inc. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994).

[103] *See supra* para. 19 & note 75 (quoting *Harborlite Corp. v. ICC*, 613 F.2d at 1093 n.11).

[104] 1997 Working Group Report § 6.2.4 (emphasis added).  A table identifies Lockheed Martin or Perot Systems as being selected in each of the seven regions, and then the report, § 6.2.5, states that "the Working Group recommends that these selections be approved by the NANC as the LNPAs for their respective regions."

[105] *See* 47 C.F.R. § 54.701(a) ("[USAC] is appointed the permanent administrator of the federal universal service support mechanisms . . . ."); *Changes to the Board of Directors of the National Exchange Carrier Ass'n, Inc.*, 13 FCC Rcd 25058, 25106 (1998) (adopting Rule 54.701(a) language appointing USAC permanent universal service administrator).

Case: 1:24-cv-00509-DWC Document #: 183-1 Filed: 11/21/25 Page 34 of 107 Page ID #:3198
Page ID #:2469
Federal Communications Commission      FCC 15-35

Commission did not do so here. We find that the Commission did not intend through section 52.26(a) to establish a permanent LNPA.

    30.      We find that the process we have undertaken is appropriate and lawful. Informal adjudications are not subject to the notice and comment procedures that the APA requires of rulemakings.[106] Rather, an agency's process in informal adjudications will be upheld so long as it meets any applicable constitutional requirements and is sufficient to establish a record that enables a reviewing court to carry out its judicial review.[107] The process we have undertaken in this LNPA selection proceeding easily satisfies that standard.[108] In 2010, after the NAPM announced its intent to develop an RFP for local number portability services in anticipation of the expiration of the current LNPA contract term, the Bureau issued a public notice "to ensure that interested parties are aware of the upcoming process."[109] In March 2011, the Bureau specifically sought comment on a draft process that the NANC and the NAPM proposed for selecting the next LNPA(s).[110] In May 2011, after receiving public comment, the Bureau issued an Order adopting the proposed selection process with certain modifications designed to make clear the Commission's ultimate oversight of the process.[111] In October 2011, the Bureau announced that the NAPM had issued a Request for Information "to obtain information, request input, and allow potential vendors to pre-qualify to bid for the contract" to serve as the next LNPA.[112] In August 2012, the Bureau issued a Public Notice seeking comment on a draft RFP, a draft TRD and draft VQS that the NAPM and the NANC had submitted for the Commission's consideration.[113] The Bureau authorized the NAPM to release final bid documents in February 2013, after reviewing those comments.[114] Finally, after the NANC submitted its LNPA selection recommendation, the Bureau in June 2014 sought comment on the recommendation, as well as related reports issued by the SWG and the FoNPAC on the recommendation and investigative reports by the SWG and FoNPAC regarding the

---

[106] *See, e.g.*, *Blanca Tel. Co. v. FCC*, 743 F.3d 860, 867 (D.C. Cir. 2014); *Conference Group, LLC v. FCC*, 720 F.3d at 966; *International Internship Program v. Napolitano*, 718 F.3d 986, 988 (D.C. Cir. 2013); *Avia Dynamics, Inc. v. FAA*, 641 F.3d 515, 520-21 (D.C. Cir. 2011); *Everett v. United States*, 158 F.3d 1364, 1368 (D.C. 1998). Nor are informal adjudications subject to the Regulatory Flexibility Act (RFA), which applies only to notice and comment rulemakings. *See* 5 U.S.C. § 604(a). Accordingly, we reject belated assertions that the Commission must conduct RFA analysis in selecting the next LNPA. *See* Letter from James C. Falvey, Counsel for LNP Alliance, to Marlene H. Dortch, FCC Secretary, at 6 (Jan. 12, 2015); Letter from NTCA—The Rural Broadband Association, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-155, WC Docket Nos. 07-149, 09-109, at 1 (filed Mar. 3, 2015) (NCTA Mar. 3, 2015 *Ex Parte* Letter) (stating that it takes no position on the merits of selecting the next LNPA, but requesting that the Commission conduct an RFA analysis, in order to review the effect on small businesses); *see also* Letter from James C. Falvey, Counsel to LNP Alliance, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-155, WC Docket No. 09-109, at 2 (filed Mar. 6, 2015).

[107] *See Independent U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 922-23 (D.C. Cir. 1982) ("*ITOC*"); *American Airlines Inc. v. Dept. of Transp.*, 202 F.3d 788, 797 (5th Cir. 200) (citing *ITOC*); *see also Goodman v. FCC*, 182 F.3d at 994.

[108] Indeed, except for the absence of Federal Register publication of an NPRM, this proceeding substantially satisfies the procedural requirements of APA rulemakings, as well.

[109] *See generally 2010 Request for Information PN*, 25 FCC Rcd 13379.

[110] *March 2011 Order*, 26 FCC Rcd at 3687, para. 6, 3691-96 (Attach. A).

[111] *May 2011 Order*, 26 FCC Rcd 6839, 6840-41, para. 6, 6845-47 (Attach. A).

[112] *Wireline Competition Bureau Announces Local Number Portability Database Platforms and Services: Request for Information Available, Telcordia Petition to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract Management*, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, Public Notice, 26 FCC Rcd 14363 (Wireline Comp. Bur. 2011).

[113] *See generally Bid Documents Comments PN*, 27 FCC Rcd 11771.

[114] *See generally Bid Documents Release PN*, 28 FCC Rcd 1003.

fairness of the process that had been prepared at the Bureau's request.[115]  To ensure a complete record and facilitate public comment, the Bureau also directed that the competing vendors' bids, the transcripts of meetings between the vendors and the FoNPAC, and the vendors' opinion letters addressing compliance with neutrality requirements be placed in the record.  All these materials were made available subject to protective orders designed to protect competitively sensitive information.[116]  In short, we find that the process we have undertaken to select the next LNPA—from start to finish—has provided the potential vendors and all other interested constituencies ample opportunity to participate.[117]

### 2. The LNPA Selection Process Involves No Unlawful Delegation of FCC Authority

31.  ***Position of the Parties.***  Neustar argues that, because section 251(e)(1) imposes a duty on the Commission to "create or designate one or more impartial entities to administer telecommunications numbering," it would be unlawful for the Commission to delegate that authority to an outside party.[118]  In this regard, Neustar contends that, because the NANC recommendation of Telcordia (and the accompanying documents supporting that recommendation) allegedly "lack any factual basis for the conclusion that [**BEGIN HIGHLY CONFIDENTIAL**] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [**END HIGHLY CONFIDENTIAL**] justifies "mak[ing] a change in the LNPA," a decision by the Commission that simply rubber-stamped that recommendation without "conducting a proceeding that allows it to reach an independent judgment, based on the evidence," would constitute an unlawful delegation of responsibility to the NANC.[119]

32.  Telcordia asserts that Neustar's delegation argument "has no relevance here," because the Commission has reserved the ultimate LNPA selection decision for itself on the basis of a full record that goes far beyond the NANC's selection recommendation.[120]

33.  ***Discussion.***  We find that our decision to approve the NANC's recommendation of Telcordia as the next LNPA, and the process used leading to this approval, raise no unlawful delegation concern.  As the Bureau made clear from the start, while the NANC was asked to recommend a new LNPA—a role Neustar does not challenge[121]—the Commission has retained throughout and is exercising in this Order the power ultimately to choose the next LNPA.[122]  This proceeding presents no question of simply rubber-stamping the recommendation that the NANC submitted after reviewing the NAPM's

---

[115] *See generally 2014 Recommendation PN,* 29 FCC Rcd 6013.

[116] *Id.*  The Commission implemented additional protections for aggregation of critical infrastructure information through restricted access conditions, which included the classification of information subsets related to business continuity, law enforcement, cybersecurity, and internal IT architecture and operations.

[117] *See* CTIA and USTelecom 2014 Recommendation Comments at 3-7; Telcordia 2014 Recommendation Reply at 60-61.

[118] Neustar 2014 Recommendation Comments at 63-64 (quoting 47 U.S.C. § 251(e)(1)); *see also id.* at 63 (citing *United States Telecomms. Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004) (*USTA II*), for the proposition that an agency may not delegate its statutory responsibilities "absent affirmative evidence of authority to do so").

[119] *Id.* at 64 (citing *USTA II,* 359 F.3d at 569 ("An agency may not … merely 'rubber-stamp' decisions made by others under the guise of seeking their 'advice.'")).

[120] Telcordia 2014 Recommendation Reply at 100; *see generally id.* at 100-02.

[121] *See* Neustar 2014 Recommendation Comments at 64 (the law "does not preclude the Commission from enlisting a Federal Advisory Committee or other advisory body to assist with evaluation and provide a recommendation").

[122] *See March 2011 Order*, 26 FCC Rcd at 3688, para. 9 ("Once the NANC/NAPM submits its bidder recommendations, the Commission – or Bureau acting on delegated authority –will select the vendor(s) to serve as the LNPA(s)."); *May 2011 Order*, 26 FCC Rcd at 6844, para. 19 ("As noted in our [March 2011] order, the Commission or the Bureau, acting on delegated authority must review and approve the procurement process, including the procurement documents, and make a final decision about the contract award.").

work.  The Commission has before it not only the NANC's recommendation and accompanying reports, but also the competing vendors' bid responses, the transcripts of meetings between the FoNPAC and those vendors, the neutrality opinions that the vendors proffered, and investigative reports on the fairness of the process.[123]  Moreover, interested parties have now had an opportunity to comment on all of those record components.[124]  As discussed below in sections II.B, C, and D of this Order, we have fully considered the complete record and exercised our independent judgment in approving the recommendation that Telcordia serve as the next LNPA.  We therefore find Neustar's unlawful delegation concerns to be unwarranted.

34.  Notwithstanding that we have exercised our independent judgment and analysis, we reject Neustar's suggestion that we should accord the NANC's recommendation (including accompanying selection reports issued by the SWG and the FoNPAC) little or no weight in our decision making.  To the contrary, we believe the NANC's recommendation warrants respect in our decision making calculus.  We have long recognized that the NANC "represents a broad cross section of carriers with interests in numbering and number portability issues and has developed substantial expertise while formulating . . . recommendations regarding number portability implementation."[125]  As CTIA and USTelecom note, the NANC's composition includes "the broadest cross-section" of the U.S. telecommunications sector, "with representatives from local exchange carriers, interexchange carriers, wireless providers, manufacturers, state regulators, consumer interests, and telecommunications industry associations."[126]  Indeed, for many months, Neustar echoed the view that the Commission could and should rely heavily on the expertise of the NANC and the NAPM.[127]  And, as the Commission had directed, the SWG subcommittee reflected a fair balance of the NANC's diverse constituencies.[128]  Similarly, we have recognized that entities in the position of the NAPM—having negotiated LNPA contracts and overseen day-to-day LNPA operations under those contracts—possess "the greatest expertise regarding structure and operation" of the local number portability databases.[129]  Moreover, as several commenters note, the constituent members of both the NANC and NAPM (and their subgroups) have a major stake in reliable local number portability

---

[123] *See 2014 Recommendation PN*, 29 FCC Rcd at 6013-14.

[124] *Id.* at 6014-15 (seeking comment "on the materials referenced above").

[125] *Second LNP Order*, 12 FCC Rcd at 12281, 12351-52, para. 129.

[126] CTIA and USTelecom 2014 Recommendation Comments at 11 (citing NANC Membership Directory, http://www.fcc.gov/encyclopedia/nanc-membership-directory); *see also* Letter from Peter Karanjia, Counsel to CTIA- The Wireless Association, to Marlene H. Dortch, Secretary, FCC WC Docket Nos.07-149, 09-109, CC Docket No. 95-116 at 2 (filed Dec. 12, 2014) (CTIA Dec. 12, 2014 *Ex Parte* Letter) ("NANC *is* impartial, and represents the broadest cross-section of the U.S. telecommunications industry, with representatives from large, medium, and small wireline and wireless carriers, state public service commissions, consumer advocates, and trade associations (including, in addition to CTIA, COMPTEL, NCTA, NASUCA, and USTelecom)").

[127] Neustar Nov. 22, 2011 *Ex Parte* Letter at 2 (urging that the NAPM should have flexibility to design an RFP process that best serves the interests of the industry and consumers); Neustar Oct. 18, 2012 *Ex Parte* Letter at 3 (arguing that "the NAPM, LLC and the NANC have exactly the right incentives to ensure that the RFP process results in the best value for the industry"); Neustar Nov. 6, 2012 *Ex Parte* Letter at 1 ("The process established by the Wireline Competition Bureau's May 2011 Order and elaborated in the RFP Documents ensures competition while providing the Commission the full benefit of the expertise of the industry and the NANC in making a final determination" regarding the next LNPA); Letter from Aaron Panner, counsel for Neustar, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 09-109, *et al.*, at 2 (filed Jan. 11, 2013) (Neustar Jan. 11, 2013 *Ex Parte* Letter) (noting that "the NAPM and the NANC will fully evaluate the substantive merits of the bid").

[128] *May 2011 Order*, 26 FCC Rcd at 6842, para. 12; *see* CTIA and USTelecom 2014 Recommendation Comments at 12 n.34 (noting that the SWG's tri-chairs were representatives of the Massachusetts Department of Telecommunications and Cable, XO Communications, and Verizon; and its other seven members were representatives of AT&T, CenturyLink, Comcast, Cox, T-Mobile, USTelecom, and the D.C. Public Service Commission).

[129] *Second LNP Order*, 12 FCC Rcd at 12346, para. 117.

administration and thus those entities have every incentive to recommend the vendor(s) best able to perform that important function.[130]  For these reasons, we find it appropriate to take the NANC's and NAPM's recommendations into consideration in making our decision.

### 3. The Decisions to Extend the Bid Submission Deadline and to Decline to Request a Second "Best and Final Offer" Were Proper

35.    *Position of the Parties*.  Neustar argues that the selection process was tainted because the Bureau first approved an unwarranted extension of the April 5, 2013 deadline for the submission of bids to accommodate Telcordia's failure to meet that deadline, and then unreasonably influenced the NAPM and NANC to deny Neustar's request to consider its second "Best and Final Offer" – or BAFO – unilaterally submitted in October 2013.[131]  In Neustar's view, these defects require the Commission to reopen the selection process to allow an additional round of bids before approving a new LNPA.[132]

36.    Telcordia responds that the extension of the deadline for bid submissions was lawful and caused no prejudice to Neustar.[133]  Telcordia also contends that neither the RFP, nor any applicable legal principles, gave Neustar a reasonable basis to assume that it would have an opportunity to submit a second BAFO; in Telcordia's view, it was reasonable to decline to request or consider such a submission.[134]  Indeed, Telcordia contends that the timing of Neustar's *sua sponte* attempt to precipitate a second BAFO process— [**BEGIN CONFIDENTIAL**] ▬▬▬▬▬▬▬▬ [**END CONFIDENTIAL**] —suggests that Neustar may have gained access to inside information.[135]  In such circumstances, Telcordia asserts, permitting another round of BAFOs not only would have needlessly delayed the selection process, but would potentially have tainted the bidding results.[136]

37.    *Discussion*.  We find that the decisions to extend the bid submission deadline and to decline to request or accept a second BAFO were reasonable, as was the Bureau's involvement in those decisions.

38.    *The Bid Deadline Extension.*  With respect to the deadline extension, Neustar asserts that Telcordia missed the deadline for submitting its bid as a matter of fact and law.  Neustar acknowledges that this selection process is not controlled by the Federal Acquisition Rules (FAR),[137] but argues that, had it been, Telcordia would have been disqualified as a matter of law.[138]  Telcordia responds that the

[130] *See* Telcordia 2014 Recommendation Reply at 104-05; CTIA and USTelecom 2014 Recommendation Comments at 16.  Indeed, when the Bureau initially sought comment in the *March 2011 Order* on the LNPA selection process with roles for the NANC and the NAPM, Neustar itself responded that because "the entities that pay the vast bulk of NPAC's costs are represented through NAPM LLC membership," NAPM has "a significant incentive . . . to ensure that the NPAC is run as efficiently and pro-competitively as possible."  Neustar 2011 Reply at 3.

[131] Neustar 2014 Recommendation Comments at 65-76; Neustar Process Petition at 25-30.

[132] Neustar 2014 Recommendation Comments at 63; Neustar Process Petition at 26.

[133]  Telcordia 2014 Recommendation Reply at 74.  *See generally id*. at 70-74; *see also* Telcordia Opposition to Neustar's Process Petition at 33-34.

[134] Telcordia 2014 Recommendation Reply at 77.  *See generally id.* at 74-80.

[135] Telcordia 2014 Recommendation Reply at 80-85; s*ee also* Telcordia Opposition to Neustar's Process Petition at 34-35.

[136] Telcordia 2014 Recommendation Reply at 80-85; Telcordia Opposition to Neustar's Process Petition at 35.

[137] *See, e.g.*, Neustar 2014 Recommendation Comments at 72 (noting that the "FAR rules have no application" to this LNPA selection process); Neustar Nov. 6, 2012 *Ex Parte* Letter at 3 (stating that the NAPM, not the government is the purchaser under the current contract and that model, in which the industry contracts with the LNPA directly, has been "extremely effective" and should continue).

[138] Neustar 2014 Recommendation Comments at 68.

NAPM's investigation indicates that, [**BEGIN CONFIDENTIAL**]

                [**END CONFIDENTIAL**] [141]

      39.      [**BEGIN CONFIDENTIAL**]

[**END CONFIDENTIAL**] It is unnecessary to resolve this factual dispute, however, because [**BEGIN CONFIDENTIAL**] [**END CONFIDENTIAL**] provides a reasonable basis for the decision to extend the filing deadline. Section 1.2 of the RFP stated that the required bid documents "must be submitted through the Iasta® SmartSource SMR Tool" and "must be received on or before the RFP Response Cut-Off dates as described in Section 1.5 of this RFP survey *via* the Iasta® SmartSource SRM Tool."[142] Section 1.5 of the RFP, in turn, provided that the cut-off date was simply "04/05/2013."[143] [**BEGIN CONFIDENTIAL**]

[**END CONFIDENTIAL**]

      40.      We find that the NAPM acted reasonably in light of the situation. Although Neustar has suggested that the deadline extension may have given Telcordia an opportunity to gain access to inside information about Neustar's own timely April 5, 2013, bid submission,[145] Neustar offers no evidence to support that contention, and the NAPM Process Report convincingly refutes that assertion. [**BEGIN CONFIDENTIAL**]

                       [**END CONFIDENTIAL**] [146] Moreover, all potential vendors were notified on April 17, 2013, that they were free to submit, resubmit, or make adjustments to any portions of their

---

[139] All responses to the RFP were to be submitted through the Iasta® SmartSource SRM Tool (Iasta Tool), "an 'on demand' technology that contains product platforms (such as Product Management and Decision Optimization) for sourcing teams." *See* RFP § 1.2.

[140] Telcordia 2014 Recommendation Reply at 71 (quoting NAPM Report at 28).

[141] Neustar 2014 Recommendation Comments at 66 (quoting NAPM Report at 28).

[142] RFP § 1.2. The RFP provided notice (a date but not a specific hour) of the deadline for submissions. The reference to the IASTA tool identified the mechanism for submitting bids.

[143] RFP § 1.5.

[144] *See Bid Documents Release PN*, 28 FCC Rcd 1003 (directing that "[p]arties interested in submitting proposals should follow the directions set forth in the procurement documents"). *Cf. Laboratory Corp. of Am. v. United States*, 108 Fed. Cl. 549, 553-55, 561 (Fed. Cl. 2013) (holding, in formal procurement context, that website "constituted nothing more than the means for submitting a proposal" and that later deadline for bid submissions contained in the formal solicitation controlled over earlier deadline listed on the website).

[145] *See*, *e.g.*, Letter from Aaron Panner, Neustar, to Julie A. Veach & Sean A. Lev, FCC, WC Docket No. 09-109, *et al.*, at 2 (April 24, 2013).

[146] NAPM Process Report at 35-38.

proposals until April 22, 2013.[147]  In light of the lack of certainty about whether the Iasta Tool operated properly, the fact that the RFP did not stipulate an 8 p.m. filing deadline, the lack of evidence of harm, and the fact that NAPM extended the deadline to all interested parties, we find that the decision to extend the deadline was reasonable and did not give Telcordia an unfair advantage.

41.      We find, in addition, that it was entirely appropriate for **[BEGIN CONFIDENTIAL]** ███

███████████████

██████████████  **[END CONFIDENTIAL]**  The RFP states that "[t]he FoNPAC reserves the right to modify or adjust" the cut-off date "with the consent of the FCC."[148]  The Bureau stated that [**BEGIN CONFIDENTIAL**]

████████████████████████████

███████████████████████████

██████████  [**END CONFIDENTIAL**] [149]  We agree that the NAPM's proposal to extend the deadline and the Bureau's consent thereto were reasonable, and in fact, failing to extend the deadline under the circumstances would have been unfair to Telcordia and other potential bidders.   We also find that the Bureau consented to the deadline extension, but did not direct the NAPM's action.[150]

42.      *The Decision Not To Seek or Accept a Second BAFO.*  We reject Neustar's contention that [**BEGIN CONFIDENTIAL**]  ████████████████

██████████████████████████

████████████████  [**END CONFIDENTIAL**]  The governing RFP provided prospective bidders with no right to even a first BAFO, much less multiple BAFOs.  Section 14.1 of the RFP "encouraged [bidders] to submit their best proposal" from the outset, including "technical, management, and cost" terms.[151]  Moreover, section 13.6 of the RFP—dealing specifically with the *possibility* of BAFOs—provided that "[a]fter responses are submitted to this RFP survey, the NAPM LLC FoNPAC *may* decide to seek best and final offers from one or more Respondents."[152]  After reviewing the initial Neustar and Telcordia bids over the summer of 2013, meeting among themselves and, in early August, 2013, meeting separately with the two bidders concerning their proposals, the FoNPAC subsequently solicited a BAFO from Neustar and Telcordia.[153]  By its clear terms, the RFP's permissive (rather than mandatory) language belies Neustar's claim that it had a reasonable expectation that it would be invited to submit a second BAFO.

43.      Neustar nevertheless asserts that, because an earlier draft RFP specifically provided for only one round of BAFOs and the final RFP deleted that limitation, bidders could reasonably assume that there would be multiple rounds of BAFOs.[154]  We disagree.  Another interpretation—and a better one—is that a "best and final offer" is just that: *final*, and there was no need to stipulate that there would not be

---

[147] North American Portability Management, LLC, 2015 NPAC RFP Submission Deadline Extended for All Prospective Responders…, https://www.napmllc.org/pages/npacrfp/npac_rfp.aspx (last visited Mar. 27, 2015). *See also* NAPM Process Report at 4.

[148] NAPM Process Report at 4.

[149] *Id.*, Attach. 3 (E-mail from Sanford Williams, WCB, to Timothy J. Decker, NAPM (Apr. 16, 2013)).

[150] *See* NAPM Process Report at 33 (describing April 25, 2013, correspondence from Julie Veach, WCB, and Sean Lev, OGC, to NAPM); *id.*, Attach. 3 (E-mail from Sanford Williams, WCB, to Timothy J. Decker, NAPM (Apr. 16, 2013)).

[151] RFP § 14.1.

[152] RFP § 13.6 (emphasis added).

[153] NAPM Process Report at 28-44. [**BEGIN CONFIDENTIAL**] ██████████████████
██████████████████  [**END CONFIDENTIAL**] *Id.* at 45.

[154] Neustar 2014 Recommendation Comments at 72-73.

multiple opportunities to submit BAFOs. Combined with the fact that there was no absolute right to submit even one BAFO, and the RFP's encouragement that bidders submit their best offers at the outset, we reject Neustar's contention that it reasonably assumed it would have the opportunity to submit multiple BAFOs.

44.    There were sound reasons for declining to entertain a third round of bidding. The selection proceedings already had two full rounds of competing bids, and, as noted above, the FoNPAC members had invested substantial time and effort reviewing those submissions, meeting among themselves, and conducting in-person interviews with Neustar and Telcordia. There was thus an ample record on which to proceed without another bidding round. In these circumstances, the decision to allow another round of bidding and evaluation of those bids had to be weighed against the desire to keep the process moving forward, and we find that, in light of this balancing, the NAPM's decision (acting through the FoNPAC) not to seek further bids was reasonable.

45.    Neustar's October 21, 2013, unsolicited second BAFO submission also raised questions about why Neustar now had a revised proposal (presumably offering more favorable terms) that it had not presented earlier. For example, Telcordia asserted that the only reason that Neustar would have sought to submit another, more favorable bid, is because it had access to non-public information.[155] At the Bureau's request, the NAPM investigated whether there was a leak of the FoNPAC's October 15 recommendation to Neustar and determined that [**BEGIN CONFIDENTIAL**] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [**END CONFIDENTIAL**] Because we find ample basis for refusing to accept or consider Neustar's unsolicited bid, we need not decide whether the submission resulted from access to non-public information.

46.    We reject Neustar's contention that the Bureau's involvement in the resolution of whether to permit a second round of BAFOs was improper and led to inconsistent and inequitable treatment of Neustar.[157] [**BEGIN CONFIDENTIAL**]



[**END CONFIDENTIAL**] the Bureau did not direct the NAPM or the NANC to do anything. Rather, its action was entirely consistent with its assigned "involvement in and oversight of the LNPA selection process to ensure that the process runs efficiently and is impartial to all potential vendors and all segments of the industry."[161] As explained above, there were sound reasons to avoid an additional round

---

[155] Telcordia 2014 Recommendation Reply at 80-85; Telcordia Opposition to Petition for Declaratory Ruling at 34-35.

[156] NAPM Process Report at 6-7. Similarly, [**BEGIN CONFIDENTIAL**] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [**END CONFIDENTIAL**] NANC/SWG Process Report at 3.

[157] Neustar 2014 Recommendation Comments at 65, 67-72.

[158] NAPM Process Report, Attach. 4 (E-mail from Julie A. Veach, Chief, Wireline Competition Bureau, FCC, to Hon. Betty Ann Kane, Chair, North American Numbering Council (Dec. 30, 2013)).

[159] *Id.*

[160] *Id.*

[161] *May 2011 Order*, 26 FCC Rcd at 6843, para. 17.

of bidding in the fall of 2013, and we find that the Bureau's guidance and the actions of the FoNPAC, SWG, and NANC were appropriate and fair to both bidders.[162]

### 4.    Neustar's Claims Regarding the Bid Document Development and Process Are Untimely and Barred by Principles of Waiver and Estoppel

47.    *Position of the Parties*.  Neustar contends that the bid documents were developed and implemented without adequate participation by relevant constituencies, including consumers, small carriers, law enforcement/public safety agencies, and state regulators.[163]  In particular, Neustar asserts that the bid documents were drafted by the NAPM and its FoNPAC subcommittee, which allegedly are not representative bodies, but rather are comprised of "large service providers."[164]  As a result, Neustar argues, the bid documents lack sufficient detail in numerous areas that are essential to the selection of a qualified LNPA.[165]  Neustar contends that the bid documents must therefore be revised and the selection process restarted.[166]

48.    Most other commenters reject the notion that the bid documents must be amended and the process reopened.[167]  Telcordia asserts that Neustar waived its right to challenge the bid documents' content and the manner in which they were was developed, because Neustar did not raise such challenges when the process was established and the bid documents were adopted.  Indeed, Telcordia notes that Neustar, on numerous occasions, submitted filings endorsing the process and urging the Commission to proceed on the basis of the documents as drafted.[168]  Telcordia and others contend, further, that the process used to develop the bid documents was fair and involved opportunities for all relevant constituencies to participate.[169]  On the merits, Telcordia argues that the bid documents adequately addressed the core LNPA selection criteria.[170]  To the extent that parties have raised national security-related concerns not specifically addressed in the RFP, Telcordia and others contend that such issues may

---

[162] Although Neustar suggests that [**BEGIN CONFIDENTIAL**]



[**END CONFIDENTIAL**]

[163] Neustar Process Petition at 1, 7-12.

[164] *Id.* at 11.

[165] *Id.* at 12-25; Neustar 2014 Recommendation Comments at 102-116; Neustar 2014 Recommendation Reply at 64-77.

[166] Neustar Process Petition at 1-2; Neustar 2014 Recommendation Comments at 87-88.

[167] *But see* Comments of the LNP Alliance, WC Docket Nos. 09-109, *et al.*, at 4-5, 17-23 (Jul. 25, 2014) (arguing that the RFP was insufficiently specific regarding the transition to IP, precluding apples-to-apples comparison of the bidders).

[168] *See* Telcordia 2014 Recommendation Reply at 61-68, 117-19; Telcordia Opposition to Neustar Process Petition at 13-19.

[169] Telcordia 2014 Recommendation Comments at 18-20; Telcordia 2014 Recommendation Reply at 60-64; Telcordia Opposition to Neustar Process Petition at 19-22; CTIA/USTelecom 2014 Recommendation Comments at 10-18; Reply Comments of the NAPM LLC, WC Docket Nos. 09-109, *et al.*, at 2-5 (Aug. 22, 2014) (NAPM 2014 Recommendation Reply).

[170] Telcordia Opposition to Neustar Process Petition at 23-33.

be addressed post-award as a matter of contract administration and do not require reopening of the selection process.[171]  We examine these contentions at length below in section III.B.3.b.

49.      ***Discussion***.  We find all challenges to the content of the bid documents and the manner in which they were developed untimely and waived, and that Neustar's challenges are barred as well by principles of estoppel.  The challenges are, in any event, without merit.

50.      Under the Commission's rules, parties aggrieved by actions taken by Commission staff on delegated authority may either seek reconsideration of that action by the staff,[172] or file an application for review of that action by the full Commission.[173]  In either case, the time for initiating further administrative proceedings is 30 days from the date the agency gave public notice of its action.[174]  Filings submitted outside of the prescribed 30-day window are untimely.[175]  Neustar's challenges to the process for developing and implementing the bid documents, and its criticisms of the content of those documents are untimely, as are those submitted by other commenters.  The Bureau established the process for selecting the next LNPA in the *May 2011 Order*,[176] after seeking public comment on a consensus proposal submitted by the NANC and the NAPM.[177]  That process provided, among other things, that the NAPM's FoNPAC subcommittee would prepare draft bid documents subject to oversight and review by the SWG subcommittee, the full NANC and, ultimately, the Commission (or Bureau acting on delegated authority).[178]  Neither Neustar nor any other commenter sought reconsideration or review of the Bureau's May 2011 process decision, much less within the 30-day window prescribed in our rules.  To the contrary, Neustar affirmatively stated that it "supports the LNPA selection process set forth by the Commission in its May 16, 2011, Order."[179]  Accordingly, its belated claim—not presented to the agency until 2014—that the FoNPAC's role in developing and implementing the bid documents unfairly excluded key constituencies is untimely.  Similarly, after seeking public comment on draft bid documents—including a draft RFP[180]—the Bureau approved the release of the final RFP (and related bid documents) on February 5, 2013.[181]  Neither Neustar nor any other commenter ever sought reconsideration or review of the content of that action within the applicable 30-day window.  Accordingly, any challenge to the content of the bid documents—again, not presented until 2014—also is untimely.

51.      Not only is Neustar's current challenge to the bid documents (and the process by which they were developed) untimely, it is fundamentally inconsistent with earlier representations Neustar made to the Commission.  Although Neustar now contends that the FoNPAC is too narrowly comprised and that key constituencies were excluded from the bid document development process, it previously—and repeatedly—endorsed the process proposal on which the Bureau sought comment in the *March 2011*

---

[171] Telcordia 2014 Recommendation Reply at 119-22; NAPM 2014 Recommendation Reply at 7; Reply Comments of the Federal Bureau of Investigation, *et al.*, WC Docket Nos. 09-109, *et al.*, at 5(Aug. 11, 2014) (FBI 2014 Recommendation Reply).

[172] 47 C.F.R. § 1.106.

[173] 47 C.F.R. § 1.115.

[174] 47 C.F.R. §§ 1.106(f), 1.115(d).

[175] The Commission may waive these deadlines under "extraordinary circumstances" but we find no basis for doing so here.  *Gardner v. FCC*, 530 F.2d 1086, 1091 (D.C. Cir. 1976).

[176] *See May 2011 Order*, 26 FCC Rcd at 6845-47, Attach. A.

[177] *March 2011 Order*, 26 FCC Rcd 3688, para. 10, 3691-97, Attach. A.

[178] *May 2011 Order*, 26 FCC Rcd at 6846-47, Attach. A, paras.  5, 7.

[179] Neustar Nov. 22, 2011 *Ex Parte* Letter at 1.

[180] *Bid Documents Comment PN*, 27 FCC Rcd 11771.

[181] *Bid Documents Release PN*, 28 FCC Rcd 1003.

*Order* and which it adopted with some amendments in the *May 2011 Order*.[182] Neustar stated in 2011 that it "intends to participate in the LNPA process as set out in the Consensus Proposal" on which the Bureau sought comment.[183] Later that year, Neustar again stated that it "supports the LNPA selection process set forth by the Commission in its May 16, 2011 Order."[184] The next year, Neustar reiterated that it "supports the consensus process and would like to see it go forward."[185] Neustar asserted that the "RFP process has garnered virtually unanimous support: every segment of the industry, state regulators, and consumers have urged the Commission to allow the RFP process to move forward."[186] It lauded "the process established by the Wireline Competition Bureau's May 2011 Order and elaborated in the bid documents" as "ensur[ing] competition while providing the Commission the full benefit of expertise of the industry and the NANC in making a final determination" regarding the LNPA.[187] Neustar emphasized that "the NAPM, LLC and the NANC have exactly the right incentives to ensure that the RFP process results in the best value for the industry"—noting that "[t]he members of the NAPM, LLC (and the FoNPAC in particular) bear the vast majority of the costs of LNP."[188] Neustar's support for the process continued into 2013, as well.[189]

52.        As with Neustar's support for the LNPA selection process generally, until it reversed course late in the day, Neustar had advocated for proceeding solely on the basis of the existing bid documents.[190] In particular, after initially proposing some modest changes to the draft bid documents in the latter half of 2012,[191] Neustar asserted that "[t]he best and most legally defensible way for the Commission to proceed is to approve the bid documents as drafted and to allow the process to go

---

[182] We note that the amendments had the effect of actually *narrowing* the FoNPAC's role in the selection process by making clear that the Bureau ultimately must approve the bid documents prepared by the FoNPAC, *May 2011 Order*, 26 FCC Rcd at 6841-42, para. 10, and that the more broadly-based SWG must also review all bid documents submitted by the FoNPAC, *id.* at 6842-43, para. 13.

[183] Neustar 2011 Reply at 2 n. 6.

[184] Neustar Nov. 22, 2011 *Ex Parte* Letter at 1.

[185] Letter from Aaron Panner, counsel for Neustar, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149 & 09-109, at 1(Mar. 9, 2012); *accord* separate Letter from Aaron Panner, counsel for Neustar, to Marlene Dortch, Secretary, WC Docket Nos. 07-149 & 09-109, Attach. at 6 (Mar. 9, 2012) (Neustar "supports the consensus process, and wants to ensure that it goes forward without delay."); *see also* Letter from Aaron Panner, counsel for Neustar, to Marlene Dortch, Secretary, FCC, WC Docket Nos. 07-149 & 09-109, at 6 (Sept. 11, 2012) ("Delaying the process at this point would be counterproductive for the Commission, for the industry, for bidders and for consumers."); *id*. at 3 (urging the Bureau to permit "the RFP process [to] move forward as scheduled" under the supervision of the FoNPAC).

[186] Neustar Oct. 18, 2012 *Ex Parte* Letter at 2.  *Accord* Neustar Oct. 23, 2012 *Ex Parte* Letter at 1; Neustar Nov. 6, 2012 *Ex Parte* Letter at 1.

[187] Neustar Nov. 6, 2012 *Ex Parte* Letter at 1.

[188] Neustar Oct. 18, 2012 *Ex Parte* Letter at 3.

[189] Neustar Jan. 11, 2013 *Ex Parte* Letter at 1 (asserting that "the industry has the correct incentives to design and implement the RFP process to ensure that the LNP administrator continues to deliver service of the highest quality and value," and urging the Commission "to allow the process to move forward").

[190] CTIA et al. Nov. 20, 2014 *Ex Parte* Letter at 1-2 (stressing, on behalf of itself, USTelecom, AT&T, T-Mobile, XO, Sprint, CenturyLink, and Verizon, that "transparency and integrity [were] maintained during the selection process" and noting that, although Neustar had "ample opportunity" to comment during the process, "Neustar's questions and concerns about the selection process arose only *after* Neustar believed it would not be the recommended vendor").

