Page 14

A.    They -- they have a group of loan officers who work directly with consumers, so it's a consumer direct division.

Q.    So these branches originate loans directly with consumers?

A.    Yes.

Q.    And what is these branches' relationship with LoanStream?

A.    They are W-2 employees for the most part that drum up their own business and bring that into LoanStream as consumer direct loans.

Q.    Is LoanStream itself a lender?

A.    Yes.

Q.    Is -- these consumer direct loans, would they be -- would the money lent be coming from LoanStream then or would it be coming from some third-party source?

A.    Please clarify.

Q.    I'm not really too familiar with how the mortgage industry operates so when you say that it's a consumer direct lender, is -- is the -- is the entity that's lending the consumer money LoanStream?

A.    Yes.

Q.    Does LoanStream hold a banking license?

A.    Please clarify.



Page 15

Q.   Is LoanStream a -- a bank or is it a lender?

A.   A lender.

Q.   Who was responsible for the operations of these LoanStream branches?

MR. LANDERS:  Objection; vague and ambiguous as to time.

BY MR. PERRONG:

Q.   During 2021 and 2022, what -- who was responsible for the day-to-day operations of these -- of these branches within LoanStream?

A.   Please clarify "operations."

Q.   Who oversaw the branches?

A.   Myself and Greg Armstrong.

Q.   Who was Greg Armstrong?

A.   Our chief operating officer at the time.

Q.   Approximately how many branches did LoanStream have during the period 2021 to 2022?

A.   During that time period -- period of 2021 and 2022, there were eight branches.

Q.   Was the C. Roberts Branch one of those branches?

A.   Yes.

Q.   Who was responsible for setting up and managing branch reimbursements?

A.   Please clarify "setting up."



MAGNA
LEGAL SERVICES

Page 16

Q.    Who was responsible for paying branch reimbursements?

MR. LANDERS:  Objection; vague and ambiguous; assumes facts not in evidence.

THE WITNESS:  Sorry, clarify what type of payments.

BY MR. PERRONG:

Q.    It's my understanding that the branches have certain expenses that are incumbent in the operation of any business, correct?

A.    Correct.

Q.    Things like office supplies, computers, marketing expenses, right?

A.    Yes.

Q.    Who would pay those expenses?

A.    Our accounting department would pay those.

Q.    Who was in charge of the accounting department?

A.    Madelina Colon.

Q.    And presumably the accounting department would have records of those payments?

A.    Yes.

MR. LANDERS:  Objection; vague and ambiguous.

Go ahead.



A.    Yes.

Q.    And what -- what sort of accounting records did you review?

A.    We found that we had -- had paid Cynthia one time.  We were only able to pay her, unfortunately, one time.  The branch was not very profitable so it looks like we were only able to give her a profit payment one time of $7,000 and, you know, the rest of it was -- you know, just wages, W-2 wages.

Q.    So other than a profit payment, the branch, who funded the startup of the branch?

MR. LANDERS:  Objection; vague and ambiguous.  Which branch are you referring to?

MR. PERRONG:  I'm sorry.  The C. Roberts Branch.

THE WITNESS:  There is no such thing as a startup payment.  When we start a branch, the -- you know, if we take a risk on bringing a branch on, we unfortunately suck up a loss for a while until they turn profitable, and if they stay unprofitable for a period of time and they do not catch up, we have to part ways with the branch.

BY MR. PERRONG:

Q.    So what -- when you -- obviously, there's start -- I think you'd agree with me that there's



MAGNA
LEGAL SERVICES

Page 19

startup costs incumbent in starting a business, right?

A. In general, yes.

Q. So to start a branch, are there costs associated with starting a branch?

A. No.

Q. Does a branch need to have employees?

A. Yes.

Q. Does a branch need to have things like computer software to run its job, things like Encompass?

A. Yes.

Q. And a branch needs a source of customers, right?

A. I would guess.

Q. Well, I'm not asking you to guess. If a branch is in business to do business, it needs customers to do that business with, right?

