Dana Oliver
dana@danaoliverlaw.com
OLIVER LAW CENTER, INC.
8780 19th Street #559
Rancho Cucamonga, CA 91701
Telephone:  (855)384-3262
Facsimile:  (888)570-2021
Attorney for Plaintiff and Putative Class

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY HUDSON-BRYANT, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>*v.*<br><br>OCMBC, INC. D/B/A LOANSTREAM, PREMIER FINANCIAL MARKETING LLC D/B/A RESMO LENDING, AND SEAN ROBERTS<br><br>*Defendants* | Case No. 8:24-cv-67-FWS-JDE<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT OCMBC, INC. d/b/a LOANSTREAM MORTGAGE'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br>Judge: Hon. Fred W. Slaughter<br><br>Magistrate: Hon. John D. Early<br><br>Hearing (In Person):<br>July 16, 2026, 10:00 A.M.<br>Courtroom 10D |

## PLAINTIFF'S OPPOSITION TO DEFENDANT OCMBC, INC. d/b/a LOANSTREAM MORTGAGE'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

# TABLE OF CONTENTS

INTRODUCTION.............................................................................................................. 1

LEGAL STANDARD ...................................................................................................... 3

FACTS ............................................................................................................................. 4

ARGUMENT ................................................................................................................... 7

    **A. There Is a Genuine Dispute That Plaintiff Received More Than One Call, and the Purpose of the Calls Is Established by the Campaign, Not the Content of an Unanswered Call.** ...................................................................................................... 7

    **B. There Is No "Personal Registration" Requirement Because the Registry Protects Telephone Numbers, Not Names.** .............................................................................. 10

    **C. Plaintiff Has Standing and Is the Real Party in Interest Because a TCPA Violation Is a *Per Se* Concrete Injury and the Statute Protects the Line's Customary User and Owner.** .................................................................................................................. 12

    **D. LoanStream's Vicarious Liability Is a Jury Question Under Each of the Three Agency Theories.** ................................................................................................... 15

        **I. The record contains irreconcilable testimonial conflicts that a jury must resolve.** 16

        **II. Actual authority is supported by the record.** ....................................................... 19

        **III. Apparent authority is supported by the record.** .................................................. 22

        **IV. Ratification is supported by the record.** .............................................................. 23

        **V. LoanStream's attempt to distinguish *Katz* only confirms the vicarious liability dispute.** ............................................................................................................... 25

    **E. Whether LoanStream Acted Knowingly or Willfully Is a Jury Question.** ............... 28

CONCLUSION .............................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrahamian v. loanDepot.com LLC*, No. CV-23-00728-PHX-SMB, 2024 WL 1092442 (D. Ariz. Mar. 13, 2024).........................................................11, 12

*ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018)....................................................15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................3, 28, 29

*Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171 (E.D.N.Y. 2018).......................22

*Bird v. Pro Star Builders, Inc.*, No. 222CV03610JLSJEM, 2022 WL 18216007 (C.D. Cal. Nov. 28, 2022)........................................................................8

*Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012) ..............................9

*Coffey v. Fast Easy Offer, LLC*, No. 25-4066, --- F.4th ---, 2026 WL 1614175 (9th Cir. June 4, 2026)........................................................................8, 9

*Grippo v. Sugared + Bronzed, LLC*, No. SA CV 24-01792-AB (DFMX), 2025 WL 596095 (C.D. Cal. Feb. 24, 2025) ...........................................................23, 24

*Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983 (9th Cir. 2023) ...................................13

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999).................................................3, 16

*Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068 (9th Cir. 2019) ..3, 16, 24, 25

*John v. Keller Williams Realty, Inc.*, No. 619CV1347ORL40DCI, 2020 WL 10502631 (M.D. Fla. Feb. 4, 2020) ........................................................19, 20

*Katz v. Allied First Bank, SB*, No. 22 C 5277, 2026 WL 636723 (N.D. Ill. Mar. 6, 2026) ........................................................... 16, 23, 25, 26, 27, 28

*Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010 (9th Cir. 2018) ........16, 23

*Lushe v. Verengo Inc.*, No. CV 13-07632 AB R, 2014 WL 5794627 (C.D. Cal. Oct. 22, 2014) ........................................................................23

*Moore v. Club Exploria, LLC*, No. 1:19-CV-02504, 2025 WL 2755076 (N.D. Ill. Sept. 26, 2025)........................................................................21

*Moore v. Healthcare Sols. Inc.*, No. 21-CV-4919, 2022 WL 17487823 (N.D. Ill. Dec. 7, 2022)........................................................................7

*N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164 (9th Cir. 2020)..10, 13, 15

*Nichols v. eHealthInsurance Servs., Inc.*, No. 23-CV-06720-EKL, 2025 WL 689721 (N.D. Cal. Mar. 3, 2025) ...............................................................11

*N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*, 124 F.3d 1094 (9th Cir. 1997) ........................................................................22

*Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724 (7th Cir. 2014).....................16

*United States v. Dish Network L.L.C.*, 954 F.3d 970 (7th Cir. 2020).....................21

*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) .............12

- iii -

*Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022) ........................................12

**ADMINISTRATIVE DECISIONS**

*In re DISH Network, LLC*, 28 FCC Rcd. 6574 (2013) ....................................22, 24