[191] *See* Neustar Sept. 13, 2013 *Ex Parte* Letter at 18-20.

forward."[192] In short, Neustar was one of the most active participants throughout the development of the contracting process. Its comments were taken into account in the process ultimately adopted. It urged the Commission on numerous occasions to move forward with the process it helped shape. Principles of waiver[193] and estoppel[194] prevent Neustar from objecting now that those processes have not yielded the result it expected or desired.

53.     Neustar acknowledges that it "was largely supportive of the bid documents and the proposed process at the time the bid documents were proposed in Fall 2012."[195] It nevertheless claims that its change of heart is excused (1) by its alleged "understanding that the industry would be free to conduct the evaluation process in a manner that would ensure that any gaps in the documents would be filled sensibly," and (2) by the allegedly "inconsistent and inequitable administration of th[e] process," as evidenced by the bid deadline extension and the failure to request a second BAFO.[196] We reject these proffered excuses. Specifically, Neustar's first excuse is difficult to reconcile with its failure to note any "gaps" in the documents when they were put out for comment and its statements that the process should move expeditiously. The second excuse fares no better. As discussed above, we reject the notion that the bid deadline extension and the decision not to request a second BAFO reflect any subsequent defects in the process that would justify revisiting settled issues that Neustar did not challenge—and, indeed, affirmatively supported—in real time. Instead, we find that, even if Neustar's criticisms of the bid documents and the process by which they were developed had merit—and, as discussed below, they do not—the failure of Neustar (or any other commenter) to present challenges to the Commission at a time when the alleged problems could have been efficiently addressed and remedied estops, or otherwise waives, such challenges at this late stage of the selection process.[197]

54.     Even if Neustar (or any other commenter) could present a basis to overcome the threshold timeliness and waiver/estoppel impediments to its bid document and related process challenges, we find, as an independent and alternative basis for our decision, that they would fail on the merits. First, we find that Neustar's claim that the bid documents were developed and implemented without adequate participation by relevant constituencies is belied by the multiple rounds of public notice and comment on the process, on the bid documents, and, ultimately, on the selection recommendation and related supporting materials identified in the *2014 Recommendation PN*.[198] The claim also fails on the basis of our previously-explained assessment that the NANC, the NAPM, and their relevant subgroups were ideally suited to the roles assigned to them in the selection process.[199] Finally, as is clear from our

---

[192] Neustar Oct. 18, 2012 *Ex Parte* Letter at 3; *see also* Letter from Aaron Panner, counsel for Neustar, to Marlene Dortch, Secretary, FCC, WC Docket Nos. 07-149 & 09-109, at 4 (Nov. 21, 2012) (noting that "the RFP Documents have attracted unanimous support  precisely because they are designed to promote rigorous competition").

[193] *See*, *e.g.*, *Community Teleplay, Inc., et al.*, 13 FCC Rcd 12426, 12428, para. 5 (Wireless Tel. Bur. 1998) (finding challenge to be "barred by the doctrine of waiver" where "a party with sufficient opportunity to raise a challenge in a timely manner . . . fails to do so"); *cf. United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952) (noting "the general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice").

[194] *See*, *e.g.*, *Time Warner Cable*, 21 FCC Rcd 9016, 9020, para. 13 (Media Bur. 2006) (stating that party is "estopped" from pursuing a particular challenge to the Commission's action after having successfully taken a contrary position before the Commission); *cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (holding that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position").

[195] Neustar Process Petition at 9 n. 19.

[196] *Id.*

[197] *See supra* notes 193, 194.

[198] *See supra* para. 30.

[199] *See supra* para. 34.

discussion of the technical merits of the competing bids under the terms of the bid documents, those documents provided a more than adequate basis upon which to assess the bidders and to select a new LNPA.[200]

### 5. The Role Played By the SWG in the LNPA Selection Process Is Consistent With the Federal Advisory Committee Act

55. ***Position of the Parties.*** In its August 2014 reply comments, Neustar argues for the first time that the Commission may not rely on the SWG's LNPA selection report or the NANC's recommendation (which considered that report) because the SWG allegedly did not comply with Federal Advisory Committee Act (FACA) requirements that federal advisory committees (1) maintain and produce certain records of their proceedings, (2) transact business in open meetings, and (3) have a fairly balanced membership.[201] In a petition for declaratory ruling filed two months later, Neustar details these claims and argues that the NANC also violated FACA in certain respects.[202] Neustar contends that the Commission must: (1) find that the SWG and the NANC "are subject to and have violated FACA;" (2) decline to use "either the NANC LNPA recommendation or the record of the LNPA selection process developed by the NANC and SWG;" and (3) "reope[n]" the selection process "to permit the development of a record that complies with FACA."[203] Telcordia responds that, as a *sub*committee of a federal advisory committee (the NANC), the SWG is not subject to FACA requirements under the circumstances applicable here.[204] Telcordia further argues, in any event, that Neustar's FACA challenges were waived and are otherwise meritless.[205]

56. ***Discussion.*** We reject Neustar's FACA challenge. By its terms, FACA imposes certain record-keeping, openness and balanced membership requirements on "advisory committee[s]."[206] The statute, in turn, defines "advisory committee" to mean, in pertinent part, "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government."[207] The General Services Administration (GSA), "the agency responsible for administering FACA,"[208] has issued regulations interpreting and implementing FACA. Those regulations demonstrate that FACA does not apply to the SWG in connection with the LNPA selection process. Rather, the GSA's FACA rules state that "[i]n general, the requirements of the Act . . . do not apply to subcommittees

---

[200] *See infra* Sections III.B.

[201] Neustar 2014 Recommendation Reply at 37-38 (citing 5 U.S.C. app. 2 §§ 3(2), 5(b)-(c), 10); *see also id.* at 60-63.

[202] Neustar Petition for Declaratory Ruling, WC Docket Nos. 09-109, *et al.* (filed Oct. 22, 2014) (Neustar FACA Petition).

[203] Neustar FACA Petition at 52. The LNP Alliance filed comments "shar[ing] many of Neustar's concerns regarding the process by which the [SWG] deliberated and question[ing] whether the process meets the standards of [FACA]." Comments of the LNP Alliance on Neustar's Petition for Declaratory Ruling, WC Docket Nos. 09-109, *et al.*, at 1 (Nov. 21, 2014) (LNPA Alliance FACA Comments).

[204] Response of Telcordia to Neustar 2014 Recommendation Reply, WC Docket Nos. 07-149 & 09-109, at 20-21 (Sept. 24, 2014) (Telcordia Sept. 24, 2014 *Ex Parte* Letter); Telcordia Opposition to Neustar FACA Petition, WC Docket Nos. 09-109, *et al.*, at 3 (Nov. 3, 2014) (Telcordia FACA Opposition).

[205] Telcordia Sept. 24, 2014 *Ex Parte* Letter at 21-23; Telcordia FACA Opposition at 2-4, 8-10. Telcordia further asserts that, even if Neustar's allegations could be viewed as setting forth technical FACA violations, those alleged violations would not require the Commission to disregard the recommendations of either the SWG or the NANC. Telcordia Sept. 24, 2014 *Ex Parte* Letter at 23-26; Telcordia FACA Opposition at 4-8, 10-14.

[206] *See* 5 U.S.C. app. 2 §§ 5(b)-(c), 10.

[207] *Id.* § 3(2).

[208] *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 463 n. 12 (1989).

of advisory committees that report to a parent advisory committee and not directly to a Federal officer or agency."[209]  Although the GSA rules "do[] not preclude" an agency from applying FACA standards more widely than the statute requires,[210] neither the statute nor those rules impose on the SWG the record-keeping, open meeting, or balanced membership requirements Neustar describes.  Indeed, GSA rules specifically excuse subcommittees from FACA's "openness requirements" unless the subcommittee's "recommendations will be adopted by the parent advisory committee *without further deliberations* by the parent advisory committee," or unless the subcommittee itself reports "directly" to the agency.[211]  The GSA rules also "exclude[]" from FACA's procedural requirements "[p]reparatory work"" —*i.e.*, "[m]eetings of two or more advisory committee or subcommittee members convened solely to gather information, conduct research or analyze relevant issues and facts in preparation for a meeting of the advisory committee, or to draft position papers for deliberation by the advisory committee."[212]  The rules similarly exclude from the FACA's procedural requirements "[a]dministrative work"—*i.e.*, "[m]eetings . . . convened solely to discuss administrative matters of the advisory committee or to receive administrative information from a Federal officer or agency."[213]

57.     Neustar points to no action by the SWG that would violate any FACA procedural requirements in light of these limitations and exclusions.  The NANC—not the SWG—submitted the LNPA selection recommendation to the Commission.[214]  Moreover, while the SWG submitted its own recommendation (along with that of the FoNPAC) *to the NANC*, the NANC did not simply adopt that recommendation "without further deliberations."[215]  Rather, after carefully considering that recommendation at its March 26, 2014 meeting, the NANC "concurred, with one abstention vote, to recommend the selection of Telcordia . . . as the sole vendor to serve as the LNPA."[216]  Instead of attempting to explain why FACA nevertheless applies to the SWG under the GSA rules, Neustar essentially asks us to ignore those rules altogether.[217]  No court, however, has set aside the rules that shield from FACA's requirements the activities of subgroups that do not report directly to the agency.[218]

---

[209] 41 C.F.R. § 102-3.35(a).

[210] *Id.*

[211] *Id.* § 102-3.145 (emphasis added).

[212] *Id.* § 102-3.160(a).

[213] *Id.* § 102-3.160(b).

[214] *See NANC Recommendation* at 1 (Public Version) (forwarding the NANC's "recommendation" that "was agreed to by the NANC members" at the NANC's March 26, 2014, meeting).

[215] 41 C.F.R. § 102-3.145.

[216] *See 2014 Recommendation PN* at 1; *see also* NANC Meeting Transcript; *see also NANC Recommendation* at 1 (Confidential Version); *see also id.* at 2 [**BEGIN CONFIDENTIAL**] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[**END CONFIDENTIAL**]

[217] Neustar FACA Petition at 30-32.  Neustar appears to contend that an advisory committee subgroup is an "advisory committee" within the meaning of FACA if it is simply "established" or "utilized" by the relevant agency and is involved even tangentially in a process in which the agency receives advice from the full advisory committee.  Neustar FACA Petition at 16-23.  In Neustar's view, the GSA regulations limiting the application of FACA to subgroups that deliver advice *directly* to the agency thus are unlawful under the "first step of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)."  Neustar FACA Petition at 31.  We believe, however, that GSA's interpretation that FACA applies only to subgroups that provide advice directly to an agency is a reasonable construction of FACA's language limiting the definition of "advisory committee" to entities established or utilized "in the interest of obtaining advice or recommendations" for the agency.  *See* 5 U.S.C. Appx. 2 § 3(2).

[218] Neustar suggests that *Lorillard, Inc. v. U.S. Food and Drug Admin.*, 2012 WL 3542228 (D.D.C. 2012), which denied the FDA's motion to dismiss claims of alleged FACA violations by an advisory committee subgroup, is inconsistent with those regulations.  Neustar FACA Petition at 28-30; *see also id* at 23-25 (citing other factually

(continued….)

29

We find those rules to be both pertinent and persuasive. Finally, even if the FACA openness requirements—including open meeting and record retention requirements—applied to the SWG, commenters that now are challenging the SWG's conduct have waived such challenges. The SWG has been in existence since 2011 and, as Telcordia notes, "it was no secret that the SWG was meeting," since "[a]t each NANC meeting after the SWG was formed, the SWG provided a report—or at least had a place on the agenda to do so."[219] Yet neither Neustar, nor any other commenter, ever asked the NANC or the Commission to require the SWG to adhere to FACA requirements until after the NANC had submitted its selection recommendation to the Commission.

58. Nor does the SWG's composition violate any "balanced membership" requirement. Although the Bureau "agree[d] with *Telcordia* on the need for balance within the SWG's membership and in its leadership,"[220] we find that the SWG's composition meets that Bureau-imposed standard. In particular, the SWG is composed of state regulators and telecommunications providers of varying sizes.[221] Although no parties that *exclusively* represent consumers are members of the SWG, such entities are members of the NANC—which ultimately voted on the SWG's LNPA selection recommendation [222]—

(Continued from previous page) ──────────

distinguishable cases). We find, however, that the unpublished district court opinion in *Lorillard* – issued at the preliminary motion-to-dismiss stage, lacking full factual development of the relevant subgroup's activities, and never mentioning the relevant GSA regulations – provides no persuasive basis to ignore GSA's reading of FACA's requirements. Other court decisions are entirely consistent with GSA's codified interpretation of the statute. *See*, *e.g.*, *Nat'l Anti-Hunger Coalition v. Exec. Committee of the President's Private Sector Survey on Cost Control*, 557 F.Supp. 524, 529 (D.D.C. 1983) (holding that advisory committee subgroup was "not subject to FACA requirements" where it did "not directly advise the President or any federal agency, but rather provide[d] information and recommendations for consideration" to the full advisory committee).

[219] Telcordia FACA Opposition at 5; *accord* XO Dec. 24, 2014 *Ex Parte* Letter at 3 ("At each of the NANC open meetings following SWG activity, the SWG presented a report … [and] [t]he SWG written reports were made available to the public at each [such] NANC meeting."); SWG Reports were presented at NANC meetings on *December* 15, 2011, March 29, 2012, and September 20, 2012. North American Numbering Council, 2012 Meeting Archives, http://www nanc-chair.org/docs/documents15-2012 html (last visited Mar. 27, 2015). *See also* Telcordia FACA Opposition at 8-10 (arguing that Neustar waived FACA-related claims).

[220] *May 2011 Order*, 26 FCC Rcd at 6842, para. 12 (emphasis added); *see* 41 C.F.R. § 102-3.35(a) (noting that the GSA's FACA rules "do[] not preclude" an agency from providing procedural protections beyond those required by rule).

[221] *See supra* note 126. The LNP Alliance focuses on the alleged lack of small carrier and VoIP representation on the SWG. LNP Alliance FACA Comments at 2-3, 10-11; LNP Alliance Mar. 23, 2015 *Ex Parte* Letter at 3 (stating that LNP Alliance was formed once "small carriers became aware that their interests were **not** represented by **any** trade association or other provider"). However, a representative of the modestly-sized competitive local exchange carrier XO was one of the SWG tri-chairs, and participation was open to NANC member COMPTEL (a trade association that includes smaller providers as members), which the LNP Alliance claims should have been included. *See* XO Dec. 24, 2014 *Ex Parte* Letter at 3-4; LNP Alliance FACA Comments at 4. Moreover, XO (among other SWG members) provides VoIP services, and Vonage, perhaps the most prominent "over-the-top" VoIP provider, participated in the selection process as a member of the NAPM**.** XO Dec. 24, 2014 *Ex Parte* Letter at 8. As USTelecom notes, small and medium carriers were not excluded from the selection process and it was not burdensome for smaller carriers to participate. *See* USTelecom Mar. 19, 2015 *Ex Parte* Letter. If the LNP Alliance members desired more representation, they were free to nominate themselves for NANC, and then SWG, membership, at any time in the process. Accordingly, there is no substance to the LNP Alliance's stated concern about small carrier and VoIP representation. Furthermore, the full NANC, including both XO and COMPTEL representatives, expressly considered [**BEGIN HIGHLY CONFIDENTIAL**] ███████████████ ███████████████████████████ [**END HIGHLY CONFIDENTIAL**] *See* NANC Meeting Transcript at 164-70; XO Dec. 24, 2014 *Ex Parte* Letter at 3-4. Finally, as discussed below, we independently find that the selection of Telcordia as the next LNPA will not unfairly burden small carriers. *See infra* para.154.

[222] Consumer representatives on the full NANC participated in and approved the NANC's ultimate decision to recommend Telcordia as the next LNPA. *See* NANC Meeting Transcript at 85-102, 150-170, 179 [**BEGIN**

(continued….)

and such entities were entitled to participate in the SWG itself if they wished to do so.  Moreover, the SWG's state regulatory commission members are charged by law with a duty to consider ratepayer (*i.e.*, consumer) interests in carrying out their duties.[223]  In addition, because the SWG's service provider members—as wholesale consumers of LNPA services—have a substantial stake in the availability of efficient LNPA services at reasonable prices, their interests also significantly overlap with those of telecommunications subscribers, who can be expected to benefit from their providers' lower costs in the increasingly competitive telecommunications marketplace.[224]  In any event, we also find, as an alternative and independent basis for our decision, that Neustar and its supporters waived any challenge to the SWG's composition by failing to object at the time the group was created and (in Neustar's case) by affirmatively supporting the consensus proposal on which the Bureau sought comment, which did not specify a particular SWG composition.[225]

59.    Neustar argues for the first time in its October 2014 FACA Petition that the NANC itself violated FACA.  It contends that the NANC violated an obligation to make publicly available its drafts and working papers and those of its constituent members.[226]  It complains that the NANC provided 13 days' Federal Register notice—rather than the required 15 days' notice—of the March 26, 2014, meeting at which it adopted its LNPA selection recommendation.[227]  Neustar argues that the notice that was given insufficiently justified the need for the meeting to be closed in its entirety.[228]  Finally, Neustar contends that the Commission unlawfully failed to provide a summary of the closed meeting pursuant to 47 U.S.C. app. 2 § 10(d).[229]  We find these belated claims to be without merit.

60.    First–and as previously noted——FACA does not apply to "preparatory" or "administrative" work.  Thus, to the extent that any drafts pertained to such matters, they are exempt from FACA's procedural requirements.[230]  Moreover, as the Commission explained in justifying the closure of the NANC's March 26, 2014 meeting, the subject matter of the meeting not only included sensitive

(Continued from previous page) ──────────────

**HIGHLY CONFIDENTIAL]** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ **[END HIGHLY CONFIDENTIAL]**

[223] Representatives of the Massachusetts Department of Telecommunications and Cable and the D.C. Public Service Commission are members of the SWG.  Those entities are charged with protecting the interests of telecommunications consumers in their jurisdictions. *See* Commonwealth of Massachusetts Office of Consumer Affairs and Business Regulations, *About the Department of Telecommunications and Cable*, http://www.mass.gov/ocabr/government/oca-agencies/dtc-lp/lp-info/about-the-dtc html (last visited Mar. 27, 2015) and Public Service Commission, *Mission and Goals*, http://www.dcpsc.org/abt/mission.asp (last visited Mar. 27, 2015).  *See also* Telcordia Reply to Neustar FACA Petition, WC Docket Nos. 09-109, *et al.*, at 3-4 (Mar. 27, 2015) (Telcordia FACA Reply) (noting that the SWG's regulatory commission members "represent the broader public interest, including consumers").

[224] In addition, even if FACA's balanced membership requirement were viewed as applying to the SWG at all, its scope is circumscribed by "the functions to be performed."  41 C.F.R. § 102-3.30(c).  Where, as here, the entity is charged with providing advice on highly technical matters, consumer groups need not necessarily be members.  *See Public Citizen v. Nat'l Advisory Committee on Microbiological Criteria for Foods*, 708 F. Supp. 359, 363 (D.D.C. 1988).

[225] *See* Neustar March 2011 Reply at 2 n. 6 ("Neustar agrees with the Bureau that the Consensus Proposal is consistent with prior delegations of authority and Commission rules regarding the LNPA selection.").

[226] Neustar FACA Petition at 36-37.

[227] *Id.* at 38 (citing Notice, FCC, 79 Fed. Reg. 14250-14251, CC Docket No. 92-237, DA 14-325 (Mar. 13, 2014)); *see* 41 C.F.R. § 102-3.150(a) & (b) (requiring 15 days Federal Register notice of advisory committee meetings absent "exceptional circumstances").

[228] *Id.* at 38.

[229] *Id.* at 38.

[230] *See* 41 C.F.R. § 102-3.160.

31

questions of critical telecommunications infrastructure, but also bidding and other information that "constitutes trade secret and privileged or confidential commercial or financial information" that is exempt from disclosure under FACA.[231]  In this regard, the Commission has gone beyond FACA's requirements in making the most significant proprietary records associated with the LNPA selection process, including the selection recommendation and process reports, certain transcripts, and the bids, available to interested parties (including Neustar) subject to protective orders and other measures necessary to protect them from unwarranted disclosure.[232]

61.     Neustar's technical claim that the Commission unlawfully provided only 13 days' (rather than 15 days') Federal Register notice of the closed March 26 meeting also lacks merit.  The Commission fully explained why "exceptional circumstances"[233] supported proceeding with the March 26 NANC meeting despite only 13 days' Federal Register notice: most NANC members had been notified of the meeting date informally in January or February of 2014; many of them had already made business and travel plans in accordance with that schedule; if the meeting were postponed, the next available date that could accommodate NANC members' schedules would have required a delay of at least one month; and the Commission had released a Public Notice of the meeting (albeit not through the Federal Register) on March 10, 2014—more than 15 days prior to the meeting—to ensure that the public would have notice *in fact* of the meeting.[234]

62.     There also is no substance to Neustar's allegation that the Commission unlawfully failed to provide a summary of the March 26 closed meeting.  The provision on which Neustar relies imposes a duty on "the advisory committee"—not the Commission.[235]  Moreover, such summaries are only required as part of a report that the advisory committee must issue "at least annually."[236]  We find that the NANC's April 24, 2014 LNPA selection recommendation letter to the Commission, which is part of this administrative record, satisfies the summary requirement.  In any event, Commission staff has now placed the transcript of the meeting in the record, subject to appropriate confidentiality protections, so there can be no plausible argument that the NANC has violated any requirement to provide an "annua[l]" summary.[237]

---

[231] FCC Announces a Closed Meeting of the North American Numbering Council, WC Docket No, 92-237, Public Notice, 29 FCC Rcd 2635, 2636 (Wireline Comp. Bur. 2014).

[232] *See 2014 Recommendation PN*, 29 FCC Rcd at 6013.

[233] 41 C.F.R. § 102-3.150(b)

[234] Notice, FCC, 79 FR 14250-14251.

[235] 5 U.S.C. Appx. 2 § 10(d).

[236] *Id.*

[237] *See* NANC Meeting Transcript.  Neustar argues that "the Commission, for months, deliberately withheld" this "critical record evidence" and "led [Neustar] to believe it did not exist."  Letter from Aaron Panner, counsel for Neustar, to Marlene H. Dortch, FCC Secretary, at 1, 2 (filed Mar. 11, 2015).  This claim is baseless.  The NANC's March 26 closed meeting initially was recorded but not transcribed.  It was not immediately placed in the record because its relevance to the issues before the Commission was largely duplicative of the NANC's written LNPA selection recommendation and attached reports, which were placed in the record.  In its August 22, 2014 reply comments, Neustar argued, for the first time, that the role played by the SWG in the LNPA selection process was inconsistent with FACA.  Neustar 2014 Recommendation Reply at 37-38.  It was not until October 22, 2014, in its FACA Petition, that Neustar argued both that the NANC had violated FACA in connection with the March 26 closed meeting and that the NANC had simply rubber-stamped the SWG's selection recommendation.  Neustar FACA Petition at 27, 32, 38.  In evaluating these new procedural arguments, Commission staff determined that the recording of the closed meeting was now pertinent and that a transcript should be created.  Commission staff then took steps necessary to include the transcript in the record: staff arranged for a transcription vendor to transcribe the recording so that it was accessible in written form; staff alerted the NANC chair that they intended to include the transcript in the docket; and staff reviewed the document to ensure that it did not contain secure information that could not be disclosed subject to protective order.  We also reject Neustar's assertion that the transcript should have

(continued….)

63.     Finally, even if one or more of these claims regarding the NANC's processes were found to make out a technical violation of FACA, review of FACA compliance is subject to the APA's "rule of prejudicial error."[238]  Neither Neustar, nor any other commenter, has demonstrated how any of these alleged shortcomings caused it harm.

64.     We also find that, to the extent that the actions of the SWG and the NANC about which Neustar complains could qualify as FACA violations, they would not, as a remedial matter, preclude us from considering the SWG's or the NANC's LNPA reports and recommendations or, more generally, the related record developed by those entities.[239]  Courts have held that so-called "use injunctions" of the kind Neustar seeks "should be the remedy of last resort"—to be employed only where FACA would otherwise be rendered "a nullity."[240]  That is not the case here.  To the contrary, precluding use of the reports and record developed by the SWG and the NANC manifestly would conflict with one of FACA's principal purposes—"the avoidance of wasteful expenditures."[241]  The NANC and the SWG have worked more than three years to develop those reports and that record with respect to the selection of the next LNPA.  Neustar's requested remedy would effectively require the process to start anew, wasting the time and resources already invested in that process, and delaying the many public benefits of a new LNPA contract.[242]  A relevant second core purpose of FACA, of course, is "public accountability of advisory committees."[243]  However, Neustar has not demonstrated any disabling deficiencies by the SWG or the NANC on that score, if indeed any violations occurred at all.  Where, as here, advisory committee deliberations involve classified or competitively sensitive materials "to which the public would not have had access even under FACA, the loss of public participation is less significant."[244]  Moreover, we find that the additional opportunity for public comment that we have provided with respect to the SWG, NAPM and NANC reports and recommendations (as well as other facets of the LNPA selection record)[245] would cure "the loss," if any, of "past opportunit[ies] to participate" that FACA might otherwise have

---

(Continued from previous page) ———————

been placed in the record without a protective order.  Neustar Mar.11, 2015 *Ex Parte* Letter at 1.  For the same reasons that it was proper to close the March 26, 2014 NANC meeting to begin with (*see* para. 60 above), it was entirely appropriate to place the transcript in the record subject to protection.

[238] *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1026 n.7 (D.C. Cir. 1998) (quoting 5 U.S.C. § 706).

[239] *See* Neustar FACA Petition at 52.

[240] *Natural Res. Def. Council v. Pena*, 147 F.3d at 1025.

[241] *Id.* at 1026; *see also Public Citizen v. U.S. Dept. of Justice*; 491 U.S. at 459; *Cal. Forestry Ass'n v. U.S. Forest Service*, 102 F.3d 609, 614 (D.C. Cir. 1996)

[242] *See Cal. Forestry Ass'n v. U.S. Forest Service*, 102 F.3d at 614 (use injunction that would require agency to "commission another … study" after "millions of dollars" had already been spent on study plaintiffs seek to bar "would not meet FACA's aim to reduce wasteful expenditures") (internal quotation marks omitted).  Indeed, parties urging the Commission to proceed to approve the NANC's LNPA selection recommendation note that, "due to escalation clauses in the incumbent Administrator's [i.e., Neustar's] contract," acceding to Neustar's demand that the selection process be reopened would impose on the public costs of approximately "$40 million per month." CTIA et al. Nov. 20, 2014 *Ex Parte* Letter at 1-2.  *See also* Letter from Peter Karanjia, counsel for CTIA, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 09-109, *et al.*, at 1-3 (Dec. 8, 2014) (CTIA Dec. 8, 2014 *Ex Parte* Letter); CTIA Dec. 12, 2014 *Ex Parte* Letter at 2.  We find [**BEGIN HIGHLY CONFIDENTIAL**] ▆▆▆▆▆▆▆▆

▆▆ [**END HIGHLY CONFIDENTIAL**]  *See infra* Sections III.C & D; WC Docket Nos. 09-109, *et al.*, at 1-2 (Nov. 20, 2014).

[243] *Cal. Forestry Ass'n v. U.S. Forest Service*, 102 F.3d at 614 (quoting *Public Citizen v. U.S. Dept. of Justice*; 491 U.S. at 459).

[244] *Natural Res. Def. Council v. Pena*, 147 F.3d at 1026.

[245] *See 2014 Recommendation PN*, 29 FCC Rcd at 6013.

33

offered the public.[246]  Finally, we note that the use injunction Neustar asks us to impose on this LNPA selection proceeding is an equitable remedy.  Neustar's delay in raising FACA claims (and that of supportive commenters such as LNP Alliance) would strongly counsel against that remedy even if it otherwise were warranted.[247]

### B.      Bidders' Technical and Management Qualifications

65.      In this section, we examine the bidders' technical and management qualifications to serve as the LNPA.  The NANC, the NAPM, and their subordinate working groups analyzed the bids, and we describe their work and analysis below.  We also explain our own internal process for evaluating the bids independent of those groups' work.  Based on staff's recommendation and review, we agree with the NANC recommendation that both bidders are qualified to serve as LNPA.

### 1.      Bid Review Methodology

66.      As described above, in May 2011 the Bureau issued an Order detailing the selection process for the next LNPA.[248]  In accordance with that process, the FoNPAC—the working group within the NAPM—drafted the VQS, the RFP, and TRD.[249]  The VQS included questions regarding vendor experience, neutrality, and key business terms and conditions.[250]  The RFP covered service level requirements, audits, future continuity of service, and pricing.[251]  The TRD identified the requisite technical capabilities of the bidder to administer the NPAC.[252]   The RFP stated that if a bidder satisfied the criteria set forth in the VQS —*i.e*., if it was qualified — its RFP and TRD would be evaluated against the Technical, Management, and Cost factors.[253]  The combined Technical and Management factors were the most significant factors in terms of scoring the bids.[254]

---

[246] *Natural Res. Def. Council v. Pena*, 147 F.3d at 1026.  Indeed, we agree with Telcordia that the multiple rounds of public comment before us, from a wide array of sources, remedies any putative harm to either Neustar or the broader public.  Telcordia Sept. 24, 2014 *Ex Parte* Letter at 24-26.

[247] *See Natural Res. Def. Council v. Pena*, 147 F.3d at 1026 ("If the plaintiff has failed to prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its delay, the district court should be reluctant to award relief.").

[248] *See May 2011 Order*, 26 FCC Rcd 6843, para. 16.

[249] *See Bid Documents Release PN*.  The three surveys were labeled as follows:  "2015 LNPA RFP," "2015 LNPA Vendor Qualification," and "2015 LNPA Technical Requirements Document."

[250] *See generally* VQS § 1.1.

[251] *See generally* RFP § 1.1.

[252] *See generally* TRD § 1.1.

[253] *See* RFP § 14.1.1 (describing "Technical Criteria" and "Management Criteria").  The responses to technical questions were evaluated against three equally-weighted technical sub-factors: Operational Performance; Reliability and Functionality; and Security.  Operational performance covered areas such as load capacity, service levels, reporting, change management, and audit administration.  Reliability and Functionality covered areas such as availability, testing, disaster recovery, and customer support.  Security covered areas such as privacy, protection of data, and security competency.  The responses to Management questions were evaluated against three management sub-factors: Customer Service; Experience and Performance; and Financial Stability.  Customer Service was considered the most important and covered the bidder's ability to provide excellent customer service to a wide spectrum of organizations.  Experience and Performance was considered second in importance and covered such areas as the bidder's ability to develop, deploy, and service comparable systems, to meet contractual obligations, and to provide full financial and operational reporting.  Financial Stability addressed the bidder's ability to endure negative economic impacts.

[254] The predetermined weighting of evaluation factors was: **[BEGIN CONFIDENTIAL]** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ **[END CONFIDENTIAL]** *See NAPM Selection Report* at 10.

67.      All questions for the RFP and TRD were categorized as Technical, Management, or Cost, and then weighted.  Within a survey, the questions were weighted relative to one another according to importance, and normalized so that the points for full credit for all questions in a survey totaled a possible 100 points.  The points for the three evaluation factors were in proportion to the predetermined relative weighting.[255]  Possible responses to some survey questions were assigned values corresponding to limited, pre-defined answer choices for those questions.  The narrative responses were assigned a range of values from which the evaluator could choose based on the evaluator's judgment.[256]

68.      Each of the FoNPAC members independently assessed each bidder's bids and established an overall rating per bidder, according to the scoring methodology described above.  These independent evaluations provided the basis for each member's recommendation as well as the NAPM's recommendation to the NANC.[257]

69.      Importantly, the potential impact of a transition to a new LNPA was addressed in the surveys, including implementation tasks and milestones, staffing categories and hours per task, risk management approach, change control approach, and quality assurance approach to develop, implement, and transition to the new NPAC without disrupting continuing NPAC operations.[258]

### 2.      NANC and NAPM Review Process

70.      As described earlier, two parties, Telcordia and Neustar, submitted bids.  Telcordia submitted regional bids and an alternative "Full Combined Proposal" covering all seven regions, and Neustar submitted only a "Full Combined Proposal."  Therefore, the FoNPAC did not consider region-by-region ratings.[259]  After satisfying the minimal qualifications criteria set forth in the VQS,[260] Neustar's and Telcordia's RFP and TRD responses were evaluated based on the quality and thoroughness of the responses and the demonstrated understanding of the requirements.[261]  The evaluation of candidate data was scaled to pre-determined weighting factors: **[BEGIN CONFIDENTIAL]** ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ **[END CONFIDENTIAL]**

71.      The nine FoNPAC members independently rated the Neustar and Telcordia RFP and TRD.  Both bidders scored closely on the Technical and Management category questions in both the RFP and TRD, but **[BEGIN CONFIDENTIAL]** ▮▮▮▮▮▮▮ **[END CONFIDENTIAL]** FoNPAC members gave Telcordia higher rankings based on its technical and management qualifications.[263]  As previously noted, the individual FoNPAC members also considered the potential risks to the industry of changing to a new LNPA.[264]  **[BEGIN CONFIDENTIAL]** ▮▮▮▮▮▮▮▮▮▮▮

---

[255]  *Id.*

[256]  Letter from Todd D. Daubert, Counsel to NAPM LLC, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 1 (filed Oct. 2, 2014).

[257]  *See NAPM Selection Report* at 4.

[258]  *See* RFP § 12.3.  *But see* Letter from Aaron M. Panner, Counsel for Neustar, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 2 (filed Oct. 10, 2014) (claiming "an evaluation of proposals that makes no effort to quantify the risks and costs of transition fails to provide a reasoned analysis").

[259]  *See* RFP § 14.1 (explaining the difference between a "Partial Combined Proposal" and a "Full Combined Proposal").

[260]  *NAPM Selection Report* at 2-3, 5.

[261]  *See* RFP § 14.1.1 (Evaluation Criteria).

[262]  *See supra* note 254.

[263]  *See NAPM Selection Report* at 4.  **[BEGIN CONFIDENTIAL]** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **[END CONFIDENTIAL]**

[264]  *See supra* para. 69.

■ **[END CONFIDENTIAL]** In accordance with the selection process established by the Bureau, members of the SWG and then the full NANC considered and ultimately endorsed the FoNPAC recommendation.[266] The memberships of these groups included additional industry stakeholders, beyond those stakeholders represented on the FoNPAC.[267] The NANC unanimously supported (with two abstentions) the recommendation that Telcordia become the next LNPA.[268]

### 3. Evaluation of Bidders' Technical and Management Qualifications

72. Commission staff has reviewed the work of the NANC, the NAPM, and their sub-working groups. To fulfill the Commission's duties under section 251 to oversee numbering administration and ensure that the new LNPA is qualified and impartial, Commission staff has reviewed the VQS, TRD, and RFP responses and supplemental attachments of the two bidders, the transcripts of the bidders' meetings with the FoNPAC, and comments submitted in response to the NANC recommendation, and engaged with interested parties via *ex parte* meetings to discuss a variety of relevant points. Based on staff's recommendation and review, we find that the evaluations of the FoNPAC on Technical and Management considerations appear to have been performed fairly, that bidders received similar scores on the Technical and Management criteria,[269] and that the resultant individual ratings are credible. Based on the reviews of the NANC, the NAPM, and their sub-working groups, as well as our own review, we find that both bidders are technically and managerially competent to be the LNPA. We first discuss the bidders' technical and management qualifications generally, and then focus on the bidders' ability to offer secure and reliable LNP service.

### a. Evaluation of Technical and Management Qualifications Generally

73. The NANC and the NAPM found that both bidders have sufficient technical and management competency to serve as the next LNPA. After Commission staff conducted its own analysis of the two bidders, based on staff's review and recommendation, we agree with the NANC's conclusion that both Neustar and Telcordia are competent and acceptable from a technical and management perspective to serve as the next LNPA.[270] In addition, as detailed below, through the Public Safety and Homeland Security Bureau, the Commission consulted with Executive Branch entities with expertise in and responsibility for law enforcement and national security matters, not for input regarding the LNPA selection, but for law enforcement and national security considerations relevant to the implementation of the LNP databases and the execution of the LNPA functions. Those entities take no position on which bidder we should select, but call for us to require the insertion of terms and conditions into the LNPA

---

[265] *NAPM Selection Report* at 3-4.

[266] See *supra* note 177.

[267] At the time the NANC Recommendation was submitted, the following entities were members of the NANC: 800 Response, AT&T, Bandwidth.com, Inc., CenturyLink, Comcast Corporation, COMPTEL, Cox Communications, Inc., CTIA, Level 3 Communications, LLC, National Association of Regulatory Utility Commissioners (NARUC)—District of Columbia, NARUC—Idaho, NARUC—Massachusetts, NARUC—Ohio, NARUC—South Carolina, NASUCA, National Cable and Telecommunications Association (NCTA), National Telephone Cooperative Association (NTCA)—The Rural Broadband Association, SMS/800, Inc., Sprint, Telesmart, T-Mobile USA, Inc., USTelecom, Verizon, Vonage and XO Communications; *see also supra* note 29.