A. Yes, I would assume.

Q. So those things that a branch needs to operate are costs for a branch, are they not?

A. No.

Q. Why not?

A. They're costs for the company who's starting a branch.

Q. So those are costs that LoanStream incurred,



Page 20

right?

A.    Correct.  They're minimal, but yes.

Q.    Did LoanStream pay for advertising costs associated with the C. Roberts Branch?

A.    Nope.

Q.    Why?

A.    We never do.  It's not our model.  They -- they go out and deal with Realtors.

Q.    I'm a bit confused.  Because you said LoanStream would pay for certain -- take on expenses in starting a branch, right?

A.    Certain expenses, yes.

Q.    What expenses would LoanStream take on?

A.    Basically the only expenses that we would take on initially until they got in the black, were just the costs of the staff.

Q.    All right.  So are you aware that we noticed a 30(b)(6) deposition of LoanStream practically over a year ago at this point?

        MR. LANDERS:  Objection; calls for speculation.

        THE WITNESS:  Yes.

BY MR. PERRONG:

Q.    What was the answer?

A.    I believe so.



Page 25

I will allow the witness to answer questions about the existence of other legal proceedings, but nothing about the legal proceedings and nothing about the facts underlying the legal proceedings.  Now if you -- if you feel like you need to ask her those questions that you already know the answer to because it's a matter of public record, go for it.  But that is the extent of the answers that I will permit her to give.

BY MR. PERRONG:

Q.    Are you currently facing any criminal charges, Ms. Vernon?

MR. LANDERS:  Let me pose the objection that it exceeds the scope of the deposition notice.  It is not relevant to the party's claims or defenses.

Subject to those objections, I will permit you to answer, Ms. Vernon.

THE WITNESS:  Yes, I am.

BY MR. PERRONG:

Q.    What charges are you currently facing?

MR. LANDERS:  Objection; exceeds the scope of the deposition notice; not relevant to the party's claims or defenses.

You may answer.

THE WITNESS:  I am currently facing a murder


MAGNA
LEGAL SERVICES

Page 26

charge.

THE REPORTER:  I'm sorry?  I'm currently facing a...

THE WITNESS:  Murder charge.

BY MR. PERRONG:

Q.  And what is the status currently of that proceeding?

MR. LANDERS:  Objection; exceeds the scope of the deposition notice; not relevant to the party's claims or defenses.

You may answer as to the status of the proceeding, if you know.

THE WITNESS:  There is no current status to share, and I will not answer any further questions.

BY MR. PERRONG:

Q.  When you say that there is no current status, has the matter been adjudicated or are the charges still pending?

MR. LANDERS:  Objection.  Objection.  Exceeds the scope of the deposition notice; not relevant to the party's claims or defenses.

With that, you may answer the narrow question asked:  Are the charges still pending.

THE WITNESS:  They are still pending.



Page 30

A.    No.

Q.    Were any payments made to Premier Financial Marketing?

A.    Yes.    That was the 7,000 profit to Cynthia. That was her corporation.

Q.    And in terms of the Premier Financial Marketing payment, was the amount of the payment for $7,000 in profit?

A.    Yes.

Q.    Okay.    So that implies that there were expenses, correct?

MR. LANDERS:    Objection; calls for speculation; misstates testimony.

THE WITNESS:    No.

BY MR. PERRONG:

Q.    If there's a profit -- what is the basis for calling it a profit payment?

A.    What it was was it was actually an advance against future pro- -- profits.    Unfortunately, her branch was never profitable.    They pulled at my heart -- you know, she pulled at my heartstrings there right before Christmas that, you know, she needed -- she needed money and, you know, I -- I gave her that, but unfortunately, it never became profitable so that was the only profit payment I ever made to her.