**STATUTES**

15 U.S.C. § 6151(b) ........................................................................................11

47 U.S.C. § 227 .................................................................................................1

47 U.S.C. § 227(a)(4) ........................................................................................9

47 U.S.C. § 227(c)(5) ......................................................................................28

**REGULATIONS**

16 C.F.R. § 310.4(b)(1)(iii)(B) ......................................................................10

47 C.F.R. § 64.1200(c)(2) ..............................................................................11

**RULES**

Fed. R. Civ. P. 56(a) .........................................................................................3

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 1.01 cmt. f..................................................21

Restatement (Third) of Agency § 2.01 ...........................................................19

Restatement (Third) of Agency § 2.03 ...........................................................22

Restatement (Third) of Agency § 4.01 .......................................................23, 24

*This Month, Pass It On to Help Someone You Know Avoid a Scam*, FTC BCP Staff (May 11, 2026), https://consumer.ftc.gov/consumer-alerts/2026/05/month-pass-it-help-someone-you-know-avoid-scam...............................................14

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

## INTRODUCTION

This Court should deny Defendant OCMBC, Inc. d/b/a LoanStream Mortgage's ("LoanStream") motion for summary judgment. Aimed at preventing unwanted intrusions into Americans' daily lives, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, affords substantial protections against unwanted telemarketing, and imposes liability on companies, like LoanStream, that direct, authorize, fund, or ratify illegal telemarketing conducted on their behalf. LoanStream now seeks to distance itself from the very telemarketing operation that placed calls promoting LoanStream's mortgage products, that its own employee branch manager arranged, and that LoanStream's ███████████████████████ ████████████████████ That bid should be rejected because the record presents genuine disputes of material fact on every issue LoanStream raises.

LoanStream's motion is built on four flawed premises. *First*, LoanStream contends that Plaintiff Kimberly Hudson-Bryant cannot show "more than one" call. But LoanStream's own data set reflects that the Number was called *three* times, Plaintiff's contemporaneous written notice to LoanStream identified two specific calls on October 12 and October 19, 2021, and Plaintiff's AT&T records confirm the subject calls. That the first call went unanswered does not create a factual vacuum. The Ninth Circuit looks to the *purpose of the call*, not whether the recipient happened to pick up, and the evidence supplies that purpose.

- 1 -

*Second*, LoanStream argues that Plaintiff lacks Article III standing and is not the real party in interest because the Number belonged to her elderly mother during the relevant period. That argument misstates the law and, at most, identifies a disputed fact for trial. Ms. Hudson-Bryant took physical possession of her mother's phone, answered and recorded a call at issue, paid the bill, and later transferred the Number into her own name, becoming both the customary user and the subscriber. The Ninth Circuit has held that TCPA standing is not exclusive to one user and protects the line's regular or customary user as well as its owner. And Ms. Hudson-Bryant did all of this while acting under a power of attorney for her mother as part of her role in caring for her mother, exactly the type of caregiving conduct that federal consumer protection guidance encourages.

*Third*, LoanStream insists Plaintiff cannot prove who placed the Number on the National Do-Not-Call Registry ("NDNCR"). But there is no "personal registration" requirement anywhere in the statute or the regulations. The Registry protects *telephone numbers*, not names. The only question that matters is whether the *Number* was on the Registry, and it was.

*Fourth*, and most importantly, LoanStream argues it is not vicariously liable for the calls. But vicarious liability turns on agency, which is a notoriously fact-bound question reserved for the jury. The record here is replete with disputed evidence of actual authority, apparent authority, and ratification, including

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

irreconcilable conflicts between the sworn testimony of LoanStream's own Rule 30(b)(6) designee and its own branch manager and employee, Cynthia Roberts, and LoanStream's own profit and loss statement. A jury, not this Court, must decide who is telling the truth.

Because a reasonable jury could return a verdict for Plaintiff on each issue LoanStream raises, summary judgment must be denied.

### LEGAL STANDARD

Summary judgment is proper only if the record shows that there is "no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The evidence of the nonmovant "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). These principles especially apply to LoanStream's vicarious liability for the conduct at issue. "Whether an agency relationship exists" is ultimately a question of fact that "should be submitted to the jury unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts." *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir. 1999). Agency is in a TCPA case "for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship." *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019).

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

# FACTS

The material facts are straightforward, but sharply disputed. Plaintiff Kimberly Hudson-Bryant alleges that her telephone number (the "Number") received telemarketing calls on behalf of LoanStream. The AT&T records reflect two calls from 213-521-2618, on October 12, 2021 and October 19, 2021. (Ex. 9 to Landers Dec., ECF No. 81-17 (AT&T Records) Page ID 2285-86; FAC ¶¶ 17-20.) The LizDev call logs, authenticated by LizDev CEO Elizabeth Stone, reflect that the Number was called three times, with a "called_count" of "3." (Ex. 4 to Landers Dec., ECF No. 81-13 (filed under seal); Stone Dec.) Plaintiff's January 3, 2023 written notice to LoanStream likewise identified two calls, one on October 12, 2021 and one on October 19, 2021. (FAC ¶ 23; Ex. 2 to Landers Dec., Page ID 2215, ECF 81-11.)