[268] *See* NANC Meeting Transcript; *see also* 2014 Recommendation PN; NANC Recommendation at 1; *see also* CTIA Dec. 8, 2014 *Ex Parte* Letter at 3 ("NANC's unanimous recommendation makes clear that its members were fully satisfied with the qualifications of the recommended vendor (Telcordia).").

[269] NAPM Selection Report at 3.

[270] *See* NANC Meeting Transcript.

contract so that law enforcement and national security issues are addressed and adequately mitigated, regardless of which bidder is ultimately selected.[271]

74.     As an initial matter, we acknowledge the NAPM's and the NANC's considerable experience in number porting matters.  The members of both those entities have been closely involved in local number portability since 1997, and have developed expertise in security and the technical and management aspects of telephone number porting.  Moreover, because those entities comprise industry members and entities committed to protecting consumers, as well as the intellectual property of their member companies, both the NAPM and the NANC have the incentive to ensure that a qualified entity administers the NPAC.[272]  They also have the incentive to ensure that the NPAC is simple for service providers to use, given the compact porting interval requirements that the Commission has established.  In addition, the NAPM and the NANC have an interest in ensuring that the NPAC is reliable so that consumers can quickly and seamlessly port their numbers from one service provider to another.  Finally, the NAPM and the NANC have the incentive to ensure that the LNPA provides good value to service providers, and in turn to consumers, by offering both high quality and low cost.   Given all these incentives, the NAPM and the NANC exerted significant time and resources in analyzing the various bid documents, the bidders' RFP responses, and the lengthy transcripts of meetings with the bidders.

75.     While the Commission gives considerable weight to the NAPM's and NANC's extensive review of the bids, we arrive at our own conclusions after Commission staff conducted its own, independent consideration of the record.  Commission staff analyzed the same bid documents, bidders' RFP responses, and bidder transcripts that the NAPM and the NANC analyzed to ensure that each bidder is technically and managerially competent to administer the NPAC and to ensure its security and reliability.  In particular, Commission staff examined technical factors such as system reliability, system stability, and proposed operations. Telcordia's bid included a robust scalable and flexible system, containing a multi-tiered and highly responsive architecture, specified hardware, and a comprehensive transition plan.[273]  Neustar's bid included a robust system, which includes support of IPv6, automation of processes between NPAC and the Pooling Administration System, specified hardware (the same type that Telcordia proposed) and comprehensive functionalities to handle Subscription Versions.[274]  Commission staff also examined managerial factors such as customer service, vendor experience, vendor performance, financial stability, and performance audits.   On the basis of these analyses, Commission staff determined, for example, that both Neustar and Telcordia sufficiently addressed factors such as system reliability and stability,[275] and met the requisite showing of Financial Responsibility and Stability requested in Question 3.2 of the VQS.  Telcordia and Neustar agreed to meet each requirement in the VQS, including maintaining the licenses necessary to operate and maintain the NPAC in each region,[276] providing disaster

---

[271] Letter from Sanford S. Williams, WCB, FCC, to Marlene H. Dortch, Secretary, FCC, CC Docket 95-116, WC Docket Nos. 07-149, 09-109, (filed Mar. 3, 2015) (attaching Letter from William R. Evanina, National Counterintelligence Executive, to Rear Admiral David Grey Simpson, USN (Ret.), Chief, Public Safety and Homeland Security Bureau, FCC, (dated Dec. 17, 2014), (Evanina Letter) (stating a Review Group of federal agencies takes no position regarding the selection of the next LNPA, but is submitting a classified report with recommendations and requirements to consider post-selection)).

[272] *See*, *e.g.*, Neustar Oct. 18, 2012 *Ex Parte* Letter at 3 ("[T]he NAPM LLC and the NANC have exactly the right incentives to ensure that the RFP process results in the best value for the industry").

[273] *See* Iconectiv Number Portability Administration Center Request for Proposal No. 2015-LNPA-RFP-1, April 2013 (Telcordia Bid).

[274] *See* Neustar's Response to the NAPM LLC's Local Number Portability Administration 2015 Surveys, April 5, 2013 (Neustar Bid).

[275] *See infra* section III.B.3.b.

[276] VQS § 3.6.11.

recovery and backup plans to ensure all data in the NPAC is recoverable at all times,[277] and maintaining NPAC user data as confidential.[278]

76.    Each bidder also demonstrated that it possesses sufficient technical and operational capabilities and experience to serve as the LNPA, sought in Statement 3.3 of the VQS.  They both agreed to comply with the Vendor Performance Audits delineated in the RFP.[279]  Neustar and Telcordia also agreed to comply with the extensive technical requirements in the TRD, such as the treatment of change orders,[280] the support of Block Holder Mass Updates,[281] addressing LNPA system functionality requirements,[282] and complying with Subscription Version Management requirements.[283]  The bidders satisfactorily illustrate that they meet the customer service and past performance standards as noted by their replies to the Past Performance information sought in Question 3.3.5 of the VQS.  Finally, Neustar and Telcordia also submitted information indicating that each is financially stable.

77.    Commission staff also examined the experience of both bidders in number administration and database management.  Both companies are experienced and are generally well-respected by the industry.[284]  Although Neustar raised general questions about Telcordia's alleged lack of experience and the LNP Alliance had concerns about Telcordia's preparation for the IP Transition,[285] until recently, no commenter has raised specific arguments or presented a colorable claim that Telcordia is not technically competent to serve as the LNPA.  On January 28, 2015, Neustar filed a report by Smith & Associates, which raised concerns about Telcordia's technical competency.[286]  Telcordia responded that the report is "methodologically flawed" and misguided in that it questions Telcordia's portability operations capability.[287]  On February 11, 2015, Commission staff met with Cheryl Smith, a principal author of the report, along with counsel for Neustar, and Ms. Smith explained the analysis and conclusions in the report.[288]  The Smith analysis evaluated Telcordia's proposal assuming that Telcordia would develop new NPAC software for the United States, and, alternatively, assuming that Telcordia would modify software

---

[277] VQS § 3.6.14.

[278] VQS § 3.6.18.

[279] RFP § 4.

[280] TRD § 1.4.

[281] TRD § 3.2.1.

[282] TRD § 3.3.

[283] TRD § 5.

[284] CTIA Dec. 8, 2014 *Ex Parte* Letter at 2 (stating "in addition to transition costs, the competence of the proposed vendors was carefully considered").

[285] *See* Neustar 2014 Recommendation Reply comments at 57 (stating that Telcordia "lacks experience in providing LNP services of anywhere near the scale and complexity that would be involved if it is selected as the next LNPA"); *see also* Neustar 2014 Recommendation Comments at 92-101.  *See generally* LNP Alliance Recommendation Comments at 17-21 (questioning whether Telcordia is prepared to fulfill the LNPA role after the IP Transition); *see also* Letter from James C. Falvey, Counsel to LNP Alliance, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 2 (filed Dec. 11, 2014) (stating that the role of the NPAC in a post-IP Transition world not been defined and the bidders may not have made the same assumptions).

[286] Letter from Thomas L. McGovern, III, Counsel to Neustar, Inc. to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, Attach. at 1 (filed Jan. 28, 2014) (attaching Smith & Associates Report) (Neustar Jan. 28, 2015 *Ex Parte* Letter).

[287] Letter from John T. Nakahata, Harris Wiltshire & Grannis, L.L.P., Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 1, 3 (filed Feb. 18, 2015) (Telcordia Feb. 18, 2015 *Ex Parte* Letter).

[288] Letter from Michele Farquhar, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket 95-116, WC Docket Nos. 07-149, 09-109 (filed Feb. 13, 2015) (Neustar Feb. 13, 2015 *Ex Parte* Letter).

Federal Communications Commission                                                    FCC 15-35

it uses in other countries.  The concerns identified by Ms. Smith relate primarily to the amount of time the transition will require, rather than technical deficiencies in Telcordia's proposal.  For example, Ms. Smith found that Telcordia's proposal was "extremely technically deficient" because it did not address "design, development, testing, or implementation efforts."[289]  But Smith's analysis determined that Telcordia's system would use "technologies very similar to the Neustar NPAC system."[290]  The analysis then explained how the two systems would be *similar*.  The Smith & Associates Report did not criticize the technologies that Telcordia proposed, but rather asserted that development of the necessary software would take 2½ to 3 years,[291] and did not include appropriate interim milestones.  Using the assumption that Telcordia would use its existing software rather than develop entirely new software for the United States, the Smith analysis concluded that [**BEGIN HIGHLY CONFIDENTIAL**] ████████████████ ████████████████████████████████████ [**END HIGHLY CONFIDENTIAL**] [292] The Smith & Associates Report states that Telcordia has no proven capability to meet the performance service level agreements (SLAs) documented in the RFP because Telcordia [**BEGIN HIGHLY CONFIDENTIAL**] ████████████████████████████████████ ████████ ████████████████████████████████ ████████████████████████████ [**END HIGHLY CONFIDENTIAL**]  Telcordia's substantial porting experience abroad offers assurance that it can reasonably anticipate and meet demand in accordance with the SLAs.[294]  Though Telcordia may not implement the NPAC Plus as its LNP solution, there is no reason Telcordia cannot apply some of the aspects of the NPAC Plus to meet the SLAs.  Moreover, as Telcordia notes, it has considerable background and experience with number porting in the United States.  That experience comes both through its participation in various number portability working groups and through "its deployment of local systems which account for a significant portion of number portability transactions in the U.S."[295]  In addition, Telcordia argues that its considerable experience with number porting outside the United States is relevant to its capability to be the LNPA here.  According to Telcordia, its portability operations abroad involve more complexity than U.S. portability operations. [296]  Finally, we note that the Smith & Associates Report has not shown that Telcordia could not meet the SLAs.  We agree with Telcordia that this number portability experience outside the United States is indeed relevant to its capability to be the LNPA in this country.

78.     The Smith & Associates Report also criticizes the Telcordia proposal for not [**BEGIN HIGHLY CONFIDENTIAL**] ████████████████████████████████████ ████████ ████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

---

[289] Smith & Associates Report at 4.

[290] *Id.* at 12.  *See also id.* at 18.

[291] Letter from Michele Farquhar, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 at 1-3 (filed Mar. 19, 2015) (Neustar Mar. 19, 2015 *Ex Parte* Letter) (stating that the Smith & Associates Report found that  such a complex transition would take 3 to 4 years to complete, FoNPAC's original estimate was 33 months, and that Telcordia does not attempt to challenge Smith & Associates' conclusions, but rather glosses over them, in Telcordia's Feb. 18, 2015 *Ex Parte* Letter).

[292] *Id.* at 19.

[293] *Id*. at 13-14.

[294] *See infra*. paras. 80, 113.

[295] Telcordia Feb. 18, 2015 *Ex Parte* Letter at 3.

[296] *Id*., *citing* VQS, Telcordia Attachment to Question 3.3.1; Eric Burger, *Issues and Analysis of a Provider Transition for the NPAC*, S²ERC Technical Report, at 2 (July 22, 2014) (attached as Exhibit B to Comments of Telcordia Technologies, Inc. (WC Docket No 09-109, CC Docket No. 95-116 (Aug. 22, 2014) (*S²SERC Report*);.

[297] Smith & Associates Report at 14.

Federal Communications Commission FCC 15-35

███████ ██ ████████████████████████████████████████████████████████████
████████████████████████████████████████████████ **[END HIGHLY CONFIDENTIAL]**
Upon scrutiny of the Smith & Associates report, we are not persuaded that Telcordia's bid is technically deficient. The FONPAC and SWG have substantial subject-matter expertise and first-hand experience with number portability, and their evaluations were technically sound.[299] In addition, Commission staff experts also reviewed Telcordia's bid documents and are persuaded that Telcordia is competent to serve as LNPA.[300]

79. Neustar has served as the LNPA since the inception of the NPAC in 1997. It has successfully managed the NPAC and other numbering databases for many years, including the National Thousands Block Pooling and the NANP databases. As the LNPA, Neustar facilitates the routing of telephone calls and text messages on a daily basis. Neustar's competence and experience is also evidenced by its support of number portability services in other countries.[301]

80. Telcordia also has a wealth of number administration and database experience, going back many years, and is well-versed in operation of the NANP. It produces the Local Exchange Routing Guide (LERG), which is used to route calls by service providers in the NANP. The LERG supports functions such as network planning and engineering and number administration. Moreover, Telcordia provides number portability services for the NPAC in other nations, including India, Brazil, and South Africa.[302] In addition, Telcordia operates the Business Integrated Routing and Rating Database System (BIRRDS), which is the information source for the LERG, and provides access to Common Language databases.[303]

81. In light of Commission staff's recommendation and review of all the materials surrounding the Neustar and Telcordia bids, the NANC and NAPM recommendations, and the bidders' considerable experience in number administration and database management, we are confident that both Neustar and Telcordia are qualified to be the LNPA.

---

[298] *Id*. at 14-15.

[299] Telcordia Feb. 18, 2015 *Ex Parte* Letter at 2; *see also generally* Section III.B.3.

[300] *See* NANC Meeting Transcript; *see also generally* Section III.B.3; CTIA Dec. 8, 2014 *Ex Parte* Letter at 2 (stating that "the competence of the proposed vendors was carefully considered").

[301] Neustar states that it provides wireline and wireless portability and network management services pursuant to a contract with providers who participate in number portability in Canada. Neustar, Inc. Annual Report Pursuant to Section 13 or 15(D) of the Security Exchange Act of 1934, for the Year Ended December 31, 2012, p.12. **[BEGIN CONFIDENTIAL]** ████████████████████████████████████████████ **[END CONFIDENTIAL]** Neustar also has experience offering number portability-related support services in Brazil and Taiwan. *See About Us*, Neustar, http://www.neustar.biz/about-us/our-history (last visited Mar. 27, 2015); *About Neustar,* NPAC, https://www.npac.com/the-npac/neustar (last visited Mar. 27, 2015).

[302] *Id.*; According to Telcordia, it is the leading provider of local number portability products and services to U.S. service providers, offering both of the major industry local number portability functions—Service Order Activation (SOA) (which allows carriers to interact with the NPAC to port numbers) and Local Service Management System (LSMS) (which enables carriers to receive broadcasts from the NPAC and deliver the numbers to carriers' number portability databases). According to Telcordia, it processes about 95% of all U.S. wireless number porting transactions, and 80% of number portability transactions involving fixed-access lines. It notes further that because Telcordia systems handle wireless pre-porting, SOA and LSMS transactions, and 100% of toll-free-number ports, Telcordia has processed more portability-related transactions than the NPAC itself; *see also* Telcordia Technologies, Inc. d/b/a iconectiv 2014 Recommendation Comments, WC Docket No. 09-109, CC Docket No. 95-116 at 50-61 (filed July 25, 2014).

[303] *See infra* para.113.

40

###### b. Evaluation of Security and Reliability

82. Secure and reliable operation of the NPAC is vital to the functioning of the Nation's critical communications infrastructure, public safety, and the national security. Regarding security, the RFP explained that the review was geared to determine whether the applicant "demonstrates a full understanding of and competency in the security requirements to operate the [number portability administration center/service management system] NPAC/SMS. This includes meeting all data security and privacy requirements."[304] The bid documents required bidders to respond to a wide array of questions designed to assess whether the bidders would provide secure and reliable NPAC operations. Our review of the bid documents and of the responses of Neustar and Telcordia confirms that each is qualified, technically acceptable, and has the requisite operational experience to serve as the LNPA with respect to security and reliability.

83. Security issues were raised through comments, *ex partes*, and Congressional correspondence.[305] Commission staff examined these items, along with the bid documents and responses, supplemented by *ex parte* discussions with the bidders and interested parties, for security aspects including business continuity,[306] the ELEP,[307] cybersecurity,[308] and public safety. Furthermore, each

---

[304] RFP § 14.1.1, Technical Criteria, Factor 3, Security.

[305] Letter from Tom Wheeler, Chairman, FCC, to the Hon. Frank Wolf, U.S. House of Representatives, WC Docket No. 09-109 (dated Apr. 11, 2014); Letter from Hon. Peter King, U.S. House of Representatives, to Tom Wheeler, Chairman, FCC, WC Docket No. 09-109 (received Aug. 4, 2014); Letter from Tom Wheeler, Chairman, FCC, to the Hon. Peter King, U.S. House of Representatives, WC Docket No. 09-109 (dated Sept. 30, 2014); Letter from the Hon. Mike Pompeo, U.S. House of Representatives, to Tom Wheeler, Chairman, FCC, WC Docket No. 09-109, (received Aug. 18, 2014); Letter from Tom Wheeler, Chairman, FCC, to the Hon. Mike Pompeo, U.S. House of Representatives, WC Docket No. 09-109 (dated Sept. 30, 2014); Letter from the Hon. Patrick Murphy, U.S. House of Representatives, to Tom Wheeler, Chairman, FCC , WC Docket No. 09-109 (received Nov. 24, 2014); Letter from Rear Admiral David G. Simpson, USN (Ret.), Chief, Public Safety and Homeland Security Bureau, FCC, to the Hon. Patrick Murphy, U.S. House of Representatives, WC Docket No. 09-109 (dated Dec. 12, [2014]).

[306] "Business continuity" planning responds to the need for an entity to be prepared for potential emergencies through a well thought out, documented, and rigorously tested program that delineates the capabilities and resources that the organization requires to continue its essential functions during an emergency. As part of the requirements, each bidder was required to submit a copy of an existing Business Continuity Plan in use by the bidder. RFP § 4.3. Neustar argues that post-selection mitigation of security procedures is equivalent to adding new requirements to the RFP and therefore, both Neustar and Telcordia should submit supplemental proposals. *See* Letter from Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 2 (filed Jan. 23, 2015) (Neustar Jan. 23, 2015 *Ex Parte* Letter). We disagree. The selection process addressed competency in necessary security measures to operate the NPAC/SMS and it is reasonable to mitigate the specific security requirements, policies and procedures post-selection. *See e.g.*, Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 3 (filed Oct. 17, 2014) (Telcordia Oct. 17, 2014 *Ex Parte* Letter) ("By framing the RFP and other procurement documents in general terms, the specifics of security implementation can evolve quickly without going outside the scope of the original procurement."); *see also infra* para. 121 (noting that very prescriptive requirements in the bid documents quickly would have become dated and that providing too much detail publicly could have security implications).

[307] The RFP requires the LNPA to provide an Enhanced Law Enforcement Platform (ELEP), a platform designed to facilitate authorized access to portability data for law enforcement, public safety dispatch personnel, and authorized supporting organizations. *See* RFP § 11.2, Requirements 1-20; *see also* RFP § 14.1, 6 k. The ELEP permits qualified law enforcement agencies and PSAPs to submit a telephone number (or list of numbers) and receive information associated with those numbers, specifically the identity and contact information for the network service provider(s). RFP § 11.2.

[308] It is critical that the LNPA implement and administer effective cybersecurity measures to prevent cyber attacks from compromising either the correct routing of calls or the effectiveness of law enforcement operations. The RFP and TRD specify various cybersecurity requirements including storage of data, protection from security breaches,

(continued….)

bidder availed itself of the opportunity to present its positions on security to the Commission's national security subject matter experts.

84.      The respective presentations and related documentation support our determination that each bidder is qualified to serve as the LNPA with respect to security and reliability issues. We did not find anything in the record that provides a comparative advantage for one bidder over the other with regard to these issues, other than the natural advantage of an incumbent in any transition to a new contract. Thus we do not find security or reliability to be determining factors in making our selection. Furthermore, we consulted with Executive Branch entities with expertise in and responsibility for law enforcement and national security matters, not for input regarding the LNPA selection, but for law enforcement and national security considerations relevant to the implementation of the LNP databases and execution of the LNPA functions. They take no position on which bidder we should select, but call for us to require the insertion of terms and conditions into the LNPA contract so that law enforcement and national security issues are addressed and adequately mitigated, regardless of which bidder provides the services.

85.      Consequently, regardless of the bidder selected, all security requirements, policies, and procedures will have to be met and, as required, mitigated to our satisfaction before we will approve the LNPA contract. Commenters recognize and support the need for post-selection mitigation.[309] These requirements, policies, and procedures will be addressed in the post-award phase in a collaborative effort among all necessary parties.[310]

86.      While the NAPM states that it "thoroughly analyzed, debated, and scored bidders with respect to . . . their ability to satisfy all national security, public safety, and law enforcement requirements [,]"[311] Neustar contends that the RFP did not "include any mechanism to examine and assess the critical national security, law enforcement, and public safety issues implicated by a potential transition of the LNPA's responsibility to a foreign-owned corporation."[312] Neustar recognizes, however, that the final review for security and reliability is the Federal government's responsibility. Below, we address Neustar's contentions and highlight critical aspects of NPAC operations relevant to our security review: business continuity, ELEP, cybersecurity, and public safety.

### (i)      Business Continuity

87.      Business continuity planning responds to the need for an entity to be prepared for emergencies through a carefully considered, documented, and rigorously tested program that delineates the capabilities and resources that the organization requires to continue its essential functions during an emergency. The RFP required bidders to submit proposals responding to the following requirements related to business continuity:

- The LNPA shall have a business continuity plan that will be executed in case of severe service disruptions due to a catastrophic event (*e.g.*, fire, act of nature, war). Service disruptions could

(Continued from previous page) ———————————————

authentication and access controls, cryptographic mechanisms, security audits and security training. *See generally infra* Section III.B.3.b(iii)*,* paras. 101-110.

[309] *Id.*; Evanina Letter; *see* FBI 2014 Recommendation Reply at 6.

[310] The post-selection implementation process will include an orientation meeting to discuss all security requirements, policies, and procedures. The discussion will help the selected bidder, the NAPM, and government stakeholders to (1) achieve a clear and mutual understanding of contract requirements, policies, and procedures as expressed through terms and conditions, and (2) identify and resolve potential or actual problems before implementation of the contract.

[311] NAPM Reply Comments at 4, 6.

[312] Neustar Reply Comments at 5-6, 68-69; Neustar Jan. 23, 2015 *Ex Parte* Letter at 2 ("[T]he consequences of any breach in the security of the NPAC could be catastrophic, and that the FCC will be held accountable for ensuring the security of this critical infrastructure.").

result from, but are not limited to, a loss of key personnel, loss of facilities, and loss of critical IT systems;[313]

- The LNPA shall conduct, at its own expense, periodic unannounced business continuity plan exercises that are non-service impacting to ensure that employees understand and follow the business continuity plan and to assess the adequacy of the plan;[314] and

- The LNPA shall prepare, at its own expense, and deliver to the NAPM a written report regarding the conduct and result of each business continuity plan exercise, including a specification of corrective actions and anticipated timelines for implementing such corrective actions, if any.[315]

88. The RFP also required bidders to provide a copy of their existing business continuity plans.[316] Both parties agreed to comply with the above requirements and submitted their business continuity plans for review. In the case of Telcordia, it also provides the business continuity plan for its subcontractor, Sungard.

89. The RFP addresses additional business continuity requirements, including data center redundancy,[317] database replication,[318] transmission path redundancy,[319] disaster recovery and backup systems,[320] cutover intervals,[321] and partial restoration intervals.[322] The TRD addresses, *inter alia*, business process flows,[323] system functionality,[324] system availability and reliability,[325] data backup procedures,[326] software restoration procedures,[327] and specific recovery functionality requirements.[328] The VQS specifies that the recovery process is subject to periodic audit and testing.[329] In addition, each bidder outlined its approach to cyber threats, as an included part of its business continuity plan.[330]

90. Because sensitive data will be located in NPAC data centers, the RFP established requirements related to the security, redundancy, and reliability of the data centers. Among these important requirements are that (1) no NPAC servers, data centers, or NPAC user data may be stored,

---

[313] RFP § 4.3, Requirement 1.

[314] *Id.* Requirement 2.

[315] *Id*. Requirement 3.

[316] *Id.* § 4.3.

[317] *Id.* Requirement 1.

[318] *Id.* Requirement 3.

[319] *Id.* Requirement 5.

[320] *Id.* § 6.9, Requirement 7.

[321] *Id.* § 9.11, Requirement 8. A maximum of 10 minutes to cutover to the backup site is mandated by the RFP.

[322] *Id.* § 9.12, Requirement 9 (partial disaster restoration will be equal to or less than four hours); *id.* § 9.13, Requirement 10 (full disaster restoration occurs at a maximum of six hours).

[323] TRD FRS § 2.

[324] *Id.* FRS § 3.3.

[325] *Id.* FRS § 10.1.

[326] *Id.* FRS § 7.7, R7-84.2.

[327] *Id.* R7-84.3.

[328] TRD FRS § 6.7.

[329] VQS § 3.6.14.

[330] For discussion of cybersecurity issues, *see infra* section III.B.3.b.(iii).

maintained, or located outside the continental United States;[331] and (2) the selectee must have multiple and geographically diverse NPAC data centers that are not located in areas prone to disasters.[332]

91. **[BEGIN CONFIDENTIAL]**



**[END CONFIDENTIAL]**

92. Telcordia provided a business continuity plan in response to the RFP.[343] Telcordia plans to use Sungard as its subcontractor for data center service continuity protection,[344] and, accordingly, submitted a business continuity plan for Sungard.[345] **[BEGIN CONFIDENTIAL]**

**[END CONFIDENTIAL]**

---

[331] RFP § 6.7, Requirement 2.

[332] *Id.* § 6.4, Requirement 2. **[BEGIN CONFIDENTIAL]**                         **[END CONFIDENTIAL]** Neustar Business Continuity Plan § 2.1.1, at 7-9.

[333] *See generally* Neustar Business Continuity Plan § 2.1. **[BEGIN CONFIDENTIAL]**                                   **[END CONFIDENTIAL]** *Id.*

[334] *Id.* § 2.2, at 15.

[335] *Id.* § 3, at 18.

[336] *Id.* § 5.1, at 21.

[337] *Id.* § 5.3, at 22-23.

[338] *Id.* § 2.4, at 15-26.

[339] *See* RFP § 9.11, Requirement 8.

[340] Neustar Response to LNPA 2015 Surveys, § 1.2.4, at 1.2.4-1 to 1.2.4-4.

[341] *Id.* § 1.2 at 1.2.1-4.

[342] *Id.* § 1.2.1.

[343] *See* Telcordia Attachment RFP § 4.3 Example BCPTT (Business Continuity Plan Telcordia Technologies).

[344] Telcordia states that it intends to use Sungard to provision data center hardware and software to provide robust security and service protection. Letter from John T. Nakahata, Harris Wiltshire & Grannis, L.L.P., Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 (filed Oct. 17, 2014) (Telcordia Oct. 17, 2014 *Ex Parte* Letter); *see also generally* Letter from John T. Nakahata, Harris Wiltshire & Grannis, L.L.P., Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 (filed Nov. 14, 2014) (Telcordia Nov. 14, 2014 *Ex Parte* Letter).

[345] *See* Telcordia Attachment RFP § 4.3 Example Business Continuity Plan Sungard (BCPSG).

[346] **[BEGIN CONFIDENTIAL]**

**[END CONFIDENTIAL]** Telcordia Bid, RFP § 4.3 Business Continuity Plan Requirements at 1.

93.     The Telcordia and Sungard business continuity plans provide insight on how Telcordia intends to comply with the business continuity requirements.  **[BEGIN CONFIDENTIAL]**



**[END CONFIDENTIAL]**  According to Telcordia, Sungard "has extensive experience providing data center infrastructure services and disaster recovery for thousands of clients."[350]  Telcordia adds that the "system will have substantial redundancy both for each region and among regions, which would aid with disaster recovery."[351]  The FoNPAC found Sungard to be **[BEGIN CONFIDENTIAL]**

**[END CONFIDENTIAL]** [352]

94.     On consideration of the record, we find that, from a business continuity standpoint, each bidder agrees to meet the outstanding requirements and provides information to support its respective claim of compliance with these requirements.  Accordingly, we find each bidder able to meet all business continuity plan requirements.

### (ii)     Enhanced Law Enforcement Platform

95.     The RFP requires the LNPA to provide an ELEP designed to facilitate authorized access to portability data for law enforcement, public safety dispatch personnel, and authorized supporting organizations.[353]  The ELEP, as currently provided by Neustar,[354] permits qualified law enforcement agencies and public safety answering points (PSAPs) to submit a telephone number (or lists of numbers) and receive information associated with those numbers, including the identity and contact information for the network service provider.[355]

96.     The RFP required bidders to submit proposals that would provide the following types of information to qualified law enforcement agencies and PSAPs:

- NPAC Service Provider Identifier (SPID) of the service provider associated with a telephone number;

- Identity of that service provider;

- Date on which the port(s) from the original service provider to the current service provider occurred with respect to that telephone number; and

---

[347] *See*, *e.g*., Telcordia Bid, RFP § 15.1 Supplemental Documentation at 14-15 (operational performance), 35-39 (system availability), and 40-43 (disaster recovery and backup).

[348] BCPSG at 4.

[349] *Id*. at 4-5.

[350] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109, (filed Nov. 14, 2014).

[351] *Id*.

[352] *NANC Selection Report* at 4.

[353]  RFP § 11.2, Requirement 1.

[354] *See supra* note 10.

[355] Neustar Response to LNPA 2015 Surveys § 1.1.7 at 1.1-23.

- Current contact name and number for each service provider as submitted to the NPAC by each service provider as its law enforcement and/or emergency contact.[356]

97.    The RFP also states that access to ELEP must be accomplished by authenticated, secure and encrypted means,[357] and that the ELEP must be available only to qualified law enforcement agencies and PSAPs that have entered into ELEP Service Agreements, in a form approved by the NAPM.[358] It also calls for the LNPA to annually engage a third party, acceptable to both the LNPA and the NAPM, to conduct audits on the following factors:

- Qualification, evaluation, confirmation, and reporting on Qualified Recipients;

- Restrictions on the use of data in each Qualified Recipient's ELEP Service Agreement;

- Assurance that there is no interaction between ELEP and the production NPAC/SMS; and

- Assurance that each Qualified Recipient is charged consistent with its ELEP Service Agreement.[359]

98.    Neustar indicates that, if selected, it will comply with all ELEP requirements. Neustar, working with the NAPM, developed the functionality for the ELEP, which was not part of the first LNPA contract.[360]

99.    Telcordia asserts that it will provide an ELEP in compliance with all criteria discussed above,[361] and provides that it "will offer all NPAC-related services for law enforcement and national security with at least equivalent functionality [as Neustar]; there will be no functionality gap."[362] Telcordia further notes that the RFP expressly provides that additional security measures will be developed and implemented in the post-selection implementation process.[363] Telcordia states that it is already consulting with law enforcement and national security agencies so that their needs can be addressed in the post-award process.[364]

---

[356] RFP § 11.2, Requirement 6.

[357] *Id.* Requirement 8.

[358] *Id.* Requirement 5.

[359] *Id.* Requirement 16.

[360] While Intrado remains neutral to which company should be selected as the next LNPA, it points out the "excellent track record experienced with Neustar." Intrado, Inc. Recommendation Comments at 3 (filed June 23, 2014); *see also* Neustar Response to LNPA 2015 Surveys § 1.1.7 at 1.1-23-1.1-25; Highly Confidential and Restricted Access Critical Infrastructure Information Letter Submission of Neustar, Inc., filed by Michael A. Sussman and Stewart A. Baker (filed on Nov. 6, 2014), at 17 ("LEAP is not an LNP service . . .").

[361] Telcordia 2014 Recommendation Reply Comments at 125.

[362] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, and Sanford Williams, Wireline Competition Division, FCC, CC Docket No. 95-116; WC Docket No. 09-109, (filed Dec. 18, 2014).

[363] Telcordia 2014 Recommendation Reply Comments at 122.

[364] *See id.* at 138; Telcordia Dec. 18, 2014 *Ex Parte* Letter at 4 ("[T]elcordia will run the NPAC securely and will work with the relevant security agencies to ensure that all of their needs and concerns are addressed. Telcordia has met with a number of relevant security agencies, and these agencies are not looking for a re-bid. If selected, Telcordia expects to work closely with these agencies to ensure a smooth transition."). Also, Telcordia holds the ELEP program as a prime example of an appropriate post-award implementation topic, because it will involve separate agreements with law enforcement agencies to be negotiated and executed post award (as per VQS § 11.2, Requirement 5). Telcordia cites to Neustar's Reply Comments, which note that the NAPM has the authority to modify the awarded contract to incorporate any additional security requirements that may emerge without needing to re-compete the requirement. Telcordia Reply Comments at 119, *citing* Neustar Comments at 116, n.314.

(continued….)

100.      On consideration of the record, we find that, from an ELEP standpoint, each bidder agrees to meet the outstanding requirements and provides information to support its respective claim of compliance with these requirements. Accordingly, we find each bidder able to meet all ELEP requirements.

### (iii)      Cybersecurity Requirements

101.      Sensitive data will be housed in NPAC/SMS data centers. These data centers are essential to the correct routing of both wireless and wireline calls, and are also critical to public safety and law enforcement agencies, which need to validate their own records and need to know which providers are associated with specific telephone numbers in order to execute lawful subpoenas and warrants.[365] Given the sensitivity of the data and queries of that data, and the significantly evolved cyber threats since the inception of the NPAC/SMS, it is critical that the LNPA implement and administer effective cybersecurity measures to prevent attacks from compromising the NPAC/SMS and the effectiveness of public safety and law enforcement operations.

102.      Recognizing the importance of maintaining NPAC data integrity, the RFP and related bid documents specify various cybersecurity requirements. The bid documents required each bidder to answer questions regarding whether it can meet these cybersecurity-related requirements. Bidders were provided the opportunity to elaborate on responses and to provide additional relevant information. In addition, each bidder availed itself of the opportunity to engage in discussions with the Commission's national security subject matter experts to address cybersecurity issues. These requirements include ones to protect the NPAC by employing capabilities for detecting cybersecurity breaches, using cryptographic technology, ensuring access control, conducting security audits, and following other safeguards to protect the data centers. A brief summary of the key requirements is provided below.

103.      *Data Centers.* The bid documents specify data and systems security controls to address the security threat environment.[366] Data centers and user data must be maintained and stored within the continental United States,[367] and no data may be stored at, in, or through a site located outside of the United States.[368] System functionality requirements involve: verification of user privileges and maintenance of logs of transaction history, transaction errors, and transmission errors.[369] Also, as noted above, data centers must meet additional business continuity requirements.[370]

104.      *Detection and protection.* To detect and respond to cybersecurity breaches in a timely manner, requirements include review of user actions, security event notifications, real-time security monitoring,[371] and reports on data items, users, and communications failures.[372] Requirements also

---

(Continued from previous page) ————————————

Separately, it should be noted that the Federal Bureau of Investigation, the Drug Enforcement Administration and the United States Secret Service filed Reply Comments articulating the importance of the ELEP program. These agencies took no position on which party should be selected as vendor, but requested that the selectee maintain at least the current capabilities of the program, and that the security and confidentiality of law enforcement queries be maintained. They also stressed the need for vigorous supply chain standards. FBI 2014 Recommendation Reply at 2, 4-6.

[365] *See generally id*.

[366] *See* TRD FRS § 7 generally; TRD FRS § 7.9.1; RFP § 6.7, Requirements 1-2. In addition, for cyber aspects of recovery, *see supra* paras. 87-90.

[367] VQS § 3.6.15; RFP § 6.7, Requirement 2.

[368] *Id*.

[369] TRD FRS § 9.3.

[370] *See supra* section III.B.3.b(i) (Business Continuity).

[371] TRD FRS § 7.6.2.

[372] *Id*.

address denial of service to customers by category, disruption of carrier operations, unauthorized switching of customers to various carriers, and disruption of NPAC functions.[373]

105. *Software, technology, cryptographic mechanisms.* There are various software and equipment implementation requirements that address, among other matters, vendor implementation of software development methodology, bypass of security procedures, documented entry,[374] hardware and software updates, performance and reliability,[375] and encryption.[376]

106. *Identification, authentication, and access control.* Requirements for protecting data and system integrity include: identification of originators of system resources, identification of information received across channels, and monitoring of system resources.[377] In addition, authentication and restricted access requirements allow only customers with authorization to utilize the system, both with respect to their obtaining access into the system, and moving within the system.[378]

107. System access requirements are specified for individuals, remote machines, entry, modification, trusted communications, user authentication failure, and network authentication.[379] Access to the ELEP must be by authenticated, secure, and encrypted means.[380] Resource access requirements include: service provider data protection; authorized user access to software, transactions, and data; access control of resources user ID and system ID; and a limitation that only NPAC personnel can modify user access.[381] Additionally, there are a variety of password requirements.[382]

108. *Auditing and record keeping.* To ensure the auditability of the system, there are requirements for monitoring and recording incidents of unauthorized system access,[383] maintaining security-related audit logs, and archiving security audit data, with no disabling of security audit contents or log contents.[384] To provide further assurances of database integrity, there are various data sampling requirements.[385]

109. *User Training.* The LNPA must provide user training, on request, regarding security and encryption measures,[386] and technical support must be provided for users experiencing problems related to security and encryption methods.[387]

110. Having highlighted the technical cybersecurity requirements, we next consider, respectively, the bidders' descriptions of their relevant capabilities, programs, and policies.