MAGNA
LEGAL SERVICES

Page 35

A.    I believe they did.

Q.    Who would pay for that office space?

A.    I believe they did.

Q.    And who -- would they receive any payments from LoanStream for the cost of that office space?

A.    Yes.

Q.    How would they receive payments from LoanStream for the cost of that office space?

A.    During the time that a branch is together with LoanStream, LoanStream would actually cut that payment directly to the landlord, so it -- it would have been direct from LoanStream accounting to that landlord for whatever period of time they were employed by LoanStream.

Q.    Would LoanStream also do that same arrangement with respect to venders that conducted marketing and advertising for the branches?

MR. LANDERS:  Objection; calls for speculation; assumes facts not in evidence.

You may answer if you know.

THE WITNESS:  Well, first of all, we -- we would -- we would never allow any sort of marketing or advertisement so absolutely not.

BY MR. PERRONG:

Q.    When you say that you wouldn't allow marketing



MAGNA
LEGAL SERVICES

Page 36

or advertisement, how do you mean?

A.    We don't -- just exactly like I said.  We don't allow any sort of telemarketing or advertising.

Q.    So how were the branches supposed to get business?

A.    They work with -- for the most part, they work with B2B with the Realtors.  Some work with, you know, department of -- Department of Commerce.  A lot of different ways.  They do what's called, you know, self-sourcing their business.

Q.    Would LoanStream pay for costs associated with that self-sourcing of business?

A.    No.

Q.    Did LoanStream ever explicitly prohibit its branches from engaging in forms of marketing other than reaching out to Realtors?

A.    Yes.

Q.    Where?

A.    It's in the -- the branch manager agreement. We don't allow them to enter into any contract, period.

Q.    Would LoanStream enter into contracts then?

MR. LANDERS:  Objection; calls for speculation; vague and ambiguous.

THE WITNESS:  I'm sorry.

MR. LANDERS:  Contracts with whom, Counselor?



Page 40

MR. PERRONG:  So we can go back on the record then.

MR. LANDERS:  Yes.

BY MR. PERRONG:

Q.   All right.  So before we breaked, we were looking at Exhibit A and, specifically, paragraphs f -- or I'm sorry, paragraph 5f and paragraph 6.

So with respect to paragraph 5f iv, there is a -- there is a representation that the branch manager has read the following OCMBC policies and one of those is the policy regarding telemarketing and phone fax solicitation laws.

Do you have a copy of that policy?

A.   As I mentioned right before we went off the record, unfortunately I was unable to get my hands on that one, so we can't produce that, unfortunately.

Q.   Do you recall reviewing that policy when it was drafted?

A.   You know, the -- the -- vaguely.  We had everybody sign that.  We don't do it, but it's -- irregardless, unfortunately, because we can't get our hands on it.

Q.   Did the policy ever state that the telemarketing was prohibited?

A.   Yes.



Page 41

Q.   So there was no permission to conduct any sort of telephonic marketing of any sort?

A.   Absolutely not.

Q.   Would telemarketing be permitted to customers with their consent?

A.   No.

Q.   Did LoanStream ever discipline or terminate branches for making telephone calls?

A.   No.

Q.   Did LoanStream ever communicate that the only permissible form of marketing was through Realtors to its branch managers?

MR. LANDERS:  Objection; misstates testimony.

You may proceed.

THE WITNESS:  No, because that wasn't the only method.

BY MR. LANDERS:

Q.   What are the methods that LoanStream authorized its branch managers to advertise?

A.   Anything that was self-sourced.

Q.    If they self-sourced telephone calls, would that be authorized?

A.   No.  That's why it was specifically called out.

Q.   What other forms of marketing would be



Page 42

authorized as opposed to not authorized?

A.    Again, things that -- that drummed up business through third-party relationships, the biggest one being Realtor.  Other was things like chamber of commerce work.  You know, a lot of people -- people that, you know, were ethnic had things that were done in those communities.  You know, things like that.

Q.    Would branch managers be authorized to self-source leads from lead generators?

A.    No.

Q.    But you're not in possession of any documents that reflect that that was the position?

A.    Unfortunately, I was unable to get my hands on that -- that for Cynthia Roberts.

Q.    If telemarketing was forbidden outright, then why is there a telemarketing compliance policy instead of simply just a statement that telemarketing is prohibited?