The October 19, 2021 call was answered and recorded by Plaintiff. (Ex. 1 to Landers Dec., ECF 81-1 (filed under seal).) During that call, the caller asked for "Ms. Woods," Plaintiff responded "Yes," and the caller identified herself as calling from "LoanStream Mortgage." (*Id.*) LoanStream's 30(b)(6) designee, Serene Vernon, also acknowledged that LoanStream's products and services were being promoted on the calls. (Vernon Dep. 79:12-15, 84:9-13.) The calls were placed by Global Experts. (Stone Dec. ¶ 7, ECF 57-5, Exhibit A to Opposition)

- 4 -

At the time of the calls, the Number was registered to Plaintiff's elderly mother, Eleanora Woods. (Ex. 9 to Landers Dec., ECF 81-17, Page ID 2288.) AT&T serviced the Number in October 2021, and the October 2021 AT&T bill was addressed to Eleanora. (*Id.*) However, the Plaintiff testified that she answered calls for her mother, as she did in this instance, paid the bill, and in her position as power of attorney for her mother. (FAC ¶ 23; Hudson-Bryant Dep. 206:1-207:14, 208:2-16, 211:2-9, 212:9-213:17.) The Number later transferred into Plaintiff's name beginning in May 2022. (*Id.*) Plaintiff wrote the January 3, 2023 notice letter to LoanStream in her capacity as Eleanora's power of attorney, referred to the Number as "my phone," and informed LoanStream of the October 12 and October 19 calls. (Ex. 2 to Landers Dec. ECF No. 81-11, Page ID 2215.). Plaintiff's number has been registered on the National Do Not Call Registry continuously since September 1, 2003. (FAC ¶ 16.)

The calls were part of a mortgage lead campaign involving Premier Financial Marketing, LLC d/b/a Resmo Lending, Global Experts, and LizDev. Resmo coordinated a campaign with Global Experts to promote a LoanStream branch operated by its owner's wife, Cynthia Roberts. (S. Roberts Dep. 31:11-32:13, 52:8-21.) LizDev's CEO understood the campaign was run for LoanStream, the invoices listed LoanStream as the

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

customer, and the call scripts and invoices referenced LoanStream. (Stone Dec., ¶¶ 4-5, 7; Landers Dec. Exs. 3, 5, 6, ECF Nos. 81-12, 81-14, (missing, filed under seal)).

LoanStream's own branch manager, Cynthia Roberts, was a LoanStream W-2 employee. (C. Roberts Dep. 9:1-10:15, 20:2-8, 44:20-45:18.) LoanStream's own profit and loss records show a ███████ ██████████████ payment to Premier/Resmo, Sean Roberts's company. (ECF No. 60-5, Exhibit B to Opposition, p. 2.) Cynthia Roberts testified that LoanStream "paid invoices" and "helped us have funding by paying marketing." (C. Roberts Dep. 10:13-14, 29:11-14.) Sean Roberts testified that LoanStream was provided LizDev invoices so it could provide or justify funding, that he communicated with Vernon about lead generation and payments, and that he met Vernon at Bistango, where he described the scripts and contact methods. (S. Roberts Dep. 45:8-25, 46:10-18, 51:15-53:8, 54:7-24.) Vernon admitted an invoice was sent to LoanStream accounting but said it was "discarded," and she responded to Sean Roberts's email about marketing expenses by requesting a cost center number so accounting could process payment. (Vernon Dep. 43:19-24, 46:5-8, 48:18-24, 61:11-24.)

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

# ARGUMENT

**A. <u>There Is a Genuine Dispute That Plaintiff Received More Than One Call, and the Purpose of the Calls Is Established by the Campaign, Not the Content of an Unanswered Call.</u>**

LoanStream contends that Plaintiff can establish only "one" solicitation call because the first call was unanswered and left no voicemail, making it supposedly "impossible to know what the purpose of the first call was." (MSJ at 15.) The record refutes that contention and the governing law forecloses it.

The records show multiple calls. The data set produced in discovery by LizDev, and authenticated through Elizabeth Stone's Declaration (Exhibit A), reflects that the Number was called *three times*. (ECF 81-13 (filed under seal)). Plaintiff's contemporaneous written notice to LoanStream, the January 3, 2023 letter, identified *two* specific calls, on October 12, 2021 and October 19, 2021. And Plaintiff's AT&T telephone records independently identify those subject calls to the Number. (ECF 81-17, Page ID 2285-86.) There is no genuine dispute that more than one call was placed to the Number. At a minimum, the conflict between LoanStream's position in its motion (one call) and its own data (three calls) and Plaintiff's records is a quintessential jury question. *See Moore v. Healthcare Sols. Inc.*, No. 21-CV-4919, 2022 WL 17487823, at *3 (N.D. Ill. Dec. 7, 2022) ("Moore received two calls from the same number, and the second caller was Healthcare Solutions. It is reasonable to conclude that Healthcare Solutions called the first

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

time, too. Does Healthcare Solutions share a phone number with someone else? Unlikely.").

The calls obviously came from the same place. LoanStream's premise, that the purpose of the first call is unknowable, ignores that the calls came from the same number, to the same Number, within the same narrow window, as part of the same operation Resmo and Global Experts conducted, and during the second call of which the Plaintiff ascertained, and recorded, that the caller was calling from "LoanStream Mortgage." (ECF 81-10.) This is exactly the situation that the *Moore* Court addressed. The TCPA does not require that a recipient answer every call, and a defendant cannot manufacture summary judgment by pointing to a call with 10 seconds of talk time. Where multiple calls come from the same number as part of the same solicitation campaign, "it is reasonable to infer that the same caller is responsible for calls from the same number, whether those calls are answered or not." *Bird v. Pro Star Builders, Inc.*, No. 222CV03610JLSJEM, 2022 WL 18216007, at *3 (C.D. Cal. Nov. 28, 2022).