---

[373] TRD § 7 generally; TRD FRS § 7.9.1; RFP § 6.7, Requirements 1-2.

[374] TRD FRS § 7.8.

[375] RFP § 6.8, Requirement 4.

[376] TRD FRS § 7.9.3.1.

[377] *Id.* § 7.5.

[378] *Id.* §§ 2.1, 7.2, 7.3, 7.4, 7.4.1, 7.4.2, 7.9.3.2, 7.9.3.4.

[379] *Id.* § 7.4.1.

[380] RFP § 11.2, Requirement 8.

[381] TRD FRS § 7.4.2.

[382] *Id.* § 7.3.1.

[383] RFP § 9.20, Requirement 17.

[384] TRD FRS § 7.6.1.

[385] *Id.* § 8.7.

[386] RFP § 6.2, Requirement 2.

[387] *Id.* Requirement 3.

111.    *Cybersecurity Capability*.  Each bidder avers that it will implement all cybersecurity requirements and offers that it has established an excellent record of LNP prior performance.

112.    Since 1997, Neustar has served as the LNPA in the United States.[388]  Neustar provides LNP support services outside of the United States as well.[389]  **[BEGIN CONFIDENTIAL]** ███ ████████████████████████████████ ██████ ████████████████ ████████████████ █████████ ███████████████ ██████ ██████████████████ ████████████████ **[END CONFIDENTIAL]**  In addition to Neustar's U.S. LNPA experience, the company provides wireline and wireless portability and network management services pursuant to a contract with providers that participate in number portability in Canada,[394] and has number portability experience in Brazil and Taiwan.[395]

113.    Telcordia claims that it has a long history of involvement in telecommunications routing and number portability.[396]  It declares that it has extensive experience in the United States operating sensitive and critical information and communications systems **[BEGIN CONFIDENTIAL]** ████ █████████ **[END CONFIDENTIAL]**  Telcordia states that it "operates the Local Exchange Routing

---

[388] On November 30, 1999, a transaction agreement between Lockheed Martin Corporation and Warburg, Pincus was finalized, approving the transfer of Lockheed Martin's Communications Industry Services (CIS) group from Lockheed Martin Corporation to Neustar, Inc.  *See* NANPA Numbering News, Dec. 1999/Jan. 2000.  This followed the Commission's November 17, 1999 order allowing the transfer of the NANPA from Lockheed Martin CIS to Neustar, Inc. *See* NANPA, *NANPA Numbering News*, http://www.nanpa.com/pdf/newsletters/nanpa_dec_jan.pdf (last visited Mar. 27, 2015).  *See also Lockheed Martin Corporation and Warburg, Pincus & Co. for Review of the Transfer of the Lockheed Martin Communications Industry Services Business*, Order, CC Docket No. 92-237; NSD File No. 98-151, 14 FCC Rcd 19792 (rel. Nov. 17, 1999).

[389] *See supra* note 301.

[390] Letter to from Aaron M. Panner, Counsel to Neustar Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket No. 09-109, (filed Oct. 16, 2014).

[391] *See generally* Neustar Response to LNPA 2015 BAFO Request, Appx. B, Section 1.4 Neustar Security Program; *see also* Neustar Response to LNPA 2015 Surveys at ES-6 (Apr. 5, 2013).

[392] Neustar Response to LNPA 2015 Surveys at ES-6 (Apr. 5, 2013).

[393] Neustar Response to LNPA 2015 Surveys, § 1.4.2.2 Information Security Framework–Detective and Corrective Controls at 1.4-10.

[394] Neustar, Inc., Annual Report Pursuant to Section 13 or 15(D) of the Security Exchange Act of 1934, for the Year Ended December 31, 2012, at 12.

[395] *See supra* note 301.

[396] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109, (filed June 16, 2014); Telcordia 2014 Recommendation Reply at 9.

[397] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109, (filed June 16, 2014); Telcordia 2014 Recommendation Reply at 9.  **[BEGIN CONFIDENTIAL]** ████████████████████ ████████████████████████████████████████████ **[END CONFIDENTIAL]**  Telcordia TRD § 12.1 TRD Detailed Response, at 9.  *See also* Telcordia Presentation, *The Telcordia LNPA RFP Proposal*, at 11, **[BEGIN CONFIDENTIAL]** ██████████████ ████████████████████████████████████████ ████████████████ **[END CONFIDENTIAL]**  Telcordia 2014 Recommendation Reply at 9 (filed Aug. 22, 2014).

Guide ('LERG') and Business Integrated Routing and Rating Database System ('BIRRDS'), and provides telecommunications infrastructure support through the Common Language databases, all of which must be protected against cyber attacks and for which business continuity needs to be maintained."[398] **[BEGIN CONFIDENTIAL]**



**[END CONFIDENTIAL]** [401]

114. *Cybersecurity Functions, Programs, and Policies*. Each bidder also indicates that it has or will have in place **[BEGIN CONFIDENTIAL]**

**[END CONFIDENTIAL]** [408]

115. **[BEGIN CONFIDENTIAL]**

---

[398] Telcordia 2014 Recommendation Reply at 9 (filed Aug. 22, 2014).

[399] Telcordia, RFP No.2015-LNPA RFP-1, RFP § 15.1 (Apr. 2013) Supp. Doc. at 4.

[400] Telcordia, RFP No.2015-LNPA RFP-1, RFP § 3.3.3 (Apr. 2013) Supp. Doc. at 70.

[401] Telcordia, RFP No.2015-LNPA Vender Qualification-1, VQS § 3.3.1 LNP Experience, Optional Attach., § 4.14, at 17-18.

[402] Neustar Response to LNPA 2015 Surveys, § 1.4.2 Information Security Framework, at 1.4-4.

[403] Appx. B–Proposal Sections, Neustar Response to 2015 LNPA Surveys, § 1.4 Neustar's Security Program, 1.4 at 2-3.

[404] Neustar Response to LNPA 2015 Surveys, § 1.4.2.1 at 1.4-9.

[405] *See generally* Neustar Information Security Policy Version 1.1 (effective Apr. 26, 2013).

[406] *See generally* Neustar Information Security Standard Version 1.0 (effective June 24, 2013).

[407] Neustar Response to LNPA 2015 Surveys, § 1.4.2.2 Information Security Framework-Detective and Corrective Controls, at 1.4-10 through 1.4-12.

[408] *Id*.

[409] iconectiv Number Portability Admin. Center, Request for Proposal No. 2015-LNPA-RFP-1, RFP § 15.1 Supp. Doc. (Apr. 2013), § 3.3.2 LNP Experience in Other Countries, at 69.

[410] Telcordia Section 15-Optional Attachs. § 2.4.2.1 Data Center Security, at 5, 51-52.

[411] Telcordia, BAFO Survey Question 2.6, § 1.3.1, at 3.

[BLACK REDACTED BAR] **[END CONFIDENTIAL]**

116.    Both parties have in place policies aligning with well-established and recognized industry and government IT cybersecurity standards.[415] **[BEGIN CONFIDENTIAL]** [BLACK REDACTED BAR]

[BLACK REDACTED BAR] **[END CONFIDENTIAL]** Telcordia states that as it "operates the NPAC, the NIST Cybersecurity Framework will provide key organizing principles."[418]  Continuing, Telcordia offers that Sungard's provision of data center hardware and software will provide robust security and service continuity protection and that the "NPAC will benefit from Sungard's substantial experience in protecting the databases that it hosts from attacks, as well as the capabilities Sungard brings for network monitoring and service restoral.  This is a substantial advantage from a security and service continuity perspective over a self-provisioned solution."[419]

117.    While the bid documents do not prescribe a cybersecurity standard, there are related technical requirements that apply to cybersecurity, *e.g.*, intrusion detection.  The RFP process required the bidders to answer questions on whether they can meet the technical requirements.  The bidders were provided the opportunity to elaborate on responses and to provide additional relevant information.  Also, each company availed itself of the opportunity to engage in discussions with the Commission's national security subject matter experts to address cybersecurity issues.  On consideration of the record, we find that, from a cybersecurity perspective, each bidder agrees to meet the outstanding requirements and provides information to support its respective claim of compliance with these requirements.  Accordingly, we find each bidder able to meet all cybersecurity requirements.

### (iv)    Public Safety

118.    Several commenters—without advocating for a particular bidder—stress the importance that the ELEP, emergency porting post-disaster, and synchronization of numbers with PSAPs continue under the new LNPA contract.[420]  These commenters highlight the value of this suite of services, and

---

[412]   *Id.* § 1.3.5, at 5.

[413]  Telcordia, TRD § 12.1 TRD Detailed Response, § 8.1, at 37-38.

[414]  *Id.* § 8.25 at 41.

[415]  FBI 2014 Recommendation Reply at 5 ("the security plan should comply with the National Institute of Technologies (NIST) cybersecurity framework.").

[416]  Neustar Response to LNPA 2015 Survey § 1.4, Neustar Security Program, at 1.4-2.

[417]  *See also* Neustar Response to LNPA 2015 BAFO Request, Appx. B, § 1.4.2, at 5; *see* Neustar Responses to LNPA 2015 Surveys, § 1.4.2 Information Security Framework at 1.4-2; the NIST Cybersecurity Framework's formal name: *Framework for Improving Critical Infrastructure Cybersecurity*, Version 1.0 (National Institute for Standards and Technology, Feb. 1, 2014).  *See* National Institute of Standards and Technology, *Framework for Improving Critical Infrastructure Cybersecurity*, http://www.nist.gov/cyberframework/upload/cybersecurity-framework-021214-final.pdf (last visited Mar. 27, 2015).

[418]  Telcordia Oct. 17, 2014 *Ex Parte* Letter at 2; *see also* Telcordia 2014 Recommendation Reply at 127.

[419]  Telcordia Oct. 17, 2014 *Ex Parte* at 2.  Further, Telcordia offers that Sungard is aligned with the Federal Risk and Authorization Management Program or FEDRAMP.  Letter from James Arden Barnett, Jr., Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109 (filed Nov. 24, 2014).

[420]  *See* Comments of Intrado, WC Docket No. 09-109, CC Docket No. 95-116 (filed July 24, 2014); Reply Comments of the Public Utilities Division of the OK Corp. Comm., WC Docket No. 09-109, CC Docket No. 95-116 (filed Aug. 8, 2014); Joint Reply Comments of International Chiefs of Police and National Sheriffs' Association, WC Docket No. 09-109, CC Docket No. 95-116 (filed Aug. 20, 2014); Comments of Telecommunications System,

(continued….)

request that we ensure their respective continuation under the new LNPA contract.  Neustar makes no mention of stopping these services.  Telcordia states that it will provide all of the functionality of the current NPAC, including number synchronization with PSAPs, as currently offered by Neustar.[421]  Concerning law enforcement and national security, Telcordia states that there will be "no functionality gap" with respect to its offerings as the LNPA.[422]  We accept Telcordia's proffer and will ensure that it is codified in the LNPA contract.[423]

### (v)     Other Comments and Concerns

119.     In addition to the issues addressed above, parties presented a variety of arguments and documentation regarding national security aspects of the NPAC.  Telcordia addresses the concerns raised by offering to provide —where required by the Commission as a condition of its selection as the LNPA— reasonable assurances to law enforcement and national security agencies during post-selection negotiations.[424]  This assurance, Telcordia offers, applies as well to its subcontractor Sungard.[425]

---

(Continued from previous page)

Inc., WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116 (filed Aug. 20, 2014); Comments of New York Police Department, WC Docket No. 09-109, CC Docket No. 95-116 (filed Oct. 15, 2014); Comments of Iowa Utilities Board, WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 3, 2014); Comments of City of Fairfax Office of Emergency Management , WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 7, 2014); Comments of Maryland Emergency Management, WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 10, 2014); Comments of Collier County Bureau of Emergency Services, WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 11, 2014); Comments of Office of Emergency Management, Arlington County, WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 15, 2014); Comments of Maryland Fire Chiefs Association, WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 18, 2014); Comments of Robert Eckman, Senior Officer, Oxnard Police Department, California, *et al*. (LEAP Users), WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 24, 2014); Comments of Orleans Parish Communications District, WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 24, 2014); Comments of Frontier, WC Docket No. 09-109, CC Docket No. 95-116 (filed Nov. 26, 2014); Comments of Illinois Emergency Management Agency, WC Docket No. 09-109, CC Docket No. 95-116 (filed Dec. 3, 2014); Comments of Cumberland County Office of Emergency Management, WC Docket No. 09-109, CC Docket No. 95-116 (filed Dec. 12, 2014); Comments of Fairfield Township Office of Emergency Management, WC Docket No. 09-109, CC Docket No. 95-116 (filed Dec. 15, 2014); Comments of California Statewide Law Enforcement Association, WC Docket No. 09-109, CC Docket No. 95-116 (filed Dec. 17, 2014); Comments of Maryln S. Bradshaw, WC Docket No. 09-109, CC Docket No. 95-116 (filed Dec. 19, 2014); Letter from the Connecticut Utilities Regulatory Authority and the Vermont Public Service Board, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 (filed Dec.19, 2014); Letter from Joe Baraso, Director Public Safety Communications, Fulton County Emergency Services Department, Fulton County, Georgia, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 95-116 (filed Feb. 5, 2015); *see generally* New America Mar. 9, 2015 *Ex Parte* Letter; Letter from Salmon Ventures, to Hon. Tom Wheeler, Chairman, FCC, WC Docket No. 09-109 (filed Mar. 16, 2015) (Former State Commissioners Mar. 16, 2015 *Ex Parte* Letter).

[421] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 95-116 at 3 (dated Oct. 27, 2014) (Telcordia Oct. 27, 2014 *Ex Parte* Letter).

[422] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket No. 09-109, (filed Dec. 18, 2014).

[423] *See supra* para. 99.

[424] Telcordia Reply Comments at 122, 126, 138.

[425] Telcordia Reply Comments at 122 ("Telcordia and its data center partner, Sungard AS, are completely capable of and committed to meeting all of the security requirements envisioned by the RFP for both the NPAC/SMS system and the ELEP. Telcordia, and Sungard AS, will steadfastly remain compliant with the security requirements outlined in the RFP, as well as any security requirements agreed to in post-selection mitigation, recognizing that these are flexible enough to account for changes in the threat environment.").

120.    Neustar submitted a report prepared by its consultant, The Chertoff Group, which it offers as a critique of the RFP's cybersecurity requirements.[426] According to the Chertoff Group, the RFP's requirements are insufficient in scope and specificity when compared with the NIST Framework's approach to cybersecurity.[427] The Chertoff Group asserts that several options are available to address the alleged deficiencies, though it notes that it is "not in a position to weigh the relative operational impact" of the options.[428] The Chertoff Group states that such options range from "canceling the procurement and conducting a new competition to a more limited step involving the reopening of negotiations with respect to changed security requirements."[429]

121.    Telcordia argues that by "framing the RFP and other bid documents in general terms, the specifics of security implementation can evolve quickly without going outside the scope of the original procurement."[430] We agree. Overly prescriptive requirements in the bid documents quickly would have become dated in today's rapidly changing cyber environment, resulting in bids that would be dated on receipt, and that would have prevented the expression of a holistic treatment of the need for security in the proposals. Furthermore, overly detailed requirements, provided generally, could have given a wider audience detailed information about the security protections of the NPAC/SMS, thus making it more vulnerable to attack. Next, as addressed at length above, any challenges to the bid documents or process are time-barred, as they could and should have been raised much earlier in this process.[431] Additionally, both bidders have indicated that they either align or will align with the NIST Framework, which was issued on February 12, 2014, after the RFP and related documents were issued.[432] Finally, the Commission, working with the NAPM, will ensure that cybersecurity concerns are addressed when the terms and conditions of the LNPA contract are developed and will not approve the new contract until any and all cybersecurity concerns are addressed and, as necessary, mitigated to our satisfaction. Accordingly, we dismiss this challenge to the sufficiency of the RFP and related documents with respect to cybersecurity.

122.    We next address several national security arguments that Neustar raises concerning Telcordia's status as a subsidiary of Ericsson, a Swedish corporation, and risks presented from Telcordia's role as a LNP provider in other countries. We are cognizant of the security issues related to foreign control of critical infrastructure and systems,[433] and we note that the Committee on Foreign Investment in the U.S. (CFIUS) cleared Ericsson's purchase of Telcordia in December 2011, finding "no

---

[426] The apparent purpose of the Report was to assess the "national and homeland security risks associated with the NPACS" and assess the "extent to which the bid terms" discussed herein "addressed those risks." Report filed Sept. 30, 2014 on behalf of Neustar, Inc., *A Review of Security Requirements for Local Number Portability Administration*, Sept. 29, 2014, at 3 (The Chertoff Report). *See also* Letter from Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109, (filed Jan. 23, 2015) (Neustar Jan. 23 *Ex Parte* Letter); *see also* Letter from Michele Farquhar, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116 (filed Mar. 18, 2015).

[427] The Chertoff Report at 3, 15-16.

[428] *Id.* at 24.

[429] *Id.*

[430] Letter from John T. Nakahata, Harris Wiltshire & Grannis, L.L.P., Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket No. 09-109 at 3 (filed Oct. 17, 2014).

[431] *See supra* section III.A.4.

[432] Framework for Improving Critical Infrastructure Cybersecurity, Version 1.0, National Institute of Standards and Technology, Feb. 12, 2014. The bid documents were released in February 2013. *See supra* note 47.

[433] *See* Neustar Reply Comments at 79-88.

unresolved national security concerns[.]"[434]  We find the CFIUS clearance relevant here, albeit not directly on point.  **[BEGIN HIGHLY CONFIDENTIAL]** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ **[END HIGHLY CONFIDENTIAL]** [435]  We find it relevant, however, that national security and law enforcement agencies (along with economic agencies),[436] previously conducted an extensive review of Telcordia's foreign parent, Ericsson.[437]

123.     Further, we recognize that Telcordia is responsible for the administration and management of the U.S. telecommunications LERG, BIRRDS, and Common Language databases that are of vital importance to U.S. communications networks and with similar national security consequences should security not be effectively maintained.

124.     Neustar contends that, despite prior CFIUS approval in another context, Telcordia's provision of these critical systems requires further foreign ownership review by the Commission[438] and that we should seek public comment on any national security-based terms and conditions.[439]  We note that no foreign ownership issues falling under the Commission's *Foreign Ownership Order* are presented in this proceeding, *e.g.*, a section 214 authority application or other authorization to provide regulated services.[440]  Based on staff's recommendation and review, we conclude that the consultation with Executive Branch entities, coupled with our planned post-selection engagement with those entities, will be sufficient to address any and all national security concerns related to Telcordia's foreign ownership in this context.  Further, we will ensure that the LNPA contract contains terms and conditions necessary to ensure that effective public safety services and law enforcement and national security operations are supported, that any and all law enforcement and national security issues are addressed and mitigated to our satisfaction, and that the Government's equities are protected by a rigorous audit program that

---

[434] *See* Letter from Mark M. Jaskowiak, Deputy Assistant Secretary, Investment Security, U.S. Dept. of Treasury, to Richard S. Elliott, Esq., Paul, Weiss, Rifkind, Wastin & Garrison, LLP (Dec. 23, 2011).

[435] Highly Confidential and Restricted Access Critical Infrastructure Information Letter from Michael A. Sussman and Stewart A. Baker , Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, at 9 (filed Nov. 6, 2014) (Neustar Nov. 6, 2014 *Ex Parte* Letter).

[436] CFIUS comprises the following departments and agencies: Department of the Treasury (chair), Department of Justice, Department of Homeland Security, Department of Commerce, Department of Defense, Department of State, Department of Energy, Office of the U.S. Trade Representative, and the Office of Science & Technology Policy. *See* 50 U.S.C. App. 2170; Public Law No. 110-49, 121 Stat. 246 (2007); Executive Order 13456, *Further Amendment of Executive Order 11858 Concerning Foreign Investment in the United States* (Jan. 23, 2008).

[437] We recognize that at the time of the CFIUS review, the question of Ericsson's fitness to control the NPAC through Telcordia was not before the CFIUS.  The CFIUS review, however, is still notable in that commerce, law enforcement, and national security-focused agencies of the U.S. Government cleared Ericsson's acquisition of Telcordia and that Telcordia continued, under Ericsson's control, to provide communications services of vital importance to the Nation.

[438] *Id.*; Neustar contends that the CFIUS review process "does not sufficiently address security concerns in the LNPA selection process."  Letter from Stewart Baker, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109, (filed Dec. 10, 2014).

[439] Letter from Stewart A. Baker and Michael A. Sussman, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109, at 2-4 (filed  Mar. 12, 2015) (Neustar Mar. 12 *Ex Parte* Letter).

[440] *See, e.g., Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4)*, IB Docket No. 11-133, Second Report and Order, 28 FCC Rcd 5741 (2013) (*Foreign Ownership Order*); *see also Commission Policies and Procedures Under Section 310(b)(4) of the Communications Act, Foreign Investment in Broadcast Licensees, Declaratory Ruling*, MB Docket No. 13-50, 28 FCC Rcd 16244 (2013); *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109, at 2-3 (filed Mar. 18, 2015) (Telcordia Mar. 18 *Ex Parte* Letter).

monitors for and ensures compliance, backstopped by robust enforcement tools throughout the term of the contract.[441]  Through the Commission's Public Safety and Homeland Security Bureau, we will seek input from Executive Branch entities with expertise in and responsibility for law enforcement and national security matters as these terms and conditions are developed.

125.    Neustar essentially alleges that Telcordia could use foreign-derived software code (some off-the-shelf) to run the NPAC should it be selected as the LNPA, and that Telcordia may use U.S. NPAC software in foreign countries, thereby posing risks to the secure functioning of the LNP.[442]  We first note that Neustar itself offers LNP-related services outside of the United States, and, that some of these same assertions could arguably apply to its own services.[443]  Telcordia responds that the "U.S. NPAC will be built in America from the ground up," and declares that it "will not use foreign code in the U.S. NPAC nor will it use U.S.[-developed] code elsewhere in the world."[444]  It continues that Telcordia employees working on NPAC/SMS systems will be U.S. citizens who will be closely screened, vetted, trained, and supervised.[445]  Telcordia responds further that it has the ability to prohibit administrator "write" functions from outside of the United States.[446]  Regarding supply chain vulnerabilities, Telcordia states that its LNP software development approach uses a U.S.-based supply chain, and that it segregates its products that serve the U.S. critical infrastructure from products that it offers abroad, to protect against supply chain exploitation.[447]

126.    Neustar's suggestion that the Commission "must now confront" and address the implications of foreign ownership of critical infrastructure[448] glosses over the nature of the types of vital services that Telcordia has been offering in the United States for many years relative to the type of service at issue here, and ignores the steps that Telcordia takes to segregate its offerings pertaining to critical infrastructure from its other services.  Neustar also ignores Telcordia's segregation of its products that serve the U.S. critical infrastructure from products it offers abroad.[449]  Telcordia has provided the mission-critical services of the U.S. LERG and BIRRDS in the United States for the past thirty years without issue,[450] and we believe that providing these services that are also critical to U.S. national security is

---

[441] *See* Evanina Letter; *see generally* FBI 2014 Recommendation Reply at 5 ("The Commission must require the LNPA vendor to maintain robust security measures and to have a written security plan that is approved by the contracting party, NAPM LLC, in consultation with Federal law enforcement and other [a]ffected agencies, and filed with the Commission.") ("The LNPA vendor must be required to file compliance and security incident reports, w[ith] the FCC that are available to government entities, but anonymized if released to the public, and there should be a process for appropriate entities to conduct regularly scheduled as well as random compliance inspections.").

[442] Neustar Nov. 6, 2014 *Ex Parte* Letter at 13.

[443] *Id*.

[444] Supplemental Ex Parte Response of Telcordia Technologies, Inc., D/B/A iconectiv to Neustar, Inc. Supplemental Reply, Sept. 23, 2014, at 5, 13.

[445] Neustar Nov. 6, 2014 *Ex Parte* Letter at 6; FBI 2014 Recommendation Reply at 6 ("[L]NPA personnel charged with the responsibility of secure network access must be U.S. citizens, capable of holding and maintaining a security clearance.  The contract with the LNPA vendor must require the LNPA vendor, in coordination with law enforcement, to assess the suitability of those individuals who will have access to the number portability system.").

[446] Supplemental *Ex Parte* Response of Telcordia Technologies, Inc., D/B/A iconectiv to Neustar, Inc. Supplemental Reply (filed Sept. 23, 2014) at 6.

[447] *Id*. at 4, 12.

[448] Reply Comments of Neustar at 79 (filed Aug. 22, 2014); FBI 2014 Recommendation Reply at 5-6 ("the LNPA vendor must also provide the NAPM LLC with a detailed accounting of its supply chain standards and procedures specific to the query system maintained by the LNPA vendor, and file with report with the FCC.").

[449] *See* Supplemental *Ex Parte* Response of Telcordia Technologies, Inc., D/B/A iconectiv to Neustar, Inc. Supplemental Reply (filed Sept. 23, 2014) at 4.

[450] *Id*.

indicative of Telcordia's ability to provide secure and reliable NPAC services. Finally, the same security commitments that Telcordia makes, it indicates, will apply to any subcontracted and supported elements of LNP service,[451] which is proper, as we will hold Telcordia liable for all actions of its subcontractors and agents.

127. Neustar challenges the alleged lack of input by the law enforcement community in the RFP preparation process and points to the RFP's requirement that the LNPA maintain a record of IVR inquiries, which Neustar contends "contradicts law enforcement's security requirements and exposes law enforcement information to compromise."[452] To that end, commenters FBI *et al* request that we prevent unwarranted visibility into law enforcement queries.[453] As we previously dismissed Neustar's claims regarding the RFP development and process,[454] we turn to the specific IVR requirement to maintain a record of inquiries.

128. Both bidders responded that they would, respectively, comply with the IVR System requirements, which apparently include the requirement to store IVR inquiries. A positive answer, Neustar acknowledges, was necessary to be responsive to the RFP.[455] The requirement at issue here relates to billing purposes; it should not, however, be an avenue for visibility into law enforcement inquiries. We find it acceptable to scrutinize the need for any such requirement, in the context of protecting law enforcement and national security interests, in the contract negotiation phase. Thus, we will reconcile RFP § 6.9, Requirement 10 with the need for overall law enforcement anonymity.[456] We further anticipate that there may be other such issues for our consideration that may arise during that stage, as commenters have noted.[457]

129. Each party notes objections to our treatment of bid information pertaining to critical infrastructure. Specifically, they challenge our restriction that access to critical infrastructure information, *i.e.*, in this context, aggregation of information related to business continuity, law enforcement, cybersecurity, and internal IT architecture and operations, be limited to U.S. citizens with security clearances.[458] While agreeing that such information is indeed sensitive, the parties contend that they were limited by our attempt to safeguard vital critical infrastructure information in that only a handful of their outside counsel and contractors had the credentials necessary to access this information.[459]

130. As the Commission lacks original classification authority,[460] the Commission's staff endeavored to make this information available to the interested parties in a timely manner while it

---

[451] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109, (filed Nov. 14, 2014) ("Telcordia is the prime contractor, responsible for the delivering the overall solution pursuant to the LNPA contract . . . .").

[452] *See* RFP § 6.9, Requirement 10; Neustar Nov. 6, 2014 *Ex Parte* Letter at 15-16.

[453] FBI 2014 Recommendation Reply.

[454] *See supra* section III.A.4.

[455] Neustar Nov. 6, 2014 *Ex Parte* Letter at 15.

[456] FBI 2014 Recommendation Reply at 3 ("Law enforcement agencies also require that their queries of the system maintained by the LNPA remain confidential . . . .").

[457] *See* Evanina Letter; *see generally* FBI 2014 Recommendation Reply; NAPM Reply Comments at 7.

[458] *See supra* note 116.

[459] Letter from Aaron M. Panner, Counsel to Neustar, Inc. to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 (filed Aug. 20, 2014); Letter from James Arden Barnett, Jr., Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109, (filed Aug. 19, 2014); *see supra* note 420.

[460] *See* Executive Order 13526, *Original Classification Authority* (Dec. 29, 2009).

concurrently sought a classification determination. Accordingly, Public Safety and Homeland Security Bureau staff permitted access to the critical infrastructure information to those individuals with appropriate security clearances while the classification review was pending, and, in fact, applied the same restrictions to Commission staff seeking access to this information. The Public Safety and Homeland Security Bureau's treatment of this information was eventually confirmed, with an interim classification, albeit at a lower-level. We find that each party had sufficient opportunity to utilize—and did in fact utilize—the Commission's secure facility to access these documents, where they were provided with secure Commission IT resources dedicated for their respective use to prepare comments for submission to the Commission. We further find that Commission staff properly balanced the need for interested parties to access this information while simultaneously protecting critical infrastructure information vital to the national security. Accordingly, we reject the parties' claims as without merit.

131. Neustar requests that we make the Executive Branch entities' recommendations on security standards part of the record in this proceeding (with appropriate redactions), allow comment on those recommendations before we select the LNPA, and allow parties with security clearances to review the recommendations in their entirety.[461] We disagree.

132. The Executive Branch entities take no position on which bidder we should select.[462] Rather, the Executive Branch entities' classified recommendations[463] will help ensure that the new LNPA contract includes terms and conditions that address and adequately mitigate law enforcement and national security issues. Because the recommendations do not address the questions we address in this Order, and we do not rely on them in deciding the issues before us, they are not part of the record of this proceeding.

133. Furthermore, under the Commission's *ex parte* rules, the recommendations do not constitute a "presentation" as they were not "directed to the merits or outcome of a proceeding," nor were they intended to "affect the ultimate decision" on the issues addressed in this LNPA selection proceeding.[464] Thus, there was no obligation to disclose them under the *ex parte* rules. Finally, even if the recommendations were deemed to be a "presentation," they would be exempt from disclosure because they involve "classified security information."[465]

## C. Cost Aspects of Bids

134. The RFP requested that interested parties submit a proposal that reflects an annual fixed fee with no annual price escalators, no transaction volume minimums (floors) or maximums (ceilings), and no recovery of any unpaid user invoices from the rest of the industry.[466] In addition, future change orders and regulatory mandates were to be included in the fixed price.[467]

---

[461] Neustar Mar. 12, 2015 *Ex Parte* Letter; Letter from Stewart A. Baker, Michael A. Sussman, and Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 95-116 (filed Mar. 17, 2015); *see also* Letter from Stewart A. Baker Letter, Michael A. Sussman, and Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 95-116 (filed Mar. 19, 2015) (challenging the staff decision not to place the recommendations in the record).

[462] Evanina Letter at 1 ("The Review Group takes no position regarding the selection of the LNPA").

[463] Telcordia recognizes that the classified recommendations are proper for discussion between national security and public safety entities and the selected bidder, and even then, on a "need-to-know" basis. Telcordia Mar. 18 Letter. Telcordia adds that "there will likely be provisions of the contract that are not appropriate for public—or even limited security-cleared—review, such as provisions regarding network and national security." Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos. 07-149, 09-109, (filed Mar. 19, 2015).

[464] *See* 47 C.F.R. §§ 1.1202; 1.1206(b)(3).

[465] *See* 47 C.F.R. § 1.1204(a)(4).

[466] RFP §§ 13.4, 14.2; *see also NAPM Selection Report* at 10.

[467] RFP § 7.2.

135.     While both bidders had similar evaluation results with respect to Technical and Management capabilities, **[BEGIN CONFIDENTIAL]** ███████████ **[END CONFIDENTIAL]** FoNPAC members gave Telcordia higher rankings based on its technical and management qualifications.[468] In addition, **[BEGIN CONFIDENTIAL]**

████████████████ **[END CONFIDENTIAL]** [469] Therefore, the NAPM's FoNPAC, the SWG, and ultimately, the NANC, recommended Telcordia as the next LNPA. **[BEGIN CONFIDENTIAL]**

███████████████████ **[END CONFIDENTIAL]** [470] The rates in the bids are set forth in the chart below.[471]

136.     ***Background.*** **[BEGIN HIGHLY CONFIDENTIAL]**

███████████████ **[END HIGHLY CONFIDENTIAL]**

**Industry Cost Based on Current Proposals (2016—2022)**

**[BEGIN HIGHLY CONFIDENTIAL]**

**[END HIGHLYCONFIDENTIAL]**

137.     CTIA/USTelecom emphasizes that the expert committees "determined that the **[BEGIN HIGHLY CONFIDENTIAL]** ██████████████

---

[468] *See NAPM Selection Report* at 4. **[BEGIN CONFIDENTIAL]** ████████████████ **[END CONFIDENTIAL]**

[469] The FoNPAC did not rate the bidders' RFPs by totaling **[BEGIN CONFIDENTIAL]** ████████ **[END CONDIFENTIAL]** but analysis of the RFP rating that would have resulted based on totaling the independent scores is consistent with the result **[BEGIN CONFIDENTIAL]** ████████████ **[END CONFIDENTIAL]** *NAPM Selection Report* at 4.

[470] *See NANC Selection Report*; NANC Recommendation; CTIA/USTelecom 2014 Recommendation Comments at 15 (stating that if the Bidders' Technical and Management merits are not significantly disparate, cost may become determinative).

[471] *See NANC Selection Report* at 3-5; *NAPM Selection Report* at 3-4; *NAPM Selection Report* at 11; *see also* Letter from Matthew A. Brill, Counsel, Latham & Watkins, LLP, to Melvin Clay, AT&T, and Timothy Decker, Verizon, Co-Chairs of the NAPM, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 (filed Sept. 17, 2013) (submitting a fair price analysis of the future NPAC contract to include a cost to the industry of less than $150M, which would allow reasonable profit margin at approximately 8-9%).

[472] *See supra* para. 11 for a discussion of BAFOs, *see* specifically note 49; *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116 at 2 (Telcordia Mar. 20, 2015 *Ex Parte* Letter) (stating that **[BEGIN HIGHLY CONFIDENTIAL]** ████████████

████ **[END HIGHLY CONFIDENTIAL]**

[473] The contract consists of one five-year term, plus any number of one-year options.

███████████████████████████████████████  █  **[END HIGHLY CONFIDENTIAL]**
████████████████████████████████████████████████

138.   ***Discussion.***  The bid documents reflect that Technical and Management qualifications are essential, and that quality performance should not be sacrificed for price.  But Cost is also an important consideration, and if good quality can be achieved at a lower cost, it is reasonable to take that into account in the analysis of the bids.  In fact, the RFP noted Cost as one of the criteria for assessing the bids.[475] Telcordia offers to provide the requested LNP services **[BEGIN HIGHLY CONFIDENTIAL]** ██ ████████████████████████████ **[END HIGHLY CONFIDENTIAL]** including all of the additional services and functions that Neustar currently provides as LNPA.[476]  Although the bid documents listed cost as one of the selection criteria, and we took that into account, our paramount consideration is to ensure that the next LNPA is well-qualified and technically competent, and, based on staff's recommendation and review, we are confident in Telcordia's ability to perform well.[477]

139.   Neustar argues that the NAPM's and NANC's analyses of cost are deeply flawed.[478]  For example, Neustar believes that the two proposals on the table will lead to an "apples-to-oranges" analysis, as Telcordia's price does not include all the services that Neustar provides under its current contract (*e.g.,* Mass Update/Mass Port process, Disaster Recovery/Emergency Preparedness, and Ecosystem Monitoring).[479]  According to Neustar, these services are necessary and expected by the industry, and there will be a huge gap in services if the contract is awarded to Telcordia.[480]

---

[474] CTIA/USTelecom 2014 Recommendation Reply at 2; *see also* CTIA et al. Nov. 20, 2014 *Ex Parte* Letter at 1-2 (stating that "any extension of the current LNPA contract beyond its scheduled June 2015 expiration will automatically trigger a price escalation clause and will cost consumers over $40 Million *per month*"); CTIA Dec. 8, 2014 *Ex Parte* Letter at 1-2 (explaining that its $40 million calculation is based on Neustar's Annual Report on SEC Form 10-K for Fiscal Year 2013 (attached to *ex parte* letter)).