        MR. LANDERS:  Objection; misstates testimony.

        You may proceed.

        THE WITNESS:  Because it was important enough to call out.

BY MR. PERRONG:

Q.    Was telemarketing forbidden outright?

A.    Absolutely.


MAGNA
LEGAL SERVICES

Page 43

Q.    And I realize that you were not at Cynthia Roberts' deposition, but at Cynthia Roberts' deposition she testified that LoanStream helped us have funding by paying marketing.  Why would she make such a statement?

MR. LANDERS:  Objection; calls for speculation.  Also, exceeds the scope of the deposition notice.

You may proceed.

THE WITNESS:  Unfortunately, you would have to ask her.  If I had to guess, she may be confusing us with another firm.

MR. LANDERS:  Ms. Vernon, on a going-forward basis, please don't guess.

MR. PERRONG:  Please don't coach the witness.

MR. LANDERS:  You should have told her that, Counselor.

MR. PERRONG:  I did.

BY MR. PERRONG:

Q.    Did Cynthia Roberts ever send invoices to LoanStream's accounting department referencing LizDev's telephone calls?

A.    In -- in hindsight now it looks like that they were at least one occasion one came over.

Q.    And LoanStream didn't instruct Ms. Roberts that telephone calls were impermissible, did it?



Page 46

BY MR. PERRONG:

Q.    Ms. Vernon, are you familiar with the document I'm referring to?

A.    Yes, I believe so.

Q.    As a result of receiving that document, did LoanStream take any action against the C. Roberts Branch?

A.    No, it appears to have been discarded.

Q.    In your review of the e-mails responsive to this litigation, did you recall -- do you recall reviewing an e-mail chain regarding missing money that was due to the branch?

A.    I reviewed an e-mail chain pur- -- purporting that there may be missing profit and loss statements, not missing money.

Q.    Do you have a copy of those profit and loss statements that were allegedly missing?

A.    I don't have any materials in front of me today as we take this deposition.

Q.    During the break, did you speak with anybody?

A.    No.

Q.    Did the C. Roberts Branch have a cost center number in OCMBC's accounting system?

A.    They did.

Q.    What is the cost center number used for?



Page 47

A.    As I don't have that in front of me, I would be -- I would be guessing.  It's a four-digit number we assign to each.

Q.    Does LoanStream have the ability to create a report with respect to the C. Roberts Branch call center number?

A.    Please rephrase that.  Produce or create?

Q.    It can search for documents based on cost center number, correct?

A.    Generally, yes.

Q.    Was a search conducted for invoices for the C. Roberts Branch cost center number?

A.    Yes.

Q.    And what did that search reveal?

A.    That by 2022, that branch was in the red or in the hole or, you know, negative by over $20,000.

Q.    When you say that it was in the hole by $20,000, what were the expenses that led for the branch to be in the hole?

A.    Just mostly W-2 employment expenses and the one profit advance that we gave them.

Q.    And there were no other expenses?

A.    There's a hard expense to every file.  There's a credit report expenses.  So, again, I don't have it in front of me.  I couldn't bring any materials to this



Page 48

sort of deposition, but with every file there is typically a credit report fee.  There's errors and omission fee.  There are also profit-related fees from the loans such as, you know -- such as origination fees on the file.  Fees for -- for selling the loan on the secondary market.  There's profit, you know, and there's loss, all, you know, together to figure out if they're in the green or in the red.

Q.    And there were no marketing fees?

A.    Correct.

Q.    No advertising fees?

A.    Correct.

Q.    Did OCMBC pay the LizDev invoice?

A.    No.

Q.    Did it reimburse the Roberts branch or anybody else for that invoice?

A.    No.

Q.    Did it delete the invoice?

A.    Did it what?

Q.    Delete the invoice.

A.    It -- it appears to have just been discarded by our accounting team.

Q.    Was any record made of why it was discarded?

A.    No.

Q.    Has OCMBC ever shut a branch down on the basis



Page 49

that it was conducting telephone marketing?