What matters is the purpose of the call, i.e., what is in the caller's heart. The Ninth Circuit has now made clear that the statutory definition of "telephone solicitation" turns on "the purpose of the *initiation* of [the] call or message," not the content of any particular conversation that did or did not occur. *Coffey v. Fast Easy Offer, LLC*, No. 25-4066, --- F.4th ---, 2026 WL 1614175, at *3 (9th Cir.

- 8 -

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

June 4, 2026) (citing *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012)). This is because the TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4).

As *Coffey* explained, the "purpose" modifies the "initiation" of the call, and a court "must consider not only the content of the messages . . . but also their context as it illuminates Defendants' purpose in initiating the messages." 2026 WL 1614175, at *3 (citing *Chesbro*, 705 F.3d at 918). "Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Id.* The purpose of these calls is not in doubt. They were placed as part of a campaign whose admitted object was to generate mortgage leads, and the one call Plaintiff answered was a caller stating she was "with LoanStream Mortgage." The unanswered call from the same number, in the same campaign, was initiated for the same purpose. That this call was not recorded does not exempt it. The call's purpose lives in the caller's intent in placing the call, not in whether the line connected.

To the extent LoanStream argues the first call cannot count because it was "intended" for Eleanora rather than Plaintiff, MSJ at 16, that is a variation of the "intended recipient" defense the Ninth Circuit has squarely rejected. "[A

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

defendant]'s intent to call a customer . . . does not exempt [it] from liability under the TCPA when it calls someone else who did not consent . . . [T]here is no obvious statutory text on which to ground an 'intended recipient' interpretation. And as we now walk through how the undefined term 'called party' is used in the statute, Credit One's interpretation becomes more and more untenable as every statutory reference to 'called party' is considered." *N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1167-68 (9th Cir. 2020) (ultimately holding that the "called party" does not refer to the "intended recipient" of the call. The Ninth Circuit has rejected the intended recipient theory *precisely because* the protected interest attaches to the line and who actually answers the call, not to whom the caller hoped to reach. Summary judgment on this element should be denied.

### B. There Is No "Personal Registration" Requirement Because the Registry Protects Telephone Numbers, Not Names.

LoanStream next argues that Plaintiff's claim fails because there is no evidence as to who registered the Number with the NDNCR. (MSJ at 16.) This argument injects into the statute a requirement that does not exist. There is no "personal" registration requirement for the Do Not Call Registry, because the Registry does not even collect names.

Start with what the Do Not Call Registry protects: *telephone numbers*, not specific persons. 16 C.F.R. § 310.4(b)(1)(iii)(B) ("That person's *telephone number* is on the 'do-not-call' registry . . . ."). The regulation states the only requirement

- 10 -

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

for proving a violation: that the "telephone number" be "on" the NDNCR. It says *nothing* about who placed it there, or even that the subscriber must have placed it there at all. Congress ratified the language the FTC promulgated, protecting "telephone numbers" that are "on the [NDNCR]," full stop, and without reference to who registered the number. 15 U.S.C. § 6151(b).

The FCC's parallel TCPA regulation permits a "residential telephone subscriber" to register "his or her telephone number" on the Registry, and provides that once registered, "registrations must be *honored indefinitely*," until cancelled by the consumer or removed by the database administrator. 47 C.F.R. § 64.1200(c)(2). "There is no limitation as to time period; nor is there a limitation as to whether the phone number is still used by the person who originally listed it in the NDNC Registry." *Nichols v. eHealthInsurance Servs., Inc.*, No. 23-CV-06720-EKL, 2025 WL 689721, at *3 (N.D. Cal. Mar. 3, 2025). Reading the regulations to impose an implied personal-registration requirement cannot be reconciled with the requirement that registrations "must be honored indefinitely," or with the reality that the Registry stores only numbers, not names.

A personal registration requirement would also be unworkable and atextual. As another court has recognized, the regulation's "indefinite[]" language exists precisely "to remove the ambiguity of which numbers should be protected." *Abrahamian v. loanDepot.com LLC*, No. CV-23-00728-PHX-SMB, 2024 WL

- 11 -
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

1092442, at *2 (D. Ariz. Mar. 13, 2024) (observing that the Ninth Circuit has taken "a broad view of this regulatory language."). In any event, who registered the Number is, at most, a disputed fact, and an immaterial one. It is undisputed that the Number was on the Registry. That forecloses summary judgment.

### C. Plaintiff Has Standing and Is the Real Party in Interest Because a TCPA Violation Is a *Per Se* Concrete Injury and the Statute Protects the Line's Customary User and Owner.

LoanStream next contends Plaintiff lacks Article III standing because the Number "belonged" to her mother, she was supposedly not a "customary user," and she was outside her mother's "zone of interest." (MSJ at 17-19.) This contention misstates the law and, at most, identifies a disputed fact for trial.