[475] RFP § 14.1.1 (C); *see also* CTIA Dec. 8, 2014 *Ex Parte* Letter at 3 (stating "[t]he NANC's unanimous recommendation makes clear that its members were fully satisfied with the qualifications of the recommended vendor (Telcordia). Under those circumstances, consideration of cost was entirely appropriate. Indeed, it would be the height of arbitrary and capricious decision-making to *disregard* cost.").

[476] *See supra* para. 76 (explaining Telcordia's submission to provide all required services); *see also supra* para. 136 (detailing cost differentials).

[477] Telcordia lifted its request for confidential treatment of the fact that the cumulative seven-year price of its bid is less than $1 billion.  *See* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 3 (filed Mar. 25, 2015) (Telcordia Mar. 25, 2015 *Ex Parte* Letter); *but see* Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene. H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 95-116 at 1 (filed Mar. 26, 2015) (alleging a violation of the Commission's Sunshine rules).  The Commission notes that contrary to Neustar's assertions, the presentation was permissible pursuant to Section 1.1204(a)(10) of the rules, and proper notice of the *ex parte* presentation was given under Section 1.1206(b)(2)(v).  *See* 47 C.F.R. §§ 1.1204(a)(10), 1.1206(b)(2)(v).

[478] Neustar 2014 Recommendation Comments 84-88 **[BEGIN CONFIDENTIAL]** ████████████████████████
███████ **[END CONFIDENTIAL]**; *see also* Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 1 (filed Aug. 6, 2014); Errata to Neustar 2014 Recommendation Comments, CC Docket No. 95-116, WC Docket No. 09-109 at 81-82 (filed Aug. 6, 2014) (Neustar Comment Errata Aug. 6, 2014) (stating that Telcordia's costs do not cover all the services currently provided by Neustar).

[479] Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 10-12 (filed Sept. 23, 2014) (Neustar Sept. 23, 2014 *Ex Parte* Letter).

[480] *See* Neustar Sept. 23, 2014 *Ex Parte* Letter at 1-2, *see also* e.g., Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket 09-109 at 1-2 (filed Oct. 2, 2014) (stating that Neustar has been providing NPAC services flawlessly; that the risks and costs of transitioning to a less capable and less reliable NPAC, stripped of services that NPAC users rely on today, are significant; there

(continued….)

59

140.    As an initial matter, when the Bureau sought comment on the bid documents, Neustar did not raise these areas as specific services that should be included in the bid documents. As discussed in more detail above, to the contrary, Neustar supported the bid documents.[481] Neustar's belated arguments about critical services allegedly missing from the bid documents are time-barred.[482] In any event, under the terms of the RFP, bidders were required to submit a bid that would fully satisfy all of the requirements in the bid documents, including start-up costs and costs associated with the Public Switched Telephone Network (PSTN) to IP Transition.[483] Telcordia's bid satisfied these requirements.

141.    Moreover, the RFP set forth detailed performance requirements, which minimize the risk that cost savings can be achieved through poor service quality.[484] Telcordia states that its bid is "based on its understanding that it will need to replicate all of the functionalities of the existing NPAC, as well as its recognition that it will have to implement future changes, such as the IP transition, and the service improvements it promised."[485] Telcordia reiterates that it "has committed to provide all of the functionality of the current NPAC—including ELEP—and there will be no 'significant gaps' in service or functionality as suggested by Neustar."[486] With respect to mass updates and ports, Telcordia states "that the bid documents required providers to support these features, and, as indicated previously, Telcordia stated that it would support this requirement,"[487] and "is well aware that it will have to support large-scale mass ports within a compressed time frame. Accordingly, Neustar is plainly wrong to suggest that any service providers will somehow lose the ability to use this functionality."[488]

142.    In addition, we address an inquiry regarding compliance with Telephone Consumer Protection Act (TCPA) regulations from the Professional Association for Customer Engagement (PACE). PACE educates its members on TCPA regulations to promote regulatory compliance, and does so by utilizing a service offered by the current LNPA that verifies which numbers are ported from a wireline to

---

(Continued from previous page)

are significant differences in the services proposed, and the maturity of Neustar's services contrasts with building new services from scratch); *see also* New America Mar. 9, 2015 *Ex Parte* Letter Attach. at 9, 14-16 (questioning whether Telcordia will be able to offer mass porting because it is proprietary to Neustar, in addition to continuing to offer other services that small carriers utilize). *But see* Telcordia Mar. 19, 2015 Response to New America *Ex Parte* Letter at 3 (confirming that Telcordia will provide those features—mass update/mass port, disaster recovery/emergency preparedness, and ecosystem monitoring—as the current NPAC does).

[481] *See supra* paras. 49-53.

[482] *See supra* section III.A.4.

[483] *See e.g.*, RFP §§ 6.6, 7.2.5.

[484] *See e.g.*, RFP § 6.5, Requirement 3 (LNPA Help Desk must answer 90% of the calls by live operators within 10 seconds during normal staffed business hours); RFP § 9.8, Requirement 5 (LNPA must maintain a minimum of seven transactions per second per User SOA for 99.9% of the transactions); RFP § 9.9, Requirement 6 (LNPA must maintain a minimum of seven transactions per second per User LSMS for 99.9% of the transactions).

[485] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 3 (dated Oct. 27, 2014) (Telcordia Oct. 27, 2014 *Ex Parte* Letter).

[486] *Id.*; *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 2 (filed Dec. 18, 2014) (Telcordia Dec. 18, 2014 *Ex Parte* Letter) (reiterating that there will not be a functionality gap, but to the extent Neustar believes its proprietary products, such as Port Power Search (which is not part of the NPAC database) is superior, than Neustar can provide such ancillary services as a user of the NPAC database).

[487] *Id.*

[488] *Id.* (Telcordia also states that in addition to mass updates and mass ports, it will provide disaster recovery/emergency preparedness, and ecosystem monitoring, as Neustar currently does.)

wireless service provider. PACE wants to ensure that this service will continue to be available.[489] The RFP section 11.1 states that the LNPA must provide the service discussed above (Intermodal TN ID Service), as well as other requirements stemming from TCPA.[490]

143. Based on staff's recommendation and review, we are confident that Telcordia will meet these obligations for the price it offers.[491] But Telcordia bears the risk if its bid did not adequately include these costs; it was required to submit a fixed-price, non-adjustable bid. Telcordia acknowledges this risk, and states that its bid includes all obligations in the bid documents.[492] Other than assertions, countered by Telcordia, that Telcordia's bid does not include all the services that Neustar provides today, Neustar does not identify functionality gaps in the services that Telcordia's bid proposes to offer, nor does Neustar explain why the bid is not credible.[493] The FoNPAC carefully considered the proposals. **[BEGIN CONFIDENTIAL]**



**[END CONFIDENTIAL]**

144. On the other hand Telcordia explained that it would use Sungard, a subcontractor, for certain services.[498] **[BEGIN CONFIDENTIAL]**

---

[489] *See* Comments of Professional Association for Customer Engagement, WC Docket No. 09-109 at 2 (filed Nov. 10, 2014) at 2.

[490] RFP § 11.1, Requirements 1-3.

[491] Telcordia states that its proposal represents a "fair and reasonable market-based price," which covers its costs plus a certain margin. Letter from Todd Daubert, Counsel to NAPM LLC, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109, at Attach. A, Transcript of Telcordia's LNPA Procurement Presentation and Q and A on August 6, 2013, at 13, 22, 61, 69 (filed Aug. 1, 2014) (Telcordia Transcript). Telcordia also states that it is using the very latest technology in order to minimize costs. *Id.* at 51. In addition, it appears that **[BEGIN CONFIDENTIAL]** **[END CONFIDENTIAL]** *See NANC Selection Report* at 4.

[492] *See supra* para. 141; *see also* Telcordia Oct. 27, 2014 *Ex Parte* Letter at 3 (stating that "there will be no 'significant gaps' in service or functionality as suggested by Neustar and that it should not be disadvantaged in this process for Neustar's undisclosed ancillary services").

[493] To the extent that Neustar alleges deficiencies in particular areas, such as security, this Order addresses those claims directly. To the extent that Neustar asserts that Telcordia will not provide the same services that Neustar is providing, Telcordia responded that its bid includes all such services.

[494] *NANC Selection Report* at 3-4.

[495] Letter from Todd Daubert, Counsel to NAPM LLC, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109, at Attach. A, Transcript of Neustar's LNPA Procurement Presentation and Q and A on August 7, 2013, at 17 (filed Aug. 1, 2014) (Neustar Transcript).

[496] Neustar Transcript at 3, 4, 6, 101, 104.

[497] Neustar Transcript at 4-5; *see also* Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109, at 1 (filed Oct. 16, 2014).

[498] *See generally* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos.07-149, 09-109, (filed Nov. 14, 2014).

▮▮▮▮▮▮▮▮▮▮▮▮▮ [END CONFIDENTIAL] Our independent analysis of technical and management qualifications, including the ability to provide a secure and reliable database,[501] confirms the FoNPAC's assessment.

145.    Neustar argues that it attempted to submit a [**BEGIN HIGHLY CONFIDENTIAL**] ▮▮▮▮▮▮▮ [**END HIGHLY CONFIDENTIAL**] Until recently, the Commission was not presented with details about Neustar's second BAFO; it was not considered by the NANC or forwarded to the Commission to be part of this record. [**BEGIN HIGHLY CONFIDENTIAL**] ▮▮▮▮▮▮▮ [**END HIGHLY CONFIDENTIAL**] [503] As explained above, it was entirely reasonable not to entertain a third round of bidding.[504]

### D.    Transition Risks and Costs

146.    *Background.* There are currently seven regional LNP Agreements between the NAPM and Neustar, collectively covering the entire United States. Each Agreement contains provisions concerning the transition of the LNPA databases and services to the new LNPA. Each of the Agreements contains substantially similar provisions. The provisions relating to transition from one contractor to another require that upon a non-renewal of an Agreement, "[Neustar] shall assist the Customer in the orderly transition of the Services specified herein from Contractor to a successor contractor" consistent with the requirements of Article 24 of the Agreement.[505] The Agreement also sets forth details of the type and nature of the transition services, and also provides for the period during which the transition services will be provided which will be up to 18 months from the date that the NAPM gives notice to terminate the Agreements.[506]

147.    The possibility of transitioning to a new LNPA was an intrinsic consideration of the selection process.[507] Consequently, the RFP required bidders to submit a Transition and Implementation Plan covering: (1) tasks and milestones of its implementation approach, (2) staff categories and hours per

---

[499] *NANC Selection Report* at 4. *See also id.* at 2.

[500] *NANC Selection Report* at 4.

[501] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket Nos.07-149, 09-109, (filed Nov. 14, 2014) (stating that Sungard has extensive experience and the ability to deliver a secure and reliable database).

[502] *See e.g.*, Neustar 2014 Recommendation Reply at 2 [**BEGIN HIGHLY CONFIDENTIAL**] (▮▮▮▮▮▮▮ [**END HIGHLY CONFIDENTIAL**] *see also supra* section III.A.3 (discussing the Commission's decision to decline to request a second BAFO); *see also* Telcordia Mar. 20, 2015 *Ex Parte* Letter at 2 (stating that [**BEGIN HIGHLY CONFIDENTIAL**] ▮▮▮▮▮▮▮ [**END HIGHLY CONFIDENTIAL**]

[503] Letter from Aaron Panner, Counsel to Neustar, Inc. to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket No. 09-109 (filed Mar. 11, 2015).

[504] *See supra* paras. 42-46.

[505] *See* Agreements, Article 24.1.

[506] *See* Agreements, Articles 24.4 and 24.2.

[507] RFP § 12.3.

task of the staff management approach, (3) its risk management approach, (4) its change control approach, and (5) its quality assurance approach for transitioning without disrupting NPAC operations.[508]

148. In response to the Transition and Implementation Plan requirement, Telcordia submitted a 63-page attachment addressing each of the Transition and Implementation Plan requirements outlined in section 12.3 of the RFP.[509] Because Neustar is the incumbent LNPA, the transition to a new LNPA was not a necessary component of Neustar's proposal. However, Neustar used the opportunity presented by the RFP to furnish the FoNPAC with material "to help the industry evaluate" other bidders' transition strategies.[510] **[BEGIN CONFIDENTIAL]** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**[END CONFIDENTIAL]**

149. The FoNPAC members considered the potential risks to the industry from changing to a new LNPA and determined that these potential transition risks could be appropriately mitigated.[514] The NANC SWG members reviewed and endorsed the FoNPAC recommendation, and ultimately the NANC agreed with this recommendation.

150. *Discussion*. The decision to conduct a competitive bid process and potentially select a new LNPA raised the prospect of an operational transition, with concomitant risks and costs. There is an inherent trade-off between keeping the same LNPA, which offers predictability and proven experience, and opening up the contract to competition and potentially a new vendor, which can lead to lower costs and innovations. As an initial matter, we note that the NPAC is not involved in real-time telephone call processing, which is a function that resides solely within service provider networks.[515] Hence, there is a buffer between the real-time operation of the telephone network and the operations of the NPAC, mitigating risks to the functioning of the PSTN of any transition.[516] Moreover, the RFP requires that no changes may be made to any existing interface functionality that will require modifications to users' Service Order Administration (SOA) or Local Service Management System (LSMS) platforms, further limiting the changes that carriers will experience.[517] As described above, we find that Telcordia has experience with numbering databases and with number portability specifically. In addition, as discussed below, there are general concerns that small providers may not be able to access the NPAC,[518] or that part

---

[508] RFP § 12.3.

[509] Telcordia proposal Attach. to RFP question 12.3.

[510] Neustar Bid, § 1.6 Transition and Implementation at 1.6-3.

[511] Neustar Bid, § 1.6 Transition and Implementation at 1.6-1.

[512] Neustar Bid, § 1.6 Transition and Implementation at 1.6-4.

[513] Neustar Bid, § 1.6 Transition and Implementation at 1.6-7; *see also* Letter from Michele Farquhar, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 at 1-2, Attach. at 4 (filed Jan. 12, 2015) (Neustar Jan. 12, 2015 *Ex Parte* Letter) (discussing the challenges and implications associated with various transition scenarios: (1) a single national flash cut; (2) a series of regional flash cuts; and (3) an incremental transition).

[514] *See supra* para. 71.

[515] RFP § 1.4.

[516] Stable and reliable number portability is nevertheless critical to the operation of a competitive telecommunications marketplace. TelePacific/Hypercube Comments at 2; Competitive Carriers Association Comments at 1; Suddenlink Comments at 4; *see also* Letter from James C. Falvey, Counsel to The LNP Alliance to Marlene H. Dortch, Secretary, FCC, at 1-4 (filed Jan. 12, 2015) (LNP Alliance Jan. 12, 2015 *Ex Parte* Letter).

[517] TRD § 1.3.

[518] *See infra* para. 154.

of the database may not cut over seamlessly. This is referred to as "reasonable degradation," or definite error rate (*e.g.* if you have 1 million transactions you may assume that a certain portion will fail).[519] The industry, the NAPM and Telcordia are well aware of these issues, which were present at the inception of the NPAC and a factor in a number of change orders implemented by the LNPA. Telcordia will work with all stakeholders to address these concerns. Moreover, as described more fully below, we will require additional oversight of the transition to ensure not only that it is implemented correctly from a technical standpoint, but also to ensure robust testing and outreach to users.[520] If concerns arise during or after the transition, any aggrieved parties will have the ability to seek relief. Parties always have the option of filing a petition with the Commission. In addition, any party may also avail itself of the portability dispute resolution process established in Commission rules.[521] Specifically, the rules state that "[p]arties shall attempt to resolve issues regarding number portability deployment among themselves and, if necessary, under the auspices of the NANC. If any party objects to the NANC's proposed resolution, the NANC shall issue a written report summarizing the positions of the parties and the basis for the recommendation adopted by the NANC. The NANC Chair shall submit its proposed resolution of the disputed issue to the Chief of the Wireline Competition Bureau as a recommendation for Commission review."[522]

151.     Neustar claims that the NAPM failed to consider the costs to transition to a new vendor with an "untested solution and inadequate transition plan."[523] Specifically, Neustar claims the NAPM failed to consider (1) direct service provider expenses such as third-party tests, training, and process development; (2) industry costs to manage the transition and develop a new NPAC functionality; and (3) law enforcement expenses to test and train on the new ELEP and IVR platforms.[524] We address these three concerns below.

152.     *Direct Service Provider Expenses.* Neustar argues that the NANC and working groups failed to consider and take into account in recommending Telcordia that users of the NPAC would bear certain additional direct costs as a result of transition to a new vendor. Neustar lists, for example, the costs for carriers to test the new NPAC, their costs to train on the use of the new NPAC, the costs of

---

[519] Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109  (filed Jan. 26, 2015) (Neustar Jan. 26, 2015 *Ex Parte* Letter), Attach., Hal J. Singer, Economists Incorporated, Addendum to "Estimated the Costs Associated with a Change in Local Number Portability Administration" at 2-3 (Singer Addendum); *see also* Neustar Jan. 12, 2015 *Ex Parte* Letter at 1-2, Attach. at 4 (discussing the challenges and implications associated with various transition scenarios: (1) a single national flash cut; (2) a series of regional flash cuts; and (3) an incremental transition).

[520] *See infra* para.158.

[521] 47 C.F.R. § 52.26(b)(3).

[522] *Id.*

[523] Neustar Comment Errata Aug. 6, 2014 at 86 ("Even where the price difference between two competing proposals is significant, that difference will still be smaller than the costs that could be entailed in transitioning to a new vendor with an untested solution and inadequate transition plan."); *see also* Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 2 (filed Dec. 3, 2014) (Neustar Dec. 3, 2014 *Ex Parte* Letter) (claiming that transition costs will "overwhelm the claimed potential savings from a lower-priced contract"); Neustar Jan. 12, 2015 *Ex Parte* Letter at 1-2 (citing comments that have highlighted possible costs and delays, stating that the process failed to address or consider costs and risks that could easily eliminate theoretical cost savings upon which the NANC's recommendation rests, and requesting that the FCC not undertake an "unnecessary and risky transition."); Letter from the Connecticut Utilities Regulatory Authority and the Vermont Public Service Board to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 09-109 at 1-2 (filed Dec. 19, 2014) (requesting that the FCC delay the transition date for the comprehensive testing of all LNP functionalities).

[524] Neustar Comment Errata Aug. 6, 2014 at 82.

64

"increased outages & service degradation in the early stages of the transition."[525] Neustar's consultant has estimated the costs to industry of the transition to be [**BEGIN CONFIDENTIAL**] ▮▮▮▮▮▮▮▮▮ [**END CONFIDENTIAL**] mostly attributable to "[e]arly-stage operations and system vulnerability."[526] This estimate is disputed in the record. Telcordia points out that Dr. Singer does not disclose his methodology or adequately source his inputs, and that in any event there is no basis for the significant costs for "early-stage operations," or porting errors, because Telcordia is an experienced provider of number portability services.[527] Telcordia's consultant, Dr. Burger, estimates the costs to the industry to test the new NPAC to be [**BEGIN CONFIDENTIAL**] ▮▮▮▮▮▮▮▮▮ [**END CONFIDENTIAL**] [528] and a few NPAC users have also disputed Neustar's estimate, predicting that costs will be far lower.[529] Neustar also commissioned an analysis conducted by the Standish Group of IT projects with similar complexity that concluded "the probability of a successful and timely NPAC transition is just 4 percent."[530] Neustar claims that the Standish Report demonstrates that the transition poses significant risks that will be borne disproportionately by smaller carriers,[531] and the costs associated with the transition [**BEGIN HIGHLY CONFIDENTIAL**] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [**END HIGHLY CONFIDENTIAL**] [532] Telcordia disputes this finding, claiming there was no validation of the Standish Report assumptions and that this report, and Neustar's other consultant reports, are simply efforts to defend Neustar's exaggerated estimates of transitions costs.[533] XO also refutes the Standish Report

---

[525] *Id.*; *see also* Neustar Dec. 9, 2014 *Ex Parte* Letter at 2 (claiming it has " demonstrated that the expected costs of transition- $60 million per month in the first year- dwarf even the full monthly cost of extending the current Neustar contract, let alone the difference between Neustar's proposal and Ericsson's proposal.").

[526] Neustar Jan. 26, 2015 *Ex Parte* Letter, Attach., Hal J. Singer, Economists Incorporated, Addendum to "Estimated the Costs Associated with a Change in Local Number Portability Administration" at 3 (Singer Addendum).

[527] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 at 1(filed Feb. 4, 2015) (claiming Dr. Singer's model used for the updated estimate of $1.136 billion in transaction costs "consists of little more than unsupported and unsupportable assumptions—including the incorrect assumption that Telcordia will make numerous errors because of a supposed lack of experience with the NPAC").

[528] Telcordia Oct. 17, 2014 *Ex Parte* Letter. Telcordia also maintains that a small subset of larger service providers and service bureaus may undertake more extensive testing of direct connections with the NPAC, in which case they may incur somewhat higher transition costs. According to Telcordia, the *S²ERC Report* projected these costs for larger providers, based on a comparison with implementation of the number pooling NPAC release, to [**BEGIN CONFIDENTIAL**] ▮▮▮▮▮▮▮▮▮ [**END CONFIDENTIAL**] *Id.* at 3, citing *S²SERC Report* at 13; *see also* Telcordia Oct. 27, 2014 *Ex Parte* Letter at 6-9 (refuting Neustar's estimates of transition costs).

[529] XO December 24, 2014 Letter at 8-13, 11 (refuting the reports done by Dr. Singer as well as by the Standish Group and stating that "XO has carefully evaluated the risks and costs associated with transition and estimates its non-recurring transition costs will be no more than [**BEGIN HIGHLY CONFIDENTIAL**] ▮▮▮▮ [**END HIGHLY CONFIDENTIAL**] for system testing and training"); *see also* CTIA 2014 Recommendation Reply at 2-8 (disputing Neustar's transition cost estimate and stating that any delay would impose massive costs that would dwarf transition costs).

[530] *See* Neustar Process Petition at 15, citing Standish Grp. Int'l, *Big Bang Boom*, at 2, http://www.standishgroup.com/sample_research_files/BigBangBoom.pdf (last visited Mar. 27, 2015) (Standish Report); *see also* Letter from Aaron M. Panner, Counsel to Neustar, Inc. to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, Attach. at 3-4 (filed Mar. 19. 2014).

[531] *See* Letter from Michele Farquhar, and Aaron M. Panner, Counsel to Neustar, Inc., to Chairman Wheeler and Commissioners Clyburn, Pai, Rosenworcel, and O'Rielly, FCC, CC Docket No. 95-116; WC Docket No. 09-109 at 6 (filed Feb. 14, 2014).

[532] Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 95-116, at 2 (filed Feb. 20, 2015) (Neustar Feb. 20, 2015 *Ex Parte* Letter).

[533] Telcordia Oct. 27, 2014 *Ex Parte* Letter at 6.

claiming it expressed its bias against selecting any LNPA vendor other than Neustar.[534]

153.    Of course, many of the transition costs would be avoided if Neustar remained the LNPA. But competitive selections bring opportunities for lower costs and innovation, and we do not agree that we should maintain the same LNPA indefinitely merely to avoid transition.  We also find here that, even assuming that Neustar's estimate of the costs to industry of transition are correct, **[BEGIN HIGHLY CONFIDENTIAL]** ███████████████████████ **[END HIGHLY CONFIDENTIAL]** [535]  We are convinced that **[BEGIN HIGHLY CONFIDENTIAL]** ██████████████████ **[END HIGHLY CONFIDENTIAL]** outweigh the costs and potential adjustments associated with the transition to a new LNPA.[536]

154.    Some commenters express concern that the impact of any transition should not be unduly borne by small providers.[537] Telcordia asserts that smaller providers that use the web-based Graphic User Interface (GUI) "may need to be familiarized with a slightly different screen layout, but the fields are specified and thus must be the same."  Telcordia also asserts that the NPAC technical interfaces, data structures, and business rules are very well-documented, and that for at least the last five years have been in stable operations with few technical changes.[538]  Therefore, Telcordia maintains, transition costs will be minimal for the vast majority of service providers.[539]  We think that the impact on providers will be

---

[534] *See* XO Dec. 24, 2014 *Ex Parte* Letter at 9 ("In other words, the Standish Group would find no justification for changing LNPA vendors *even if* the Standish Group itself believed the cost savings would outweigh the transition costs.").

[535] By comparing the two bidders' prices over time, and adding Neustar's estimated costs of transition to the price of Telcordia's bid, we see that **[BEGIN HIGHLY CONFIDENTIAL]** ████████████████████



**[END HIGHLY CONFIDENTIAL]**

[536] CTIA/USTelecom 2014 Recommendation Reply at 2; *see also* CTIA et al. Nov. 20, 2014 *Ex Parte* Letter at 1-2 *see generally*  Neustar Dec. 3, 2014 *Ex Parte* Letter at 1 (stating that transition costs are estimated to be $60M in the first year alone); *see also id.* at 3 (stating that "the Commission cannot simply look at gross price differentials"); *see also* Telcordia Oct. 27, 2014 *Ex Parte* Letter at 6-9 (refuting Neustar's estimates of transition costs).

[537] TelePacific/Hypercube Comments at 4; Competitive Carriers Association Comments at 1; Suddenlink Comments at 6; *see also* Letter from James C. Falvey, Counsel to LNP Alliance, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-155, WC Docket No. 09-109, at 1 (filed Mar. 12, 2015) (stating that an improperly implemented transition could impose significantly more costs than benefits on small carriers and consumers) (LNP Alliance Mar. 12, 2015 *Ex Parte* Letter); *see also* NCTA Mar. 3, 2015 *Ex Parte* Letter at 1-2 (requesting assurance that if any costs or burdens on small businesses should arise, that those are accounted for and mitigated).

[538] Telcordia Reply Comments, Exh. B, *Issues and Analysis of a Provider Transition for the NPAC* (July 22, 2014); *see also* Number Portability Administration Center, *NANC Change Orders,* https://www.npac.com/lnpa-working-group/nanc-change-orders (last visited Mar. 27, 2015).

[539] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 95-116 at (filed Mar. 16, 2015) (Telcordia Mar. 16, 2015 *Ex Parte* Letter) (stating that some small and medium carriers use service bureaus and other interface with the NPAC using GUI which requires little effort for transition, thus it is extremely unlikely for Telcordia to be able to disadvantage small providers to favor large wireless carriers); *see also* Letter from John T. Nakahata, Counsel to

(continued….)

66

reasonably mitigated by the requirement, set forth above,[540] that service providers' SOA and LSMS platform interface functionality will be unchanged, and by the use of web–based Graphical User Interfaces and common third-party service bureau platforms for SOA and LSMS functionality.[541]  We note, too, that many small providers today use third parties, such as Syniverse, to help navigate the NPAC.[542]  However, as described more fully below, to ensure that the transition is as smooth and efficient as possible for smaller provider, we direct the NAPM to reach out and involve small providers in planning LNPA transition requirements, schedules, and testing appropriate to their needs.[543]

155.     *Costs of developing a new NPAC.*  Neustar also argues that the NANC and the working groups failed to consider various "industry-wide expenses, such as project management of the transition; development and testing of new NPAC functionality to effect the transition (for example, data extraction & conversion); activity for the National Pooling Administrator to support testing of a new LNPA; and costs of extensions to Neustar's contract due to delay, including any period of overlap during region-by-region transition or for potential rollback purposes."[544]  The RFP made clear that the bids had to include expenses related to the transition and implementation of a new NPAC.[545]  Thus, to the extent that the new LNPA has start-up expenses associated with providing services required, its bid had to include those expenses.  Telcordia states that, as the bid documents require, it "will be building an NPAC that is compatible with all existing interface specifications," and "will work with the industry to develop and implement a comprehensive test plan to ensure that all constituents can process porting transactions."[546]  Thus, Telcordia's bid covers any costs to Telcordia for these elements.  Costs arising for the industry generally for any need to extend Neustar's existing contract or period of overlap are addressed above and, as explained, even using Neustar's assumptions regarding costs, **[BEGIN HIGHLY CONFIDENTIAL]** ██████████████████████████████ **[END HIGHLY CONFIDENTIAL]** [547]  Finally, to the extent Neustar is correct that there are other "industry-wide expenses" such as project management or pooling administrator testing, based on staff's recommendation and review, we are confident that they would not be so substantial **[BEGIN HIGHLY CONFIDENTIAL]** ████████████████ ████████████████ **[END HIGHLY CONFIDENTIAL]**

(Continued from previous page) ─────────────────
Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, WC Docket No. 09-109, CC Docket No. 95-116 at (filed Mar. 19, 2015) (Telcordia Mar. 19, 2015 *Ex Parte* Letter).

[540] *See supra* para. 150.

[541] *See also* NANC Meeting Transcript at 164-173 **[BEGIN CONFIDENTIAL]** ████████████████ ████████████████████████████ **[END CONFIDENTIAL]**

[542] XO Dec. 24, 2014 *Ex Parte* Letter at 12 (explaining that most small and medium carriers will not have major software upgrades as "companies like XO will rely on these third party vendors to establish and test their gateway services with the new NPAC databases, and XO will then administer test cases using the vendor gateways in order to ensure the data flows through appropriately"); *see also supra* note 539; USTelecom Mar. 19, 2015 *Ex Parte* Letter at 3-4 (stating that small and medium carriers will use service bureaus and will not be largely affected in transition and, while some smaller carriers may have raised issues in this proceeding, the industry at large – including many small and medium carriers – is unified in support of the Commission's draft Order).

[543] *See infra* para.159; *see also* LNP Alliance Mar. 12, 2015 *Ex Parte* Letter at 2.

[544] Neustar Comment Errata Aug. 6, 2014 at 82.

[545] RFP § 12.3.

[546] Telcordia Oct. 17, 2014 *Ex Parte* Letter; *see also* Neustar Jan. 12, 2015 *Ex Parte* Letter at 2 (stating that technology transitions usually take much longer and cost more than initially anticipated, such as Digital Television (22+ years) and the public safety broadband transition (20+ years)); *see also* Neustar Jan. 12, 2015 *Ex Parte* Letter Attach. at 4 - 6 (describing different transition methodologies and challenges).

[547] *See supra* note 535.  Neustar also suggests that the transition period could take three years and that its contract may need to be extended for that additional time.  But even if correct, this argument is merely a variation on its assertion that selecting Neustar as the next LNPA will eliminate transition costs.

156. *Costs and risks borne by the law enforcement community.* Neustar asserts that members of the law enforcement community will bear costs associated with testing and training on new systems.[548] We recognize that Telcordia will introduce a new ELEP,[549] and the transition will necessarily impose some costs on those who use it. But Neustar has not quantified those costs, and no one in the law enforcement community has contended that the costs associated with a new LNPA will be significant or that they should factor into our selection. In fact, members of the law enforcement community have filed comments in this proceeding, urging the Commission to ensure continued access by law enforcement personnel, but have stated that, as long as those concerns are met, they do not have an opinion as to which vendor is selected.[550] As we covered ELEP and emergency porting in earlier discussions,[551] we turn to synchronization. Telcordia states that it will provide all of the functionality of the current NPAC, including number synchronization with PSAPs, as currently offered by Neustar.[552] Concerning law enforcement and national security, Telcordia states that there will be "no functionality gap" with respect to its offerings as the LNPA.[553] We accept Telcordia's proffer and will ensure that it is codified in the LNPA contract. In addition, several commenters raise concerns, without advocating for a particular bidder, that ELEP, emergency porting post-disaster, and synchronization of numbers with PSAPs continue under the new LNPA contract.[554]

157. The FoNPAC members considered carefully the potential risks and costs of changing to a new LNPA and determined that these potential transition risks could be appropriately mitigated with careful project and risk management.[555] The NANC SWG members reviewed and analyzed the FoNPAC's determinations with respect to risks and costs of transition on behalf of the NANC, and

---

[548] Neustar Process Petition at 24-25 (stating that the Commission cannot be assured that significant transition expenses for law enforcement will be avoided).

[549] *See* Response of Telcordia Technologies, Inc., d/b/a iconectiv to Neustar Reply Comments to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 09-109, 07-149 at 1 (filed Sept. 24, 2014) (explaining that "the RFP established robust security and ELEP requirements; Telcordia fully addressed and satisfied those requirements; and the details of implementation will obviously be addressed as a matter of routine contract administration.").

[550] *See* FBI 2014 Recommendation Reply at 2-3 (stating that "[w]hile the Federal Law Enforcement Agencies take no position on either the selection of Telcordia as the LNPA vendor…it is appropriate for the Commission to consider the ability of the LNPA vendor to satisfy the important law enforcement, public safety, and national security equities of the Federal, State, Local, and Tribal law enforcement agencies").

[551] *See supra* paras. 95-100.

[552] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket No. 95-116 at 3 (dated Oct. 27, 2014) (Telcordia Oct. 27, 2014, *Ex Parte* Letter).

[553] Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116; WC Docket No. 09-109 (filed Dec. 18, 2014).

[554] *See supra* para. 118.

[555] See *supra* para. 71; *see also* CTIA Dec. 8, 2014 *Ex Parte* Letter at 3 ("The very notion of an RFP, however, contemplates that a different vendor may be selected. And Neustar has presented no cogent evidence that a smooth transition to Telcordia could not be accomplished."); *see also* Former State Commissioners Mar. 16, 2015 *Ex Parte* Letter at 1 (stating that they take no position on the vendor selected but encourage the Commission to accomplish the transition in a "measured manner"); *see also* Letter from James Bradford Ramsey, General Counsel, National Association of Regulatory Utility Commissioners (NARUC) to Hon. Thomas Wheeler, Chairman, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109 at 1 (filed Mar. 18, 2015) (urging the Commission to ensure an adequate timeframe for a proper transition and requesting that the Commission seek input from NARUC's public service commissions on any draft transition plan); *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116 (filed Mar. 19, 2015) (stating that Telcordia will work cooperatively with NARUC and all state and local government stakeholders as it implements its NPAC database and associated systems).

ultimately, the NANC evaluated and agreed with these determinations.[556] The Commission has independently reviewed and analyzed the risks and costs associated with the transition to a new LNPA. We concur with the FoNPAC's and the NANC's assessment of the potential risks and costs associated with that transition and with their conclusions that they can be mitigated appropriately.

158. We nonetheless believe that the NPAC is a national resource that provides critical inputs to communications services, public safety, and law enforcement. While, based on staff's recommendation and review, we are confident that Telcordia can provide the necessary functionalities, any transition involving important communications infrastructure should be undertaken with care. We therefore direct the NAPM to take all necessary steps to ensure that the transition is overseen by experienced third parties familiar with communications infrastructure, project management, and change management. The NAPM shall provide the Commission with a detailed transition oversight plan within 30 days of the release of this Order. The Wireline Competition Bureau, with support from the Public Safety and Homeland Security Bureau, will be responsible for approving the transition plan (including directing any necessary changes before such approval).[557] The NAPM shall also provide status reports to the Bureau every 30 days during the transition, and should immediately notify the Bureaus of any concerns or issues as the transition unfolds. The Bureau will provide regular updates to the Chairman and Commissioners throughout the transition.

159. The Transition Oversight Plan should include oversight, timelines, performance benchmarks and incentives, dispute resolution, testing,[558] stakeholder outreach and education (with emphasis on smaller providers), and steps to ensure security and reliability. Throughout the transition, the NAPM and its third-party manager shall determine and enforce relative responsibilities of the incumbent and the incoming LNPA to maintain all porting, law enforcement assistance, and other service, and establish a plan to ensure that, throughout the transition, network security and public safety are protected.[559] The NAPM may identify additional work requirements for the third-party manager.[560]

---

[556] CTIA Dec. 8, 2014 *Ex Parte* Letter at 3 (stating "the RFP required prospective bidders to submit detailed plans demonstrating how they would manage multiple aspects of a transition… [a]nd the FoNPAC, SWG, and NANC itself each diligently evaluated those issues.").

[557] Suddenlink Comments at 2-3 ("The transition from one vendor to another of the many systems, databases and complex processes involved in managing those 650 million telephone numbers, and related transactions, will be complex. That process will likely require a multifaceted campaign of coordination across thousands of carrier accounts, law enforcement and public safety agency contacts, regulators and other stakeholders during the transition. Such a transition will need to rely upon seamless and cohesive management, sequencing of interdependent work streams, and participation by multistakeholder groups over a fixed timeline."); Neustar Comments at 92; Public Utilities Division of the OK Corp. Comm. Reply Comments at 3.