A.    Not that I can recall.

Q.    Why did OCMBC terminate the C. Roberts Branch?

A.    I don't believe we did.  I believe business just dried up.

Q.    And LoanStream accepted the business that was generated by the C. Roberts Branch?

A.    Yeah, there were a few loans that came through the branch.  Not very many, but there were a few.

Q.    And LoanStream never sent any notices to the C. Roberts Branch stating that the use of LizDev violated Section 6 of the agreement, did it?

A.    We -- our accounting department wouldn't have known what LizDev was.

Q.    Does LoanStream have the prohibited activity policy in section 5f ii of the agreement?

A.    Prohibited activities?  I'm not sure.  I know we -- we didn't have that as it related to Cynthia Roberts, but we can look and see if we have those in general even though we didn't have them in Cynthia's file to put our fingers on.  We can -- we can certainly get you a copy of just those policies.

Q.    Does LoanStream maintain an internal, do-not-call list?

A.    No, there's no reason to.  We don't -- we


MAGNA
LEGAL SERVICES

Page 50

don't participate in any sort of telemarketing campaigns.

Q.   Does it maintain an internal do-not-call policy?

A.   No, for the same reason.

Q.   So sitting here today, you can't point to any specific document stating that telemarketing is prohibited?

A.   I did not look for it outside of just Cynthia's records.

Q.   Did LoanStream require its branches to disclose to LoanStream where it obtained a particular customer from?

A.   No.

Q.   Who designed the LoanStream beta branch concept?

MR. LANDERS:   Objection; vague and ambiguous.

THE WITNESS:   Sorry.   There is no beta branch concept.

BY MR. PERRONG:

Q.   Who designed this beta branch -- this C. Roberts Branch, this branch idea?

A.   So are you -- are you asking who developed just our retail branch network in general?

Q.   Who developed that business plan to hire



Page 51

branches like the C. Roberts Branch?

A.   To -- okay.  To -- to have a retail branch network, really the -- the -- the market built it. It's very similar across lenders in our market.  You can come to me, you can come to New American Funding, you can go to, you know, loanDepot down the street.  We all operate the same way so I wouldn't say it was any one individual.  In 2021, business was still good after COVID so why not go after it.  Like I said, it wasn't really anyone's one concept.  It was just, you know, market driven.

Q.   How often did you communicate with Cynthia Roberts during the branch's operation?

A.   Oh, gosh.  Maybe three times over the course of her employment.

Q.   And approximately when was the branch in operation for?

A.   If I recall, it was August of '21 through mid-'22.

Q.   Did you ever ask Cynthia Roberts about how the branch was generating leads?

A.   No.

Q.   Did anybody at LoanStream ask about how the branch was generating leads?

A.   No.



Page 59

Q.   So in that time frame, that would -- the idea to use a lead generator, that would have been shot down during that time as well?

A.   Hundred percent.  I -- I would not, you know, give anybody hundreds of thousands of dollars to, you know, try -- try to make some call campaign work.  That would be a hard no.

Q.   Was LoanStream aware that Cynthia Roberts's husband was banned from the mortgage company by the DFPI?

MR. LANDERS:   Objection; vague and ambiguous as to time.

BY MR. PERRONG:

Q.   At any time.

A.   He wasn't banned from the mortgage industry. He had lost one of his licenses so he was -- from what I can recall, he was still active with his DRE license, but he had lost his DFPI license, yes.

Q.   And when did LoanStream become aware of this fact?

A.   I think June or July of 2021.

Q.   And it continued to permit the C. Roberts Branch to operate?

A.   I -- you'll have to rephrase it.  I don't get what that one has to do with the other.


MAGNA
LEGAL SERVICES

Page 60

Q.    Why did LoanStream find out -- in what context did LoanStream find out that Sean Roberts had some issues with the DFPI?