As an initial matter, receipt of an unwanted call is itself a concrete injury. In the Ninth Circuit, "[u]nsolicited telemarketing phone calls or text messages, by their nature, invade the privacy and disturb the solitude of their recipients," so "a violation of the TCPA is a concrete, *de facto* injury," and a plaintiff "need not allege any additional harm beyond the one Congress has identified." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). The Ninth Circuit has reaffirmed this central holding. *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118 (9th Cir. 2022). Plaintiff personally answered the first two calls and recorded the second call at issue. The injury is established.

What's more, standing is not exclusive, and the statute protects the line's owner and its customary user alike. LoanStream's premise that only the "owner" may sue is wrong. The Ninth Circuit has held that both the owner *and* subscriber of a number on the Do Not Call Registry "suffers a concrete, *de facto* injury when their right to be free from such communications is violated—even if the communications are intended for or solicited by another individual, and even if someone else is using the phone at the time the messages are transmitted." *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023). In *Hall*, the Ninth Circuit held that the owner and subscriber of a DNC-registered phone suffered a TCPA injury, even though she had given the phone to her thirteen-year-old son to use, and held that the privacy injury is not defeated merely because someone else is using the phone, and that standing is not necessarily exclusive to one user. *Id.* The TCPA's protections thus reach both the subscriber and the phone's regular or customary user alike. *Id.*; *N.L. by Lemos*, 960 F.3d at 1168-70 (a case LoanStream itself cites).

The record places Plaintiff squarely within that protection, on both accounts. Ms. Hudson-Bryant took physical possession of her mother's phone prior to the calls at issue and pursuant to an authorization through the power of attorney, making her the customary and regular user, she answered the calls directed to the Number, she paid the bill, and she later transferred the Number into her own name,

- 13 -
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

becoming the subscriber outright. At minimum, Ms. Hudson-Bryant was plainly the customary user (if not the subscriber) of her elderly mother's phone, since she answered all calls directed toward her mother. To the extent the question of whether Ms. Hudson-Bryant was a subscriber or regular or customary user of the Number is even disputed, and the record makes clear she was both, at different times, that dispute is for the jury and is itself a reason to deny summary judgment, not grant it.

Critically, Plaintiff acted as her mother's caregiver under a power of attorney. The reason Ms. Hudson-Bryant was answering her mother's phone is not some litigation artifice. It is that her mother, Eleanora Woods, in an advanced age ███████████████████████████ and Ms. Hudson-Bryant held and acted under a power of attorney to manage her affairs, including her telephone. LoanStream's own motion concedes the point. Plaintiff wrote to LoanStream about these very calls "in her capacity as Eleanora's Power of Attorney." (MSJ at 11.) Federal consumer protection guidance encourages family caregivers to help older adults avoid scam and nuisance calls, including by helping them screen, answer, block, and manage unwanted calls and report fraud. *E.g.*, *This Month, Pass It On to Help Someone You Know Avoid a Scam*, FTC BCP STAFF (May 11, 2026), https://consumer.ftc.gov/consumer-alerts/2026/05/month-pass-it-help-someone-you-know-avoid-scam.

- 14 -
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

In the TCPA context, courts recognize that the protected privacy interest in a phone line is not limited to the account holder or the intended recipient. A person who regularly or customarily uses a line falls within the TCPA's protected zone of interests. Where an elderly parent authorizes an adult child to routinely screen, answer, block, or manage calls as part of caregiving and fraud prevention, that course of conduct supports treating the child as the regular or customary user of the line. The DC Circuit has likewise recognized that the term "customary user," may include such persons as "a close relative on a subscriber's family calling plan." *ACA Int'l v. FCC*, 885 F.3d 687, 707 (D.C. Cir. 2018). A daughter caring for her elderly mother under a power of attorney, who answers and manages that mother's phone, is *exactly* the customary user the TCPA protects.

Finally, LoanStream's repeated suggestion that the calls were "intended" for Eleanora and therefore caused Plaintiff no injury is the intended-recipient defense the Ninth Circuit rejected in *N.L. by Lemos*. 960 F.3d at 1167. The privacy injury belongs to the person whose solitude the call invaded, here, the daughter who answered. At a minimum, standing on this record is not so clear as to be undisputed, and summary judgment must be denied.

**D. LoanStream's Vicarious Liability Is a Jury Question Under Each of the Three Agency Theories.**

LoanStream's central argument is that it cannot be vicariously liable for the calls. But a defendant is vicariously liable for violations of the TCPA where

- 15 -

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

"federal common law principles of agency" would impose it, and the bedrock theories of agency, actual authority, apparent authority, and ratification each offer an independent basis for liability. *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018); *Henderson*, 918 F.3d at 1072. Plaintiff need prevail on only one theory. And because agency is a "notoriously fact-bound question," *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731 (7th Cir. 2014), it must go to the jury "unless the facts are clearly insufficient to establish agency or there is no dispute as to the underlying facts." *Harris*, 183 F.3d at 1054. Here, the facts are sharply disputed, and the disputes go to the heart of the agency inquiry. The same court LoanStream relies on for its distinguishing argument, *Katz v. Allied First Bank, SB*, sent materially similar disputes to the jury. No. 22 C 5277, 2026 WL 636723, at *6-*12 (N.D. Ill. Mar. 6, 2026)

## I. The record contains irreconcilable testimonial conflicts that a jury must resolve.

The record contains irreconcilable inconsistencies between the testimony of LoanStream's Rule 30(b)(6) designee, Serene Vernon, and its own branch manager and employee, Cynthia Roberts. These inconsistencies go to the heart of the vicarious liability inquiry. A jury must determine who is telling the truth on a dispositive question, whether LoanStream is directly or vicariously liable for the calls at issue. And it will need to weigh the credibility of the witnesses' respective

testimony. As it relates to credibility, it also bears noting that Ms. Vernon testified, "I am currently facing a murder charge." (Vernon Dep. 25:25-26:1.)