[558] Testing should involve public safety services and the law enforcement community, with assistance from Public Safety and Homeland Security Bureau, to ensure that appropriate testing and validation is conducted to ensure that safety-of-life response and law enforcement operations remain uninterrupted. Testing should also involve the industry users of the database, in particular smaller providers. *See* Public Utility Division of the OK Corp. Comm. Reply Comments at 4 ("Ensuring the integrity of the 9-1-1 system is paramount and any transition plan must include adequate development and testing time, even if that involves an extension of time beyond the current June, 2015 contract expiration date."); Consolidated Law Enforcement Nov. 21, 2014 *Ex Parte* Letter ("[W]e request that before the number portability system is transitioned, the public safety community be directly involved with any testing and transition planning for LEAP ]."); *see also* Neustar Feb. 20, 2015 *Ex Parte* Letter at 3 (stating that, "if the Commission ultimately decides to select a vendor other than Neustar to serve as LNPA, additional transition services agreements would have to be negotiated in any event, because the provisions of the current agreement do not adequately cover the services that would be required to effectuate a transition.").

[559] We direct the NAPM to consider what remedies, including, if appropriate, financial penalties, should attach if the incumbent should fail to meet its obligations to ensure the protection of these interests.

[560] Letter from Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116, at 1-2 (filed Mar. 6, 2015) (requesting the Commission ensure that an LNPA selection order be certified by an independent third party transition manager before transition begins and that a "fail-

(continued….)

Furthermore, the Commission expects Telcordia and Neustar to carry out their respective transition responsibilities in good faith and in a reasonable and cooperative manner. Each company's record in successfully transitioning from and to the LNPA may be considered by the government in past performance evaluations under future procurements, e.g., the Commission's numbering contracts. This includes, but is not limited to, adherence to schedules, reasonable and cooperative behavior and commitment to customer satisfaction, integrity and business ethics, and business-like concern for the interests of the customer.

### E.    Neutrality Considerations

160.    *Background.* Section 251(e) of the Act provides that "[t]he Commission shall create or designate one or more *impartial entities* to administer telecommunications numbering and to make such numbers available on an equitable basis."[561] In 1997, the Commission adopted criteria to ensure that numbering administrators[562] would be neutral consistent with that statutory requirement.[563] The neutrality criteria provide that a numbering administrator:

(a)(1)(i)  . . . may not be an affiliate of any telecommunications service provider(s)....

(ii)  . . . may not issue a majority of its debt to, nor may it derive a majority of its revenues from, any telecommunications service provider…and

(iii)  Notwithstanding the neutrality criteria set forth in paragraphs (a)(1)(i) and (ii) of this section,... may be determined to be or not to be subject to undue influence by parties with a vested interest in the outcome of numbering administration and activities.[564]

In determining whether all potential or existing numbering administrators are neutral, the Commission has applied the neutrality criteria set forth in section 52.12 of its rules since they were adopted in 1997. In particular, the Commission has required that numbering administrators be impartial, non-governmental entities, not aligned with any particular industry segment.[565] For example, in evaluating Neustar's ability

---

(Continued from previous page)

back" capability be maintained until the any new system is at the same level as the existing NPAC); *see also* Letter from Aaron M. Panner, Counsel to Neustar, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116, at 1-2 (filed Mar. 12, 2015); *see also* Telcordia Mar. 16, 2015 *Ex Parte* Letter at 5 (stating that Telcordia will have a comprehensive testing and rollback plan that will be agreed to by the industry and that Neustar's transition requirements are duplicative); *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116, at 1-2 (filed Mar. 19, 2015) (stating that Telcordia envisions a "transition overseer" to assist in program managing transition functions, but Neustar's proposed "transition overseer" extends far beyond facilitating transition, which would be helpful; in addition, subjecting contracts to FCC review is not legally required and would delay implementation further); *see also* Telcordia Mar. 19, 2015 *Ex Parte* Letter at 5; *see also* USTelecom Mar. 19, 2015 *Ex Parte* Letter at 4-5 (stating that the industry group did not express a preference for a third party administrator, although mentioned it may be useful to resolve any potential disputes; nevertheless, a third party is not necessary to address technical aspects of the transition and was opposed to seeking public comment on the LNPA contract); *see also* Letter from James C. Falvey, Counsel to the LNP Alliance, to Marlene H. Dortch, Secretary, FCC, at 1-2, 5-6, Attachs. (filed Mar. 19, 2015) (expressing support for a third party transition manager and seeking comment on the LNPA contract, in addition to proposing a list of conditions for a new LNPA, attached as Exhibit B).

[561] 47 U.S.C. § 251(e)(1) (emphasis added).

[562] *See generally* 47 C.F.R. § 52.12, which provides neutrality rules for the North American Numbering Plan Administrator and the associated Billing and Collection Agent but has been expanded to cover other number administrators. *See supra* para. 7.

[563] *Id.*

[564] 47 C.F.R. § 52.12 (a)(1)(i)-(iii).

[565] *See* 47 C.F.R. §§ 52.12, 52.21(d). *See also* 47 C.F.R. §52.21(k) (defining the term "LNPA" in part as "an independent, non-governmental entity, not aligned with any particular telecommunications industry").

70

to serve as a neutral North American Numbering Plan Administrator when it changed from a privately held company to a publicly held company, the Commission determined that no telecommunications service provider (TSP) or TSP affiliate may own five percent or more of Neustar's stock.[566]

161.    The RFP identified neutrality criteria that the next LNPA must meet. Those criteria incorporate the Commission's neutrality criteria. [567] Each party bidding on the contract was required to file an opinion of counsel describing how it would meet the Commission's neutrality criteria, and each bidder did so.

162.    *Telcordia's Relationship with Ericsson*.  Telcordia is a wholly-owned subsidiary of Ericsson, a Swedish company manufacturing communications equipment, software, and providing managed network services.  Neustar asserts that Telcordia relies on, or is otherwise intertwined with, its parent Ericsson for credit, business planning, interest rates, and employees among other things, and that each of these areas provide Ericsson with an opportunity to affect Telcordia's neutrality by, among other things, controlling Telcordia's access to capital through intercompany loans, and controlling Telcordia's budget.[568]

163.    Telcordia claims that Ericsson's Code of Business Ethics prohibits service on a board of directors if such service would create a conflict of interest, and states that Telcordia's board of directors will be constituted with a majority of independent directors.  Telcordia further explains that all of Telcordia's other businesses, apart from its Interconnection Business Unit, have been moved to other Ericsson divisions.  Telcordia states that additional structural safeguards and a Code of Conduct will be put in place for Telcordia to ensure its neutrality.[569]

164.    ***Discussion***.  The Commission is committed to ensuring that the next LNPA complies with our neutrality criteria.  As it has done in the past, the Commission will take steps necessary to ensure that the LNPA is neutral, and remains neutral throughout the term of its contract.  This is the first opportunity that the Commission has had to consider the neutrality of a newly selected LNPA under the neutrality requirements as codified in section 52.12 of our rules.  This inquiry is also unique, one of first impression, inasmuch as the recommended numbering administrator in this case is a wholly-owned subsidiary of a company that both makes telecommunications equipment and manages networks for telecommunications service providers.  This is not the first time, however, that the Commission has evaluated an entity's ability to meet our neutrality requirements despite having relationships with the TSPs.  In that regard, the *Warburg Transfer Order* is instructive. Similar to the manner in which the Commission undertook a careful evaluation of Neustar's and its predecessor Lockheed Martin's fitness to serve as a neutral North American Numbering Plan Administrator (NANPA) in that Order, Commission staff has undertaken a careful and even more extensive review of Telcordia's fitness to serve as a neutral LNPA.

165.    To determine whether Telcordia, a wholly-owned subsidiary of Ericcson, meets our neutrality requirements, we evaluated Telcordia's opinion of counsel and related submissions.  We also considered challenges asserting that Telcordia does not satisfy neutrality requirements.  We conclude that Telcordia has demonstrated that it is not a TSP, is not affiliated with a TSP,[570] and does not issue a

---

[566] *See In the matter of North American Numbering Plan Administration Neustar, Inc.*, CC Docket 92-237, Order, 19 FCC Rcd 16982, 16991, para. 22. (2004) (*Safe Harbor Order)*; *see also supra* note 23.

[567] *See* RFP § 3.4 (citing to, among other things, 47 C.F.R. § 52.12(a)).

[568] Neustar Reply at 25-26.

[569] *See generally* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to The Future of NPAC Subcommittee and the North American Portability Management LLC at 4-5 (filed Apr. 4, 2013) (Initial Opinion).

[570] 47 C.F.R. 52.12(a)(1)(i).

majority of its debt to, nor derive a majority of its revenues from, a TSP.[571]  We further conclude that Telcordia, subject to conditions we impose in this Order and the safeguards that Telcordia has offered,[572] will not be subject to undue influence by parties with a vested interest in the outcome of LNP administration and activities.[573]

166.     As a requirement of the RFP, Telcordia filed an opinion of counsel as well as supplemental information in response to Commission requests.[574]  In its Initial Opinion, counsel for Telcordia states that Telcordia is not a TSP nor is it affiliated with a TSP.  It has not issued a majority of its debt to, and does not derive a majority of its revenues from, a TSP.  Counsel asserts that Telcordia is not subject to undue influence, and that it is not aligned with any industry segment.[575]  Telcordia's responses to specific challenges are set forth below.

167.     ***Challenges to Telcordia's Neutrality Showing.***  Neustar filed extensive comments challenging Telcordia's neutrality showing.[576]  CTIA/USTelecom and the LNP Alliance also commented on Telcordia's neutrality.[577]  CTIA/USTelecom assert that Telcordia would be a neutral LNPA; the LNP Alliance asserts that it would not.

168.     Telcordia proposed safeguards intended to address any concerns about its neutrality.  Although we agree that those conditions are of value, we find that additional safeguards are appropriate to satisfy the neutrality requirement.[578]  We find that, when considered together in light of the safeguards and conditions that we adopt in this Order, Telcordia will not be subject to undue influence by Ericsson, nor will Ericsson adversely affect Telcordia's ability to serve as a neutral LNPA.[579]  Telcordia has proposed safeguards to ameliorate possible undue influence from Ericsson.  These include a proposal that Telcordia's board of directors have a majority of independent directors, to prevent control by the Ericsson-appointed directors.  Also, the RFP requires a bi-annual neutrality audit.  We conclude that the audit will disclose inappropriate conduct, should it occur, and enable us to take remedial action.  It will further act as a deterrent to inappropriate conduct before it occurs.  We also note that having Ericsson as its parent will give Telcordia a reliable source of financing.[580]  We therefore conclude that these safeguards, coupled with the conditions we impose in this Order, will ensure that Telcordia will not be subject to undue influence by Ericsson or other outside parties.

---

[571] 47 C.F.R. 52.12(a)(1)(ii).

[572] *See* Telcordia 2014 Recommendation Reply at 29-30.

[573] *Cf.*, 47 C.F.R. 52.12(a)(1)(iii) (referring to "numbering" administration and activities with respect to the NANPA and Billing and Collection Agent).

[574] *See* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to The Future of NPAC Subcommittee and the North American Portability Management LLC, (filed Apr. 4, 2013) (Initial Opinion), as supplemented by the letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to The Future of NPAC Subcommittee and Sanford S. Williams, FCC (filed Nov. 13, 2013) (Supplemental Opinion). *See also*, Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC (filed Sept. 17, 2014) (Telcordia Sept. 17, 2014 *Ex Parte* Letter).

[575] *See* Initial Opinion at 5-6; Telcordia 2014 Recommendation Comments at 13-5.

[576] *See* Neustar 2014 Recommendation Comments at 13-50; *see also* Neustar Reply at 6-30, *see also* Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, at 14-18 (filed Sept. 23, 2014).

[577] *See* CTIA/USTelecom 2014 Recommendation Comments at 16-18; *see also* CTIA/USTelecom 2014 Recommendation Reply at 11-12; *see also* LNP Alliance Comments at 11-17, *see also* LNP Alliance Reply at 2-4; *see also* LNP Alliance Mar. 12, 2015 *Ex Parte* Letter at 2-4.

[578] The Commission used the same approach with Neustar, imposing conditions to ensure neutrality.

[579] *See infra* paras. 179-188.

[580] *Cf. Warburg Transfer Order*, 14 FCC Rcd at 19807, para. 22 (finding that having Warburg as its corporate parent will provide Neustar with a reliable source of financing).

169.    Neustar also claims that, because Ericsson is a major manufacturer of telecommunications networking equipment and provides infrastructure service to many of the nation's TSPs, with a 40 percent global market share in wireless network infrastructure, and also arranges vendor financing for TSP customers, Telcordia cannot be neutral.[581]  Neustar further claims that the Commission's regulations require an evaluation of whether *Ericsson* "(a) is aligned with any particular segment of the telecommunications industry; (b) is subject to undue influence from any party with a vested interest in the outcome of numbering administration; or (c) is a manufacturer of telecommunications network equipment."[582]  Neustar also asserts that a prohibition against a manufacturer of telecommunications network equipment serving as the LNPA was incorporated into the Commission's rules by reference,[583] and thus Ericsson is barred from serving as LNPA. We disagree, and find that *Ericsson's* equipment manufacturing activities do not, *per se*, disqualify *Telcordia* from serving as the LNPA.

170.    As an initial matter, we reject Neustar's apparent position that the Commission must evaluate Ericsson's neutrality, rather than Telcordia's.  Telcordia, not Ericsson, will serve as the LNPA, and thus it is Telcordia's neutrality that must be evaluated for compliance with our neutrality requirements.[584]  To the extent that Neustar contends that the Commission must separately or solely evaluate Ericsson's neutrality, we reject that contention.[585]  Further, we note that Telcordia itself is not a telecommunications equipment manufacturer, so even if the Commission had incorporated the language to which Neustar refers as a "prohibition" into its rules, that specific language would not extend to Telcordia.  Moreover, as Telcordia notes, the language purporting to prohibit an equipment manufacturer from serving as the LNPA was not a recommendation in the 1997 Selection Working Group Report; rather, it appeared in a section of the report describing the process followed by the 1997 Selection

---

[581] Neustar 2014 Recommendation Comments at 18-20; *see also* New America Mar. 9, 2015 *Ex Parte* Letter Attach. at 12, 16 (stating that if the LNPA is influenced by telecommunications service providers, *e.g.* the wireless industry, it will not maintain or implement services or processes to facilitate porting and would benefit from the lack of "churn"); *see also* LNP Alliance Mar. 12, 2015 *Ex Parte* Letter at 3 (stating that because effective number porting causes "churn" for the larger carriers and benefits the smaller carriers, there may be incentive not to effectively port; and therefore, Commission should measure the impact of the LNPA transition prior to making a decision on the next LNPA); *see also* Telcordia Mar. 16, 2015 *Ex Parte* Letter at 4 (disputing the arguments that the selection of Telcordia will create a bias in favor of large wireless carriers to the detriment of smaller competitors): *see also* USTelecom Mar. 19, 2015 *Ex Parte* Letter at 1-3 (refuting LNP Alliance's arguments that small and medium carriers were excluded and it was over burdensome for smaller carriers to participate); *see also* Telcordia Mar. 19, 2015 Response to New America *Ex Parte* Letter at 2, 4 (stating that Telcordia refutes the allegation that it could discriminate against small providers as there will be no material change in the way carriers will interact with the NPAC); *see also* Telcordia Mar. 20, 2015 *Ex Parte* Letter at 3-4 (stating that Telcordia's selection is supported by a wide range of carriers and small entities usually interact with the NPAC through larger intermediaries the same way larger carriers do, or through a GUI). We find that concerns about discriminatory service quality and port timing requirements are sufficiently addressed by the service standards set forth in the bid documents and Commission rules, and note that that Telcordia committed in its bid to meeting the requirements in the bid documents.  We find these concerns speculative, particularly in light of the conditions we impose to ensure Telcordia's neutrality and independent decision-making.

[582] *See* Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, at 1-2 (filed Oct. 17, 2014).

[583] Neustar Reply at 16 (Neustar states that the Commission's rules do not permit a telecommunications equipment manufacturer or its affiliate to act as the LNPA citing the NANC Working Group Report, *supra* para.169, that Neustar claims were explicitly incorporated into 47 C.F.R. § 52.26(a).)).

[584] *Cf.*, *Warburg Transfer Order*, 14 FCC Rcd at 19806, paras. 21-22 (where the Commission explains that it is Neustar, not Warburg, that is subject to the neutrality requirements and further explains that Neustar's affiliation with Warburg will provide it with a reliable source of financing).

[585] Alternatively, if we were to consider Ericsson's role as the sole shareholder of Telcordia, we consider that the conditions imposed by this order are sufficient to deal with any influence that Ericsson may have over Telcordia.

Working Group to arrive at its recommendations to the Commission.[586]  The Commission expressly incorporated by reference into its rules certain *recommendations* of the 1997 Selection Working, not the report in its entirety.[587]  Consequently, we reject the claim that the Commission in fact or in effect intended categorically to prohibit telecommunications equipment manufacturers from serving as the LNPA.

171.    *Ericsson's Relationship with Industry Segments.* Neustar claims that Ericsson's extensive business interests in the telecommunications sector disqualify Telcordia from serving as the LNPA.[588]  In particular, Neustar claims that Ericsson has entered into Managed Service Agreements (MSAs) with Sprint and T-Mobile which in turn gives Sprint and T-Mobile a significant role in the management and policies of Ericsson.[589]  Additionally, Neustar alleges that the terms of the Sprint MSA require Ericsson's employees to comply at all times with the policies and procedures of Sprint.[590]  Further, the LNP Alliance argues that **[BEGIN HIGHLY CONFIDENTIAL]** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ **[END HIGHLY CONFIDENTIAL]** Neustar and the LNP Alliance claim that Ericsson is "aligned with" the wireless industry and thus cannot be neutral, and neither can its subsidiary, Telcordia.[592]

172.    First, we note that these contractual relationships are with Ericsson, not Telcordia.  Even if, however, by virtue of these contractual relationships, Sprint and T-Mobile might attempt to exert undue influence over Ericsson, which commenters have not shown is likely, nothing in the record demonstrates that Sprint or T-Mobile could exert undue influence over Telcordia, particularly Telcordia's independent board, although we appreciate that it could hypothetically occur.  Similarly, even if Ericsson is aligned with the wireless industry, we cannot conclude that such alliance spills over to Telcordia.[593]  Telcordia is a separate company with a separate independent board of directors, each of whom owes fiduciary duties to Telcordia.  We therefore reject the broad and unsubstantiated claim that Telcordia does not meet the Commission's neutrality requirements because of Ericsson's business relationships.[594]

---

[586] Telcordia 2014 Recommendation Reply at 16.  *See* 1997 Working Group Report (§ 4.2.2 provides an example of one of the seven regional RFP's which provided certain conflict of interest provisions.  The 1997 Selection Working Group referred to such provisions but did not adopt them when making its recommendations).

[587] *See* 47 C.F.R. § 52.26 (a).  Former Commissioner Furchtgott-Roth argues that the express exclusion in Rule 52.26(a) of portions of Appendices D and E of the 1997 SWG Report – which are not themselves recommendations -- demonstrates that more than just the Report's recommendations were incorporated into the rule.  *See* Letter from Aaron M. Panner, Counsel to Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, Attach. at 7-8 (filed Mar. 12, 2015).  In Furchtgott-Roth's view, if "only language specifically marked 'recommendations' were included, there would have been no reason for the Commission to have excluded those [appendix sections]."  *Id*. at 8.  We disagree.  The "recommendations" section of the Report cross references Appendices D and E.  *See, e.g.*, 1997 SWG Report § 6.5.4 (cross referencing Appendix D), § 6.7.2 (cross referencing Appendix E).  The express exclusion of portions of those appendices from Rule 52.26(a) thus serves the purpose of eliminating any question about whether the excluded materials were incorporated into the recommendations by virtue of the cross references.

[588] Neustar 2014 Recommendation Comments at 14; Neustar Reply at 9.

[589] Neustar 2014 Recommendation Comments at 15 (stating that in these Managed Service Agreements, Ericsson undertakes responsibility for network design, planning and building, and day-to-day operations).

[590] Neustar 2014 Recommendation Comments at 16.

[591] LNP Alliance Comments at 13; *see also* Telcordia Mar. 20, 2015 *Ex Parte* Letter at 3-4; *see also supra* note 581.

[592] Neustar 2014 Recommendation Comments at 21, Alliance Comments at 4.  *See* 47 C.F.R. §52.21(k).

[593] Thus, even to the extent that Ericsson is "aligned with" the wireless industry as that term is understood in our neutrality rules, it does not follow that Telcordia is so aligned.

[594] We also reject the suggestion that the only way to remedy the corporate bond between Ericsson and Telcordia is for Telcordia to be "spun off" from Ericsson.  The conditions that are imposed in this order make such a spin off

(continued….)

Further, Neustar's claim that the MSAs give Sprint and T-Mobile a significant role in Ericsson's management and policies by, for example, requiring Ericsson's employees to comply with Sprint's policies and procedures, is unsubstantiated speculation. We are persuaded by Telcordia's explanation that such provisions are standard independent contractor provisions that simply require Ericsson's employees to abide by such policies in connection with the provision of the services under the agreement or while on Sprint's property.[595] We thus reject the claim that such provisions empower Sprint and T-Mobile to exert undue influence over Telcordia, particularly when considered in conjunction with the conditions that we impose in this Order.

173. *Compliance with Warburg Transfer and Safe Harbor Orders*. Neustar claims that the conditions imposed on it by the *Warburg Transfer Order* and the *Safe Harbor Order* should be imposed on Telcordia.[596] We disagree. Those conditions were adopted to deal with situations specific to Neustar. In the *Warburg Transfer Order*, for example, the Commission imposed conditions to address the affiliation of Neustar's majority owner, Warburg, Pincus & Co.[597] The conditions in the *Safe Harbor Order* were imposed to ensure that Neustar would remain neutral despite its transition from a privately held to a publicly owned company. These issues are not present here and the conditions imposed in those Orders are not pertinent.[598] To the extent the decisions have relevance, they are useful to show that the Commission has, and will exercise ample authority to ensure that the contract includes targeted conditions to ensure that the LNPA is neutral and remains neutral throughout the term of the contract.

174. *Telcordia's Provision of LSMS/SOA Systems*. The LNP Alliance comments that if Telcordia became the LNPA while also supplying LSMS/SOA systems[599] that service providers need to access the NPAC, Telcordia would be in a unique position to provide favorable treatment or preferred information flow to its own systems.[600] In response, Telcordia points out that Neustar is also a leading provider of LSMS/SOA services, but there is no indication that Neustar has had an opportunity to leverage its control of the NPAC into a monopoly.[601] We find that the potential for Telcordia to provide preferential treatment to some customers is speculative. We note that the Commission retains oversight of the LNPA, and if evidence suggests a potential problem regarding Telcordia's neutrality, we have the ability to investigate and, if appropriate, take remedial action, including imposing additional conditions. We thus reject the argument that Telcordia does not meet our neutrality requirements based merely on speculation that Telcordia might act in a non-neutral manner because it also provides LSMS/SOA systems.

---

(Continued from previous page) ————————————

unnecessary. *See* Letter from James C. Falvey, Counsel to the LNP Alliance, to Marlene H. Dortch, Secretary, FCC, at 2 (filed Dec. 11, 2014).

[595] Neustar 2014 Recommendation Comments at 25-27.

[596] Neustar 2014 Recommendation Comments at 24-27. *See also Warburg Transfer Order*, 14 FCC Rcd at 19792 (requiring Neustar's majority shareholder, *inter alia*, to reduce its stockholding to under 10% due to its affiliations with TSPs); *see also Safe Harbor Order*, 19 FCC Rcd at 16982, paras. 16988 - 95 (removing certain conditions imposed on Neustar in order to allow it to become a publicly-traded company and imposed other conditions relating to its ownership as a widely-held company).

[597] *Warburg Transfer Order*, 14 FCC Rcd at 19798, para. 8.

[598] Telcordia is not affiliated with a TSP. Further, Telcordia is a private company, being a wholly-owned subsidiary of Ericsson, having no need of the public company safeguards that were imposed on Neustar in the *Safe Harbor Order*.

[599] *See supra* note 302 for an explanation of LSMS/SOA systems.

[600] Alliance Comments at 11, Alliance Reply at 2-4. *See also* Letter from James C. Falvey, Counsel to LNP Alliance, to Marlene H. Dortch, Secretary, FCC, at 5, Attach. at 13 (filed March 12, 2015); New America Mar. 9, 2015 *Ex Parte* Letter at 2 (stating that combining all of the databases—LSMS/SOA, LERG, BIRRDS and the NPAC—into one entity creates the opportunity for Telcordia to remain dominant in the LSMS/SOA market).

[601] Telcordia 2014 Recommendation Reply at 34-35.

175.    *Neutrality Issues Raised by Telcordia's Subcontractor Sungard.*  Telcordia stated in its bid that it will use Sungard to provide database management services at Telcordia's direction.  Neustar asserts that Sungard, Telcordia's contractor, is not neutral.[602]  Specifically, Neustar asserts that two of Sungard's ultimate owners hold significant interests in Avaya, a provider of VoIP service.[603]  Neustar further points out that Sungard is an affiliate of Sungard Network Solutions Inc. (SNS) and that SNS is a TSP.[604]  Also, Neustar states that KKR, an owner of Sungard, owns a 30 percent interest in Rignet, a TSP.

176.    Telcordia argues that Avaya is not an affiliate of Sungard, that SNS does not provide common carrier services and is therefore not a TSP, and that different funds, forming part of KKR, own interests in Rignet and Sungard, making them legally separate.[605]  With respect to Sungard's parent, Sungard Data Systems., Inc., Telcordia asserts that the two owners that have a greater than 10 percent interest in a TSP will recuse themselves from participating in any material discussions or decisions involving the contract between Sungard and Telcordia, including excluding themselves from any day-to-day decision-making.[606]

177.    We find that Telcordia's contractual relationship with Sungard will not disqualify Telcordia, on neutrality grounds, from serving as the LNPA.  As an initial matter, we find that only subcontractors that perform certain key administration functions are required to meet the Commission's neutrality criteria.[607]  In the context of the NANPA, for example, the Commission has held that neutrality need only be satisfied with respect to subcontractors that perform specific functions, namely "NANP administration and central office code administration."[608]  These functions can be described as core functions of the NANPA, which is primarily tasked with assigning NANP numbering resources.  By analogy, we find that the core functions of the LNPA include LNP administration, central office code administration, and billing and collection functions.  Thus, we will apply our neutrality requirements only to those LNPA subcontractors that will provide such core LNP activities.  Telcordia asserts that it will contract with Sungard to provision data center hardware and software, which in turn will provide robust security and service continuity protection.[609]  Because we find that Sungard will not provide core LNP activities, we conclude that we need not evaluate Sungard under our neutrality criteria.  Nevertheless, it is appropriate to consider whether Telcordia, as the LNPA, would be "subject to undue influence by parties with a vested interest in the outcome of numbering administration and activities" by virtue of its contractual relationship with Sungard.[610]

---

[602] Neustar 2014 Recommendation Comments at 35, Neustar Reply at 17-20.

[603] Neustar 2014 Recommendation Comments at 40; Neustar Reply at 20.

[604] Neustar 2014 Recommendation Comments at 40.

[605] Telcordia 2014 Recommendation Reply 37-42; *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC (filed Dec. 9, 2014) (stating that Rignet had filed an application with the Commission to discontinue all domestic common carrier services as of January 1, 2015, which application was automatically granted on November 24, 2014).

[606] Initial Opinion at 15.  Subsequently, in April 2014, Sungard's parent was spun off.  Sungard is now owned by Sungard Availability Services Holdings, LLC which is, in turn, owned by seven private equity funds. *See* Telcordia 2014 Recommendation Comments at 16; *see also* Telcordia 2014 Recommendation Reply at 37-38.

[607] *See* 47 C.F.R. § 52.12(a)(2). We acknowledge that the rule expressly applies only to the NANPA and the Billing and Collection Agent, but because the Commission has extended its neutrality requirements to other numbering administrators, *see supra* note 562 and accompanying text, we apply these provisions in our analysis of the Telcordia's neutrality.

[608] *Id.*

[609] *See* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc., d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, at 2 (filed Oct. 17, 2014).

[610] 47 C.F.R. § 52.12(a)(1)(iii).

178.     Moreover, Sungard lacks both the ability and the incentive to exert improper influence over LNP administration.[611]  First, Sungard is unlikely to be in a position to affect number porting decisions.  Telcordia states that it will use Sungard to run its data center and manage certain databases in a data center, which are largely ministerial functions.[612]  Sungard will not enter data into the databases or determine the order in which ports are processed. Second, a minority of Sungard's owners are alleged to have interests in TSPs.  Sungard has a disincentive to permit such minority interests from jeopardizing the ongoing contractual relationship with Telcordia.  Third, Telcordia's board members each owe to the company a fiduciary duty that will help preserve ongoing neutral administration of the contract.  Fourth, the bi-annual audit will include an audit of the operation of Telcordia's contract with Sungard, and thus should alert us to any improprieties, including undue influence by Sungard, involving Telcordia's LNPA operations.  Finally, the additional conditions that Telcordia offers or that the Commission unilaterally imposes, as set forth below, address any lingering concerns.  Accordingly, we find that Telcordia's contractual relationship with Sungard will not subject Telcordia to undue influence.  Thus Sungard may serve as Telcordia's subcontractor and perform the functions that Telcordia has described it will perform.

179.     ***Safeguards and Conditions***.  The neutrality of the LNPA is a cornerstone of the statute and our regulations concerning the qualifications of the LNPA and the conditions that we adopt in this Order are designed to ensure such neutrality is preserved.[613]  Telcordia has implemented a number of safeguards as part of its neutrality showing that when, coupled with the conditions we impose herein, lead us to conclude that Telcordia meets our neutrality requirements.  Initially, as of January 1, 2013, all of Telcordia's operations and employees other than its former Interconnection Business Unit operations and employees were transferred to other divisions of Ericsson.  Consequently, Telcordia has its own financial and accounting systems.  Also, employees of Telcordia no longer are able to participate in Ericsson's Long Term Variable Stock Plan.[614]  Telcordia has a board of directors, a majority of whom are independent directors.[615]  As noted, the Commission requires that a neutrality audit be conducted on a bi-annual basis.[616]  Telcordia also proposes that it will institute an auditable LNPA Code of Conduct to ensure that the company is and remains neutral.[617]

180.     Neustar questions the efficacy of Telcordia's neutrality safeguards by pointing out that Telcordia's board of directors will have a number of "insiders" seated on it who may also be on the board of directors of Ericsson or be otherwise connected with Ericsson.[618]  Neustar also points out that, because Ericsson is the sole shareholder, it is able to appoint and remove all of the directors.[619]  The fiduciary duties that are owed to Telcordia by the independent directors, Neustar asserts, are also owed to the shareholder, thereby potentially compromising Telcordia's neutrality.  Neustar asserts that Telcordia concedes this point.[620]  Neustar also argues that Telcordia's LNPA Code of Conduct is "threadbare" and

---

[611] Telcordia 2014 Recommendation Reply at 43.

[612] *Id*. at 37.

[613] *See supra.* para. 160.

[614] Opinion at 8.

[615] *Id*. at 8.

[616] *Id*. at 9.  *See* RFP § 3.5.

[617] Opinion at Exhibit A.

[618] Neustar Reply at 27.

[619] *Id*.

[620] *Id*. (citing Telcordia 2014 Recommendation Comments indicating that Telcordia will have its own board of directors, a majority of whom will be independent outside directors who will owe fiduciary duties of loyalty and care solely to Telcordia *and its shareholders*) (emphasis added).

has a number of significant omissions, for example, it fails to review each member of the boards of directors of Ericsson and all of its subsidiaries for neutrality issues.[621]

181.    We acknowledge Ericsson's general ability, as the sole shareholder of Telcordia, to remove any of the board's directors.  Additionally, even though Ericsson is not an "affiliate" of a TSP as that term is defined in our rules,[622] Ericsson's managed services contracts and equipment sales revenues are worth considerably more than its bid for the LNPA contract, and so it is conceivable that Ericsson might be tempted to prioritize those contracts and sales over the LNPA contract.[623]  We also recognize that Ericsson's ability to remove directors from Telcordia's board, including the independent directors, could present opportunities for Ericsson to exert undue influence over Telcordia.  Telcordia and Ericsson, however, have provided credible assurances and offered to abide by certain conditions to demonstrate that Ericsson has no interest in, and in fact will not involve itself in the management and activities of Telcordia as the LNPA.[624]  Moreover, there is nothing in the record and no concrete reason to conclude that Telcordia or Ericsson would jeopardize Telcordia's neutrality in such a manner.  While these concerns are somewhat speculative, we do acknowledge that they reflect potential incentive and ability to behave in a manner that benefits Telcordia's parent, Ericsson.  The Commission's rules give us flexibility to consider potential sources of undue influence that might impair neutrality.  We have historically addressed such concerns by imposing conditions on the numbering administrators,[625] and we do so here.

182.    Although Telcordia, not Ericsson, is subject to compliance with our neutrality requirements, Ericsson has agreed to "take whatever actions are necessary to address any issues raised by the Federal Communications Commission . . . for neutral governance and operation."[626]  To address any potential for undue influence by Ericsson, therefore, we require a condition that will restrict Ericsson's ability to exert undue influence on Telcordia by limiting Ericsson's direct influence on Telcordia's board of directors.[627]  Specifically, we require that, prior to executing the LNPA contract, Ericsson transfer all of its voting stock in Telcordia to a voting trust administered by two unaffiliated trustees,[628] appointed by Ericsson after notice to and with prior written consent of the Bureau[629] after consultation with the Office

---

[621] Neustar 2014 Recommendation Comments at 29.

[622] *See* 47 C.F.R. § 52.12 (a)(1)(i).

[623] In fact, the contract bid amount is substantially less than the amount of at least one of the managed services contracts and is substantially less than the aggregate sales of equipment to at least one of the TSPs in the United States.

[624] *See* Telcordia 2014 Recommendation Reply at 29-30.

[625] *See e.g.*, *Safe Harbor Order*, 19 FCC Rcd at 16991, para. 22.

[626] Telcordia 2014 Recommendation Reply at 33; *See also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, at 1-2 (filed Feb. 9, 2015) (Telcordia Voting Trust Letter).

[627] In the *Warburg Transfer Order*, the Commission sought to insulate Neustar from shareholders that had affiliations with TSPs by requiring that a controlling portion of Neustar's stock be placed in an irrevocable voting trust through which the trustees vote on all matters normally voted on by the stockholders, thereby ensuring that the beneficial owners of the stock cannot improperly influence matters by, for example, voting for directors who would be sympathetic to the stockholders' views, and consequently maintaining Neustar's neutrality.  *See Warburg Transfer Order*, 14 FCC Rcd at 19798, paras. 8-11.

[628] The trustees shall have no familial or business connection with the management of Telcordia, Ericsson, or any TSP.  Further, the trustees' compensation, and any formula for varying such compensation, must be set forth in the deed of trust and may not be altered by Ericsson without the prior written consent of the Commission.  No changes may be made to the voting trust without the prior written consent of the Commission.

[629] *See Applications for Consent to the Transfer of Control of Licenses from Comcast Corporation and AT&T Corp., Transferors, to AT&T Comcast Corporation, Transferee*, MB Docket No.02-70, 17 FCC Rcd 23246, para.70 (2002).

of General Counsel.[630] The beneficiary under the trust will be Ericsson, which will continue to be entitled to all the economic benefits as the beneficial owner of Telcordia's shares. The trustees will vote on the majority of matters that are ordinarily subject to a stockholders' vote.[631] In particular, the trustees will vote on the election of all the independent directors.[632] The voting trust will not hold any voting or beneficial interests in any other entity, including a TSP.[633]

183. For a number of reasons Neustar alleges that a voting trust of the type suggested by Ericsson "does not and cannot address [Telcordia's] lack of neutrality."[634] We disagree. Initially, Neustar complains that the *Safe Harbor Order* states that a voting trust is not consistent with FCC precedent.[635] The *Safe Harbor Order* was adopted at Neustar's request to facilitate the company holding an initial public offering whereby it would become a public company. The Commission found that "after an IPO there will be less of a need to monitor all transactions affecting Neustar's ownership" due to the Securities and Exchange Commission regulations that would come into effect upon Neustar becoming a publicly-traded company. Due to such regulations, the Commission limited TSP investment in Neustar to five percent and prohibited additional TSP investment being placed in a voting trust.[636] The Commission did not say generally that voting trusts would no longer be permitted.[637]

184. Neustar further asserts that a voting trust, as a long-term workaround for structural non-neutrality, would be an abuse of the voting trust mechanism.[638] We disagree and note that Neustar takes matters out of context. The Commission reserves to itself the ability to craft remedies or adopt conditions that fit the situation at hand. Neustar can hardly complain about the use of a long-term voting trust as it has benefited from the use of such a trust and without which, it would not have been able to serve as the

---

[630] In response to the Telcordia Voting Trust Letter, Neustar argues that it is too late for Telcordia to "modify its bid" to propose that Ericsson establish a voting trust for a portion of Ericsson's interest in Telcordia. *See* Letter from Aaron M. Panner, Counsel to Neustar, Inc. to Marlene H. Dortch. Secretary, FCC (filed Feb. 27, 2015) (Voting Trust Response Letter). We disagree that Telcordia's voting trust proposal constitutes a bid modification. The relevant portions of the bid documents clearly stated that the Commission would make a neutrality assessment, and verify neutrality compliance, prior to awarding the LNPA contract. In addition, if the Commission were to determine that a bidder was not in compliance with the neutrality criteria, and the "noncompliance would not be cured by the start date of the new LNPA contract", at that point the Commission would disqualify the bidder. *See* VQS §§ 3.4-3.5. Consequently, the bid documents clearly anticipated that bidder neutrality concerns could continue to be addressed prior to the start date of the new LNPA contract.