A.    By checking his license.  He had first pitched LoanStream on him being the branch manager.

Q.    And knowing that fact, LoanStream still allowed his wife to be the branch manager, right?

A.    Yes.  She was clean.

Q.    Did LoanStream undertake any steps or restrictions on Mr. Roberts' ability to participate in or -- or work in his -- his wife's branch?

A.    Not that I recall.  There was no reason to.

Q.    Was LoanStream aware that Mr. Roberts was working in his wife's branch?

MR. LANDERS:  Objection; mischaracterizes the evidence; misstates testimony; assumes facts not in evidence; calls for speculation.

You may answer if you can.

THE WITNESS:  Yeah, I have no knowledge that he was working in her branch.

BY MR. PERRONG:

Q.    You have no knowledge of whether or not he was working or you have -- you had no knowledge that he was working?

A.    I had no knowledge -- knowledge that he was



MAGNA
LEGAL SERVICES

Page 61

physically working in her branch, no.

MR. PERRONG:  I want to bring up a document that's been -- that we'll mark as Exhibit B.

[Whereupon, Exhibit B was marked for identification.]

MR. PERRONG:  Just let me know when you have it and are ready to discuss it.

THE WITNESS:  Got it.  Give me a minute.

Okay.  I'm ready.

BY MR. PERRONG:

Q.   If you can go to page 4 it looks like Sean Roberts e-mailed you directly on February 7th of 2022. And in this e-mail he discusses -- third -- third line from -- in that paragraph:  (Reading.)

"We are continuing to build our pipeline and we have some fixed (office rent) and variable (marketing) expenses due/past due."

Do you see that?

A.   I do.

Q.   And then you replied:  (Reading.)

Oh no!  Please reply with your cost center number and I will ask accounting for produce asap!

Do you recall sending that message?



Page 62

A.    I do.

Q.    Why would accounting be paying for marketing expenses if it was your testimony that these branches were not authorized to conduct -- to pay for marketing expenses?

MR. LANDERS:  Objection; state --

THE WITNESS:  Well, first of all -- sorry, Tom.

MR. LANDERS:  Objection; misstates testimony.

You may proceed.

THE WITNESS:  First of all, you have to understand that -- the context.  So I was answering from my -- my cell phone which you can tell from, you know, the -- the e-mails I produced.  So I was sitting in my car replying from my cell phone, you know, and that was just a quick, you know, hey, got your e-mail. Let my accounting department, you know, follow up.

So I wasn't, you know, digging into what this guy was saying.  This was probably the second time I even respond -- responded, you know, myself to, you know, e-mails from either him or his wife or, you know, whatever.

And second, you know, whatever marketing they have, I don't have a problem with marketing expenses. Typically, they're desk rental fees and, you know,



MAGNA

LEGAL SERVICES

Page 63

their -- their print media.  So like I said, it's -- it's routine that our people have these, you know, desk rental fees.

A lot of times, you know, we -- we have, you know, the -- the -- the cover -- what are they called?  Oh, like print media campaigns.  So they'll do like co-branding, the agent along with our mortgage company, and then they'll have flyers and pamphlets and whatever and there will be a training session done -- done with the real estate agents.  Anyway, we're very used to marketing, just not telemarketing campaigns.

So I have no issue with what they asked for here, but certainly not telemarketing.

BY MR. PERRONG:

Q.   Did LoanStream ever pay for expenses that were characterized as marketing for the C. Roberts Branch?

A.   Sorry.  Sorry.  Somebody was knocking on my door.  My apologies.  Please restate that.

Q.   Yes.  So did LoanStream ever pay invoices for marketing as articulated here with respect to the C. Roberts Branch?

A.   No.  In fact, there were no lump-sum payments at all after that $7,000 one.

Q.   And that 7,000 was in approximately December of '21?



Page 64

A.    Yeah, I think it was the 21st of December.

Q.    Did LoanStream have a practice of paying expenses from branches that were categorized as "marketing expenses"?

A.    Sorry.  Rephrase that for me.

Q.    So I think you -- you mentioned that there were some -- some marketing expenses would be printing expenses, co-renting expenses, right?