In December 2021, LoanStream's own books and records reflect that it made a ███████ ACH payment to Sean Roberts' company for ████████████ Despite LoanStream's books and records showing otherwise, Vernon characterized the payment as one made to the C. Roberts Branch itself as a charitable "advance against future profits" driven by the holiday season because "[Cynthia Roberts] pulled at my heartstrings there right before Christmas." (Vernon Dep. 30:4-25.) But LoanStream's own internal profit and loss statement tells a fundamentally different story. That document records the ████████████████████ ██████████████████████████████████████ ████████████████ (Ex. B, Profit and Loss Statement, p. 2.) It is the *sole entry* under "████████████ on the entire profit and loss statement. The payment was not classified as a ██████████████████████████ item. It was classified as a ██████████████████████████, the very entity through which the telemarketing campaign was funded and operated. (*Id.*) Cynthia Roberts corroborated the P&L, not Vernon's testimony. She testified that LoanStream "helped us have funding by paying marketing." (C. Roberts Dep. 10:13-14.) And, when asked directly if LoanStream provided "funding or cash advances for the purpose of marketing, or did it just pay invoices," Cynthia replied that LoanStream

- 17 -

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

"paid invoices." (*Id.* 29:11-14.) Cynthia Roberts' testimony and LoanStream's own books are consistent with each other, reflecting a ███████████ payment to Premier. Vernon's testimony is consistent with neither. This is for the jury to determine.

Vernon also testified that LoanStream never paid for advertising or marketing costs for the branch and that she was unaware of any telemarketing activity, instead claiming the branches were supposed to get business by working with Realtors. (Vernon Dep. 20:3-5, 35:15-36:20, 48:9-12, 63:22-64:12.) But Cynthia Roberts testified that invoices from LizDev went "[t]o LoanStream's accounting" to be paid. (C. Roberts Dep. 12:14-16.) Vernon admitted an invoice was sent to accounting but was "discarded." (Vernon Dep. 43:19-24, 46:2-8, 48:18-24.) And Sean Roberts testified that he communicated with Vernon regarding lead generation and payments. (S. Roberts Dep. 51:15-52:7.) When asked to distill the relationship, Sean Roberts stated, "Resmo Lending hired LizDev for leads in which we sent those leads and hired Global Experts to call those individuals," and confirmed that "LoanStream was provided LizDev's invoices so that they could provide the funding or justify the funding necessary [for the C. Roberts Branch]." (*Id.* 52:15-53:8.) LoanStream's P&L confirming ███████ ███████ expense to Premier Financial contradicts any claimed lack of knowledge.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

Sean Roberts testified that he was present at a meeting with Serene Vernon at the Bistango Restaurant in Irvine, California, and "gave her a description of the scripts and how we contact the clients." (S. Roberts Dep. 54:7-55:13.) Vernon, for her part, acknowledged meeting Sean Roberts at Bistango with a LoanStream employee, but denied that Cynthia was present and denied ever having met Cynthia. (Vernon Dep. 67:3-24, 92:23-24.) Whether LoanStream's president met directly with Sean Roberts, Cynthia Roberts, or both, and what was discussed at those meetings concerning lead generation procedures, bears directly on the nature of the agency relationship for the jury to resolve. These are not collateral squabbles. Tey are the core of the actual authority, apparent authority, and ratification inquiries, and they cannot be resolved on the disputed record here.

## II.    Actual authority is supported by the record.

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." RESTATEMENT (THIRD) OF AGENCY § 2.01. Actual authority may be express or implied, and "does not require the principal to specify the singular acts for which . . . authority exists as long as the acts are incidental to or reasonably necessary to accomplish what is authorized." *John v. Keller Williams*

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

*Realty, Inc.*, No. 619CV1347ORL40DCI, 2020 WL 10502631, at *2 (M.D. Fla. Feb. 4, 2020).

Here, viewed in the light most favorable to Plaintiff, the actual authority evidence is substantial. LoanStream placed Cynthia Roberts in a position to solicit business on its behalf. It hired her as a W-2 employee, gave her a LoanStream email address and NMLS number, funded the branch, paid its rent, and accepted its loans. (C. Roberts Dep. 9:16-25, 20:8-21:3 44:20-45:18; Vernon Dep. 35:1-14, 47:22-48:8, 49:6-9.) LoanStream knew that Sean Roberts, who had lost his DFPI license, was associated with the branch. (Vernon Dep. 59:8-18, 60:1-12.) LoanStream authorized its branches to "drum up[] business" on their own. (*Id.* 14:9-11, 88:21-25.)