[631] The trustees will not vote the shares with respect to those matters set forth in the Telcordia Voting Trust Letter at 1. *See also* Telcordia Mar. 25, 2015 *Ex Parte* Letter at 2.

[632] For example, the Supplemental Opinion sets forth the criteria on which Telcordia agrees that a director's independence is based. While we accept those criteria we would add that, to the extent the New York Stock Exchange regulations have additional or more strict criteria, then such criteria will apply. Additionally, references to the listed company in such regulations must include Ericsson. *See* Supplemental Opinion at 5; *see also* Rules of the New York Stock Exchange §303A.02.

[633] We expect that the voting trust will be in substantially the same form as that used in the *Warburg Transfer Order*. Telcordia should file a draft of the trust with the Wireline Competition Bureau within 30 days of the date of this Order; *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, at 1-2 (filed Feb. 9, 2015) (discussing the specifics of a voting trust).

[634] *See* Telcordia Voting Trust Letter at 1-2; *see also* Voting Trust Response Letter at 1; *see also* LNP Alliance Mar. 12, 2015 *Ex Parte* Letter at 4 (urging the Commission to make public the details of the voting trust and giving the public time and information necessary to review and comment on this proposal).

[635] Voting Trust Response Letter at 2.

[636] *See Safe Harbor Order*, 19 FCC Rcd at 16991.

[637] *See* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, at 3 (filed Mar. 17, 2015).

[638] Voting Trust Response Letter at 2.

LNPA.  The *Safe Harbor Order* did not invalidate voting trusts, as it allowed the voting trust approved in the *Warburg Transfer Order* to continue.  The *Safe Harbor Order* restricted the use of such trusts, however, in the context of Neustar becoming a publicly-traded company.[639]  As Telcordia is a privately-held company, there is no express or implied restriction on the use of such a trust.

185.     Neustar next alleges that in a government procurement context, a voting trust would not be permitted.  We note that the selection of the LNPA is not governed by the FAR.[640]  Further, our requirement in this order is that the majority of the Telcordia board of directors will be independent, thus ensuring that the incentives of Telcordia managers will be aligned with Telcordia, not its shareholder.  It matters not that Ericsson beneficially owns all of Telcordia's shares as, without the voting power conferred by the legal ownership of those shares, Ericsson cannot elect a majority of the board of directors.  Finally, Neustar's suggestion that the trustees of the voting trust will be beholden to Ericsson is misplaced as the Commission reserves the right to approve the trustees to ensure that the trustees are unbiased.

186.     Telcordia has also proposed a LNPA Code of Conduct (Code) to further bolster its neutrality.  The Code states, for example, that Telcordia will not show any preference or provide any special consideration to any TSP with respect to LNPA.  The Code also states that no employee, contractor, officer, or director of the LNPA, or any dedicated employee of a subcontractor, directly involved in LNPA services will hold any financial or other interest that would cause the LNPA to no longer be neutral.[641]  Neustar asserts that the draft Code is inadequate as, among other things, it fails to provide a mechanism for monitoring Telcordia's shareholders and their affiliates, and fails to provide for Ericsson's board members to be vetted for neutrality issues.[642]  We direct Telcordia to adopt its proposed Code[643] with additional provisions covering the following:  (1) each member of the board of directors must be vetted for neutrality issues;  (2) no member of the board of directors may be elected if such person is an employee, recently retired employee, officer, director, managing member or partner of a TSP; (3) no employee of Telcordia involved in Local Number Portability Administrator services may be a shared employee with Ericsson, nor shall any such Telcordia employee be detailed  from Ericsson; and (4) all Telcordia employees working on the LNP Contract must receive neutrality training when hired and on an annual basis.[644]  We condition the selection of Telcordia in this Order on Telcordia submitting a revised Code to the Bureau within 60 days of this Order's release.[645]  As noted below, the Commission will consider the Code of Conduct when it reviews and decides whether to approve the proposed contract with Telcordia.[646]  We further require that prior to making any changes to the voting trust or the Code, Telcordia must request and receive consent from the Commission.

---

[639] *See Safe Harbor Order*, 19 FCC Rcd at 16993, para. 30

[640] *See supra* para. 38; *see also* Neustar 2014 Recommendation Comments at 72 (noting that the "FAR rules have no application" to this LNPA selection process).

[641] Opinion – Exhibit A; *see also* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116,  Attach. (filed Mar. 16, 2015) (errata filed Mar. 19, 2015, attaching Telcordia's LNPA Code of Conduct).

[642] Neustar 2014 Recommendation Comments at 29.

[643] Further, and for the avoidance of doubt, the Code includes the provisions relating to Sungard Availability Services, LLP .  *See* Initial Opinion Exhibit A.

[644] Additionally, no employee of Telcordia shall participate in any profit-sharing or long-term compensation program offered to employees of Ericsson, except to the extent that such employee participates, as of the effective date of the Order, in an Ericsson pension plan.  Telcordia Mar. 25, 2015 *Ex Parte* Letter at 2-3.

[645] We also note that Ericsson's Code of Business Ethics will be in effect to further ensure the neutrality of the LNPA.  *See* Opinion at 12.

[646] *See infra* para. 193.

187.     We further note that James Greene, the KKR representative on the Sungard board of directors, has agreed to recuse himself from any decisions concerning the Telcordia contract.[647]  We accept that commitment, and make it a condition of this Order.  In an abundance of caution, we further require, as a condition of this Order, that Telcordia secure the same written commitment from any person on Sungard's board of directors who owns or represents an entity that holds both a direct or indirect interest in Sungard of 10 percent or more and an interest in one or more TSPs of 10 percent or more.  That is, any such director on the Sungard board must recuse him or herself from any decisions concerning the Telcordia contract.[648]  We believe that this added layer of protection should negate any chance that Telcordia will be subject to undue influence by parties with a vested interest in the outcome of number administration and activities.

188.     Having carefully considered all the comments and concerns raised in the record of this proceeding, we likewise find that Telcordia is not *per se* precluded from serving as the LNPA by the Commission's rules and precedent or otherwise.  Moreover, subject to the safeguards and conditions enumerated herein,[649] we find that Telcordia has demonstrated its commitment to maintain neutrality in its LNPA operations, and thus meets our neutrality requirements.  We require that the Code be finalized, and the formation of the voting trust, the appointment of the trustees, and the election of the independent directors to the Telcordia board of directors all be in effect prior to Telcordia commencing to provide LNPA services pursuant to a contract with the NAPM.[650]

## F.     IP Transition Issues

189.     *Background.*  The technology transitions currently underway, and in particular the transition from TDM-based voice services to IP-based voice services, have implications for numbering administration.  As the TDM-to-IP transition progresses, it raises questions about how networks interconnect and for call routing, including translations from telephone numbers to IP addresses.  The numbering databases, including the NPAC, support these functions.[651]  Several industry standardization fora are in the process of addressing various issues of numbering resource definition and allocation, as well as carrier interconnection in support of the IP Transition.[652]

190.     In recognition of the role in the IP Transition process of the NPAC database and of the transitional state of the industry, the RFP required bidders to propose NPAC architecture that would have the flexibility to support the transition from the status quo to an all-IP network.  In addition, the RFP stated that the LNPA would have to work expeditiously with the industry to implement any changes

---

[647] Telcordia 2014 Recommendation Reply at 43.

[648] We note that this condition does not at this time affect either of the two funds that currently have ownership interests in Sungard and Avaya as neither of them have representatives on the board of directors.

[649] We have included as an appendix a compilation of the requirements discussed in this Order that we find are necessary to ensure the neutrality of Telcordia as the next LNPA.  We recognize that the requirements might need to be modified in the future.  In the event of any conflict between the language of the Order and the language of the appendix, the language of the Order shall prevail.

[650] Telcordia Mar. 25, 2015 *Ex Parte* Letter at 3.

[651] In addition to the NPAC, these shared numbering databases include the LERG, the BIRRDS, and the SMS/800 database.  The Commission hosted a Numbering Testbed Workshop on March 24, 2014.  Workshop objectives included identifying gaps in the existing number assignment and management systems that may arise during transition to an all-IP environment. *FCC Chief Technologist to Host Numbering Testbed Workshop*, WC Docket No. 13-97, Public Notice, 29 FCC Rcd 2115 (Wireline Comp. Bur. 2014).

[652] Comments of LNP Alliance, WC Docket No. 09-109, at 19 (filed July 25, 2014); *see also* LNP Alliance Mar. 12, 2015 *Ex Parte* Letter at 2; *see also* Reply Comment of Public Knowledge, WC Docket No. 09-109, *et al.*, at 13-14 (stating that the number administrator is crucial to ensuring competition, reliability, and public safety in the network, especially during technology transitions).

required by the transition.[653] Both bidders are engaged in IP Transition discussions and thus are knowledgeable about IP Transition technology issues and alternatives.[654] Both acceded to these requirements in their responses to the RFP.

191. *Discussion*. One commenter notes that the RFP does not specify how numbering resources and roles will be restructured to support post-IP Transition requirements. This commenter speculates that the bids therefore may not be comparable in this regard, because the bidders may have quite different views of how the IP transition is likely to be implemented and of the flexibility needed to support the transition.[655] We do not agree. We note in particular that Telcordia has been actively engaged in industry IP transition discussions, and is well-informed as to the implications of the possible alternative architectural choices.[656] Neustar asserts that, if Telcordia is selected, the transition to IP will be delayed because it will have to wait for the transition to a new LNPA to be completed.[657]

192. One commenter suggests that the Commission extend the current contract by two years, establish clear post-IP transition requirements for the NPAC, and then re-bid the LNPA contract.[658] Other commenters respond that either bidder would be in the same position following the LNPA award to deal with industry agreements on IP transition technology choices.[659] We see little merit in such an extension. Either the incumbent provider or the new LNPA will need to adapt and respond to technological and marketplace changes. Moreover, we expect the transition to occur over the course of years; there is

---

[653] RFP § 7.2.5.

[654] *See*, *e.g*., Letter from Louise Tucker, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, WC Docket 13-97 (filed Mar. 5, 2014) (Numbering Policies for Modern Communications); *see also* Letter from Aaron N. Goldberger, Associate General Counsel, Neustar, Inc., to Marlene H. Dortch, Secretary, FCC, GN Docket No. 13-5, et al. Attach. (filed Mar. 14, 2014).

[655] Comments of LNP Alliance, WC Docket No. 09-109, at 22. (filed July 28, 2014); *see also* LNP Alliance Reply, WC Docket No. 09-109, at 17 - 22 (filed Aug. 21, 2014) (LNP Alliance Reply).

[656] See, *e.g.*, Telcordia 2014 Recommendation Reply at 111 n.284.

[657] Neustar Feb. 13, 2015 *Ex Parte* Letter at 1; *see also* Smith & Associates Report at 34 (asserting that neither company **[BEGIN CONFIDENTIAL]** ███████████████████████████████████████ ███████████████████████████████████████████████ **[END CONFIDENTIAL]**

[658] LNP Alliance Reply, WC Docket No. 09-109, at 16 (filed Aug. 21, 2014); *see also* XO Dec. 24, 2014 *Ex Parte* Letter at 6 (stating that there is very little risk that the LNPA transition could disrupt or delay the IP Transition); *see also* Letter from James C. Falvey, Counsel to The LNP Alliance to Marlene H. Dortch, Secretary, FCC, at 1-2, Attach. (filed Dec. 11, 2014); *see also* LNP Alliance Jan. 12, 2015 *Ex Parte* Letter at 8-9; *see also* New America Mar. 9, 2015 *Ex Parte* Letter Attach. at 10-11 (stating that policy decisions regarding ENUM and IP Transition should be evaluated and decided prior to finalizing a new LNPA contract); *see also* LNP Alliance Mar. 12, 2015 *Ex Parte* Letter at 5-6 (requesting the Commission extend the current contract by two years, or a shorter period, to address outstanding concerns); *see also* Letter from Richard A. Gephardt, Gephardt Government Affairs, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116 at 1 (filed Mar. 18, 2015) (recommending the Commission fully evaluate the implications before taking action in selecting a new LNPA); *see also* Letter from Benjamin D. Tarbell, Squire Patton Boggs, LLC, to Marlene H. Dortch, Secretary, FCC, WC Docket Nos. 07-149, 09-109, CC Docket No. 95-116 at 1 (filed Mar. 18, 2015); *see also* Neustar Mar. 19, 2015 *Ex Parte* Letter at 3 (requesting the Commission undertake an independent evaluation of both proposals prior to making a final selection); *see also* USTelecom Mar. 19, 2015 *Ex Parte* Letter at 1, 5 (urging the Commission to adopt the pending draft and reiterating Nebraska Public Service Commissioner Anne Boyle recent statements that the Commission should not give weight to these efforts to forestall or "paralyze" a decision in this long-pending proceeding); Telcordia Mar. 19, 2015 Response to New America *Ex Parte* Letter at 4 (stating that "the question of how to handle the IP Transition has nothing to do with the identity of the LNPA" and the NPAC support of ENUM is a matter of ongoing discussion within the industry and at the FCC and the RFP requires the LNPA to support those decisions).

[659] CTIA/USTelecom Reply, WC Docket No. 09-109, at 98 (filed Sept. 3, 2014).

unlikely to be a definitive end date to the transition, and even if there were, we cannot predict it will have occurred within two years. We thus see no benefit in delaying, or restarting, the selection of the LNPA in light of the ongoing transition to IP architecture and we decline to adopt the suggestion that the LNPA contract be re-bid because of pending IP transition issues. In addition, a few commenters mentioned how ENUM services will be provided if there is a new LNPA.[660] There is no evidence that Telcordia's provision of ENUM services, which are peripheral to and independent of the LNPA, will have any impact on its performance as the LNPA. Therefore, we have no concerns with ENUM as it pertains to Telcordia serving as the LNPA.

## G.    Contract Negotiation and Ongoing Oversight of the LNPA

193.    The Commission has delegated to the Bureau significant oversight of matters involving numbering administration, and we support and affirm the process the Bureau established in 2011. The Bureau directed the NANC, working with the NAPM, to recommend an LNPA, with ultimate selection by the Commission. We are grateful for the hard work and assistance from the NANC and the NAPM. They provided expertise and detailed analysis, and implemented an impartial selection process that we believe will lead to a contract that will well serve the needs of industry, consumers, and government. The process is not yet concluded, however. The terms of the LNPA contract still must be negotiated.[661] As noted above, we direct the NAPM to develop and submit to the Bureau, the Commissioners and the Chairman, within 30 days of this Order, a Transition Oversight Plan to ensure that the transition to a new LNPA occurs without disruption to its many users.[662] We also direct the NAPM, with Commission oversight, to negotiate the terms of the LNPA contract with Telcordia in accordance with this Order. Once contract terms are reached, and a Code of Conduct is finalized, the NAPM shall submit the contract and Code of Conduct to the Commission for review and approval. We condition our selection of Telcordia as the LNPA on the satisfactory negotiation of contract terms that are consistent with the Commission's requirements regarding neutrality and security matters. In the event that negotiations with the NAPM do not result in an acceptable contract, we retain all options.[663]

194.    We direct the Bureau, in consultation with Public Safety and Homeland Security Bureau, to work with the NAPM to ensure that the LNPA contract contains terms and conditions necessary to ensure that effective public safety services and law enforcement and national security operations are supported, and that any and all national security issues are addressed and mitigated to our satisfaction. We will also require that the terms and conditions of the contract ensure that the Government's equities are protected by a rigorous audit program that monitors for and ensures compliance, backstopped by robust enforcement tools throughout the term of the contract. Through Public Safety and Homeland

---

[660] *See* Internet Engineering Task Force, *RFC 6116 The E.164 to Uniform Resource Identifiers (URI) Dynamic Delegation Discovery System (DDDS) Application (ENUM)* (Mar. 2011), https://tools.ietf.org/html/rfc6116 (E.164 Number Mapping (ENUM) provides a facility for unifying the international telephone number system with the Internet addressing and identification name spaces so that the Internet Doman Name System technology can be used, for example, in setting up phone calls); *see* LNP Reply at 8-13 (stating that Neustar and Telcordia have different visions for ENUM service and the costs will likely vary); *see also* XO December 24, 2014 *Ex Parte* Letter at 6, Exh. A.; *see also* LNP Alliance Jan. 12, 2015 *Ex Parte* Letter at 7-8; *see also* LNP Alliance Mar. 12, 2015 *Ex Parte* Letter at 2 (urging the Commission to ensure that the ENUM IP database is included in the LNPA requirements to avoid a negative impact on consumers and competitive carriers and requesting extensive and exhaustive transition period, especially if LNP transition coincides with the IP transition); Telcordia Mar. 16, 2015 *Ex Parte* Letter at 5 (stating that Telcordia will continue any current use of the NPAC data for ENUM and any requirements for the IP Transition, as required by the RFP, until any future changes are made by the Commission or the NANC); Telcordia Mar. 19, 2015 *Ex Parte* Letter at 5.

[661] SWG Report § 6.2.4 (Recommendation), *see also May 2011 Order*, 26 FCC Rcd at 6841, para. 8 (discussing process for negotiating LNPA contract once a vendor is selected).

[662] *See supra* paras. 158-159.

[663] *Second LNP Order*, 12 FCC Rcd 12281, 12301-12303 (1997).

Security Bureau, we will seek input from Executive Branch entities with expertise in and responsibility for law enforcement and national security matters as these terms and conditions are developed.

195. In the *First LNP Order*, the Commission directed the NANC to recommend one or more independent, non-governmental entities, not aligned with any particular telecommunications segment, to serve as LNPA(s).[664] The NANC established the 1997 Working Group to review and advise on LNP administration issues, including selection of the LNPA(s). As noted above, the SWG recommended a process that ultimately resulted in formation of the NAPM.[665] Thus, the NAPM has been involved with the LNPA contract since 1997. We concur with the Bureau's assessment in the *March 2011 Order*, that the NAPM has the resources and expertise to handle the final contract negotiations with Telcordia.[666] However, the Commission will exert oversight of the final contract negotiations.[667] As stated in the *May 2011* Order, the Commission has "final approval authority of the contract."[668] The NAPM must coordinate with various bureaus within the Commission, primarily the Wireline Competition and the Public Safety and Homeland Security Bureaus and the Office of General Counsel. Moreover, we direct the NAPM to cooperate with any other relevant government agencies in completing its negotiations.

196. The *May 2011 Order* stated that "[t]he Commission or the Bureau will also decide at a later date who should manage the LNPA contract(s)."[669] Until that question is decided, we will continue to rely on the NAPM. We expect to revisit this question after the new LNPA contract is executed and the LNPA fully providing service.

## H. Pending Telcordia Petitions

197. In 2007, Telcordia filed a petition asking the Commission to revise Amendment 57 to the current LNPA contract by eliminating the financial penalty provisions set forth in the amendment and to initiate an open competitive bidding process for number portability administration services.[670] In 2009, Telcordia filed an updated petition[671] asking the Commission to (1) direct the NAPM to refrain from taking any actions to add Uniform Resource Identifier (URI) fields to the NPAC database, pending further review by the Commission, (2) direct the NAPM not to execute any additional contract amendments

---

[664] *First LNP Order*, 11 FCC at 8401, para. 93.

[665] *See supra* para. 5.

[666] *March 2011 Order*, 26 FCC Rcd at 3687, para. 5 ("The NAPM has obtained considerable expertise from overseeing and managing the LNP contract for over ten years. Moreover, we anticipate that the selection process will require substantial resources and that the NAPM is in a position to provide those resources.").

[667] *See May 2011 Order*, 26 FCC Rcd at 6844, para. 19 ("[T]he Commission or the Bureau, acting on delegated authority, must review and approve the procurement process, including the procurement documents, and make a final decision about the contract award. In addition, once the LNPA contract is in place, the Commission or the Bureau will retain ultimate oversight and control over the contract.").

[668] *See May 2011 Order*, 26 FCC Rcd at 6841, para. 8.

[669] *May 2011 Order* at para 20.

[670] Petition of Telcordia Technologies, Inc. to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration, WC Docket No. 07-149 (filed June 13, 2007); *see also Wireline Competition Bureau Seeks Comment on Telcordia Technologies, Inc.'s Petition Regarding Number Portability Administrative Services*, WC Docket No. 07-149, Public Notice, 22 FCC Rcd 13572 (Wireline Comp. Bur. 2007).

[671] Petition of Telcordia Technologies, Inc. to Reform or Strike Amendment 70, to Institute a Competitive Bidding for Number Portability Administration, and to End the North American Portability Management, LLC Interim Role in Number Portability Administration Contract Management (filed May 20, 2009); *see also Wireline Competition Bureau Seeks Comment on Telcordia Petition to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract Management*, WC Docket No. 09-109, Public Notice, 24 FCC Rcd 10271 (Wireline Comp. Bur. 2009).

without prior Commission approval, (3) initiate a competitive bidding process for a multi-vendor NPAC administration system, (4) require Neustar's compensation to be calculated in accordance with Amendment 70, without the provisions related to discounts for implementing URI fields; and (5) terminate the NAPM's interim designation as the manager of contracts governing NPAC administration.

198.     Telcordia's petitions culminated in the competitive bidding process outlined in the *May 2011 Order* and implemented in this Order.[672]  We therefore grant Telcordia's requests that the Commission initiate a competitive bidding process for the LNPA contract.  We deny without prejudice Telcordia's requests pertaining to LNPA contract Amendments 57 and 70 as those amendments are not relevant to the new LNPA contract that will be negotiated with Telcordia.  Finally, we deny without prejudice Telcordia's remaining requests pertaining to the role of the NAPM and to Commission oversight of URI additions to the NPAC and contract amendments.  As discussed above, the NAPM has been authorized to negotiate the contract with the next LNPA.[673]  However, we have not decided whether the NAPM will continue to manage that contract and if so, whether the NAPM's responsibilities or composition, or oversight of the NAPM, should change in any respect. In establishing the appropriate oversight of the contract going forward, the Bureau will decide how to handle matters such as contract amendments and the addition of URI fields to the NPAC database in the context of the new LNPA contract.

## IV.     ORDERING CLAUSES

199.     Accordingly, IT IS ORDERED, pursuant to the authority contained in sections 1-4, 251(e), and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 251(e) and 303(r), sections 1.3 and 52.26 of the Commission's rules, 47 C.F.R. §§ 1.3 and 52.26 that the North American Portability Management LLC, with Commission oversight, is directed to negotiate the proposed terms of the LNPA contract in accordance with this Order, and submit the proposed contract to the Commission for approval.

200.     IT IS FURTHER ORDERED, pursuant to the authority contained in sections 251(e), and 303(r) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 251(e) and 303(r), sections 1.3 and 52.26 of the Commission's rules, 47 C.F.R. §§ 1.3 and 52.26, that the North American Portability Management LLC develop and submit within 30 days of this Order a Transition Oversight Plan to the Commission, in accordance with this Order.

201.     IT IS FURTHER ORDERED,  pursuant to the authority contained in sections 1-4, 251(e), 303(r) and 408 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151-154, 251(e), and 303(r), section 1.103 of the Commission's rules, 47 C.F.R. § 1.103, that this Order in WC Docket Nos. 09-109, 07-149, and CC Docket No. 96-115 IS ADOPTED and IS EFFECTIVE UPON RELEASE.

202.     IT IS FURTHER ORDERED, pursuant to the authority contained in sections 1-4, and 251(e) of the Communications Act, as amended, 47 U.S.C. §§ 151, 154(i), and 251(e), and section 1.1 of the Commission's rules, 47 C.F.R. § 1.1, that the Telcordia Technologies, Inc. Petition to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration, filed June 13, 2007 and the Telcordia Technologies, Inc. Petition to Reform or Strike Amendment 70, to Institute a Competitive Bidding for Number Portability Administration, and to End the North American Portability Management, LLC Interim Role in Number Portability Administration Contract Management, filed May 20, 2009 are GRANTED IN PART to the extent consistent with this Order and ARE OTHERWISE DENIED WITHOUT PREJUDICE.

203.     IT IS FURTHER ORDERED, pursuant to the authority contained in sections 1-4, and 251(e) of the Communications Act, as amended, 47 U.S.C. §§ 151, 154(i), and 251(e), and sections 1.1 and 1.2 of the Commission's rules, 47 C.F.R. §§ 1.1 and 1.2, that the Neustar, Inc. Petition for

---

[672] *See supra* Section II.B; *see also generally May 2011 Order*, 26 FCC Rcd 6839.

[673] *See supra* paras. 193-196.

Declaratory Ruling Concerning the Local Number Portability Administration Selection Process, filed February 12, 2014, and the Neustar Petition for Declaratory Ruling Concerning the Federal Advisory Committee Act, filed October 22, 2014 ARE DENIED as described herein.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**APPENDIX**

**Conditions on Impartiality/Neutrality**

1. Telcordia shall never, directly or indirectly, show any preference or provide any special consideration to any Telecommunications Service Provider with respect to Local Number Portability Administrator services.

2. Telcordia shall not share local number portability data or proprietary information of any Telecommunications Service Provider served by Telcordia (except as necessary for the performance of local number portability duties by Telcordia as the Local Number Portability Administrator).

3. Telcordia or Ericsson shall not share confidential information about Telcordia's Local Number Portability Administrator business services or operations with employees of any Telecommunications Service Provider (except as necessary for the performance of Telcordia's Local Number Portability Administrator duties).

4. No employee, contractor, officer, or director of Telcordia, or any dedicated employee of a sub-contractor, directly involved in Local Number Portability Administrator services shall hold any interest, financial or otherwise, that would cause Telcordia to no longer be neutral without obtaining prior approval from the Federal Communications Commission or recusing herself or himself from all activities relating to the provision of Local Number Portability Administrator services.

5. No person serving in the management of Telcordia and directly involved in Local Number Portability Administrator services shall simultaneously serve: i) in the management, ii) as a member of the Board of Directors, iii) as a Managing Member of an LLC, or iv) as a General Partner of a partnership of any Telecommunications Service Provider, without obtaining prior approval from the Federal Communications Commission or recusing herself or himself from all activities associated with Local Number Portability Administrator services.

6. Telcordia shall retain all decision-making authority regarding Local Number Portability Administrator services; any sub-contractor shall provide services to the specific direction of Telcordia and shall not have discretionary decision-making authority regarding Local Number Portability Administrator services.

7. Ericsson shall establish a voting trust and transfer its voting stock in Telcordia to said trust.

    a. The trust shall not hold any voting or beneficial interests in any other entity, including any Telecommunications Service Provider.

    b. The trust shall be administered by two unaffiliated trustees who shall have no familial or business connection with the management of Telcordia, Ericsson, or any Telecommunications Service Provider.

    c. Ericsson shall appoint the trustees subject to prior written approval of the Federal Communications Commission.

    d. The trustees shall vote on the matters that are ordinarily subject to a stockholders' vote, including on the election of Telcordia's independent directors, except as specified in the Order and Telcordia's *Voting Trust Letter* (filed February 9, 2015).

    e. The trustees' compensation, and any formula for varying such compensation, shall be set forth in the deed of trust and shall not be altered by Ericsson without the prior written consent of the Federal Communications Commission.

f.  Ericsson shall not make any change to the voting trust without obtaining prior written approval from the Federal Communications Commission.

8.  No member of Telcordia's board of directors shall be an employee, recently retired employee, officer, director, managing member, or partner of a Telecommunications Service Provider. Further, the independence of such directors will be established as set forth in the Supplemental Opinion, and as set forth in the Rules of the New York Stock Exchange - §303A.02.

    a.  Each member of the board of directors shall be vetted for neutrality issues.

    b.  The majority of Telcordia's board of directors shall be independent.

    c.  No independent member of Telcordia's board of directors shall be an employee, recently retired employee, officer, director, managing member, or partner of Ericsson or the management of Telcordia. Further, the independence of such directors will be established as set forth in the Supplemental Opinion, and as set forth in the Rules of the New York Stock Exchange - §303A.02.

9.  No employee of Telcordia involved in Local Number Portability Administrator services may be a shared employee with Ericsson, nor shall any such Telcordia employee be detailed from Ericsson.

    a.  No employee of Telcordia shall participate in any profit-sharing or long-term compensation program offered to employees of Ericsson, except to the extent that such employee participates, as of the effective date of the Order, in an Ericsson pension plan.

    b.  All Telcordia employees working on Local Number Portability Administrator services must receive impartiality/neutrality training when hired and on an annual basis.

10. Telcordia must secure a written commitment of recusal from any decisions regarding Local Number Portability Administrator services from any person on Sungard Availability Services, LLC's ("Sungard") board of directors who owns or represents an entity that holds both a direct or indirect interest in Sungard of 10 percent or more and an interest in one or more Telecommunications Service Providers of 10 percent or more.

    a.  Sungard will notify Telcordia if, at any time, it becomes aware that any Sungard affiliate intends to commence providing switched services to utilize number portability.

    b.  Any owner of Sungard that also has, or serves as an officer or director of an entity that has ownership interests, including voting rights, greater than ten percent in a Telecommunications Service Provider shall recuse him or herself from participating in material discussions or decisionmaking involving the services Sungard provides to Telcordia in support of Local Number Portability Administrator services.

    c.  All Sungard managers overseeing day-to-day responsibilities regarding—and all Sungard employees dedicated to providing—services to Telcordia in support of Local Number Portability Administrator services shall be bound by the Code of Conduct.

11. Telcordia must conduct a biannual neutrality audit that, among other things, verifies its compliance with these conditions.

**STATEMENT OF
CHAIRMAN TOM WHEELER**

Re:     *Telcordia Technologies, Inc. Petition to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration*, WC Docket No. 07-149, *Petition of Telcordia Technologies, Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract Management*, WC Docket No. 09-109, *Telephone Number Portability*, CC Docket No. 95-116.

Since becoming FCC Chairman, my mantra has been clear and consistent: Competition, Competition, Competition. And I've consistently identified consumer protection, public safety, and national security as components of the network compact. That is why I am glad the Commission utilized a competitive process to determine who should administer the FCC's "local number portability" system, which, fittingly, is one of our most successful pro-competition programs. And our staff here at the FCC has given each of the bids a thorough review to ensure that the values of the network compact are protected and preserved regardless of which bid is ultimately selected. This effort has led to a better deal for American consumers; one that will yield significant cost savings over the existing contract. Today, the Commission conditionally approves switching administrators of the program that helps us switch phone companies.

Every day, more than 100,000 individuals and businesses in America switch their phone carriers but keep their old phone number. This ability to transfer – or "port" – our numbers enhances consumer choice and makes for a more competitive marketplace. These transfers happen almost seamlessly, and we take them for granted, but these transactions are actually carried out by a neutral third-party called the Local Number Portability Administrator (LNPA).

The same company has held the contract to serve as LNPA for more than 15 years. Ironically, this company received multiple "no-bid" extensions of its contract to run this pro-competition program. Putting this contract out for competitive bidding was long overdue.

Starting in 2011, we conducted a lengthy, thorough, and transparent process, which was supported by the incumbent and other contenders for the contract.

We engaged both an industry consortium – the North American Portability Management, LLC (NAPM) – and our federal advisory committee on numbering issues – the North American Numbering Council (NANC) – to help conduct the bidding process and then to review and provide a recommendation on the bids. They recommended that we select a new company, Telcordia, as the next LNPA.

We requested and received comment from stakeholders at various points throughout the process, including early on as we established the process and again most recently when we sought comment on the recommendation from NANC.

Every bidder was invited to improve on its initial bid, and every bidder took advantage of that opportunity to submit a "best and final offer."

Commission staff independently evaluated the recommendation and the record while also conferring with national security and law enforcement experts. The integrity and reliability of the porting system is our paramount concern. After extensive review and analysis of all the data submitted to the Commission, staff concurred with the recommendation of the NANC that Telcordia best met the evaluation criteria.

Importantly, this Order is approval for the NAPM to move forward with contract negotiations with Telcordia. The NAPM and – if contract negotiations are successful – Telcordia are the ones with the business relationship; the FCC oversees that relationship. Accordingly, this Order requires Telcordia to comply with specific conditions to ensure that it serves as a neutral administrator and to ensure that Telcordia's service conforms with national security and law enforcement needs. The approach we adopt

in this Order is consistent with the one the Commission used to ensure the neutrality of the current LNPA.

This Order is only one important step toward implementing a new contract. There is more to do. We will continue to engage law enforcement and national security experts as we look at the post-selection process to ensure that national security and law enforcement concerns are adequately addressed.

If there is a successful contract negotiation with Telcordia, we will work closely with stakeholders to ensure that the transition process is as smooth as possible so that the LNPA continues to facilitate the kind of competition in the voice marketplace that consumers have come to expect and deserve.

Case: 8:24-cv-00609-DOC-JDE #: 33 Filed: 11/21/25 Page 1 of 1 Page ID #:3426
Case 8:24-cv-00669-DWS-JDE Document 81-2/21/25 Page 04426 of 107 Page 177 of 196
Page ID #:2543
Federal Communications Commission                    FCC 15-35

## STATEMENT OF
## COMMISSIONER MIGNON CLYBURN

Re:     *Telcordia Technologies, Inc. Petition to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration*, WC Docket No. 07-149, *Petition of Telcordia Technologies, Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract Management*, WC Docket No. 09-109, *Telephone Number Portability*, CC Docket No. 95-116.

In today's always-on, 24/7 digital society, some people's 10-digit telephone number is as an important identifier as their birthdate or social security number. They may have moved to a new home, changed jobs, or even switched service providers but, thanks to number portability, their telephone number can stay the same if they wish. The nation's local number portability administrator plays a critical role in ensuring that the process of managing numbering including number porting works seamlessly. Congress also recognized the importance of numbering administration – so much so, that certain requirements regarding the numbering administrator or administrators, including the need for impartiality, are enshrined in section 251(e) of the Telecommunications Act of 1996.

Given the importance of this issue, I do not reach today's decision lightly. I have carefully considered the concerns raised in the record, which range from process, security, impact on small providers, to neutrality and believe that Today's Order, which culminates a five-year process, has allowed all interested parties the opportunity to adequately participate and weigh-in. Transitions are rarely easy, and this one in particular has been the subject of considerable analysis and robust public debate. When it is all said and done, it should be noted that this transition should yield significant savings over the next seven years – savings that I hope will ultimately be passed along, to consumers.

Now, I am not so naïve to believe that today's action will end the debate. What we are voting to approve after much thoughtful review, debate and deliberation is the North American Numbering Council's (NANC) recommendation for the next local number portability administrator. This action will launch the negotiations for a new contract and, despite the intense debate, I am hopeful that everyone will work in good faith to ensure a smooth transition.

I want to thank the NANC including its Chair and Chairman of the DC Public Service Commission, Commissioner Betty Ann Kane, as well as the Wireline Competition Bureau and Public Safety and Homeland Security Bureau, for their dedication and hard work on this item.

## STATEMENT OF
## COMMISSIONER AJIT PAI

Re:     *Telcordia Technologies, Inc. Petition to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration*, WC Docket No. 07-149, *Petition of Telcordia Technologies, Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract Management*, WC Docket No. 09-109, *Telephone Number Portability*, CC Docket No. 95-116.

Almost eight years ago, Telcordia petitioned the FCC to hold a competitive bidding process to select the next local number portability administrator.[1] Two years later, Telcordia petitioned us again, reminding us that "costs drop through competition."[2] Today, the Commission responds to those petitions by awarding Telcordia the contract for local number portability administration.

Some question how we arrived at this point. Should the full Commission have responded to those petitions sooner? Should we have put safeguards in place before commencing the bidding process to ensure the winner's impartiality? Are there legitimate concerns about whether the needs of law enforcement or small carriers were adequately represented? One could reasonably answer in the affirmative to these (and perhaps other) queries about the competitive bidding process. But by the time the commissioners received this item three weeks ago, that process had run its course.