A.    Yes.

Q.    And those would all be characterized as marketing, right?

A.    Yes.

Q.    And LoanStream paid those expenses with respect to other branches?

A.    Generally not.

Q.    In what circumstances would it?

A.    It's very rare for one of the branches to come say, hey -- hey, you know, we need help.  We need -- we need you to do an advance, you know, blah, blah, blah. Typically, they earn their money, they're in the black, and we actually just pay them for their profit on their loans.

You know, on the rare occasion we have something like this where, you know, they're -- it looks like, you know, the train that could.  You know,


MAGNA
LEGAL SERVICES

Page 67

Q.    Did you speak with anybody during the break?

A.    No, I did not.

Q.    Are you familiar with the Bistango Restaurant in Irvine, California?

A.    Yes.

Q.    Did you meet with Cynthia Roberts and Sean Roberts at that restaurant in around May or June of 2022?

A.    No.

Q.    Did you meet with Cynthia Roberts and Sean Roberts at that restaurant at any time?

A.    No.

Q.    In what context, then, do you know the Bistango Restaurant in Irvine, California?

A.    I met with Sean Roberts and one of my employees at the Bistango in 2021.

Q.    What was the purpose of that meeting?

A.    My employee at the time was personal friends with Sean Roberts and asked me to go to lunch because I guess at the time Sean Roberts was looking -- looking to move from his -- I believe the company was lending three (phonetic) or something -- something similar to that name and was looking for a new branch away from this lending three.

Q.    And who was the employee?



Page 79

let me know if you heard it.

(Audio played.)

BY MR. PERRONG:

Q.    Can you hear that?

A.    Yes.

Q.    Okay.  So I'm going to play the file now. Like I said, it doesn't need to be transcribed, and we'll just listen to it and I've got a few questions about it.

(Audio played.)

BY MR. PERRONG:

Q.    Okay.  You heard in that recording where it's stated that my name is Karisha with LoanStream Mortgage, correct?

A.    That's what I heard, yes.

Q.    So global experts or this LizDev was contacting customers identifying themselves as being with LoanStream Mortgage, correct?

MR. LANDERS:  Objection; calls for speculation; assumes facts not in evidence; and an incomplete hypothetical.

THE WITNESS:  Not that I'm aware of.

BY MR. PERRONG:

Q.    A reasonable customer that would receive such a call would believe that the call was being made by



Page 80

LoanStream, right?

MR. LANDERS:  Objection; calls for speculation; incomplete hypothetical.

MR. PERRONG:  You can't make -- hold on.  You keep making speculation objections.  You keep making hypothetical objections.

These are not objections to form and privilege, which are provided for under the rules.  You -- you can't make these objections.  I don't know why you keep making these objections.  And if you continue to make such objections, we're going to have a problem because we're going to call the Court.  So make an objection to form, if you want to -- have a problem with the form of the question, but you are un -- you are not permitted under the federal rules to make speaking objections which is precisely what you're doing, Mr. Landers.

So I'm going to ask the question again and you can make an objection as to form and, if not, then we're going to call the Court and we're going to inform them that we're suspending the deposition because you continue to make improper speaking objections.

MR. LANDERS:  Counsel, I believe my objections are proper, and my objections are not inhibiting your deposition in any --



Page 83

MR. LANDERS:  So you would prefer me to say the words "objection as to form," and then just leave it to you to speculate what my objection was?

MR. PERRONG:  That is how the federal rules anticipate an objection during a deposition to work is just stating an objection to form.

MR. LANDERS:  And that's how you want to proceed?

MR. PERRONG:  Yes.

MR. LANDERS:  Okay.

BY MR. PERRONG:

Q.  So, Ms. Vernon, would a customer receiving such a call believe that the call was made on LoanStream's behalf?

MR. LANDERS:  Object as to form.

THE WITNESS:  Yes, I can see that.