Both Mr. and Mrs. Roberts testified that LoanStream knew of Resmo's involvement and that LizDev sent invoices to LoanStream's accounting. LoanStream's accounting records reflect that it paid ███████ to Premier/Resmo for ███████████████████ And when Sean Roberts emailed Vernon about "variable (marketing) expenses due/past due," Vernon's response was not to inquire about the nature of those expenses but to ask for a cost center number so accounting could process payment. (Vernon Dep. 61:11-24.) Sean Roberts further testified that LoanStream "wanted [] a verbal agreement that . . . we weren't going to just start dialing white pages . . . they basically asked me how I received my data. I told

them how I received my data," and that this was "part of the original conversation . . . my wife had and I was in the room because they wanted to [have a conversation about] how you market." (S. Roberts Dep. 45:8-25, 46:10-18.)

That a principal's instructions regulate, rather than prohibit, telemarketing supports actual authority. It does not defeat it. A defendant cannot escape liability by pointing to a generalized instruction to "comply with the law" while funding, regulating, and benefitting from the calling. *See United States v. Dish Network L.L.C.*, 954 F.3d 970, 975-76 (7th Cir. 2020). A provision regulating *how* an agent markets is not a prohibition but an affirmative recognition that the marketing will occur and an instruction on how to do it. *See Moore v. Club Exploria, LLC*, No. 1:19-CV-02504, 2025 WL 2755076, at *11-12 (N.D. Ill. Sept. 26, 2025) (holding that, under federal common law, "actual authority may be either express or *implied*" and that contractual instructions to generate live transfers in compliance with the law demonstrated implied control). "The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." Restatement (Third) of Agency § 1.01 cmt. f. On this record, a reasonable jury could find actual authority.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

### III.    Apparent authority is supported by the record.

"Apparent authority arises from the principal's manifestations to a third party that supplies a reasonable basis for that party to believe that the principal has authorized the alleged agent to do the act in question." *N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997); Restatement (Third) of Agency § 2.03; *Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171, 174 (E.D.N.Y. 2018). The FCC's illustrative indicia include allowing the outside entity access to the seller's systems and "[t]he authority to use the seller's trade name, trademark and service mark." *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6592-93 (2013) (cleaned up).

Here, the callers identified themselves on recording as calling from "LoanStream Mortgage." (Vernon Dep. 79:12-15.) From Plaintiff's perspective, the call *was* LoanStream's call. The person who spoke to Plaintiff identified herself as "with LoanStream Mortgage," and solicited Plaintiff for LoanStream's mortgage products. Those manifestations, LoanStream's name and LoanStream's products delivered by an individual who claimed to be "from LoanStream," "could reasonably give the appearance that [LoanStream], the purported principal, authorized . . . the purported agent, to initiate the [calls] on its behalf." *Banks*, 416 F. Supp. 3d at 174-75.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

And LoanStream's own corporate designee made two admissions that, by themselves, create a triable issue. Vernon conceded that a customer receiving such a call "would believe that the call was made" on LoanStream's behalf. (Vernon Dep. 83:14-16.) And she acknowledged that "LoanStream was the entity whose products and services were being promoted" on the calls. (Id. 84:9-13.) That admission alone may be sufficient for a finding of vicarious liability, even without any separate finding of an agency relationship. *Katz*, 2026 WL 636723, at *7 (N.D. Ill. Mar. 6, 2026). Because the apparent authority inquiry turns on how a reasonable person would perceive the calls, the use of LoanStream's name and brand in the solicitations supports the inference that the callers were authorized to act for LoanStream, which is more than sufficient to defeat summary judgment.

## IV.    Ratification is supported by the record.

Ratification is the "affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018) (quoting *Restatement*, § 4.01(1)). A principal can ratify his agent's actions *either* by not repudiating them *or* by accepting their benefit. *Lushe v. Verengo Inc.*, No. CV 13-07632 AB R, 2014 WL 5794627, at *4 (C.D. Cal. Oct. 22, 2014); *Grippo v. Sugared + Bronzed, LLC*, No. SA CV 24-01792-AB (DFMX), 2025 WL 596095,

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

at *3 (C.D. Cal. Feb. 24, 2025); Restatement (Third) of Agency § 4.01 & cmt. f ("A principal may ratify an act by failing to object to it or to repudiate it.").

Ratification requires either knowledge of material facts or "willful ignor[ance]," that is, "knowledge of facts that would have led a reasonable person to investigate further," followed by ratification "without further investigation." *Henderson*, 918 F.3d at 1075. The FCC has long instructed that a seller is responsible "if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct." *In re DISH Network*, 28 FCC Rcd. at 6592.

The ratification evidence here is textbook, and the ▮▮▮▮ marketing payment is its centerpiece. LoanStream's own P&L classified the payment to Premier Financial as ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. At trial, a jury will determine whether the books and records of a federally- and state-regulated lending institution that classify the payment for these calls as a ▮▮▮▮▮▮▮ expense suffice to establish ratification and will weigh that documentary evidence against the *post hoc* litigation testimony of LoanStream's president.

The evidence accumulates from there. LoanStream received a LizDev invoice and simply discarded it, even though that very invoice warned that the

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

leads ██████████████████████████████████████████ ██████████████████████ and ████████████████████████ ████████████████████████████████████ (Vernon Dep. 43:19-24, 46:5-8, 48:18-24; Ex. 6 to Landers Dec. (filed under seal).) LoanStream received an email from Sean Roberts referencing "marketing expenses" and responded with a cost center number request. It never investigated the branch's marketing practices, never disciplined the branch (or any branch), never asked how the branch generated leads, and never enforced any purported telemarketing prohibition, which it could not even produce. (Vernon Dep. 40:14-25, 41:1-9, 48:25-49:1-2, 51:21-25.) This is the very definition of willful ignorance. And it accepted the loans few the branch generated, which were LoanStream loans. (*Id.* 49:6-9.)