And so today, we confront a different question: Should we now declare Telcordia the next local number portability administrator? When you compare the numbers, the answer is clear. Last year, the current contract cost about $460 million.[3] In contrast, Telcordia bid less than $1 billion for a seven-year term—that's less than $143 million per year.[4] That's substantial savings for the American public. And the stringent conditions set forth in the Appendix mitigate any concerns about Telcordia's impartiality, which is a critical factor under the Communications Act and our rules. As our precedent makes clear,[5] measures like these will ensure that Telcordia is impartial notwithstanding any preferences its parent company (Ericsson) might have.

I appreciate the efforts Commissioners Clyburn and O'Rielly made to ensure that the transition from one local number portability administrator to the next will be smooth. I also thank my colleagues for supporting my suggestions to guarantee impartiality. Finally, I am grateful to the staff of the Wireline Competition Bureau and the Office of General Counsel for accommodating my office's request to reduce the number of redactions in this *Order* in order to promote transparency.

---

[1] Petition of Telcordia Technologies, Inc. to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration, WC Docket No. 07-149 (filed June 13, 2007).

[2] Petition of Telcordia Technologies Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration and to End the NAPM LLC's Interim Role in Number Portability Administration Contract, WC Docket No. 09-109, at iii (filed May 20, 2009).

[3] NeuStar, Inc. Form 10-K at 7, 15 (Feb. 13, 2015) (total contracts with NAPM of $474.8 million represented 49% of total revenue, with the local number portability contract representing approximately 48% of total revenue).

[4] *See* Letter from John T. Nakahata, Counsel to Telcordia Technologies, Inc. d/b/a iconectiv, to Marlene H. Dortch, Secretary, FCC, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, at 3 (Mar. 25, 2015).

[5] *Request of Lockheed Martin Corporation and Warburg, Pincus & Co. for Review of the Transfer of the Lockheed Martin Communications Industry Services Business*, CC Docket No. 92-237, Order, 14 FCC Rcd 19792 (1999).

## STATEMENT OF COMMISSIONER MICHAEL O'RIELLY
## APPROVING IN PART AND CONCURRING IN PART

Re:     *Telcordia Technologies, Inc. Petition to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration*, WC Docket No. 07-149, *Petition of Telcordia Technologies, Inc. to Reform or Strike Amendment 70, to Institute Competitive Bidding for Number Portability Administration, and to End the NAPM LLC's Interim Role in Number Portability Administration Contract Management*, WC Docket No. 09-109, *Telephone Number Portability*, CC Docket No. 95-116.

Today, the Commission takes the next step in what has been a long process to select the Local Number Portability Administrator (LNPA). Like Chairman Wheeler, I was not at the Commission for most of it, and the work that has led to this stage has been conducted by Bureau staff and external numbering groups. Based on staff's analysis of the record, assuming it is complete and accurate, and staff's recommendation to the Commission, I concur on the process, but approve of the outcome.

I have concerns about the procedures used leading up to today's decision, even though the outcome, based on the information available, seems to have merit. Admittedly, this entire venture is somewhat unique given that the statute assigns the Commission the role to "create or designate" numbering administrators, which some have interpreted to mean a procurement-like process. Personally, I cannot understand why the Commission didn't just conduct a full-blown notice and comment proceeding in this instance, especially since over the last three-plus years there was certainly plenty of time.

In addition, a significant amount of information—more than was probably necessary or justifiable—has been cloaked behind protective orders.

Moreover, as I've said in other Commission items, we should endeavor to act on issues as quickly as possible, but it is also important to get things right. Here, more than three years after we started down this path, we find ourselves inexplicably running up against a deadline of sorts with important details still to-be-determined.

Nonetheless, assuming all of the information in the item is accurate, especially the analysis comparing the two proposals on the technical, managerial, and cost aspects, the outcome seems justified. Notably, Telcordia stated for the record: "On price, however, there was simply no contest."[1] Depending on the terms of the final contract, these savings will lower the cost for those contracting with the numbering administrator, and ultimately end users.

Given the importance of the transition to a new LNPA, I thank the Chairman for his willingness to accommodate my request for greater involvement by the full Commission going forward. The Commission will receive the North American Portability Management LLC (NAPM) transition oversight plan and status updates, and staff will report to the full Commission. This will help ensure that the transition proceeds as smoothly as possible and that any further concerns by carriers or other parties about the transition, contract terms, or associated costs receive sufficient attention.

Finally, it is critical that this process not impede or impinge on the IP transitions that are occurring every day in every market. For example, one party suggested that the contract should include ENUM or IP numbering, but I have significant concerns with such a step. While the LNPA must be cognizant of future technological and marketplace developments, we are not deciding at this time to bring ENUM within the LNP contract. Industry experts and standards groups, such as Alliance for Telecommunications Industry Solutions (ATIS), have been hard at work for years to ensure that technical requirements are in place to support IP transitions, including for numbering. At times the Commission

---

[1] Telcordia Comments at 11.

93

has let unfounded policy fears regarding new technologies and network transitions override industry-led technical and network engineering solutions.  I will be vigilant in guarding against that here.

# EXHIBIT 12

Case 8:24-cv-00067-FWS-JDE   Document 81-20   Filed 06/04/26   Page 182 of 196
Page ID #:2548
Case 1:09-cv-00705-AWI-JLT   Document 158   Filed 09/19/11   Page 1 of 15

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SANTIAGO ROJAS, JOSEPHINO RAMIREZ, CATALINA ROBLES, JUAN MONTES, BENITO ESPINO, and GUILLERMINA PEREZ, on behalf of themselves and a class of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MARKO ZANINOVICH, INC, and SUNVIEW VINEYARDS OF CALIFORNIA, et al.,<br><br>Defendants. | Case No.: 1:09-cv-00705 AWI JLT<br><br>ORDER GRANTING MOTION TO STRIKE DECLARATION OF AARON WOLFSON<br><br>(Doc. 105) |

Defendant Sunview Vineyards of California, Inc. ("Sunview" or "Defendant") seeks to strike the declaration of Aaron Woolfson (Doc. 39), filed in support of Plaintiffs' motion for class certification. (Doc. 150). In addition, Defendant objects to the initial expert report of Mr. Woolfson, and asserts Mr. Woolfson is not qualified to testify as an expert. Therefore, Defendant seeks to have his opinions stricken or, in the alternative, to have a *Daubert* hearing regarding Mr. Woolfson's qualifications and conclusions. *Id.*

Plaintiffs filed an opposition to the motion on September 2, 2011, asserting that they had a duty to supplement the report in light of the information received in the declaration, and that Mr. Woolfson was a qualified expert. (Doc. 50). Defendant filed a reply on September 9, 2011. (Doc. 154). The Court heard arguments regarding this motion on September 16, 2011.

1

Case 8:24-cv-00067-FWS-JDE   Document 81-20   Filed 06/04/26   Page 183 of 196
Page ID #:2549
Case 1:09-cv-00705-AWI-JLT   Document 158   Filed 09/19/11   Page 2 of 15

For the following reasons, Defendant's motion to strike the declaration and to strike the opinions of Mr. Woolfson is **GRANTED.**

**FACTUAL AND PROCEDURAL HISTORY**

On November 9, 2005, Plaintiffs' counsel initiated an action against table grape growers based in Kern County, including Sunview Vineyards of California. *See Doe v. D.M. Camp & Sons*, 624 F.Supp.2d 1153 (E.D. Cal. 2008). At the time the action was brought, the plaintiffs were unnamed former and current employees of the defendants. *Id.* at 1156. Defendants to the *Doe* action, including Sunview, filed motions to dismiss the operative complaint, which were granted by the Court on March 31, 2008. Likewise, motions to sever the action were granted, and the Court required the plaintiffs to file amended pleadings against each defendant to effectuate the severance. On May 29, 2008, Santiago Rojas and Josefino Ramirez were named as plaintiffs in the Third Amended Complaint against Sunview. (*Doe*, Doc. 171)[1]. On March 31, 2009, the Court ordered Plaintiffs to finalize the severance by re-filing their suit in a new case number within twenty days. (*Doe*, Doc. 238).

On April 20, 2009, Plaintiffs filed their complaint against Defendant Sunview for the following: violation of the Agricultural Workers Protection Act, 29 U.S.C. § 1801, *et seq*; failure to pay wages; failure to pay reporting time wages; failure to provide rest and meal periods; failure to pay wages of terminated or resigned employees; knowing and intentional failure to comply with itemized employee wage statement provisions; penalties under Labor Code § 2699, *et seq*; breach of contract; and violation of unfair competition law. (Doc. 1). Plaintiffs brought the action "on behalf of Plaintiffs and members of the Plaintiff Class comprising all non-exempt agricultural, packing shed, and storage cooler employees employed, or formerly employed, by each of the Defendants within the State of California." *Id.* at 6. On September 22, 2009, an amended complaint added the following named plaintiffs: Catalina Robles, Juan Montes, Benito Espino, and Guillermina Perez. (Doc. 18).

---

[1] The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). Therefore, the Court may take judicial notice of the docket in *Doe v. D.M. Camp & Sons*, case number 1:05-cv-01417-AWI-SMS.

2

Case 8:24-cv-00067-FWS-JDE   Document 81-20   Filed 06/04/26   Page 184 of 196
Page ID #:2550
Case 1:09-cv-00705-AWI-JLT   Document 158   Filed 09/19/11   Page 3 of 15

Plaintiffs filed a motion for class certification on May 17, 2011. (Docs. 36-37). In support of the motion, Plaintiffs submitted a declaration of Aaron Woolfson, a retained expert. (Doc. 39). Mr. Woolfson asserted that, with the declaration, he amended his expert report regarding the application of pay code 31. (Doc. 39 at 3, 8). Mr. Woolfson stated he relied upon the information relayed to him by Tom Lynch to create his initial report, and learned from Defendant's counsel at his deposition that he had misapplied the pay code. *Id.* at 8. Therefore, in the "excess of caution," he re-analyzed the data in light of information he received at his deposition. *Id.*

**MOTION TO STRIKE THE DECLARATION OF MR. WOOLFSON**

I.   Legal Standard for Expert Reports

The Federal Rules of Civil Procedure govern the use of expert witnesses, and requires a party to disclose the identity of expert witnesses expected to testify at trial. Fed. R. Civ. P. 26(a)(2)(A). When a witness is "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," disclosure must be accompanied by a written report containing:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the data or other information considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all the publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). Disclosures and the accompanying reports must be made at the time and in the sequence ordered by the court. Fed. R. Civ. P. 26(a)(2)(D). If a report is required, the expert may not be deposed until after the report is provided. Fed. R. Civ. P. 26(b)(4)(A).

A party must supplement or correct disclosure or a response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1). With an expert report, "the party's duty to supplement extends to both information included in the report and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(2). Further, "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are

3

due." *Id.* The requirement to "supplement or correct" under Rule 26(e) "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *United States v. 14.3 Acres of Land*, 72 Fed. R. Serv. 3d (Callaghan) 853, 2009 U.S. Dist. LEXIS 7248 at *7 (S.D. Cal. January 30, 2009) (citations omitted).

II.   Discussion and Analysis

Plaintiffs submitted a declaration of Aaron Woolfson in support of their motion for class certification, which Defendant argues was "untimely, procedurally unauthorized and woefully flawed." (Doc. 105 at 5). According to Defendant, the declaration "is nothing more than a supplemental expert report that does not comply with the applicable procedure for submitting a supplemental report and violates th[e] Court's order regarding the schedule for expert discovery." *Id.* Further, Defendant asserts the "myriad [of] errors" made in Mr. Woolfson's original report "would have been apparent had he taken the time to cross- check his conclusions against the data that was readily available to him. He failed to do so." *Id.* at 6. Rather, Defendant notes Mr. Woolfson relied upon information provided to him by Plaintiffs' counsel regarding pay code "031," and then changed the opinions and analysis of his initial report in the declaration. *Id.* at 9, 13.

On the other hand, Plaintiffs argue they "had a *duty* to supplement and clarify Mr. Woolfson's report once additional information was provided, shedding light on an important matter addressed in Mr. Woolfson's report." (Doc. 150 at 3). According to Plaintiffs,

> Mr. Woolfson prepared his supplementation based on information that was revealed to him by Sunview's counsel at his May 3, 2011 deposition. In Mr. Woolfson's May 16, 2011 supplementation, he reanalyzes a portion of his previous findings in light of this previously unprovided *or* mischaracterized information regarding Code 31. Specifically, Woolfson's supplementation was based on the revelation that his original understanding of one of defendant's database entries (Code 31) was mistaken.

*Id.* at 4. Plaintiffs contend that at his deposition, Defendant's counsel informed Mr. Woolfson that he applied pay code 031[2] in his initial report incorrectly, and "[t]he disclosure of this information allowed Woolfson to reanalyze the data provided by Defendant to determine whether Code 031 transactions by Defendants cured payroll deficiencies to class members related to minimum wage

---

[2]Pay code 031 is a method by which Defendant pays additional sums to piece-rate employees, when the amount of pieces picked for the pay period would not ensure payment of at least, minimum wage.

4

and piece rate work." *Id.* at 5.  Further, Plaintiffs argue the supplementation was timely because Mr. Woolfson received the information on May 3, 2011, "and promptly carried out a new portion of his overall analysis of the data provided by Sunview and submitted his supplementation." *Id.* at 6.

In reply, Defendant argues, "Mr. Woolfson's purported need to submit a supplemental report with changed opinions directly resulted from his failure to review the PMK testimony of Sunview and his blind reliance on Plaintiffs' counsel and their misunderstanding of Sunview's payroll system." (Doc. 152 at 5).

In fact, Mr. Woolfson admitted at his deposition that he had not reviewed any deposition transcripts, including that of Defendant's PMK deposition, and was unaware that the PMK deposition had taken place. (Woolfson Depo at 43:6-10; 174:14-175:3; 182:2-14; 197:13-198:2.[3]) Mr. Woolfson admitted that he was unaware of the issues raised in this litigation and explained that he merely responded to a series of questions posed to him by Plaintiffs' lawyers (Id. at 44:9-15); in essence, he tallied various data as requested by the attorneys.  *Id*. at 45:25-46:3.

Mr. Woolfson explained that his information about the pay codes used in Defendant's payroll program–and in particular, his knowledge of pay code 031— came from Plaintiffs' attorneys.  Mr. Woolfson testified, "So here's the thing.  I asked Tom and Steve what these codes were." (Woolfson Depo. at 128:14- 130:3)  Mr. Woolfson clarified that he meant that he received the information about the pay codes from Plaintiffs' lawyers, Tom Lynch and Steve Hernandez.  Id. Mr. Woolfson explained, " . . . I sent them this exact list that you have on the screen. I said, 'Please find out...'" . . . "Yeah, it's Codes Appearing In Data.doc. I said, 'Please find out what all of these mean from defense counsel so that I can conduct as thorough of an analysis as possible.' There's some e-mails–there are e-mails to that extent. This is what your company sent–your client sent back." Id. Then Mr. Woolfson admitted that pay code 031 *was on the list* entitled Codes Appearing In Data.doc.  *Id*. at 130:18-131:17.  Thus, his information on the topic was, in essence, the attorneys'

---

[3] Instead, in his supplemental report, he identifies "Files provided by Sunview and Reviewed by Me" which lists only the electronic, payroll/timekeeping database produced by Defendant as the only materials reviewed by him in conducting his review.  (Doc. 39 at 2-3) However at his deposition, he also provided a list of pay codes that he indicated that he reviewed. (Woolfson Depo. at 20:12-22:22) There may have been other paper documents reviewed but there is no evidence presented here as to whether this is true or, if so, which documents were reviewed.  Id.

interpretation of the meaning of the pay code.  Woolfson admitted that some of the information Tom Lynch provided was incorrect.  For example, Mr. Lynch gave him information  which resulted in him excluding codes as "pay codes" that were, in fact, "job codes," though his supplemental report describes them as "paytypes." (Woolfson Depo. at 145:12-146:7; 83:15-18; Doc. 39 at 3.)

Notably also, while on a break from his deposition, Woolfson telephoned Plaintiffs' counsel, Mr. Palau and Mr. Lynch.  In this conversation–while the deposition was still ongoing–Mr. Palau provided additional information to Mr. Woolfson that further explained the pay codes used by Defendant.  (Woolfson Depo at 171:4-172:3; 178:21-179:2.)  Mr. Woolfson explained that the attorneys told him that, "According to the PMK gentleman who was deposed said that 31 was a computer-generated makeup. But, in fact, as I just learned today, it is an adjustment to be applied at the end of the payroll. So I would like to have the opportunity to recast that and provide an errata. And I'm sorry."  (Woolfson Depo at 171:17-22.)  However, Mr. Gallegos–Defendant's PMK deponent– was not asked whether the "computer generated-makeup" was applied daily or at the end of the payroll period.  However, when shown a list of the pay codes that Mr. Gallegos provided at his deposition, that included explanation as to the meaning of the codes, Mr. Woolfson admitted that the list would have triggered questions for him as to how pay code 031 was to be applied, although he seemed to indicate that counsel failed to obtain sufficient explanation from the PMK deponent regarding the application of the pay codes.  *Id*. at 178:21-180:17.

Next, Mr. Woolfson admitted that he excluded "certain pay codes" from the database analysis because he "was told to . . . [by] Tom Lynch." (Woolfson Depo. at p. 68:11-69:13; 73:14-25)  He clarified, "Tom Lynch told me how to use all the pay codes, except they were to apply specifically not to certain job codes."[4]  *Id*. at 182:1-3. On the other hand, Mr. Woolfson admitted that he was not provided the list of pay codes produced by Defendant but, even if he had been, he would not have tabulated the data  according to the descriptions provided by Defendant "*because these descriptions are wrong.*" *Id*. at 189:15-19.  Mr. Woolfson reported, "So there's certain things that I was aware of

---

[4]Other than to say that Tom Lynch told him to do it, he does not explain why he does not consider pay type 630, which describes when an employee makes boxes, in his tabulations.  (Doc. 39 at 3)

and how to use them, but the description here and the way that I was told to use it is different than what I had been led to understand it to mean." *Id*. 181:10-14.

Plaintiffs' and Mr. Woolfson's attempt to place blame for this lack of understanding on Mr. Gallegos, is unjustified.

At his deposition, Mr. Gallegos testified,

How about 31?
A.      It's a computer-generated makeup.
Q.      How is it different than 10?
A.      10 is a manual-generated makeup code.

(Doc. 154, Ex 1 at 61.)  No other questions were posed to him about pay code 031 or how it was applied. (Gallegos Depo.)  Moreover, Mr. Gallegos' declaration filed in opposition to the motion for class certification further explains that pay code 031 signifies an amount added to a worker's paycheck to ensure that he receives minimum wage.  (Doc. 116 at 3-4)

On the other hand, Mr. Woolfson admitted that he did not do a wholesale comparison of his results with the payroll register provided by Defendant such to verify his methodology.  Instead, he compared his data points with the "constituent components" of the payroll register–meaning the hours worked as reflected on the payroll.  (Woolfson Depo. at 77:8-21.)  He reported that he "assumed" that if the "constituent components" were accurate, the total would be accurate as well.[5] *Id*.

Moreover, when asked specifically how he determined whether an employee was not being paid minimum wage, he referred to a piece of data that showed the hourly rate.  (Woolfson Depo. at 94:2-19)  In doing so, he failed to take into account other pay codes that worked in conjunction with the hourly rate that were designed to boost the rate of pay to minimum wage.  *Id*. at 102:4-14.  In fact, Mr. Woolfson testified that he was unaware that there was such a "wage accelerator."  *Id*.

[5]Though Mr. Woolfson later claimed that he compared his data results with the pay stub information (*Id*.), this testimony is contradicted by his later declaration that he failed to consider pay code 031 for the entirety of a pay period–rather than just one day of the pay period–when identifying the total number of employees whom he reported had not been paid minimum wage and reporting that the number was fewer. (Doc. 39 at 8) In fact, he admitted that he interpreted pay code 031 to adjust the pay of the employee only as to one particular day, rather than as to the entire pay period. (Woolfson Depo. at 231:13-232:13)

7

Case 8:24-cv-00067-FWS-JDE    Document 81-20    Filed 06/04/26    Page 189 of 196
Page ID #:2555
Case 1:09-cv-00705-AWI-JLT    Document 158    Filed 09/19/11    Page 8 of 15

Consistent with this testimony, Mr. Woolfson testified also that "pay code 10 is not how I– I didn't group these by pay code . . ." which meant that he failed to appreciate that when pay code 10 was used, it indicated that the employee's wage was increased to bring it up to minimum wage. *Id*. at 120:3-25. Instead, he testified that he believed that pay code 010 meant that there was a later entry made on the payroll program. *Id*. at 121:10-24.

On the other hand, Mr. Woolfson testified that he determined that some employees were paid on a piece rate basis because of the use of pay code 021 without hours worked being associated with this pay code. (Woolfson Depo. at 106:1-4) Mr. Woolfson's understanding of this pay code, once again, was provided to him by Tom Lynch. *Id*. at 113:1-6; 114:2-22. However, Mr. Nickerson–Defendant's retained expert–declares that pay code 021 without associated "hours worked" data, when used with other codes, may show, not that the worker was paid on a "piece rate," but that his work involved the use of equipment or that the employee received an incentive bonus and that the hours worked would be associated with these other codes, rather than the 021 pay code. (Doc 144, Ex. 44, at 10; Doc. 152, Ex 1 at 83; Doc. 152, Ex 1 at76-77; Gallegos Depo. at 61:18-20) On the other hand, Mr. Woolfson testified that pay code 412, "is not a standalone" code and that it must be used in conjunction with another code to have meaning. *Id*. at 134:19-20. However, to the contrary, Mr. Nickerson has attested that Mr. Woolfson's results show that he considered any use of pay code 412 that was not associated with an "hours worked" entry, as identification of a piece rate worker. (Doc. 144, Ex. 44 at 11) Finally, among other criticisms, Nickerson notes that Mr. Woolfson's conclusions that the database fails to demonstrate that workers were given meal and rest breaks is faulty given that there is no showing whatsoever that the payroll system would account for this time. (Doc. 144, Ex 44 at 11)

It is upon this factual backdrop that the Court decides the motion.

A. Mr. Woolfson's declaration was not a proper supplemental report under Rule 26(e).

An expert's duty to supplement under Rule 26(e), is not a right to supplement at will. "Duties are usually owed to other people, and are not for the benefit of the party who has the duty." *Sandata Technologies, Inc. v. Infocrossing, Inc.*, 2007 U.S. Dist. LEXIS 85176 (S.D.N.Y. Nov. 16, 2007) (rejecting an untimely supplemental report that benefitted only the party producing the report);

8

Case 8:24-cv-00067-FWS-JDE   Document 81-20   Filed 06/04/26   Page 190 of 196
Page ID #:2556
Case 1:09-cv-00705-AWI-JLT   Document 158   Filed 09/19/11   Page 9 of 15

*see also Reid v. Lockhead Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001) ("In short, Rule 26 imposes a *duty* on Plaintiffs; it grants them no *right* to produce information in a belated fashion."). Here, Woolfson's supplemental report and the declaration offered in opposition to the motion for summary judgment, benefits only Plaintiffs.

Further, as Defendant argues, supplementation "was necessitated by the fact that Mr. Woolfson failed to adequately prepare for his initial report by relying on the representations of counsel, rather than reviewing the deposition of Sunview's witness on the topic of the payroll system." (Doc. 105 at 14).

Notably, a party may not rely on supplementation "as a way to remedy a deficient expert report or as a means of getting in, in effect, a brand new report." *Medtronic Vascular, Inc. v. Abbot Cardiovascular Systems, Inc.*, 2008 U.S. Dist. LEXIS 112148 at *6 (N.D. Cal. Oct. 15, 2008); *Plumley v. Mockett*, 2010 U.S. Dist. LEXIS 57254 (C.D. Cal May 26, 2010) (finding an expert's declaration was not a proper supplement under Rule 26(e) because "supplementary disclosures do not permit a party to introduce new opinions after the disclosure deadline under the guise of a 'supplement'"). Similarly, supplementation is not appropriate simply "because the expert did an inadequate or incomplete preparation." *Akeva LLC v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002) (citations omitted). As one district court explained:

> To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given. This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions. That process would hinder rather than facilitate settlement and the final disposition of the case.

*Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003); *see also Akeva*, 212 F.R.D. at 310 ("To construe supplementation to apply whenever a party wants to bolster or submit additional opinions would reek (sic) havoc in docket control and amount to unlimited expert opinion preparation."). Of particular concern to the Court is Mr. Woolfson's reliance on the understanding of Plaintiffs' lawyers as to the meaning of the data rather than reviewing the statements of the witnesses and other

9

evidence directly so that *he could decide* what was needed.[6]  When the lawyers maintain control of the information and parse out only what they choose, this presents a real risk of sandbagging; not by the expert, *but by the attorneys*. However, the impact on the opponent is the same: incomplete information and deprivation of a full and complete expert deposition.  The information was clearly available at the time Mr. Woolfson prepared his original report should have been known to him at that time.  Consequently, Mr. Woolfson's lack of preparation and failure to review documents produced by Sunview and the other evidence describing the pay codes, is not a proper basis for supplementing his report.[7, 8]

B.   Plaintiffs failed to show the supplemental report was substantially justified or harmless.

A party's failure to comply with the rules regarding expert witnesses and their reports exposes that party to sanctions under Federal Rule of Civil Procedure 37(c). The Ninth Circuit gives "wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)," which "gives teeth" to the requirements. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001), citing *Ortiz- Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 248 F.3d 29, 34 (1st Cir. 2001).  This rule provides that a party who fails to provide required information "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1). Accordingly, Plaintiffs have the burden of establishing that their failure to follow the strictures of the Federal Rules was substantially justified and harmless.  *Id.; see also Yeti by Molly*, 259 F.3d at 1107.

Further, the sanction of exclusion is self-executing, and "is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or

---

[6]He, not the lawyers, is the expert.  He, not the lawyers, is best suited to comprehend the meaning of the codes in the database.  By taking this course of action–relying on the lawyers' understanding of the information contained in the database–Mr. Woolfson and the lawyers risked that the lawyers were wrong.

[7] Because the Court concludes that the supplementation was not proper on these bases, it declines to address the issue of its timeliness under the Scheduling Order that setting the deadlines for expert discovery related to class certification.

[8]For the same reason, his declaration submitted in opposition to the motion to strike, which *further* explains his opinions, is not a proper supplementation.  However, it does not appear that he intended it to be, given that it is incomplete and fails to meet most of the requirements for an expert report.  Instead, it further demonstrates the inadequacy of his original and supplemental reports.

Case 8:24-cv-00067-FWS-JDE    Document 81-20    Filed 06/04/26    Page 192 of 196
Page ID #:2558
Case 1:09-cv-00705-AWI-JLT    Document 158    Filed 09/19/11    Page 11 of 15

harmless." *Jimena v. UBS AG Bank*, 2010 U.S. Dist. LEXIS 117596, at *15 (E.D. Cal. Nov. 5, 2010), quoting *Salgado v. General Motors Corporation*, 150 F.3d 135, 142 (7th Cir. 1998); *see also Yeti by Molly*, 259 F.3d at 1106.

### 1.  *Substantial Justification*

Plaintiffs assert, "Defendant's failure to adequately produce this necessary information regarding the application of the Code 31 payroll function provides all the necessary 'substantial justification' Plaintiffs' need." (Doc. 150 at 8).  On the other hand, Defendant asserts the supplementation was not substantially justified because it "was necessitated by the fact that Mr. Woolfson failed to adequately prepare for his initial report by relying on the representations of counsel, rather than reviewing the deposition of Sunview's witness on the topic of the payroll system." (Doc. 105 at 14).  Further, Defendant argues, "The lack of diligence on the part of Mr. Woolfson and Plaintiffs' counsel do not require the requisite substantial justification to avoid the consequences of Rule 37." (Doc. 153 at 8).  As addressed above, failure to adequately review information that was readily available at the time of the preparation of the report is not a proper basis for a supplemental report.

### 2.  *Harmlessness*

The Ninth Circuit has articulated several factors for the Court to consider when determining whether a violation of the expert discovery rules was harmless, including: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not disclosing the evidence." *Lanard Toys, Ltd. v. Novelty, Inc.*, 375 Fed. Appx. 705, 713 (9th Cir. 2010), citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).  Notably, the Ninth Circuit has found that "even absent a showing in the record of bad faith or willfulness, exclusion is an appropriate remedy" for a failure to comply with the rules regarding experts and their reports.  *Yeti by Molly*, 259 F.3d at 1106.

Plaintiffs assert there is no prejudice because Defendant had three months to prepare a response to Mr. Woolfson's supplemental report, because the opposition to class certification was not due until August 18, 2011.  (Doc. 150 at 9).  Further, Plaintiffs assert "there is [no] potential

11

Case 8:24-cv-00067-FWS-JDE   Document 81-20   Filed 06/04/26   Page 193 of 196
Page ID #:2559
Case 1:09-cv-00705-AWI-JLT   Document 158   Filed 09/19/11   Page 12 of 15

disruption to the trial or management of the case through permitting Woolfson's supplementation," and they did not act in bad faith. *Id.*

On the other hand, Defendant asserts that "the supplemental report is particularly prejudicial" because Defendant did not have the opportunity to depose Mr. Woolfson about his new opinions. (Doc. 105 at 5; Doc. 153 at 8). Expert discovery related to class certification concluded on May 6, 2011.[9] (Docs. 33, 35). As a result, Defendant would not have an opportunity to depose Mr. Woolfson regarding his methodology and analysis for his supplemental report *without further disruption to the case schedule*. To abate the prejudice, the Court would be forced to reopen discovery related to class certification to allow Defendant to depose Mr. Woolfson, and have its expert prepare a response to the supplemental report. This would likely cause further delay with resolution of Plaintiffs' motion for class certification and the trial. As a result, submitting the declaration and supplemental report of Mr. Woolfson was not harmless. *See Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1062 (9th Cir. 2005) ("[d]isruption to the scheduling of the court and other parties is not harmless"); *Hoffman v. Const. Protective Servs.*, 541 F.3d 1175, 1180 (9th Cir. 2008) (failure to comply with Rule 26 was not harmless where the court would be required to create a new briefing schedule").

### MOTION TO STRIKE MR. WOOLFSON'S OPINIONS

I.  Legal Standard for Expert Testimony

Under the Federal Rules, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. Testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods." *Id.* Further, the expert witness must have "applied the principles and methods reliably to the facts of the case." *Id.* The Supreme Court has imposed a "gatekeeping responsibility" for courts to engage in objective screening to ensure that evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S 579, 589

_____

[9] As Defendant notes, extension of rebuttal expert disclosure to June 10, 2011 "did not permit Sunview to conduct further discovery into Mr. Woolfson's new/changed opinions or re-open his deposition." (Doc. 153 at 8).

Case 8:24-cv-00067-FWS-JDE   Document 81-20   Filed 06/04/26   Page 194 of 196
Case 1:09-cv-00705-AWI-JLT   Document 158   Filed 09/19/11   Page 13 of 15
Page ID #:2560

(1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999) (clarifying the "gatekeeping" obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge").

Before considering proffered expert testimony, a trial court "must merely make a determination as to the proposed expert's qualifications." *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir. 1994). Further, a trial court is not to attempt to determine whether the expert's conclusions are correct, but rather only "the soundness of his methodology." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).

II. Discussion and Analysis

According to Mr. Woolfson, he was hired by Plaintiffs to provide database analysis and prepared an expert report on April 18, 2011. (Doc. 151 at 2). In his declaration filed September 2, 2011, Mr. Woolfson asserts he has twenty-four years of "professional experience working with large-scale databases" and has been retained "in approximately 54 class-action cases to analyze wage and hour data points." *Id.*

Defendant contends Mr. Woolfson lacks the necessary qualifications to offer expert opinions in this matter, and therefore seeks to strike all opinions offered by Mr. Woolfson. (Doc. 105 at 19). According to Defendant, Mr. Woolfson's academic career was insufficient to establish him as an expert: "He does not have an advanced degree, or even a bachelor's degree, and does not hold any of the standard database certifications used by Microsoft, Oracle, or any other software or database company. This lack of relevant experience and education renders him unqualified to provide expert testimony." (Doc. 105 at 6) (emphasis omitted). In addition, Defendant asserts errors in Mr. Woolfson's analysis "render his testimony inadmissible." *Id.* at 18. Specifically, Defendant points to Mr. Woolfson's decision to delete pay code 031 from his analysis when he completed the initial report. *Id.* at 18-19.

Case 8:24-cv-00067-FWS-JDE    Document 81-20    Filed 06/04/26    Page 195 of 196
Page ID #:2561
Case 1:09-cv-00705-AWI-JLT    Document 158    Filed 09/19/11    Page 14 of 15

With the experience attested to by Mr. Woolfson, it appears he may be qualified as an expert.[10] Fed. R. Evid. 702 does not require an expert to have a college degree. Instead, "knowledge, skill, [or] experience" is sufficient to allow a witness to opine on topics that are beyond the typical knowledge of a lay person. Thus, the failure of Mr. Woolfson to have a college degree or to be certified on the topics raised by his report does not render him unqualified to opine here.

On the other hand, the Court is not convinced that Mr. Woolfson's opinions are reliable. Clearly, the original report contains erroneous conclusions; even Mr. Woolfson admits this. (Doc. 39 at 8) Though he minimizes the degree to which his original report is wrong, the fact remains that it is wrong.

Likewise, Mr. Woolfson fails to adequately explain why he took certain actions, i.e. excluding certain "pay types" such as "make boxes" or to outline the assumptions he made in his tabulations. For example, he asserts that Defendant is flat wrong that there are no "purely piece rate workers"–he concludes this is the case because he finds pay codes without associated hours–and that it has wrongly described its pay codes (*Id*. at 189:15-19).[11] All hubris aside, notably, Mr. Nickerson has investigated Mr. Woolfson's results and has been able to replicate them, though not completely. (Doc. 152, Ex 1 at 26-27; 30-32; 57-58; at 65-66) In doing so, Mr. Nickerson used the very assumptions that Mr. Woolfson made and determined that Mr. Woolfson's conclusions resulted in significant incorrect tabulations. More important, Mr. Nickerson *compared* Woolfson's results to the data Sunview produced and determined that Mr. Woolfson's results are incorrect because he omitted certain data. (Doc. 152, Ex 1 at 32)

[10] The Court notes that his report fails to provide " a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Fed. R. Civ. P. 26(a)(2)(B)(v). Instead, while noting that he has "been retained as either a consulting or testifying expert in database analysis in over 40 cases," he identifies only two cases where "the court has relied upon my expert findings" (Doc. 39 at 200) Moreover, though his CV details his professional experience, it appears that little of the work he has done relate to searching databases and reporting tallies for categories of data. (Doc. 39 at 196-200) It appears that this type of experience has been gained over the last two-and-a-half years through forensic work with attorneys. (Woolfson Depo. at 10-14) However, once again, there is little detail included in the deposition transcript. However, Defendant focuses its argument only Mr. Woolfson's lack of formal education.

[11] On the other hand, Mr. Nickerson reports that, "There are no instances of piece rate payments without associated hours somewhere in the Payroll Detail Data." (Doc. 144, Ex. 44 at 12)

14

Case 8:24-cv-00067-FWS-JDE   Document 81-20   Filed 06/04/26   Page 196 of 196
Page ID #:2562
Case 1:09-cv-00705-AWI-JLT   Document 158   Filed 09/19/11   Page 15 of 15

Perhaps most damning is Mr. Woolfson admission that, "So there's certain things that I was aware of and how to use them, but the description here and the way that I was told to use it is different than what I had been led to understand it to mean." (Woolfson Depo. at 181:10-14.) Therefore, considering Woolfson's admitted error regarding the pay code 031, his failure to conduct any expert investigation or analysis into the meaning of Defendant's pay codes, his apparent willingness to offer conclusions about ultimate issues, i.e. lack of meal and rest breaks, without adequate foundation and given that he failed to conduct a holistic verification of his results by comparing them against Defendant's payroll register, the Court lacks any confidence in the reliability of Mr. Woolfson's findings. Thus, in performing its gatekeeper function, that Court concludes that Mr. Woolfson's methodology is so inherently flawed that it cannot permit the use of his opinions rendered thus far.

<b>ORDER</b>

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1. Defendant's motion strike the declaration offered in opposition to the motion for class certification of Aaron Woolfson (Doc. 39) is **GRANTED**;

2. Defendant's motion to strike all opinions of Aaron Woolfson is **GRANTED**; and

3. Defendant's request for a *Daubert* hearing is **DENIED** as **MOOT**.

IT IS SO ORDERED.

Dated:   **September 19, 2011**                     **/s/ Jennifer L. Thurston**
                                       UNITED STATES MAGISTRATE JUDGE