BY MR. PERRONG:

Q.  Did LoanStream ever investigate the calling practices or telemarketing practices allegedly used by the C. Roberts Branch?

A.  I mean, hindsight, you know, yes.  Once we got that information, we certainly -- we certainly looked into it.

Q.  When you say "when we got this information," what -- what is this information that you refer to?



Page 84

A.    This lawsuit that you've pushed on us.

Q.    When you say "pushed on us," why do you say pushed on us?

A.    We don't -- we don't concur that we ever, you know, made any phone calls.  We don't concur that we've ever had a call center.  I can go on and go on for days, but in any case, we certainly did our due diligence to confirm those things.

Q.    By the plain audio of the call, LoanStream was the entity whose products and services were being promoted, right?

MR. LANDERS:  Object as to form.

THE WITNESS:  By somebody, possibly.

BY MR. PERRONG:

Q.    And it would have been the beneficiary of the call if the person had said that they were interested?

MR. LANDERS:  Object as to form.

THE WITNESS:  None of us know that.

BY MR. PERRONG:

Q.    Is LoanStream a defendant in any other telemarketing case?

A.    No.

Q.    Are you aware of a case against LoanStream entitled Winslow versus OCMBC, Inc.?

A.    Vaguely.



Page 88

LoanStream, yes.

Q.    And LoanStream presumably would have the calling records of the calls sent and received through those phones?

A.    I'm not sure, after all this time.  We would have to check.

Q.    Did it periodically review the phone bills?

A.    I don't know.

Q.    As part of the branch concept, if a loan officer was using their personal phone to make and receive calls, would that be a reimbursable expense for the use of their cell phone?

MR. LANDERS:  Object as to form.

THE WITNESS:  Typically not, no.  It's a cost of their doing business.

BY MR. PERRONG:

Q.    So they would pay for that individually?

A.    Yes.

Q.    I'm trying to understand the structure of how this branch operated a little more.

If I'm a loan officer at a branch, do potential customers get assigned to me or am I on my own to obtain potential customers?

MR. LANDERS:  Objection as to form.

THE WITNESS:  You're on your own to go -- to



MAGNA
LEGAL SERVICES

Page 89

go out and get with Realtors and, you know, drum up that purchase business.

BY MR. PERRONG:

Q.    And LoanStream authorized its mortgage loan people to go off on their own and generate that business?

MR. LANDERS:  Object as to form.

THE WITNESS:  Yes.  The loan officers went outside the branch to drum up business.

BY MR. PERRONG:

Q.    Did LoanStream ever audit the method in which that business was being -- was being generated?

A.    Not that I'm aware of.

MR. PERRONG:  Okay.  So what I think we can do is let me clean up my outline here.  I'm pretty much done.  We can resume at -- at 30 past, half past.  And then I have some questions that I want to ask in the individual -- Ms. Vernon's individual capacity, and then we'll just circle back to redirect.

MR. LANDERS:  So we're coming back in seven minutes?  It's 12:23 now.

MR. PERRONG:  Yup.

MR. LANDERS:  Okay.

(Brief recess.)



Page 92

BY MR. PERRONG:

Q.    Do you have any idea as to when your criminal proceedings are scheduled to conclude?

MR. LANDERS:  Object as to form.

THE WITNESS:  No, I don't.

BY MR. PERRONG:

Q.    Do you have a trial date set?

A.    No.

Q.    Are you on house arrest?

MR. LANDERS:  Object as to form and I instruct the witness not to answer.

MR. PERRONG:  Public record.

MR. LANDERS:  I don't believe it is.

BY MR. PERRONG:

Q.    Have you ever been convicted of any other crimes?

A.    Yes.

Q.    What crimes have you been convicted of?

A.    DUI several -- well, a decade ago.

Q.    Have you ever been convicted of a crime of honesty or dishonesty?

A.    No.

Q.    How did you first meet Cynthia Roberts?

A.    I've never personally met Cynthia Roberts.

Q.    You've only spoken to her over the telephone?