In essence, LoanStream attempts to convert the agency analysis into a profitability one. But ratification does not turn on whether the ratified conduct turned a profit, it turns on whether some benefit of that conduct was accepted by the alleged ratifier. And here, the benefits were unquestionably accepted by LoanStream. Whether this conduct shows ratification, or at least willful ignorance, is a paradigmatic jury question. *See Henderson*, 918 F.3d at 1075.

### V. LoanStream's attempt to distinguish *Katz* only confirms the vicarious liability dispute.

LoanStream argues *Katz* is distinguishable because there, the principal "accepted call transfers . . . and paid for them," integrated systems, and controlled

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

call volume, whereas LoanStream supposedly "never interacted with Resmo or Global Experts," "did not accept or receive any call transfers," and made no payment. (MSJ at 21-22.) That's a (disputed) distinction without a difference, and that argument depends on resolving the very facts the jury must decide.

The structural parallel to *Katz* is exact, and it is fatal to LoanStream's distinction. In *Katz*, the marketing ran through an Allied *employee*, Mattson, who arranged lead generation through his marketing company, Consumer Nsight, which subcontracted the actual calling to another company, Iconic Results. On that record, Allied argued precisely what LoanStream argues here, that it had no contract and no relationship with Iconic, just as with Global Experts, the "defunct Jamaican company" that physically placed the calls here. The court rejected this very argument at summary judgment, reasoning that "a reasonable jury could find that Mattson, Consumer [Nsight], and Iconic were linked through a cascade of agent and subagent relationships and are each liable for Iconic's actions," and that the layered subcontracting did not break the chain where the employee set the campaign in motion with the bank's approval and the bank funded and accepted its fruits. *Katz*, 2026 WL 636723, at *8. That LoanStream "never interacted with" Global Experts is thus no distinction at all. Allied never interacted with Iconic either, and the calls still ran through the very subcontracting chain its employee arranged.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

This case presents the same chain. LoanStream's marketing likewise ran through its *employee* branch manager, Cynthia Roberts, whose husband, Sean Roberts, operated the marketing company, Resmo/Premier Financial Marketing, which in turn subcontracted the actual calling out to Global Experts and LizDev. This layered arrangement was disclosed to LoanStream from the outset. And LoanStream's professed indifference to the bottom of that chain does not save it. Sean Roberts testified that LoanStream was not even interested in the mechanics of how the calls were placed, but rather just the basics of how the data was received, with his *wife and LoanStream branch manager, Cynthia Roberts in the room*. (S. Roberts Dep. 45:8-25, 46:10-18.) A principal that is told how the leads are generated, funds the campaign as ▮▮▮▮▮▮▮▮ and then deliberately declines to look at the mechanics has supplied the jury with evidence of both the right to control and the willful ignorance that independently support actual authority and ratification. At a minimum, exactly as in *Katz*, that is a question for the jury.

Continue with the factual dispute. The record contains evidence that LoanStream *did* pay, with its own P&L books reflecting a ▮▮▮▮▮▮▮▮▮ payment to Premier/Resmo, that LoanStream *did* receive the campaign's invoices and "discarded" them, that LoanStream's president communicated directly with Sean Roberts about "marketing expenses" and lead generation, and that LoanStream's president met with Sean Roberts (and possibly Cynthia Roberts) at

- 27 -

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

Bistango and was given "a description of the scripts and how we contact the clients."

LoanStream's contrary account comes from a single interested witness facing a murder charge, contradicted by its own employee and its own books. *Katz* itself held that, on this kind of conflict, "a reasonable jury could find" the agency facts and it did so on facts no stronger than these. *Katz,* 2026 WL 636723, at *1. The factual disputes are precisely why summary judgment is improper.

**E.   Whether LoanStream Acted Knowingly or Willfully Is a Jury Question.**

In the alternative, LoanStream seeks partial summary judgment, arguing no reasonable factfinder could find it acted "willfully or knowingly." 47 U.S.C. § 227(c)(5). That request fails for the same reason its liability arguments fail, because the underlying facts are disputed. Whether a defendant acted knowingly or willfully is a quintessential question of intent and state of mind reserved for the jury, particularly where, as here, the record would permit a jury to find that LoanStream funded the campaign as ▮▮▮▮▮▮ received and discarded an invoice warning that the leads were not TCPA-compliant and might include DNC-registered numbers, and then took no action whatsoever. A factfinder crediting that evidence could readily conclude LoanStream knew it was associated with unlawful calling and proceeded anyway. Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

are jury functions," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and because the willfulness inquiry depends on the same disputed facts that preclude summary judgment on liability, summary adjudication on treble damages should likewise be denied and the question left for the jury.

## CONCLUSION

For the foregoing reasons, LoanStream's motion for summary judgment, or in the alternative for partial summary judgment, should be denied in its entirety, and this matter should proceed to a jury trial.

Dated: June 17, 2026

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> (*Pro Hac Vice*)
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com

## **LOCAL RULE 11-6.2 COMPLIANCE STATEMENT**

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 6,556 words, which complies with the word limit of L.R. 11-6.1.

June 18, 2026

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

June 18, 2026

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
*Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*