THOMAS F. LANDERS [SBN 207335]
tlanders@swsslaw.com
ADAM R. SCOTT [SBN 333706]
ascott@swsslaw.com
SOLOMON WARD SEIDENWURM & SMITH, LLP
401 B Street, Suite 1200
San Diego, California 92101
(t) 619.231.0303
(f) 619.231.4755

Attorneys for Defendant OCMBC, INC.
d/b/a LOANSTREAM MORTGAGE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| KIMBERLY HUDSON-BRYANT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OCMBC, INC. D/B/A LOANSTREAM MORTGAGE, PREMIER FINANCIAL MARKETING LLC D/B/A RESMO LENDING, AND SEAN ROBERTS,<br><br>Defendants. | Case No. 8:24-cv-67-FWS-JDE<br><br>**DEFENDANT OCMBC, INC. D/B/A LOANSTREAM MORTGAGE'S RESPONSE TO STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT FILED BY PLAINTIFF KIMBERLY HUDSON-BRYANT IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:        July 16, 2026<br>Time:        10:00 a.m.<br>Crtrm.:      10D<br><br>Judge:       Hon. Fred W. Slaughter<br>Magistrate:  Hon. John D. Early<br><br>Action Filed: January 11, 2024<br>Trial Date:   October 27, 2026 |

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-3, Defendant OCMBC, Inc. d/b/a LoanStream Mortgage ("Defendant" or "LoanStream") submits the following Response to Statement of Genuine Disputes of Material Fact ("Response") in Support of its Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Motion") in the above-referenced action:

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 1. Plaintiff alleges she received two telemarketing calls "on behalf of" LoanStream at the telephone number ▮▮▮▮▮ (the "Number"). <br><br> *Evidence*: FAC ¶¶ 14, 17. | 1. **Undisputed.** <br><br> Undisputed that the FAC so alleges. |
| 2. Plaintiff alleges the Number is her telephone number. <br><br> *Evidence*: FAC ¶ 14. | 2. **Undisputed.** <br><br> Undisputed that the FAC so alleges. |
| 3. The Number received two calls from the telephone number ▮▮▮▮. <br><br> *Evidence*: FAC ¶¶ 17-20; Declaration of Thomas F. Landers Filed In Support of Defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Landers Decl.") ¶¶ 13, 16 & Ex. 9 at pp. 4-5 (AT&T Subpoena R.'s), Ex. 10 (Pl.'s Dep. Tr.) 170:8-10, 173:6-13. | 3. **Disputed in part.** <br><br> Undisputed that the AT&T records reflect two calls from 213-521-2618. Disputed to the extent the fact represents the total number of calls placed to the Number. The LizDev call logs reflect that the Number was called *three* times. <br><br> *Evidence:* Stone Decl. (ECF 58-5) ¶¶ 6-7; Ex. 4 to Landers Dec. (filed under seal), ("called_count" references "3"). |
| 3. Moving Party's Response <br><br> The focus of Plaintiff's allegations are the two calls that occurred on October 12, 2021, and October 19, 2021. LoanStream has shown that "Composite Exhibit A" – i.e. what Plaintiff refers to as the "LizDev call logs" and what LoanStream has | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| defined as the "Unauthenticated Data Set" – is not trustworthy because, among other things, it lists three phone calls made to the Number, but the AT&T records, and Plaintiff's own testimony, establish there were only two calls to the Number. Furthermore, even if, the Unauthenticated Data Set suggests a third call was placed to the Number, Plaintiff has never alleged such (despite receiving the Unauthenticated Data Set on or about July 2, 2024—*two months before* filing its First Amended Complaint on September 10, 2024). Also, the potential existence of a third call does not impact Plaintiff's TCPA cause of action, which is based on 47 U.S.C. § 227(c)(5), and there is no evidence that the supposed third call – like the first call – was placed by Global Experts "on behalf of" LoanStream. *See* FAC ¶¶ 10, 14, 17-19. | |
| 4.  The first call occurred on October 12, 2021.<br><br>*Evidence*: Landers Decl. ¶ 13 & Ex. 9 at p. 4 (AT&T Subpoena R.'s). | 4.  **Undisputed.**<br><br>Undisputed. |
| 5.  Plaintiff alleges the first call was unanswered and went to voicemail.<br><br>*Evidence*: FAC ¶ 19. | 5.  **Undisputed.**<br><br>Undisputed. |
| 6.  There is no evidence that the first call left a voicemail.<br><br>*Evidence*: Landers Decl. ¶¶ 13, 16 & Ex. 9 (AT&T Subpoena R.'s), Ex. 10 (Pl.'s Dep. Tr.) 170:8-10, 186:19-187:3. | 6.  **Disputed in part.**<br><br>Undisputed that no voicemail recording exists. Disputed insofar as the AT&T Subpoena records reflect a 10 second talk time for the referenced call.<br><br>*Evidence:* Landers Decl. Ex. 9 (AT&T Subpoena R.'s) (ECF 81-17, Page ID 2285, line 447). |
| 6.  Moving Party's Response<br><br>Plaintiff has never alleged, and has submitted no evidence, that a voicemail was left on Eleanora Woods' phone. The FAC only asserts that "the first call at 1:07 p.m. was unanswered and went to voicemail." During her deposition, Plaintiff | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| testified that she did not recall a voicemail "[t]o the best of [her] recollection." The AT&T records obtained by LoanStream also state that the call had an "Elapsed Time" of the "0:10"— but no information suggests that a voicemail was left. *See* FAC ¶ 19; Pl.'s Dep. Tr. 186:19-187:3; Landers Decl. ¶ 14, Ex. 9, at 12 (Dkt. 79-3). | |
| 7. Plaintiff answered and recorded the second call, which occurred on October 19, 2021 (the "Global Experts Call"). <br><br> *Evidence*: FAC ¶ 20; Landers Decl. ¶¶ 5-6, 13, 16 & Ex. 1 (Audio Recording of the Global Experts Call), Ex. 9 at p. 5 (AT&T Subpoena R.'s), Ex. 10 (Pl.'s Dep. Tr.) 108:15-17, 191:16-25, 194:16-195:5, 196:2-13. | 7. **Undisputed.** <br><br> Undisputed. |
| 8. The caller of the Global Experts Call asked "Is this Ms. Woods?" and Plaintiff responded "Yes." <br><br> *Evidence*: FAC ¶ 20; Landers Decl. ¶¶ 5, 16 & Ex. 1 (Audio Recording of the Global Experts Call), Ex. 10 (Pl.'s Dep. Tr.) 192:12-20, 193:1-6, 193:16-22, 194:1-8. | 8. **Undisputed.** <br><br> Undisputed. |
| 9. In October 2021, the Number was registered to Plaintiff's now ▮▮▮▮ mother, Eleanora C. Woods ("Eleanora"). <br><br> *Evidence*: Landers Decl. ¶¶ 13, 16 & Ex. 9 (AT&T Subpoena R.'s); Ex. 10 (Pl.'s Dep. Tr.) 55:22-57:7, 98:9-19. | 9. **Undisputed.** <br><br> Undisputed. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 10.    Plaintiff was physically in ▮▮▮ when she answered and recorded the Global Experts Call.<br><br>*Evidence*: Landers Decl. ¶ 16 & Ex. 10 (Pl.'s Dep. Tr.) 108:15-17, 191:16-25, 194:16-195:5, 196:2-13. | 10.    **Undisputed.**<br><br>Undisputed. |
| 11.    Plaintiff was not physically with Eleanora when she answered the Global Experts Call.<br><br>*Evidence*: Landers Decl. ¶ 16 & Ex. 10 (Pl.'s Dep. Tr.) 56:10-14, 129:12-13, 188:22-189:3, 191:7-192:11. | 11.    **Undisputed.**<br><br>Undisputed. |
| 12.    At the time of the Global Experts Call, Plaintiff lived in ▮▮▮ and Eleanora lived in ▮▮▮.<br><br>*Evidence*: Landers Decl. ¶¶ 5, 13, 16 & Ex. 1 (Audio Recording of the Global Experts Call), Ex. 9 (AT&T Subpoena R.'s), Ex. 10 (Pl.'s Dep. Tr.) 56:10-57:10, 59:19-25, 196:11-13. | 12.    **Undisputed.**<br><br>Undisputed. |
| 13.    No employee of LoanStream ever directly contacted or attempted to contact Plaintiff.<br><br>*Evidence*: Declaration of Sean Roberts Filed In Support of Defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Roberts Decl.") ¶¶ 8-9, 12-13; Declaration of Serene Vernon Filed In Support of Defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment | 13.    **Undisputed.**<br><br>Undisputed that no LoanStream employee personally placed the calls at issue, which were placed by Global Experts. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
| --- | --- |
| ("Vernon Decl.") ¶ 30. | |
| 14. No employee of LoanStream ever directly spoke to Plaintiff.<br><br>*Evidence*: Roberts Decl. ¶¶ 8-9, 12-13; Vernon Decl. ¶ 31. | 14. **Undisputed.**<br><br>Undisputed. |
| 15. No employee of LoanStream ever directly contacted or attempted to contact Eleanora.<br><br>*Evidence*: Roberts Decl. ¶¶ 8-9, 12-13; Vernon Decl. ¶ 32. | 15. **Undisputed.**<br><br>Undisputed. |
| 16. No employee of LoanStream ever directly spoke to Eleanora.<br><br>*Evidence*: Roberts Decl. ¶¶ 8-9, 12-13; Vernon Decl. ¶ 33. | 16. **Undisputed.**<br><br>Undisputed. |
| 17. AT&T serviced the Number between September 2014 and July 2024, at which point the Number was transferred to T-Mobile.<br><br>*Evidence*: Landers Decl. ¶¶ 12, 13-15, 16 & Ex. 8 (Pl.'s March 2025 Disc. Produc.), Ex. 9 (AT&T Subpoena R.'s), Ex. 10 (Pl.'s Dep. Tr.) 109:18-21, 181:15-17. | 17. **Undisputed.**<br><br>Undisputed. |
| 18. In October 2021, AT&T was the Number's service provider.<br><br>*Evidence*: Landers Decl. ¶¶ 12, 13-15, 16 & Ex. 8 (Pl.'s March 2025 Disc. Produc.), Ex. 9 (AT&T Subpoena R.'s), Ex. 10 (Pl.'s Dep. Tr.) 109:18-21, | 18. **Undisputed.**<br><br>Undisputed. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 181:15-17. | |
| 19.    The Number initially functioned as Eleanora's landline managed by AT&T, and it was later converted into a cellular number.<br><br>*Evidence*: Landers Decl. ¶¶ 13, 16 & Ex. 9 (AT&T Subpoena R.'s), Ex. 10 (Pl.'s Dep. Tr.) 55:22-57:7, 98:9-19, 107:21-108:7, 109:5-21. | 19.    **Undisputed.**<br><br>Undisputed. |
| 20.    The AT&T billing statement for October 2021 was addressed to "Eleanora Woods" and sent to her home at ███████████████ ███████████████ (the "██████s ████ Home").<br><br>*Evidence*: Landers Decl. ¶ 13 & Ex. 9 at pp. 7-12 (AT&T Subpoena R.'s). | 20.    **Undisputed.**<br><br>Undisputed. |
| 21.    The Number was transferred into Plaintiff's name starting in May 2022, when the AT&T billing statements changed and were directed to "Kimberly Hudson" at the ████████ Home.<br><br>*Evidence*: Landers Decl. ¶¶ 13, 16 & Ex. 9 at pp. 13-17 (AT&T Subpoena R.'s); Ex. 10 (Pl.'s Dep. Tr.) 111:14-112:13. | 21.    **Undisputed.**<br><br>Undisputed. |
| 22.    In a communication dated January 3, 2023, Plaintiff contends she contacted LoanStream on *behalf of her mother*, Eleanora, concerning an alleged violation of the Telephone Consumer | 22.    **Undisputed.**<br><br>Undisputed. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Protection Act (the "Letter").<br><br>*Evidence*: FAC ¶ 23; Landers Decl. ¶¶ 5, 16 & Ex. 2 (Letter), Ex. 10 (Pl.'s Dep. Tr.) 208:2-19, 211:2-212:23. | |
| 23.   Plaintiff wrote the Letter in her capacity as Eleanora's Power of Attorney.<br><br>*Evidence*: FAC ¶ 23; Landers Decl. ¶¶ 5, 16 & Ex. 2 (Letter), Ex. 10 (Pl.'s Dep. Tr.) 206:1-207:14, 208:2-16, 211:2-9, 212:9-18. | 23.   **Undisputed.**<br><br>Undisputed. |
| 24.   The Letter refers to the Number as "my phone."<br><br>*Evidence*: FAC ¶ 23; Landers Decl. ¶ 5 & Ex. 2 (Letter). | 24.   **Undisputed.**<br><br>Undisputed. |
| 25.   The Letter informed LoanStream that Eleanora's Number received two telephone calls one on October 12, 2021, and one on October 19, 2021.<br><br>*Evidence*: FAC ¶ 23; Landers Decl. ¶¶ 5, 16 & Ex. 2 (Letter), Ex. 10 (Pl.'s Dep. Tr.) 212:19-213:17. | 25.   **Undisputed.**<br><br>Undisputed. |
| 26.   Plaintiff alleges the Number "has been registered on the National Do Not Call Registry continuously since September 1, 2003."<br><br>*Evidence*: FAC ¶ 16. | 26.   **Undisputed.**<br><br>Undisputed that the FAC so alleges. |
| 27.   Plaintiff does not know who registered the Number on the National- | 27.   **Undisputed.** |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Do-Not-Call-Registry ("NDNCR").<br><br>*Evidence*: Landers Decl. ¶ 16 & Ex. 10 (Pl.'s Dep. Tr.) 184:25-185:15. | Undisputed. |
| 28.    Plaintiff does not recall registering the Number on the NDNCR.<br><br>*Evidence*: Landers Decl. ¶ 16 & Ex. 10 (Pl.'s Dep. Tr.) 184:25-185:15. | 28.    **Undisputed.**<br><br>Undisputed. |
| 29.    Plaintiff does she know if Eleanora registered the Number on the NDNCR.<br><br>*Evidence*: Landers Decl. ¶ 16 & Ex. 10 (Pl.'s Dep. Tr.) 184:25-185:15. | 29.    **Undisputed.**<br><br>Undisputed. |
| 30.    Premier Financial Marketing, LLC dba Resmo Lending ("Resmo") independently organized and coordinated a call campaign with Global Experts, Limited ("Global Experts"), to place calls and identify potential leads for three different entities: (i) American Financial Network, Inc. ("AFN"); (ii) Lending 3 (also known as "L3"); and (iii) LoanStream (the "Call Campaign").<br><br>*Evidence*: Roberts Decl. ¶¶ 1, 3, 8-13; Declaration of Serene Rosenberg Vernon ("Vernon Decl.") Filed In Support of Defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Landers Decl.") ¶¶ 12-34; Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 31:11-32:13, 52:8-21. | 30.    **Disputed in part.**<br><br>Undisputed that Resmo coordinated a campaign with Global Experts that included LoanStream among the entities.<br><br>Disputed as to "independently": LizDev's CEO understood the campaign was one Sean Roberts "ran for LoanStream"; LoanStream's branch manager Cynthia Roberts (Sean Roberts' wife) was a LoanStream W-2 employee; LoanStream's P&L records a $▮▮▮ "MARKETING" payment to Premier/Resmo. Sean Roberts described his data sourcing and scripts to LoanStream's president.<br><br>*Evidence:* (ECF 60-5) (accounting ledger/profit and loss statement) (filed |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | under seal); S. Roberts Dep. 45:8-25, 54:7-24; Stone Decl., ECF 58-5, ¶ 4; C. Roberts Dep. 9:16-25. |

30.     Moving Party's Response

Several issues exist with Plaintiff's purported dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

For example, Elizabeth Stone's declaration does not properly authenticate, nor attach, documents she references and contains inadmissible statements, including her unsupported statement that she "understand[s] that Resmo hired a company called Global Experts, LLC to serve as the call center for the LoanStream Campaign." Conversely, Sean Roberts (a former managing member at Resmo) provided a sworn declaration stating that "Resmo independently organized, marketed, and coordinated a call campaign, with the assistance of LizDev and Global Experts, to contact and identify consumers who were potentially interested in securing and/or refinancing mortgage loans." Mr. Roberts also declared that "[n]o contractual or financial relationship has ever existed between LoanStream, on the one hand, and [himself] or Resmo, on the other hand." Mr. Roberts further testified that Resmo "never had a relationship with LoanStream, period" and Resmo "marketed on [their] own behalf." Moreover, Mr. Roberts testified that the alleged conversation about his marketing practices occurred with an unspecified person at LoanStream—not Ms. Vernon (as Plaintiff incorrectly suggests). *See* Stone Decl. ¶¶ 4, 6-7 (Dkt. 85-5); Sean Roberts Decl. ¶¶ 5, 8 (Dkt. 81-8); Sean Roberts Dep. Tr. 23:6-19, 31:8-32:21. Mr. Roberts also testified that he met with Ms. Vernon at the Bistango restaurant in May or June of 2022—after the Resmo Call Campaign and more than six months *after* Plaintiff answered and recorded a call made to her mother's phone. Sean Roberts Dep. Tr. 55:1-13.

Plaintiff's claim that "LoanStream's P&L records a $█████ 'MARKETING' payment to Premier/Resmo" is also contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $█████ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—***two months after the $█████ payment was issued and also after the Resmo Call Campaign***

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| *had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▮▮▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮▮▮ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).<br><br>Plaintiff's statement that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3. | |
| 31.    According to Sean Roberts, the Call Campaign was conducted as follows: (i) Resmo obtained a list of opt-in leads, which consisted of consumers who previously provided their consent to be contacted because, among other things, they expressed their interest in securing and/or refinancing mortgage loans (the "Leads"); (ii) Resmo compared the Leads against the NDNCR; (iii) Resmo provided the vetted the Leads to Global Experts; (iv) Sean Roberts understands that Global Experts then called some of the Leads that Resmo vetted through the NDNCR; and (v) for consumers who expressed interest, Global Experts transferred the | 31.    **Disputed in part.**<br><br>Undisputed that this is Sean Roberts' account.<br><br>Disputed as to (ii), that the Leads were vetted against the NDNCR: the LizDev invoice warned the leads "were NOT obtained under procedures intended to comply with the [TCPA]" and "may contain leads from consumers registered with state and/or federal DO-NOT-Call Registries."<br><br>*Evidence*: Vernon Dep. 43:19-24, 46:5-8; Ex. 6 to Landers Decl. (LizDev |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| call to Resmo to discuss mortgage options that were potentially available through AFN, L3, and LoanStream.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 52:8-21; Roberts Decl. ¶¶ 9-10. | Invoice) (filed under seal). |
| 31.     Moving Party's Response<br><br>Plaintiff's reliance on the deposition testimony of Ms. Vernon is misplaced because Ms. Vernon does not have any knowledge about the policies and practices of Resmo and did not review the ***undated*** LizDev Invoice when it was allegedly first sent to LoanStream (and therefore could only testify about the boilerplate language after the fact). *See* Sean Roberts Dep. Tr. 43:10-45:7, 54:7-25; Vernon Dep. Tr. 43:19-44:13, 74:13-14. Moreover, how Resmo obtained opt-in call data is largely unrelated to the specific ways in which Resmo and/or Global Experts allegedly conducted the Call Campaign, which again, Ms. Vernon would not have substantive information about. | |
| 32.     Resmo and/or Global Experts conducted the Call Campaign using a data set obtained from LizDev, Inc. ("LizDev").<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 11 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set), Ex. 7 (Sean Roberts Dep. Tr.) 19:13-16, 20:91:21-9; Roberts Decl. ¶¶ 8-10, 15-16. | 32.     **Undisputed.**<br><br>Undisputed. |
| 33.     The data set produced by LizDev is not legally authenticated (the "Unauthenticated Data Set").<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 10 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); Roberts | 33.     **Disputed.**<br><br>This "fact' impermissibly makes legal argument and is a legal argument masquerading as a "fact."<br><br>Factually disputed. The LizDev call logs were authenticated by the |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Decl. ¶¶ 15-16. | Declaration of Elizabeth Stone, LizDev's CEO, who attested they are LizDev business records made and maintained in the ordinary course and produced in this action.<br><br>*Evidence:* Stone Decl. (ECF 58-5) ¶¶ 2-4, 6-7. |

33.    Moving Party's Response

LoanStream has shown that "Composite Exhibit A" – i.e. what Plaintiff refers to as the "LizDev call logs" and what LoanStream has defined as the "Unauthenticated Data Set" – is not trustworthy because, among other things, it has not been properly authenticated. The Stone Declaration states that Ms. Stone "received a subpoena from Plaintiff in this action that generally sought information about the LoanStream Campaign . . . [and a]ttached as Composite Exhibit A [to her declaration] are true and accurate copies of documents LizDev produced in connection with the Subpoena and this case generally." But no documents were actually attached to the Stone Declaration. *See* Stone Decl. ¶ 6 (Dkt. 85-5). And the Unauthenticated Data Set has not been properly authenticated under the business records exception to the hearsay rule.

But even if the Stone Declaration did attach documents, it does not confirm that Ms. Stone is qualified to authenticate Exhibit A (to confirm that it is what she claims it to be). *See, e.g., United States v. Estrada-Eliverio*, 583 F.3d 669, 672, 673 (9th Cir. 2009) ("[Rule] 901 does not require personal knowledge of a document's creation, but rather only personal knowledge that a document was part of an official file."). Instead, the Stone Declaration merely states that "Composite Exhibit A contains logs of outbound calls placed by Global Experts, LLC in connection with the LoanStream Campaign . . . [and Ms. Stone] had access to these documents by virtue of either [her] prior business dealings with Sean Roberts at Resmo in relation to the LoanStream Campaign, or because [she] invested in Global Experts, which [she] understand[s] is now defunct." In other words, Ms. Stone did not create the Unauthenticated Data Set, nor was she the custodian of the Unauthenticated Data Set (or the file containing such). Instead, she relies on Mr. Roberts to validate their authenticity—a task he also cannot complete since Mr. Roberts testified that he merely purchased "opt – in leads from LizDev" and then provided the information to Global Experts. *See* Stone Decl. ¶ 7 (Dkt. 85-5); Sean

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
| --- | --- |
| Roberts Decl. ¶¶ 3, 8-9 (Dkt. 81-8); Sean Roberts Dep. Tr. 20:19-21:9, 47:18-48:7. | |
| 34.    There is no evidence regarding who created the Unauthenticated Data Set, how it was prepared, when it was prepared, or how it was maintained.<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 10 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); Roberts Decl. ¶¶ 15-16. | 34.    **Disputed.**<br><br>This "fact" impermissibly makes legal argument and is a legal argument masquerading  as a "fact."<br><br>The Stone Declaration supplies the foundation. LizDev's CEO attested the logs were generated and maintained by LizDev in the ordinary course of business, at or near the time, by or from someone with knowledge, and that  they reflect outbound calls placed by Global Experts in connection with the LoanStream Campaign, and explained what the data purported to show.<br><br>*Evidence*: Stone Decl. (ECF 58-5) ¶¶  3, 7. |

34.    Moving Party's Response

LoanStream has shown that "Composite Exhibit A" – i.e. what Plaintiff refers to as the "LizDev call logs" and what LoanStream has defined as the "Unauthenticated Data Set" – is not trustworthy because, among other things, it  has not been properly authenticated. The Stone Declaration states that Ms. Stone "received a subpoena from Plaintiff in this action that generally sought information about the LoanStream Campaign . . . [and a]ttached as Composite Exhibit A [to her declaration] are true and accurate copies of documents LizDev produced in connection with the Subpoena and this case generally." But no documents were actually attached to the Stone Declaration. *See* Stone Decl. ¶ 6 (Dkt. 85-5). And the Unauthenticated Data Set has not been properly authenticated under the business records exception to the hearsay rule.

But even if the Stone Declaration did attach documents, it does not confirm that Ms. Stone is qualified to authenticate Exhibit A (to confirm that it is what she claims it to be). *See, e.g.*, *United States v. Estrada-Eliverio*, 583 F.3d 669, 672,

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 673 (9th Cir. 2009) ("[Rule] 901 does not require personal knowledge of a document's creation, but rather only personal knowledge that a document was part of an official file."). Instead, the Stone Declaration merely states that "Composite Exhibit A contains logs of outbound calls placed by Global Experts, LLC in connection with the LoanStream Campaign . . . [and Ms. Stone] had access to these documents by virtue of either [her] prior business dealings with Sean Roberts at Resmo in relation to the LoanStream Campaign, or because [she] invested in Global Experts, which [she] understand[s] is now defunct." In other words, Ms. Stone did not create the Unauthenticated Data Set, nor was she the custodian of the Unauthenticated Data Set (or the file containing such). Instead, she relies on Mr. Roberts to validate their authenticity—a task he also cannot complete since Mr. Roberts testified that he merely purchased "opt – in leads from LizDev" and then provided the information to Global Experts. *See* Stone Decl. ¶ 7 (Dkt. 85-5); Sean Roberts Decl. ¶¶ 3, 8-9 (Dkt. 81-8); Sean Roberts Dep. Tr. 20:19-21:9, 47:18-48:7. | |
| 35.    LizDev does not know where it got the Unauthenticated Data Set from, whether it be Sean Roberts or Global Experts.<br><br>*Evidence*: Dkt. 85-5 (Declaration of Elizabeth Stone filed by Plaintiff on April 13, 2026); Landers Decl. ¶¶ 5, 8, 10 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); Roberts Decl. ¶¶ 15-16. | 35.    **Disputed.**<br><br>The Stone Declaration states that LizDev's CEO had access to the logs of the calls placed by Global Experts because she "invested in Global Experts" and that the business records and reports were "generated and maintained by LizDev."<br><br>*Evidence:* Stone Decl. (ECF 58-5) ¶¶ 3, 7. |

35.    Moving Party's Response

LoanStream has shown that "Composite Exhibit A" – i.e. what Plaintiff refers to as the "LizDev call logs" and what LoanStream has defined as the "Unauthenticated Data Set" – is not trustworthy because, among other things, it has not been properly authenticated. The Stone Declaration states that Ms. Stone "received a subpoena from Plaintiff in this action that generally sought information about the LoanStream Campaign . . . [and a]ttached as Composite Exhibit A [to her declaration] are true and accurate copies of documents LizDev produced in connection with the Subpoena and this case generally." But no documents were actually attached to the Stone Declaration. *See* Stone Decl. ¶ 6 (Dkt. 85-5). And

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| the Unauthenticated Data Set has not been properly authenticated under the business records exception to the hearsay rule.<br><br>But even if the Stone Declaration did attach documents, it does not confirm that Ms. Stone is qualified to authenticate Exhibit A (to confirm that it is what she claims it to be). *See, e.g.*, *United States v. Estrada-Eliverio*, 583 F.3d 669, 672, 673 (9th Cir. 2009) ("[Rule] 901 does not require personal knowledge of a document's creation, but rather only personal knowledge that a document was part of an official file."). Instead, the Stone Declaration merely states that "Composite Exhibit A contains logs of outbound calls placed by Global Experts, LLC in connection with the LoanStream Campaign . . . [and Ms. Stone] had access to these documents by virtue of either [her] prior business dealings with Sean Roberts at Resmo in relation to the LoanStream Campaign, or because [she] invested in Global Experts, which [she] understand[s] is now defunct." In other words, Ms. Stone did not create the Unauthenticated Data Set, nor was she the custodian of the Unauthenticated Data Set (or the file containing such). Instead, she relies on Mr. Roberts to validate their authenticity—a task he also cannot complete since Mr. Roberts testified that he merely purchased "opt – in leads from LizDev" and then provided the information to Global Experts. *See* Stone Decl. ¶ 7 (Dkt. 85-5); Sean Roberts Decl. ¶¶ 3, 8-9 (Dkt. 81-8); Sean Roberts Dep. Tr. 20:19-21:9, 47:18-48:7. | |
| 36.     Neither Sean Roberts nor Resmo created or prepared the Unauthenticated Data Set.<br><br>*Evidence*: Roberts Decl. ¶¶ 15-16. | 36.     **Undisputed.**<br><br>Undisputed. The logs were LizDev/Global Experts records, as set forth in the Stone Declaration.<br><br>*Evidence:* Stone Decl. (ECF 58-5) ¶¶ 3, 7. |
| 36.     Moving Party's Response<br><br>LoanStream has shown that "Composite Exhibit A" – i.e. what Plaintiff refers to as the "LizDev call logs" and what LoanStream has defined as the "Unauthenticated Data Set" – is not trustworthy because, among other things, it has not been properly authenticated. The Stone Declaration states that Ms. Stone "received a subpoena from Plaintiff in this action that generally sought information about the LoanStream Campaign . . . [and a]ttached as Composite Exhibit A [to her declaration] are true and accurate copies of documents LizDev produced in | |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
| --- | --- |
| connection with the Subpoena and this case generally." But no documents were actually attached to the Stone Declaration. *See* Stone Decl. ¶ 6 (Dkt. 85-5). And the Unauthenticated Data Set has not been properly authenticated under the business records exception to the hearsay rule.<br><br>But even if the Stone Declaration did attach documents, it does not confirm that Ms. Stone is qualified to authenticate Exhibit A (to confirm that it is what she claims it to be). *See, e.g.*, *United States v. Estrada-Eliverio*, 583 F.3d 669, 672, 673 (9th Cir. 2009) ("[Rule] 901 does not require personal knowledge of a document's creation, but rather only personal knowledge that a document was part of an official file."). Instead, the Stone Declaration merely states that "Composite Exhibit A contains logs of outbound calls placed by Global Experts, LLC in connection with the LoanStream Campaign . . . [and Ms. Stone] had access to these documents by virtue of either [her] prior business dealings with Sean Roberts at Resmo in relation to the LoanStream Campaign, or because [she] invested in Global Experts, which [she] understand[s] is now defunct." In other words, Ms. Stone did not create the Unauthenticated Data Set, nor was she the custodian of the Unauthenticated Data Set (or the file containing such). Instead, she relies on Mr. Roberts to validate their authenticity—a task he also cannot complete since Mr. Roberts testified that he merely purchased "opt – in leads from LizDev" and then provided the information to Global Experts. *See* Stone Decl. ¶ 7 (Dkt. 85-5); Sean Roberts Decl. ¶¶ 3, 8-9 (Dkt. 81-8); Sean Roberts Dep. Tr. 20:19-21:9, 47:18-48:7. | |
| 37.    The Unauthenticated Data Set purports to show the number of calls made to a particular phone number and the timing of the last call made.<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 10 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); Roberts Decl. ¶¶ 15-16. | 37.    **Undisputed.**<br><br>Undisputed. |
| 38.    The Unauthenticated Data Set does not show who, when, or what number Global Experts called "on behalf of" LoanStream (as opposed to L3 or AFN) or the purpose of each call. | 38.    **Disputed in part.**<br><br>Undisputed that the logs do not themselves itemize each call by each purportedly promoted entity. |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| *Evidence*: Landers Decl. ¶¶ 5, 8, 10, 18 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set), Ex. 13 (Expert Report of Madelyn Moran ("Moran Report") ¶¶ 19, 21, 69; Roberts Decl. ¶¶ 15-16. | Disputed to the extent it implies that the calls were placed by or on behalf of any entity other than LoanStream, as the invoices listed LoanStream as the customer.<br><br>*Evidence:* Stone Decl. (ECF 58-5) ¶¶4, 7; S. Roberts Dep. 22-23; Ex. 6 to Landers Decl. (LizDev Invoice) (filed under seal).<br><br>Moreover, the answered October 19 call was recorded, and the caller identified herself as calling from "LoanStream Mortgage" and Vernon acknowledged LoanStream's products and services were being promoted on the calls.<br><br>*Evidence:* Exhibit 1 to Landers Dec., (ECF 81-10) (Call Recording) (filed under seal); Vernon Dep. 79:12-15, 84:9-13. |

38.    Moving Party's Response

The Unauthenticated Data Set contains limited information, including the (i) phone number making the call, (ii) the phone number receiving the call, (iii) the number of calls made, and (iv) the time of the last call—facts that Plaintiff admits are undisputed here. *See, e.g.*, SUF # 37. However, the Unauthenticated Data Set does **not** explain **why** each call was made, the purpose of the call, or who the caller placed the call "on behalf of". Additionally, no discovery or testimony exists regarding what calls, if any, were made "on behalf of" LoanStream—except for the single October 19, 2021 call to Eleanora Woods, which Plaintiff answered and recorded. *See* FAC ¶ 20; Landers Decl. ¶ 8, Ex. 4 (Dkt. 79-2); Pl.'s Dep. Tr. 196:2-198:24; Sean Roberts Decl. ¶¶ 8-11 (Dkt. 81-8).

Plaintiff's statement that "Vernon acknowledged LoanStream's products and services were being promoted on the calls" is also inaccurate and misleading

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| because Ms. Vernon merely responded to a hypothetical question raised by Plaintiff's counsel concerning what a "reasonable customer" might think after hearing the recorded call from October 19, 2021. However, Ms. Vernon does not have knowledge about what products or services were contemplated by the caller at that time, nor does she have knowledge about any other alleged calls listed in the Unauthenticated Data Set. *See* Vernon Dep. Tr. 78:16-80:3, 83:12-16; Landers Decl. ¶ 6, Ex. 1 (Dkt. 79-1). | |
| 39.   The Unauthenticated Data Set associates the Number with "Eleanora Woods" (not "Kimberly Hudson-Bryant").<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 10, 18 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); Ex. 13 ¶ 40 (Moran Report). | 39.   **Undisputed.**<br><br>Undisputed. |
| 40.   The Unauthenticated Data Set states that Eleanora's Number was called *three* times, but does not reference *when* each call occurred.<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 10, 18 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); ); Ex. 13 ¶ 40 (Moran Report). | 40.   **Undisputed.**<br><br>Undisputed that the logs reflect the Number was called three times. However, the logs do reflect the date of the last call.<br><br>*Evidence*: Landers Decl., ¶¶ 5, 8, 10, 18 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set). |
| 40.   Moving Party's Response<br><br>The focus of Plaintiff's allegations are the two calls that occurred on October 12, 2021, and October 19, 2021. LoanStream has shown that "Composite Exhibit A" – i.e. what Plaintiff refers to as the "LizDev call logs" and what LoanStream has defined as the "Unauthenticated Data Set" – is not trustworthy because, among other things, it lists three phone calls made to the Number, but the AT&T records, and Plaintiff's own testimony, establish there were only two calls to the Number. Furthermore, even if the Unauthenticated Data Set suggests a third call was placed to the Number, Plaintiff has never alleged such (despite receiving the | |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Unauthenticated Data Set on or about July 2, 2024—*two months before* filing its First Amended Complaint on September 10, 2024). Also, the potential existence of a third call does not impact Plaintiff's TCPA cause of action, which is based on 47 U.S.C. § 227(c)(5), and there is no evidence that the supposed third call – like the first call – was placed by Global Experts "on behalf of" LoanStream. *See* FAC ¶¶ 10, 14, 17-19; Sean Roberts Decl. ¶¶ 8-11 (Dkt. 81-8). | |
| 41.    The Unauthenticated Data Set only lists the final call attempt made to each phone number (data indicated by the "last_local_call_time" column).<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 10, 18 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); Ex. 13 ¶ 40 (Moran Report). | 41.    **Undisputed.**<br><br>Undisputed. |
| 42.    According to the Unauthenticated Data Set, the last call placed to Eleanora's Number occurred on "10/19/2021 14:17" (previously defined as the "Global Experts Call").<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 10, 18 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); ); Ex. 13 ¶ 40 (Moran Report). | 42.    **Undisputed.**<br><br>Undisputed. |
| 43.    The Unauthenticated Data Set lists Eleanora's address as ███████ ████████████████████ ███████ (the "██████████ house").<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8, 10, 18 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); ); Ex. 13 ¶ 40 (Moran Report). | 43.    **Undisputed.**<br><br>Undisputed as to what the data set states. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 44. The Unauthenticated Data Set lists Eleanora's email address as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Evidence*: Landers Decl. ¶¶ 5, 8, 10, 18 & Ex. 4 (extracted excerpt from the Unauthenticated Data Set); ); Ex. 13 ¶ 40 (Moran Report). | 44. **Undisputed.** Undisputed as to what the data set states. |
| 45. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Eleanora's son and Plaintiff's brother, lived at the ▓▓▓▓▓▓ house at the time of the Global Experts Call. *Evidence*: Landers Decl. ¶ 16 & Ex. 10 (Pl.'s Dep. Tr.) 49:4-5, 50:5-7, 51:15-20, 54:21-55:3. | 45. **Undisputed.** Undisputed. |
| 46. ▓▓▓▓▓▓▓ uses the email address ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Evidence*: Landers Decl. ¶ 16 & Ex. 10 (Pl.'s Dep. Tr.) 49:4-5, 50:5-7, 51:15-20, 52:16-54:9, 54:21-55:3. | 46. **Undisputed.** Undisputed. |
| 47. LizDev also produced call scripts ("Call Scripts") and Global Experts Invoices related to the Call Campaign as a whole, including calls allegedly placed referencing AFN, Lending 3/L3, and LoanStream (the "Global Experts Invoices"). *Evidence*: FAC ¶¶ 21-22; Landers Decl. ¶¶ 5, 8-9 & Ex. 3 (Call Scripts), Ex. 5 (Global Experts Invoices); Roberts Decl. ¶¶ 16-17. | 47. **Undisputed.** Undisputed, including that the scripts and invoices reference LoanStream. |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 48.    The Call Scripts, along with Sean Roberts' testimony, demonstrate that the Call Campaign related to other entities, including AFN and L3.<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8-9 & Ex. 3 (Call Scripts); Roberts Decl. ¶¶ 10-11, 16. | 48.    **Disputed in Part.**<br><br>Undisputed only that the purported scripts make reference to AFN and L3.<br><br>Disputed to the extent it implies that the calls were placed by or on behalf of any entity other than LoanStream, as the invoices listed LoanStream as the customer.<br><br>*Evidence*: Stone Decl. (ECF 58-5) ¶¶ 4, 7; S. Roberts Dep. 22-23; Ex. 6 to Landers Decl. (LizDev Invoice) (filed under seal).<br><br>Moreover, the answered October 19 call was recorded, and the caller identified herself as calling from "LoanStream Mortgage" and Vernon acknowledged LoanStream's products and services were being promoted on the calls.<br><br>*Evidence*: Exhibit 1 to Landers Dec., (ECF 81-10) (Call Recording) (filed under seal); Vernon Dep. 79:12-15, 84:9-13. |

48.    Moving Party's Response

The Unauthenticated Data Set contains limited information, including the (i) phone number making the call, (ii) the phone number receiving the call, (iii) the number of calls made, and (iv) the time of the last call—facts that Plaintiff admits are undisputed here. *See, e.g.*, SUF # 37. However, the Unauthenticated Data Set does **not** explain **why** each call was made, the purpose of the call, or who the caller placed the call "on behalf of". Additionally, no discovery or testimony exists regarding what calls, if any, were made "on behalf of" LoanStream—except for the single October 19, 2021 call to Eleanora Woods, which Plaintiff answered and recorded. *See* FAC ¶ 20; Landers Decl. ¶ 8, Ex. 4

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| (Dkt. 79-2); Pl.'s Dep. Tr. 196:2-198:24; Sean Roberts Decl. ¶¶ 11, 16 (Dkt. 81-8).<br><br>Plaintiff's statement that "the invoices listed LoanStream as the customer" is also incorrect and misleading since **only one LizDev Invoice** was submitted to LoanStream—and even then, it was never paid. Vernon Dep. Tr. 43:19-44:13, 48:13-14. The LizDev Invoice is described as a "New Data Invoice" issued for "50k records @ .20." *See* Landers Decl. ¶ 8, Ex. 6 (Dkt. 80-1). But Sean Roberts, who independently organized the Call Campaign, testified that he purchased opt-in leads directly from LizDev and then used the information to "identify potential leads for three different companies: (i) American Financial Network, Inc. ("AFN"); (ii) Lending 3 (also known as "L3"); and (iii) LoanStream." Sean Roberts Decl. ¶¶ 8-10 (Dkt. 81-8). The mere fact that LizDev sent a single invoice to LoanStream, which LoanStream never paid, does not indicate or establish that the Call Campaign was performed "on behalf of" only LoanStream—an assumption that Plaintiff now urges. Moreover, despite having an opportunity to do so, Ms. Stone did not testify (and Plaintiff provides no other evidence to suggest) that the LizDev Invoice was paid for a simple reason—it was not.<br><br>Plaintiff's statement that "Vernon acknowledged LoanStream's products and services were being promoted on the calls" is also inaccurate and misleading because Ms. Vernon merely responded to a hypothetical question raised by Plaintiff's counsel concerning what a "reasonable customer" might think after hearing the recorded call from October 19, 2021. However, Ms. Vernon does not have knowledge about what products or services were contemplated by the caller at that time, nor does she have knowledge about any other alleged calls listed in the Unauthenticated Data Set. *See* Vernon Dep. Tr. 78:16-80:3, 83:12-16; Landers Decl. ¶ 6, Ex. 1 (Dkt. 79-1). | |
| 49.    The Call Scripts do not mention LoanStream by name; instead, they reference "LS mortgage" which is not LoanStream's name or a name under which it does business.<br><br>*Evidence*: Landers Decl. ¶¶ 5, 8-9 & Ex. 3 (Call Scripts); Roberts Decl. ¶¶ 16-17; Vernon Decl. ¶ 13. | 49.    **Disputed in Part.**<br><br>Undisputed only that the purported scripts make reference to the shorthand "LS mortgage."<br><br>Disputed to the extent it implies that the calls were placed by or on behalf of any entity other than LoanStream, as the invoices listed LoanStream as |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | the customer. |
| | *Evidence*: Stone Decl. (ECF 58-5), ¶¶ 4, 7; S. Roberts Dep. 22-23.; Ex. 6 to Landers Decl. (LizDev Invoice) (filed under seal). |
| | Moreover, the answered October 19 call was recorded, and the caller identified herself as calling from "LoanStream Mortgage" and Vernon acknowledged LoanStream's products and services were being promoted on the calls. |
| | *Evidence*: Exhibit 1 to Landers Dec., (ECF 81-10) (Call Recording) (filed under seal); Vernon Dep. 79:12-15, 84:9-13. |

49.    Moving Party's Response

Ms. Vernon previously testified that "LS mortgage" is not a name that LoanStream uses to do business. Vernon Decl. ¶ 13 (Dkt. 81-3).

The Unauthenticated Data Set also contains limited information, including the (i) phone number making the call, (ii) the phone number receiving the call, (iii) the number of calls made, and (iv) the time of the last call—facts that Plaintiff admits are undisputed here. *See, e.g.*, SUF # 37. However, the Unauthenticated Data Set does **not** explain **why** each call was made, the purpose of the call, or who the caller placed the call "on behalf of". Additionally, no discovery or testimony exists regarding what calls, if any, were made "on behalf of" LoanStream—except for the single October 19, 2021 call to Eleanora Woods, which Plaintiff answered and recorded. *See* FAC ¶ 20; Landers Decl. ¶ 8, Ex. 4 (Dkt. 79-2); Pl.'s Dep. Tr. 196:2-198:24; Sean Roberts Decl. ¶¶ 11, 16 (Dkt. 81-8). Also, according to the audio file created and produced by Plaintiff, the caller of the October 19, 2021 call did not claim that she was calling "***from*** LoanStream Mortgage"—she stated that she was calling "***with*** LoanStream Mortgage." Landers

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Decl. ¶ 5, Ex. 1 (Dkt. 79-1).<br><br>Additionally, Plaintiff's statement that "the invoices listed LoanStream as the customer" is incorrect and misleading since **only one LizDev Invoice** was submitted to LoanStream—and even then, it was never paid. Vernon Dep. Tr. 43:19-44:13, 48:13-14. The LizDev Invoice is described as a "New Data Invoice" issued for "50k records @ .20." *See* Landers Decl. ¶ 8, Ex. 6 (Dkt. 80-1). But Sean Roberts, who independently organized the Call Campaign, testified that he purchased opt-in leads directly from LizDev and then used the information to "identify potential leads for three different companies: (i) American Financial Network, Inc. ("AFN"); (ii) Lending 3 (also known as "L3"); and (iii) LoanStream." Sean Roberts Decl. ¶¶ 8-10 (Dkt. 81-8). The mere fact that LizDev sent a single invoice to LoanStream, which LoanStream never paid, does not indicate or establish that the Call Campaign was performed "on behalf of" only LoanStream—an assumption that Plaintiff now urges. Moreover, despite having an opportunity to do so, Ms. Stone did not testify (and Plaintiff provides no other evidence to suggest) that the LizDev Invoice was paid for a simple reason—it was not.<br><br>Plaintiff's statement that "Vernon acknowledged LoanStream's products and services were being promoted on the calls" is also inaccurate and misleading because Ms. Vernon merely responded to a hypothetical question raised by Plaintiff's counsel concerning what a "reasonable customer" might think after hearing the recorded call from October 19, 2021. However, Ms. Vernon does not have knowledge about what products or services were contemplated by the caller at that time, nor does she have knowledge about any other alleged calls listed in the Unauthenticated Data Set. *See* Vernon Dep. Tr. 78:16-80:3, 83:12-16; Landers Decl. ¶ 6, Ex. 1 (Dkt. 79-1). | |
| 50.    Other mortgage companies exist with "LS"—like LendSure Mortgage Corp. (www.lendsure.com).<br><br>*Evidence*: www.lendsure.com. | 50.    **Disputed.**<br><br>This " fact" impermissibly makes legal argument and is a legal argument masquerading as a "fact," and moreover appears nowhere in the record.<br><br>Disputed to the extent offered to show the calls referenced a company other than LoanStream. No evidence in the |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | record exists that the calls were placed by or on behalf of LendSure Mortgage.<br><br>Disputed to the extent it implies that the calls were placed by or on behalf of any entity other than LoanStream, as the invoices listed LoanStream as the customer.<br><br>*Evidence*: Stone Decl. (ECF 58-5), ¶¶ 4, 7; S. Roberts Dep. 22-23.; Ex. 6 to Landers Decl. (LizDev Invoice) (filed under seal).<br><br>Moreover, the answered October 19 call was recorded, and the caller identified herself as calling from "LoanStream Mortgage" and Vernon acknowledged LoanStream's products and services were being promoted on the calls.<br><br>*Evidence*: Exhibit 1 to Landers Dec., (ECF 81-10) (Call Recording) (filed under seal); Vernon Dep. 79:12-15 , 84:9-13. |

50.    Moving Party's Evidence

The Call Scripts produced by LizDev reference "LS mortgage"—but they do not name LoanStream Mortgage or OCMBC by name. *See* Landers Decl. ¶ 8, Ex. 3 (Dkt. 79-1). LoanStream does not do business using the name "LS mortgage". *See* Vernon Decl. ¶ 13 (Dkt. 81-3). The Call Scripts  do **not** explain when how or when each script was used, nor does the Unauthenticated Data Set explain if or when the Call Scripts were used. Additionally, no discovery or testimony exists to clarify who "LS mortgage" is actually referring to. *See* Sean Roberts Decl. ¶¶ 15-16 (Dkt. 81-8). Instead, the only evidence showing that a call was potentially made "on behalf of" LoanStream is the single October 19, 2021 call to Eleanora Woods, wherein the caller stated she was calling "*with* LoanStream Mortgage." *See* FAC ¶

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 20; Landers Decl. ¶¶ 5, 8 & Exs. 1, 3-4 (Dkt. 79-1).<br><br>Plaintiff's statement that "Vernon acknowledged LoanStream's products and services were being promoted on the calls" is also inaccurate and misleading because Ms. Vernon merely responded to a hypothetical question raised by Plaintiff's counsel concerning what a "reasonable customer" might think after hearing the recorded call from October 19, 2021. However, Ms. Vernon does not have knowledge about what products or services were contemplated by the caller at that time, nor does she have knowledge about any other alleged calls listed in the Unauthenticated Data Set. *See* Vernon Dep. Tr. 78:16-80:3, 83:12-16; Landers Decl. ¶ 6, Ex. 1 (Dkt. 79-1). | |
| 51.    The Global Experts Invoices also reflect that the Call Campaign only occurred for a limited duration, between September 27, 2021, and November 16, 2021.<br><br>*Evidence*: Landers Decl. ¶ 5, 8 & Ex. 5 (Global Experts Invoices); Roberts Decl. ¶ 17. | 51.    **Undisputed.**<br><br>Undisputed. |
| 52.    Sean Roberts testified that "[Resmo and he] never had a relationship with LoanStream, period."<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 31:8-32:13. | 52.    **Disputed.**<br><br>Undisputed that Sean Roberts gave this testimony at his deposition, but disputed as to the assertion.<br><br>LoanStream's P&L records a $▮ "MARKETING" payment to Premier/Resmo, LizDev's CEO understood the campaign was run "for LoanStream" and that LizDev prepared invoices to be sent to Resmo "or LoanStream directly." Cynthia Roberts was LoanStream's W-2 branch manager, and at least Sean Roberts (and possibly Cynthia Roberts) communicated with Vernon about lead |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | generation and payments and met her at Bistango. |
| | *Evidence:* (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal Stone Decl., ECF 58-5, ¶¶ 4-5; C. Roberts Dep. 9:16-25; S. Roberts Dep. 51:15-52:7, 54:7-24. |

52.     Moving Party's Response

Plaintiff's counsel has no basis to dispute the sworn testimony of Mr. Roberts. Mr. Roberts repeatedly testified that no relationship ever existed between LoanStream and himself and/or Resmo (despite being asked multiple times in his deposition). Sean Roberts Dep. Tr. 31:8-32:13, 41:12-42:5. Mr. Roberts also reiterated this point in a written declaration. *See* Sean Roberts Decl. ¶¶ 4-5, 8, 12-14, 18-19 (Dkt. 81-8). As evidenced by sworn testimony, it is clear that no relationship existed between Resmo and LoanStream, because, among other things, (i) LoanStream did not approach Resmo to conduct a call campaign and (ii) Resmo did not offer to perform a campaign on LoanStream's behalf. Sean Roberts Dep. Tr. 23:2-19, 24:2-18, 30:23-32:17, 33:8-21, 39:15-40:1, 41:12-42:13; Sean Roberts Decl. ¶¶ 5, 13-14, 18, 20 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13, 15-21, 24-28, 34 (Dkt. 81-3).

Several other issues also exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

For example, Elizabeth Stone's declaration is unauthenticated and contains inadmissible statements, including her unsupported statement that she "understand[s] that Resmo hired a company called Global Experts, LLC to serve as the call center for the LoanStream Campaign." Conversely, Sean Roberts (a former managing member at Resmo) provided a sworn declaration stating that "Resmo independently organized, marketed, and coordinated a call campaign, with the assistance of LizDev and Global Experts, to contact and identify consumers who were potentially interested in securing and/or refinancing mortgage loans." Mr. Roberts also declared that "[n]o contractual or financial relationship has ever existed between LoanStream, on the one hand, and [himself] or Resmo, on the other hand." Mr. Roberts also testified that Resmo "never had a relationship with LoanStream, period" and they "marketed on [their] own behalf." Moreover, Mr.

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Roberts testified that the alleged conversation about his marketing practices occurred with an unspecified person at LoanStream—not Ms. Vernon (as Plaintiff incorrectly suggests). *See* Stone Decl. ¶¶ 4, 6-7 (Dkt. 85-5); Sean Roberts Decl. ¶¶ 5, 8 (Dkt. 81-8); Sean Roberts Dep. Tr. 23:6-19, 31:8-32:21. Mr. Roberts also testified that he met with Ms. Vernon at the Bistango restaurant in May or June of 2022—after the Resmo Call Campaign and more than six months *after* Plaintiff answered and recorded a call made to her mother's phone. Sean Roberts Dep. Tr. 55:1-13. | |
| | |
| Plaintiff's claim that "LoanStream's P&L records a $███ 'MARKETING' payment to Premier/Resmo" is also contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $███ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—*two months after the $███ payment was issued and also after the Resmo Call Campaign had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $███ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $███ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). | |
| | |
| Plaintiff's statement that "LoanStream's P&L records a $███ 'MARKETING' payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3. | |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 53.    Sean Roberts has never been an employee, agent, or independent contractor of LoanStream.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 13:11-13, 30:18-22; Roberts Decl. ¶¶ 4-5. | 53.    **Disputed in part.**<br><br>Undisputed that Sean Roberts was not a LoanStream W-2 employee.<br><br>Disputed in that the issue of whether or not someone is an "agent" or an "independent contractor "is a legal conclusion and this is a legal argument/conclusion masquerading as a " fact."<br><br>The factual basis for a finding that Sean Roberts was an agent of LoanStream is found in that Sean Roberts testified LoanStream wanted to know how he obtained his data and how he marketed that he described the scripts and contact methods to Vernon at Bistango and LoanStream funded the marketing through a payment to his company.<br><br>*Evidence*: S. Roberts Dep. 45:8-25, 46:10-18, 54:7-24; (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal). |

53.    Moving Party's Response

Even if the conversations described by Plaintiff above happened the way argued (they did not), mere conversations are insufficient to create an agency relationship. Similarly, even if a payment occurred in the manner argued by Plaintiff (it did not), a single payment alone is insufficient to establish the agency relationship argued by Plaintiff.

Mr. Roberts also testified about his relationship with LoanStream, including the fact that he has "never been an employee, agent, or independent contractor of LoanStream" and "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| in, or assist with, the Call Campaign on [its] behalf in any way at no point did LoanStream authorize, request, instruct, or command." Sean Roberts Decl. ¶¶ 4, 13 (Dkt. 81-8). Mr. Roberts has also repeatedly testified that he has never been paid by LoanStream, including for the Call Campaign conducted through Resmo and with Global Experts. Sean Roberts Dep. Tr. 30:23-32:17, 41:12-42:13; Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). In fact, Mr. Roberts testified that he developed the call scripts directly with Global Experts and did not discuss them or the Call Campaign with Ms. Vernon or LoanStream until months *after it concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign *until after it occurred*. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3). Mr. Roberts also testified that he met with Ms. Vernon at the Bistango restaurant in May or June of 2022—after the Resmo Call Campaign and more than six months *after* Plaintiff answered and recorded a call made to her mother's phone. Sean Roberts Dep. Tr. 55:1-13.<br><br>Ms. Vernon also testified that the $■■■ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $■■■ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).<br><br>Finally, Plaintiff's statement that "LoanStream funded the marketing" is an argument unsupported by the evidence cited. Sean Roberts testified unambiguously that LoanStream did not pay for the Call Campaign he organized. Sean Roberts Dep. Tr. 31:8-32:21; Sean Roberts Decl. ¶¶ 5, 12, 14 (Dkt. 81-8). | |
| 54.    Resmo has never been an agent, or independent contractor of LoanStream.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 31:2-32:21; Roberts Decl. ¶¶ 4-5; Vernon Decl. ¶¶ | 54.    **Disputed.**<br><br>Disputed in that the issue of whether or not someone is an "agent" or an "independent contractor" is a legal conclusion and this is a legal argument/conclusion masquerading as a |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 10, 16, 18-21. | " fact."<br><br>The factual basis for a finding that Resmo was an agent of LoanStream is found in that Sean Roberts testified LoanStream wanted to know how he obtained his data and how he marketed that he described the scripts and contact methods to Vernon at Bistango and LoanStream funded the marketing through a payment to Premier/Resmo.<br><br>*Evidence*: S. Roberts Dep. 45:8-25, 46:10-18, 54:7-24; (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal). |

54.    Moving Party's Response

Even if the conversations described by Plaintiff above happened the way argued (they did not), mere conversations are insufficient to create an agency relationship. Similarly, even if a payment occurred in the manner argued by Plaintiff (it did not), a single payment alone is insufficient to establish the agency relationship argued by Plaintiff.

Mr. Roberts also testified about his relationship with LoanStream, including the fact that he has "never been an employee, agent, or independent contractor of LoanStream" and "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage in, or assist with, the Call Campaign on [its] behalf in any way at no point did LoanStream authorize, request, instruct, or command." Sean Roberts Decl. ¶¶ 4, 13 (Dkt. 81-8). Mr. Roberts has also repeatedly testified that he has never been paid by LoanStream, including for the Call Campaign conducted through Resmo and with Global Experts. Sean Roberts Dep. Tr. 30:23-32:17, 41:12-42:13; Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). In fact, Mr. Roberts testified that he developed the call scripts directly with Global Experts and did not discuss them or the Call Campaign with Ms. Vernon or LoanStream until months ***after it concluded***. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign ***until after it occurred***. *See* Sean Roberts

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3). Mr. Roberts also testified that he met with Ms. Vernon at the Bistango restaurant in May or June of 2022—after the Resmo Call Campaign and more than six months *after* Plaintiff answered and recorded a call made to her mother's phone. Sean Roberts Dep. Tr. 55:1-13.<br><br>Ms. Vernon also testified that the $▮▮▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮▮▮ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).<br><br>Finally, Plaintiff's statement that "LoanStream funded the marketing" is an argument unsupported by the evidence cited. Sean Roberts testified unambiguously that LoanStream did not pay for the Call Campaign he organized. Sean Roberts Dep. Tr. 31:8-32:21; Sean Roberts Decl. ¶¶ 5, 12, 14 (Dkt. 81-8). | |
| 55.    No contractual relationship has ever existed between LoanStream and Sean Roberts.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 31:2-32:21; Roberts Decl. ¶¶ 4-5; Vernon Decl. ¶¶ 10, 16, 18-21. | 55.    **Disputed in Part.**<br><br>Undisputed as to the existence of a *written* contract.<br><br>LoanStream's P&L records a $▮▮▮ "MARKETING" payment to Premier, Sean Roberts' company. Sean Roberts emailed Vernon about "marketing expenses" due/past due, and Vernon responded by requesting a cost-center number so accounting could process payment.<br><br>Evidence: ECF 60-5 (accounting ledger/profit and loss statement) (filed |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
|  | under seal); Vernon Dep. 61:11-24. |

55.     Moving Party's Response

Several issues exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

Plaintiff's claim that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier, Sean Roberts' company" is contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▮▮▮ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—*two months after the $▮▮▮ payment was issued and also after the Resmo Call Campaign had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▮▮▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮▮▮ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).

Plaintiff's statement that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier, Sean Roberts' company" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3.

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 56.    No financial relationship has ever existed between LoanStream and Sean Roberts.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 31:2-32:21; Roberts Decl. ¶¶ 4-5; Vernon Decl. ¶¶ 10, 16, 18-21. | 56.    **Disputed.**<br><br>LoanStream's P&L records a $▮▮ "MARKETING" payment to Premier, Sean Roberts' company. Sean Roberts emailed Vernon about "marketing expenses" due/past due, and Vernon responded by requesting a cost-center number so accounting could process payment.<br><br>*Evidence:* ECF 60-5 (accounting ledger/profit and loss statement) (filed under seal); Vernon Dep. 61:11-24. |

56.    Moving Party's Response

Several issues exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

Plaintiff's claim that "LoanStream's P&L records a $▮▮ 'MARKETING' payment to Premier, Sean Roberts' company" is contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is ***not*** corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▮▮ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—***two months after the $▮▮ payment was issued and also after the Resmo Call Campaign had already concluded***. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▮▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮▮ payment was ***not*** for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).<br><br>Plaintiff's statement that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier, Sean Roberts' company" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3. | |
| 57.    No contractual relationship has ever existed between LoanStream and Resmo.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 31:2-32:21; Roberts Decl. ¶¶ 4-5. | 57.    **Disputed in Part.**<br><br>Undisputed as to the existence of a *written* contract.<br><br>LoanStream's P&L records a $▮▮▮ "MARKETING" payment to Premier, Sean Roberts' company. Sean Roberts emailed Vernon about "marketing expenses" due/past due, and Vernon responded by requesting a cost-center number so accounting could process payment. Cynthia Roberts testified LoanStream "helped us have funding by paying marketing" and "paid invoices." LizDev prepared invoices to be sent to Resmo "or LoanStream directly."<br><br>*Evidence:* ECF 60-5 (accounting ledger/profit and loss statement) (filed under seal); Vernon Dep. 61:11-24.; C. Roberts Dep. 10:13-14, 29:11-14; Stone Decl., ECF 58-5, ¶ 5. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|

57.    Moving Party's Response

Several issues exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

Plaintiff's claim that "LoanStream's P&L records a $▓▓▓ 'MARKETING' payment to Premier, Sean Roberts' company" is contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▓▓▓ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—*two months after the $▓▓▓ payment was issued and also after the Resmo Call Campaign had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▓▓▓ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▓▓▓ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).

Plaintiff's statement that "LoanStream's P&L records a $▓▓▓ 'MARKETING' payment to Premier, Sean Roberts' company" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3.

Plaintiff's assertion that "Cynthia Roberts testified LoanStream helped us have funding by paying marketing and paid invoices" is also misleading. In truth,

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Plaintiff's counsel asked Mrs. Roberts if "LoanStream provide[s] any funding or cash advances for the purpose of marketing, or did it just pay invoices?" Mrs. Roberts' responded that LoanStream "paid invoices"—no other context or explanation was provided. Mrs. Roberts also testified that she submitted invoices to LoanStream accounting for payment (because she was not authorized to pay vendor invoices on the company's behalf) and further testified that she was not involved in any call campaigns during her employment at LoanStream and she likewise confirmed that telemarketing campaigns are expressly prohibited at LoanStream. Cynthia Roberts Dep. Tr. 12:10-16, 29:11-30:5, 37:15-22, 40:23-25, 49:14-59:25.<br><br>Finally, Plaintiff's statement that "LizDev prepared invoices to be sent to Resmo or LoanStream directly" is incorrect and misleading since *only one LizDev Invoice* was submitted to LoanStream—and even then, it was disregarded and never paid since LoanStream never had any relationship with LizDev. Vernon Dep. Tr. 43:19-44:13, 48:13-14. The LizDev Invoice is described as a "New Data Invoice" issued for "50k records @ .20." *See* Landers Decl. ¶ 8, Ex. 6 (Dkt. 80-1). But Sean Roberts, who independently organized the Call Campaign, testified that he purchased opt-in leads directly from LizDev and then used the information to "identify potential leads for three different companies: (i) American Financial Network, Inc. ("AFN"); (ii) Lending 3 (also known as "L3"); and (iii) LoanStream." Sean Roberts Decl. ¶¶ 8-10 (Dkt. 81-8). The mere fact that LizDev sent a single invoice to LoanStream, which LoanStream never paid, does not indicate or establish that the Call Campaign was performed "on behalf of" only LoanStream—an assumption Plaintiff now urges. Moreover, despite having an opportunity to do so, Ms. Stone did not testify (and Plaintiff provides no other evidence to suggest) that the LizDev Invoice was paid—because it was not. | |
| 58.    No financial relationship has ever existed between LoanStream and Resmo.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 31:2-32:21; Roberts Decl. ¶¶ 4-5; Vernon Decl. ¶¶ 10, 16, 18-21. | 58.    **Disputed.**<br><br>LoanStream's P&L records a $▮▮▮ "MARKETING" payment to Premier, Sean Roberts' company. Sean Roberts emailed Vernon about "marketing expenses" due/past due, and Vernon responded by requesting a cost-center number so accounting could process payment. Cynthia Roberts testified LoanStream "helped us have funding |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | by paying marketing" and "paid invoices." LizDev prepared invoices to be sent to Resmo "or LoanStream directly." |
| | *Evidence:* ECF 60-5 (accounting ledger/profit and loss statement) (filed under seal); Vernon Dep. 61:11-24.; C. Roberts Dep. 10:13-14, 29:11-14; Stone Decl., ECF 58-5, ¶ 5. |

58.     Moving Party's Response

Several issues exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

Plaintiff's claim that "LoanStream's P&L records a $▓▓ 'MARKETING' payment to Premier, Sean Roberts' company" is contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▓▓ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—*two months after the $▓▓ payment was issued and also after the Resmo Call Campaign had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▓▓ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▓▓ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).

Plaintiff's statement that "LoanStream's P&L records a $▓▓ 'MARKETING' payment to Premier, Sean Roberts' company" is also improper because Plaintiff

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3.<br><br>Plaintiff's assertion that "Cynthia Roberts testified LoanStream helped us have funding by paying marketing and paid invoices" is also misleading. In truth, Plaintiff's counsel asked Mrs. Roberts if "LoanStream provide[s] any funding or cash advances for the purpose of marketing, or did it just pay invoices?" Mrs. Roberts' responded that LoanStream "paid invoices"—no other context or explanation was provided. Mrs. Roberts also testified that she submitted invoices to LoanStream accounting for payment (because she was not authorized to pay vendor invoices on the company's behalf) and further testified that she was not involved in any call campaigns during her employment at LoanStream and she likewise confirmed that telemarketing campaigns are expressly prohibited at LoanStream. Cynthia Roberts Dep. Tr. 12:10-16, 29:11-30:5, 37:15-22, 40:23-25, 49:14-59:25.<br><br>Finally, Plaintiff's statement that "LizDev prepared invoices to be sent to Resmo or LoanStream directly" is incorrect and misleading since ***only one LizDev Invoice*** was submitted to LoanStream—and even then, it was disregarded and never paid since LoanStream never had any relationship with LizDev. Vernon Dep. Tr. 43:19-44:13, 48:13-14. The LizDev Invoice is described as a "New Data Invoice" issued for "50k records @ .20." *See* Landers Decl. ¶ 8, Ex. 6 (Dkt. 80-1). But Sean Roberts, who independently organized the Call Campaign, testified that he purchased opt-in leads directly from LizDev and then used the information to "identify potential leads for three different companies: (i) American Financial Network, Inc. ("AFN"); (ii) Lending 3 (also known as "L3"); and (iii) LoanStream." Sean Roberts Decl. ¶¶ 8-10 (Dkt. 81-8). The mere fact that LizDev sent a single invoice to LoanStream, which LoanStream never paid, does not indicate or establish that the Call Campaign was performed "on behalf of" only LoanStream—an assumption Plaintiff now urges. Moreover, despite having an opportunity to do so, Ms. Stone did not testify (and Plaintiff provides no other evidence to suggest) that the LizDev Invoice was paid—because it was not. |  |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 59.    No contractual relationship has ever existed between LoanStream and Global Experts.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 32:14-21, 39:15-40:1; Roberts Decl. ¶ 7; Vernon Decl. ¶¶ 27-29. | 59.    **Undisputed.**<br><br>Undisputed that there was no direct contract between LoanStream and Global Experts, as the campaign ran through Resmo. |
| 60.    No financial relationship has ever existed between LoanStream and Global Experts.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 32:14-21, 39:15-40:1; Roberts Decl. ¶ 7; Vernon Decl. ¶¶ 27-29. | 60.    **Undisputed.**<br><br>Undisputed that there is no record that LoanStream made direct payment to Global Experts. |
| 61.    At no point was Global Experts an approved vendor of LoanStream.<br><br>*Evidence*: Vernon Decl. ¶ 24. | 61.    **Disputed in part.**<br><br>Undisputed in that Global Experts was not a formally approved vendor.<br><br>Disputed to the extent that any testimony adduced implies that such approval was required. |

61.    Moving Party's Response

Despite disputing this fact in part, Plaintiff does not provide any evidence to support its arguments.

Additionally, LoanStream's former president, Ms. Vernon, testified that LoanStream has a formal vendor onboarding process (which she described in detail during her deposition) that requires pre-approval of all vendors. *See* Vernon Dep. Tr. 73:1-74:14; Vernon Decl. ¶¶ 4, 24-29 (Dkt. 81-3). Mrs. Roberts also confirmed that LoanStream had multiple policies in place, which she read and agreed to follow, including how and when to "contract with vendors." Cynthia

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Roberts Dep. Tr. 58:2-59:16. | |
| 62.    LoanStream never contracted with Global Experts directly or indirectly to engage in the Call Campaign for LoanStream's benefit.<br><br>*Evidence*: Vernon Decl. ¶ 27. | 62.    **Disputed in part.**<br><br>Undisputed that LoanStream did not contract with Global Experts directly.<br><br>Disputed as to "indirectly . . . for LoanStream's benefit," as the campaign ran through LoanStream's branch manager Cynthia Roberts and Sean Roberts' Resmo, which engaged Global Experts, and LoanStream funded the marketing.<br><br>*Evidence*: S. Roberts Dep. 52:8-21, 52:15-53:8 Stone Decl., ECF 58-5, ¶4); ECF 60-5 (accounting ledger/profit and loss statement) (filed under seal). |

62.    Moving Party's Response

Ms. Vernon testified that LoanStream never interacted or worked with Global Experts—"directly or indirectly"—and never paid them for any work they may have performed. *See* Vernon Decl. ¶¶ 27-28 (Dkt. 81-3). Mr. Roberts also repeatedly confirmed that Global Experts never interacted with LoanStream or provided any indirect benefit to them. *See* Sean Roberts Dep. Tr. 20:12-22:6, 26:6-8, 32:14-21, 33:8-14, 39:15-19; Sean Roberts Decl. ¶¶ 7-9, 18 (Dkt. 81-8). Plaintiff's statement that "the campaign ran through LoanStream's branch managers Cynthia Roberts" is argument unsupported by the evidence cited. Resmo contracted with Global Experts to conduct a call campaign. Sean Roberts Dep. Tr. 20:19-21:9, 52:8-21; Sean Roberts Decl. ¶¶ 8-9, 16-17 (Dkt. 81-8).

Similarly, Plaintiff's statement that "LoanStream funded the marketing" is an argument unsupported by the evidence cited. Sean Roberts testified unambiguously that LoanStream did not pay for the Call Campaign he organized. Sean Roberts Dep. Tr. 31:8-32:21; Sean Roberts Decl. ¶¶ 5, 12, 14 (Dkt. 81-8).

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
| --- | --- |
| 63.    LoanStream never had a business relationship with Global Experts.<br><br>*Evidence*: Vernon Decl. ¶ 27. | 63.    **Undisputed.**<br><br>Undisputed as to a *direct* business relationship with Global Experts. |
| 64.    LoanStream never received any benefit (financial or otherwise) from the alleged telemarketing efforts of Global Experts.<br><br>*Evidence*: Vernon Decl. ¶ 28. | 64.    **Disputed.**<br><br>Vernon testified LoanStream accepted the loans the campaign generated, which were LoanStream loans, and acknowledged LoanStream's products and services were being promoted on the calls.<br><br>*Evidence*: Vernon Dep. 49:6-9, 84:9-13. |

64.    Moving Party's Response

Plaintiff misstates the testimony. There is a difference between LoanStream funding loans generated by Mrs. Roberts' branch, and LoanStream funding loans that arose from the Global Experts Call Campaign. Plaintiff's argument assumes, without evidence, that the few loans the branch generated came from the Call Campaign. When asked whether LoanStream accepted business generated by Cynthia Roberts' branch, Ms. Vernon testified that "Yeah, there were a few loans that came through the branch. Not very many, but there were a few." Vernon Dep. Tr. 49:6-9. But Ms. Vernon did ***not*** testify that LoanStream "accepted the loans the campaign generated." Ms. Vernon also repeatedly testified that LoanStream does not participate in telemarketing campaigns—a fact Mrs. Roberts likewise confirmed when discussing the policies and practices she agreed to follow as a LoanStream employee—***and more importantly, LoanStream never participated in Resmo's Call Campaign and it never received any direct or indirect financial benefit from it***. Vernon Dep. Tr. 49:23-50:5, 59:1-7; Vernon Decl. ¶¶ 19-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5 (Non-Producing Branch Manager Employment Agreement). Because LoanStream did not participate in or benefit from the Call Campaign, there is no evidence or testimony to support Plaintiff's claim that LoanStream accepted any loans that originated from the Call Campaign and were subsequently routed through Mrs. Roberts' branch. And, in fact, the very opposite is true. LoanStream had robust measures in place to ensure it only accepted and processed loans that

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| complied with the company's policies and applicable law—an expectation and requirement that Mrs. Roberts understood and enforced as the branch manager. Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25.<br><br>Additionally, branch managers (including Cynthia Roberts) were not given unqualified discretion to obtain business and could not, for example, use impermissible telemarketing methods—*a fact confirmed by Mrs. Roberts herself*. *See* Vernon Dep. Tr. 40:5-41:6, 41:18-42:25, 55:19-57:19; Vernon Decl. ¶¶ 7-9, 11, 14-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5.<br><br>Plaintiff's statement that "Vernon acknowledged LoanStream's products and services were being promoted on the calls" is also inaccurate and misleading because Ms. Vernon merely responded to a hypothetical question raised by Plaintiff's counsel concerning what a "reasonable customer" might think after hearing the recorded call from October 19, 2021. However, Ms. Vernon does not have knowledge about what products or services were contemplated by the caller at that time, nor does she have knowledge about any other alleged calls listed in the Unauthenticated Data Set. *See* Vernon Dep. Tr. 78:16-80:3, 83:12-16; Landers Decl. ¶ 6, Ex. 1 (Dkt. 79-1). | |
| 65.   At no point did LoanStream control the manner or means by which the Call Campaign was conducted in any way.<br><br>*Evidence*: Roberts Decl. ¶¶ 12-14; Vernon Decl. ¶¶ 16-21, 24-28, 34. | 65.   **Disputed.**<br><br>Sean Roberts testified LoanStream wanted a verbal agreement that he "weren't going to just start dialing white pages," asked how he received his data, and discussed "how you market." LoanStream provided the funding, including marketing funding, for the C. Roberts branch.<br><br>*Evidence*: S. Roberts Dep. 45:8-25, 46:10-18; C. Roberts Dep. 9:16-25, 44:20-45:18; Vernon Dep. 47:22-48:8. |
| 65.   Moving Party's Response | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Even if the conversations occurred as described above (they did not), such simple conversations do not amount to controlling the "manner or means" by which Global Experts conducted the Call Campaign.  Similarly, even if the funding argued above occurred as described above (it did not), mere payment does not establish control over the "manner and means". <br><br> Mr. Roberts also testified about his relationship with LoanStream, including the fact that he has "never been an employee, agent, or independent contractor of LoanStream" and "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage in, or assist with, the Call Campaign on [its] behalf in any way at no point did LoanStream authorize, request, instruct, or command." Sean Roberts Decl. ¶¶ 4, 13 (Dkt. 81-8). Mr. Roberts has also repeatedly testified that he has never been paid by LoanStream, including for the Call Campaign conducted through Resmo and with Global Experts. Sean Roberts Dep. Tr. 30:23-32:17, 41:12-42:13; Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). In fact, Mr. Roberts testified that he developed the call scripts directly with Global Experts and did not discuss them or the Call Campaign with Ms. Vernon or LoanStream until months *after it concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign *until after it occurred*. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3). <br><br> The only evidence of "funding" by LoanStream is the payment that it made in December 2021—just before the holidays. Ms. Vernon explained, both in her deposition and in her declaration, that LoanStream made the payment because Cynthia Roberts requested an advance against future profits. Vernon Dep. Tr. 30:16-25. The payment was *not* made to fund telemarketing, which LoanStream prohibited. Vernon Dep. Tr. 36:2-20. | |
| 66.    LoanStream did not supervise the Call Campaign in any way, it did not supply any resources, tools, or any other resources to assist in the Call Campaign, and it did not make any payments towards services related to the Call Campaign. <br><br> *Evidence*: Roberts Decl. ¶¶ 12-14; | 66.    **Disputed.** <br><br> Sean Roberts testified LoanStream wanted a verbal agreement that he "weren't going to just start dialing white pages,"  asked how he received his data, and discussed "how you market." LoanStream's P&L records a $▮▮▮ "MARKETING" payment to Premier/Resmo." LoanStream |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Vernon Decl. ¶¶ 16-21, 24-28, 34. | provided the funding, including marketing funding, for the C. Roberts branch. LizDev invoices were sent to LoanStream's accounting.<br><br>*Evidence:* S. Roberts Dep. 45:8-25, 46:10-18; C. Roberts Dep. 9:16-25, 12:14-16, 44:20-45:18 Vernon  Dep. 47:22-48:8; ECF 60-5 (accounting ledger/profit and loss statement) (filed under seal). |

66.     Moving Party's Response

Even if the conversations occurred as described above (they did not), such simple conversations do not amount to supervising Global Experts' conduct of the Call Campaign.

Mr. Roberts testified that no relationship exists between LoanStream and himself and/or Resmo. Sean Roberts Dep. Tr. 31:8-32:13; Sean Roberts Decl. ¶ 5 (Dkt. 81-8). Mr. Roberts has also repeatedly affirmed that he has "never been an employee, agent, or independent contractor of LoanStream." Same thing for Resmo. Sean Roberts Decl. ¶¶ 4-5 (Dkt. 81-8).

For example, Mr. Roberts testified that he has "never been an employee, agent, or independent contractor of LoanStream" and "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage in, or assist with, the Call Campaign on [its] behalf in any way at no point did LoanStream authorize, request, instruct, or command." Sean Roberts Decl. ¶¶ 4, 13 (Dkt. 81-8). Mr. Roberts has also repeatedly testified that he has never been paid by LoanStream, including for the Call Campaign conducted through Resmo and with Global Experts. Sean Roberts Dep. Tr. 30:23-32:17, 41:12-42:13; Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). In fact, Mr. Roberts testified that he developed the call scripts directly with Global Experts and did not discuss them or the Call Campaign with Ms. Vernon or LoanStream until months *after it concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign ***until after it occurred***. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| (Dkt. 81-3).<br><br>Plaintiff's claim that "LoanStream's P&L records a $▮ 'MARKETING' payment to Premier/Resmo" is also contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▮ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—***two months after the $▮ payment was issued and also after the Resmo Call Campaign had already concluded***. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).<br><br>Plaintiff's statement that "LoanStream's P&L records a $▮ 'MARKETING' payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3. | |
| 67.    At no point did LoanStream authorize, request, instruct, or command Sean Roberts—directly, implicitly, or otherwise—to engage in, or assist with, the Call Campaign on LoanStream's behalf. | 67.    **Disputed.**<br><br>Sean Roberts testified LoanStream only wanted to know how he obtained his data and how he marketed and that he gave Vernon "a description of the scripts and how we contact the clients" |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| *Evidence*: Roberts Decl. ¶¶ 12-13; Vernon Decl. ¶¶ 17-20. | at the Bistango meeting.<br><br>*Evidence:* S. Roberts Dep. 45:8-25, 46:10-18, 54:7-24. |

67.    Moving Party's Response

Even if the conversation argued above took place when and how Plaintiff argues (it did not), such a conversation does not amount to LoanStream authorizing, requesting, instructing or commanding Sean Roberts to engage a call campaign on LoanStream's behalf.

Mr. Roberts repeatedly affirmed that "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage in, or assist with, the Call Campaign on [its] behalf in any way." Sean Roberts Decl. ¶¶ 4-5, 8-10 (Dkt. 81-8). Mr. Roberts also repeatedly testified in his deposition that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *Id.* ¶¶ 4-5, 13-14, 18; *see also* Sean Roberts Dep. Tr. 30:23-32:13; Vernon Decl. ¶¶ 20-21 (Dkt. 81-3).

Finally, Mr. Roberts testified that he did not discuss the Call Campaign with Ms. Vernon or LoanStream until months *after it concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign *until after it occurred*. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3). Mr. Roberts also testified that he met with Ms. Vernon at the Bistango restaurant in May or June of 2022—after the Resmo Call Campaign and more than six months *after* Plaintiff answered and recorded a call made to her mother's phone. Sean Roberts Dep. Tr. 55:1-13.

| | |
|---|---|
| 68.    At no point did LoanStream authorize, request, instruct, or command Resmo—directly, implicitly, or otherwise—to engage in, or assist with, the Call Campaign on LoanStream's behalf in any way.<br><br>*Evidence*: Roberts Decl. ¶¶ 12-13; | 68.    **Disputed.**<br><br>Sean Roberts testified LoanStream only wanted to know how he obtained his data and how he marketed and that he described the scripts and contact methods to Vernon at Bistango. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Vernon Decl. ¶¶ 17-20. | *Evidence:* S. Roberts Dep.45:8-25, 46:10-18, 54:7-24. |

68.    Moving Party's Response

Even if the conversation argued above took place when and how Plaintiff argues (it did not), such a conversation does not amount to LoanStream authorizing, requesting, instructing or commanding Resmo to engage a call campaign on LoanStream's behalf.

Mr. Roberts repeatedly affirmed that "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage in, or assist with, the Call Campaign on [its] behalf in any way." Sean Roberts Decl. ¶¶ 4-5, 8-10 (Dkt. 81-8). Mr. Roberts also repeatedly testified in his deposition that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *Id.* ¶¶ 4-5, 13-14, 18; *see also* Sean Roberts Dep. Tr. 30:23-32:13; Vernon Decl. ¶¶ 20-21 (Dkt. 81-3).

Finally, Mr. Roberts testified that he did not discuss the Call Campaign with Ms. Vernon or LoanStream until months *after it concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign *until after it occurred*. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3). Mr. Roberts also testified that he met with Ms. Vernon at the Bistango restaurant in May or June of 2022—after the Resmo Call Campaign and more than six months *after* Plaintiff answered and recorded a call made to her mother's phone. Sean Roberts Dep. Tr. 55:1-13.

| 69.    At no point did Sean Roberts believe that he had the express or implied authority to act on behalf of LoanStream with respect to the Call Campaign.<br><br>*Evidence*: Roberts Decl. ¶¶ 12-13; Vernon Decl. ¶¶ 17-20. | 69.    **Disputed.**<br><br>Undisputed that Sean Roberts so declared; disputed as it conflicts with his deposition testimony that LoanStream wanted a verbal agreement about how he obtained his data and how he marketed and that he described his scripts and contact methods to Vernon. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
|  | *Evidence:* S. Roberts Dep. 45:8-25, 46:10-18 54:7-24. |

69.     Moving Party's Response

Even if the conversation argued above took place when and how Plaintiff argues (it did not), such a conversation does not establish that Sean Roberts thought he had LoanStream's authority to act on LoanStream's with respect to the Call Campaign.

Mr. Roberts' testimony is not in conflict. Mr. Roberts has repeatedly testified that no relationship existed between LoanStream and himself and/or Resmo. For example, Mr. Roberts has repeatedly affirmed that he has "never been an employee, agent, or independent contractor of LoanStream." Same thing for Resmo. Sean Roberts Decl. ¶¶ 4-5 (Dkt. 81-8). Mr. Roberts has also repeatedly affirmed that "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage in, or assist with, the Call Campaign on [its] behalf in any way." *Id.* ¶¶ 4-5, 8-10. Additionally, Mr. Roberts has repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *Id.* ¶¶ 4-5, 13-14, 18; *see also* Sean Roberts Dep. Tr. 30:23-32:13; Vernon Decl. ¶¶ 20-21 (Dkt. 81-3). In fact, Mr. Roberts testified that he developed the call scripts directly with Global Experts and did not discuss them or the Call Campaign with Ms. Vernon or LoanStream until months ***after it concluded***. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign ***until after it occurred***. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3).

| 70.     At no point did Sean Roberts believe that Resmo had the express or implied authority to act on behalf of LoanStream with respect to the Call Campaign.<br><br>*Evidence*: Roberts Decl. ¶¶ 12-13; Vernon Decl. ¶¶ 17-20. | 70.     **Disputed.**<br><br>Undisputed that Sean Roberts so declared; disputed as it conflicts with his deposition testimony described in response to Nos. 67-69.<br><br>*Evidence*: S. Roberts Dep. 45:8-25, 46:10-18, 54:7-24. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 70.    Moving Party's Response<br><br>Even if the conversation argued above took place when and how Plaintiff argues (it did not), such a conversation does not establish that Sean Roberts thought Resmo had LoanStream's authority to act on LoanStream's with respect to the Call Campaign.<br><br>Mr. Roberts' testimony is not in conflict. Mr. Roberts has repeatedly testified that no relationship existed between LoanStream and himself and/or Resmo. For example, Mr. Roberts has repeatedly affirmed that he has "never been an employee, agent, or independent contractor of LoanStream." Same thing for Resmo. Sean Roberts Decl. ¶¶ 4-5 (Dkt. 81-8). Mr. Roberts has also repeatedly affirmed that "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage in, or assist with, the Call Campaign on [its] behalf in any way." *Id.* ¶¶ 4-5, 8-10. Additionally, Mr. Roberts has repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *Id.* ¶¶ 4-5, 13-14, 18; *see also* Sean Roberts Dep. Tr. 30:23-32:13; Vernon Decl. ¶¶ 20-21 (Dkt. 81-3).<br><br>Finally, Mr. Roberts testified that he did not discuss the Call Campaign with Ms. Vernon or LoanStream until months ***after it concluded***. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign ***until after it occurred***. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3). | |
| 71.    Sean Roberts did not receive compensation from a representative, employee, or agent of LoanStream at any point before, during, or after the Call Campaign.<br><br>*Evidence*: Roberts Decl. ¶¶ 14, 18; Vernon Decl. ¶ 18-19. | 71.    **Disputed.**<br><br>LoanStream's P&L records a $▮▮▮ "MARKETING" payment to Premier/Resmo, Sean Roberts' company, and Cynthia Roberts testified LoanStream "paid invoices " and "helped us have funding by paying marketing"<br><br>*Evidence:* (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal); C. Roberts Dep. 10:13-14, |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | 29:11-14. |

71.     Moving Party's Response

Several issues exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

Plaintiff's claim that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier/Resmo" is contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▮▮▮ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—*two months after the $▮▮▮ payment was issued and also after the Resmo Call Campaign had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▮▮▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮▮▮ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).

Plaintiff's statement that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3.

Mr. Roberts also testified about his relationship with LoanStream, including the

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| fact that he has "never been an employee, agent, or independent contractor of LoanStream" and "at no point did LoanStream authorize, request, instruct, or command—whether directly, implicitly, or otherwise—Resmo or [him] to engage in, or assist with, the Call Campaign on [its] behalf in any way at no point did LoanStream authorize, request, instruct, or command." Sean Roberts Decl. ¶¶ 4, 13 (Dkt. 81-8). Mr. Roberts has also repeatedly testified that he has never been paid by LoanStream, including for the Call Campaign conducted through Resmo and with Global Experts. Sean Roberts Dep. Tr. 30:23-32:17, 41:12-42:13; Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). In fact, Mr. Roberts testified that he developed the call scripts directly with Global Experts and did not discuss them or the Call Campaign with Ms. Vernon or LoanStream until months *after it concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that she did not learn about the Call Campaign *until after it occurred*. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3).<br><br>Finally, Plaintiff's assertion that "Cynthia Roberts testified LoanStream paid invoices" is also misleading. In truth, Plaintiff's counsel asked Mrs. Roberts if "LoanStream provide[s] any funding or cash advances for the purpose of marketing, or did it just pay invoices?" Mrs. Roberts' responded that LoanStream "paid invoices"—no other context or explanation was provided. Mrs. Roberts also testified that she submitted invoices to LoanStream accounting for payment (because she was not authorized to pay vendor invoices on the company's behalf) and further testified that she was not involved in any call campaigns during her employment at LoanStream and she likewise confirmed that telemarketing campaigns are expressly prohibited at LoanStream. Cynthia Roberts Dep. Tr. 12:10-16, 29:11-30:5, 37:15-22, 40:23-25, 49:14-59:25. | |
| 72.   At no point did LoanStream pay Sean Roberts for the Global Experts Invoices.<br><br>*Evidence*: Roberts Decl. ¶ 18; Vernon Decl. ¶ 27. | 72.   **Disputed in part**.<br><br>Undisputed that there is no record of a payment line-itemed to the "Global Experts Invoices."<br><br>Disputed to the extent it denies that LoanStream funded the campaign. Sean Roberts testified LoanStream was provided LizDev's invoices so that they could provide the funding or justify the funding, and LoanStream's P&L |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | records a $[redacted] "MARKETING" payment to Premier/Resmo.<br><br>*Evidence*: S. Roberts Dep. 52:15-53:8; (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal) |

72.     Moving Party's Response

Mr. Roberts repeatedly testified in his deposition that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. Sean Roberts Decl. ¶¶ 4-5, 13-14, 18 (Dkt. 81-8); *see also* Sean Roberts Dep. Tr. 30:23-32:13. Mr. Roberts also testified that he did not inform LoanStream about the Call Campaign until after it occurred. Similarly, Ms. Vernon did not learn about the Call Campaign ***until after it occurred***. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3).

Plaintiff's statement that "LoanStream funded the campaign" is also unsupported by the evidence cited. Sean Roberts testified unambiguously that LoanStream did not pay for the Call Campaign he organized. Sean Roberts Dep. Tr. 31:8-32:21; Sean Roberts Decl. ¶¶ 5, 12, 14 (Dkt. 81-8).

Additionally, Plaintiff's statement that "LoanStream was provided LizDev's invoices so that they could provide the funding" is incorrect and misleading since ***only one LizDev Invoice*** was submitted to LoanStream—and even then, it was never paid. *See* Vernon Dep. Tr. 43:19-44:13, 48:13-14. The LizDev Invoice is described as a "New Data Invoice" issued for "50k records @ .20." *See* Landers Decl. ¶ 8, Ex. 6 (Dkt. 80-1). But Sean Roberts, who independently organized the Call Campaign, testified that he purchased opt-in leads directly from LizDev and then used the information to "identify potential leads for three different companies: (i) American Financial Network, Inc. ("AFN"); (ii) Lending 3 (also known as "L3"); and (iii) LoanStream." Sean Roberts Decl. ¶¶ 8-10 (Dkt. 81-8). The mere fact that LizDev sent a single invoice to LoanStream, which LoanStream never paid, does not indicate or establish that the Call Campaign was performed "on behalf of" only LoanStream—an assumption that Plaintiff now urges. Moreover, despite having an opportunity to do so, Ms. Stone did not testify (and Plaintiff provides no other evidence to suggest) that the LizDev Invoice was paid for a simple reason—it was not.

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Plaintiff's claim that "LoanStream's P&L records a $⬛ 'MARKETING' payment to Premier/Resmo" is also contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $⬛ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—*two months after the $⬛ payment was issued and also after the Resmo Call Campaign had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $⬛ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $⬛ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). <br><br> Plaintiff's statement that "LoanStream's P&L records a $⬛ 'MARKETING' payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3. | |
| 73.   At no point did LoanStream pay Resmo for the Global Experts Invoices. <br><br> *Evidence*: Landers Decl. ¶ 5, 8 & Ex. 5 (Global Experts Invoices); Roberts Decl. ¶ 18; Vernon Decl. ¶ 27. | 73.   **Disputed.** <br><br> Undisputed that there is no record of a payment line-itemed to the "Global Experts Invoices." <br><br> Disputed to the extent it denies that LoanStream funded the campaign. Sean Roberts testified LoanStream was |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | provided LizDev's invoices so that they could provide the funding or justify the funding, and LoanStream's P&L records a $▉▉▉ "MARKETING" payment to Premier/Resmo. Cynthia Roberts testified LoanStream paid invoices. Vernon testified that she responded to an email from Sean Roberts asking for a cost center number for a past due invoice. *Evidence:* S. Roberts Dep. 52:15-53:8; (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal); C. Roberts Dep. 10:13-14, 29:11-14; Vernon Dep. 61:11-24. |

73.    Moving Party's Response

Mr. Roberts repeatedly testified in his deposition that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. Sean Roberts Decl. ¶¶ 4-5, 13-14, 18 (Dkt. 81-8); *see also* Sean Roberts Dep. Tr. 30:23-32:13. Mr. Roberts also testified that he did not inform LoanStream about the Call Campaign until after it occurred. Similarly, Ms. Vernon did not learn about the Call Campaign ***until after it occurred***. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3).

Plaintiff's statement that "LoanStream funded the campaign" is also unsupported by the evidence cited. Sean Roberts testified unambiguously that LoanStream did not pay for the Call Campaign he organized. Sean Roberts Dep. Tr. 31:8-32:21; Sean Roberts Decl. ¶¶ 5, 12, 14 (Dkt. 81-8).

Additionally, Plaintiff's statement that "LoanStream was provided LizDev's invoices so that they could provide the funding" is incorrect and misleading since ***only one LizDev Invoice*** was submitted to LoanStream—and even then, it was never paid. *See* Vernon Dep. Tr. 43:19-44:13, 48:13-14. The LizDev Invoice is described as a "New Data Invoice" issued for "50k records @ .20." *See* Landers Decl. ¶ 8, Ex. 6 (Dkt. 80-1). But Sean Roberts, who independently organized the Call Campaign, testified that he purchased opt-in leads directly from LizDev and

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| then used the information to "identify potential leads for three different companies: (i) American Financial Network, Inc. ("AFN"); (ii) Lending 3 (also known as "L3"); and (iii) LoanStream." Sean Roberts Decl. ¶¶ 8-10 (Dkt. 81-8). The mere fact that LizDev sent a single invoice to LoanStream, which LoanStream never paid, does not indicate or establish that the Call Campaign was performed "on behalf of" only LoanStream—an assumption that Plaintiff now urges. Moreover, despite having an opportunity to do so, Ms. Stone did not testify (and Plaintiff provides no other evidence to suggest) that the LizDev Invoice was paid for a simple reason—it was not. | |
| | |
| Plaintiff's claim that "LoanStream's P&L records a $▮▮▮▮ 'MARKETING' payment to Premier/Resmo" is also contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▮▮▮▮ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—***two months after the $▮▮▮▮ payment was issued and also after the Resmo Call Campaign had already concluded***. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▮▮▮▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮▮▮▮ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). | |
| | |
| Plaintiff's statement that "LoanStream's P&L records a $▮▮▮▮ 'MARKETING' payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of | |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| foundation and hearsay. *See* Dkt. 85-6, 87-3.<br><br>Finally, Plaintiff's assertion that "Cynthia Roberts testified LoanStream helped us have funding by paying marketing and paid invoices" is also misleading. In truth, Plaintiff's counsel asked Mrs. Roberts if "LoanStream provide[s] any funding or cash advances for the purpose of marketing, or did it just pay invoices?" Mrs. Roberts' responded that LoanStream "paid invoices"—no other context or explanation was provided. Mrs. Roberts also testified that she submitted invoices to LoanStream accounting for payment (because she was not authorized to pay vendor invoices on the company's behalf) and further testified that she was not involved in any call campaigns during her employment at LoanStream and she likewise confirmed that telemarketing campaigns are expressly prohibited at LoanStream. Cynthia Roberts Dep. Tr. 12:10-16, 29:11-30:5, 37:15-22, 40:23-25, 49:14-59:25. | |
| 74.    Neither LoanStream nor Serene Vernon learned about the Call Campaign until after the campaign concluded.<br><br>*Evidence*: Landers Decl. ¶ 11 & Ex. 7 (Sean Roberts Dep. Tr.) 54:10-55:13; Roberts Decl. ¶ 19; Vernon Decl. ¶ 11. | 74.    **Disputed.**<br><br>LoanStream's P&L records the $▓▓▓ "MARKETING" payment to Premier/Resmo as a December 22, 2021 transaction. Sean Roberts testified he communicated with Vernon about lead generation and payments and met her at Bistango, where he described the scripts and contact methods. LoanStream received and "discarded" a LizDev invoice that had language that the leads were not TCPA compliant.<br><br>*Evidence:* (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal); S. Roberts Dep. 51:15-52:7, 54:7-24; Vernon Dep. 43:19-24, 46:5-8, 48:18-24, 61:11-24; Ex. 6 to Landers Decl. (LizDev Invoice) (filed under seal). |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|

74. Moving Party's Response

Several issues exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

Plaintiff's claim that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier/Resmo" is contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▮▮▮ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—*two months after the $▮▮▮ payment was issued and also after the Resmo Call Campaign had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▮▮▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮▮▮ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8). Mr. Roberts also testified that he met with Ms. Vernon at the Bistango restaurant in May or June of 2022—after the Resmo Call Campaign and more than six months *after* Plaintiff answered and recorded a call made to her mother's phone. Sean Roberts Dep. Tr. 55:1-13.

Plaintiff's statement that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| foundation and hearsay. *See* Dkt. 85-6, 87-3.<br><br>Mr. Roberts also repeatedly testified that the Call Campaign was conducted without LoanStream's knowledge—and neither he nor Resmo were ever compensated for their actions. Sean Roberts Decl. ¶¶ 4-5, 8-10, 12-14 (Dkt. 81-8). Mr. Roberts also testified that he did not inform LoanStream about the Call Campaign until after it occurred. Similarly, Ms. Vernon did not learn about the Call Campaign *until after it occurred*. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3).<br><br>Ms. Vernon did indeed testify that a single invoice was sent from LizDev to LoanStream and "appears to have just been discarded by [LoanStream's] accounting team." However, contrary to Plaintiff's misleading statement, Ms. Vernon also confirmed that LoanStream did not pay the LizDev Invoice and that LizDev has never been an approved vendor of LoanStream. Vernon Dep. Tr. 48:13-24; Vernon Decl. ¶¶ 22-26 (Dkt. 81-3).<br><br>Moreover, Plaintiff's reliance on the deposition testimony of Ms. Vernon is misplaced because Ms. Vernon does not have any knowledge about the policies and practices of Resmo and did not review the *undated* LizDev Invoice when it was allegedly first sent to LoanStream (and therefore could only testify about the boilerplate language after the fact). *See* Sean Roberts Dep. Tr. 43:10-45:7, 54:7-25; Vernon Dep. Tr. 43:19-44:13, 74:13-14. Moreover, how Resmo obtained opt-in call data is largely unrelated to the specific ways in which Resmo and/or Global Experts allegedly conducted the Call Campaign, which again, Ms. Vernon would not have substantive information about. | |
| 75.    According to Serene Vernon, LoanStream and she did not learn about the Call Campaign until after the filing of the lawsuit in 2024, years after the campaign concluded in 2021.<br><br>*Evidence*: Vernon Decl. ¶ 12. | 75.    **Disputed.**<br><br>Undisputed that Vernon so declared.<br><br>Disputed as it conflicts with the LoanStream's P&L records which record a $▓▓▓ "MARKETING" payment to Premier/Resmo as a December 22, 2021 transaction. Sean Roberts testified he communicated with Vernon about lead generation and payments and met her at Bistango, |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| | where he described the scripts and contact methods. LoanStream received and "discarded" a LizDev invoice that the leads were not TCPA compliant. |
| | *Evidence:* (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal); S. Roberts Dep. 51:15-52:7, 54:7-24; Vernon Dep. 43:19-24, 46:5-8, 48:18-24, 61:11-24; Ex. 6 to Landers Decl. (LizDev Invoice) (filed under seal). |

75.    Moving Party's Response

Several issues exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

Plaintiff's claim that "LoanStream's P&L records a $▇▇ 'MARKETING' payment to Premier/Resmo" is contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is *not* corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▇▇ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—*two months after the $▇▇ payment was issued and also after the Resmo Call Campaign had already concluded*. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▇▇ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▇▇ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).

Plaintiff's statement that "LoanStream's P&L records a $▇▇ 'MARKETING'

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
| --- | --- |

payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3.

Mr. Roberts also repeatedly testified that the Call Campaign was conducted without LoanStream's knowledge—and neither he nor Resmo were ever compensated for their actions. Sean Roberts Decl. ¶¶ 4-5, 8-10, 12-14 (Dkt. 81-8). Mr. Roberts also testified that he did not inform LoanStream about the Call Campaign until after it occurred. Similarly, Ms. Vernon did not learn about the Call Campaign *until after it occurred*. *See* Sean Roberts Decl. ¶ 19 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13 (Dkt. 81-3). Mr. Roberts also testified that he met with Ms. Vernon at the Bistango restaurant in May or June of 2022—after the Resmo Call Campaign and more than six months *after* Plaintiff answered and recorded a call made to her mother's phone. Sean Roberts Dep. Tr. 55:1-13.

Ms. Vernon did indeed testify that a single invoice was sent from LizDev to LoanStream and "appears to have just been discarded by [LoanStream's] accounting team." However, contrary to Plaintiff's misleading statement, Ms. Vernon also confirmed that LoanStream did not pay the LizDev Invoice and that LizDev has never been an approved vendor of LoanStream. Vernon Dep. Tr. 48:13-24; Vernon Decl. ¶¶ 22-26 (Dkt. 81-3).

Moreover, Plaintiff's reliance on the deposition testimony of Ms. Vernon is misplaced because Ms. Vernon does not have any knowledge about the policies and practices of Resmo and did not review the *undated* LizDev Invoice when it was allegedly first sent to LoanStream (and therefore could only testify about the boilerplate language after the fact). *See* Sean Roberts Dep. Tr. 43:10-45:7, 54:7-25; Vernon Dep. Tr. 43:19-44:13, 74:13-14. Moreover, how Resmo obtained opt-in call data is largely unrelated to the specific ways in which Resmo and/or Global Experts allegedly conducted the Call Campaign, which again, Ms. Vernon would not have substantive information about.

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 76.    Sean Roberts is not aware of LoanStream ever paying Global Experts directly for the Global Experts Invoices.<br><br>*Evidence*: Roberts Decl. ¶ 18. | 76.    **Undisputed.**<br><br>Undisputed that LoanStream made no *direct* payment to Global Experts. |
| 77.    LoanStream has no record of ever paying Global Experts for any work it performed.<br><br>*Evidence*: Vernon Decl. ¶¶ 27-29. | 77.    **Disputed in part.**<br><br>Undisputed as to a *direct* payment to Global Experts.<br><br>However, disputed in that LoanStream's P&L records which record a $▮▮▮ "MARKETING" payment to Premier/Resmo as a December 22, 2021 transaction.<br><br>*Evidence:* (ECF 60-5) (accounting ledger/profit and loss statement) (filed under seal). |

77.    Moving Party's Response

Several issues exist with this dispute. Plaintiff not only relies on several unauthenticated and inadmissible statements, but she also ignores admissible documentary evidence and sworn deposition testimony.

Plaintiff's claim that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier/Resmo" is contradicted in several ways. Although Plaintiff believes that LoanStream paid Sean Roberts and/or Resmo for the Call Campaign, that theory that is ***not*** corroborated by documents or sworn testimony. For example, the P&L Statement indicates that the $▮▮▮ payment was issued on December 22, 2021. *See* Dkt. 85-6, 87-3. But the email from Sean Roberts to Ms. Vernon (asking for additional monies) was sent in February 2022—***two months after the $▮▮▮ payment was issued and also after the Resmo Call Campaign had already concluded***. Sean Roberts Decl. ¶ 19 (Dkt. 81-8). Ms. Vernon also testified that the $▮▮▮ payment was "actually an advance against future . . . profits" and LoanStream made the payment, even though Mrs. Roberts' branch was never profitable, because the request "pulled at [her] heartstrings . . . right

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| before Christmas." Vernon Dep. Tr. 30:16-25. In other words, the $▮▮▮ payment was *not* for marketing-related costs, as the P&L Statement indicates, and it was completely unrelated to Mr. Roberts' subsequent email to Ms. Vernon in February 2022. Mr. Roberts has also repeatedly testified that neither he nor Resmo have ever been paid by LoanStream, including for the Call Campaign with Global Experts. *See* Sean Roberts Decl. ¶¶ 4-5, 14, 18 (Dkt. 81-8).<br><br>Plaintiff's statement that "LoanStream's P&L records a $▮▮▮ 'MARKETING' payment to Premier/Resmo" is also improper because Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3. | |
| 78.    At no point was LizDev an approved vendor of LoanStream.<br><br>*Evidence*: Vernon Decl. ¶ 24. | 78.    **Disputed in part.**<br><br>Undisputed in that Global Experts was not a formally approved vendor.<br><br>Disputed to the extent that any testimony adduced implies that such approval was required. |
| 78.    Moving Party's Response<br><br>Plaintiff cites no evidence in support of her argument in dispute of this fact. Ms. Vernon previously testified that LoanStream has a formal vendor onboard process (which she described in detail during her deposition). *See* Vernon Dep. Tr. 73:1-74:14; Vernon Decl. ¶¶ 4, 24-29 (Dkt. 81-3). Mrs. Roberts also confirmed that LoanStream had multiple policies in place, which she read and agreed to following, including how and when to "contract with vendors." Cynthia Roberts Dep. Tr. 58:2-59:16. | |

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| 79.    The Call Campaign did not generate any leads that were fulfilled for LoanStream's benefit at any time.<br><br>*Evidence*: Vernon Decl. ¶ 29. | 79.    **Disputed.**<br><br>Vernon testified LoanStream accepted the loans the campaign generated, which were LoanStream loans.<br><br>*Evidence:* Vernon Dep. 49:6-9. |

79.    Moving Party's Response

Plaintiff misstates the testimony. There is a difference between LoanStream funding loans generated by Mrs. Roberts' branch, and LoanStream funding loans that arose from the Global Experts Call Campaign. Plaintiff's argument assumes, without evidence, that the few loans the branch generated came from the Call Campaign. When asked whether LoanStream accepted business generated by Cynthia Roberts' branch, Ms. Vernon testified that "Yeah, there were a few loans that came through the branch. Not very many, but there were a few." Vernon Dep. Tr. 49:6-9. But Ms. Vernon did *not* testify that LoanStream "accepted the loans the campaign generated." Ms. Vernon also repeatedly testified that LoanStream does not participate in telemarketing campaigns—a fact Mrs. Roberts likewise confirmed when discussing the policies and practices she agreed to follow as a LoanStream employee—***and more importantly, LoanStream never participated in Resmo's Call Campaign and it never received any direct or indirect financial benefit from it***. Vernon Dep. Tr. 49:23-50:5, 59:1-7; Vernon Decl. ¶¶ 19-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5 (Non-Producing Branch Manager Employment Agreement). Because LoanStream did not participate in or benefit from the Call Campaign, there is no evidence or testimony to support Plaintiff's claim that LoanStream accepted any loans that originated from the Call Campaign and were subsequently routed through Mrs. Roberts' branch. And, in fact, the very opposite is true. LoanStream had robust measures in place to ensure it only accepted and processed loans that complied with the company's policies and applicable law—an expectation and requirement that Mrs. Roberts understood and enforced as the branch manager. Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25.Additionally, branch managers (including Cynthia Roberts) were not given unqualified discretion to obtain business and could not, for example, use impermissible telemarketing methods—***a fact confirmed by Mrs. Roberts herself***. *See* Vernon Dep. Tr. 40:5-41:6, 41:18-42:25, 55:19-57:19; Vernon Decl. ¶¶ 7-9, 11, 14-22, 26-29, 34 (Dkt. 81-3);

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5. | |
| 80.    LoanStream received no revenue from the Call Campaign.<br><br>*Evidence*: Vernon Decl. ¶ 29. | 80.    **Disputed.**<br><br>Vernon testified LoanStream accepted the loans the campaign generated, which were LoanStream loans, acknowledged LoanStream's products and services were being promoted on the calls, and testified that the branch was *never* profitable.<br><br>*Evidence:* Vernon Dep. 30:16-25; 49:6-9, 84:9-13. |

80.    Moving Party's Response

Plaintiff misstates the testimony. There is a difference between LoanStream funding loans generated by Mrs. Roberts' branch, and LoanStream funding loans that arose from the Global Experts Call Campaign. Plaintiff's argument assumes, without evidence, that the few loans the branch generated came from the Call Campaign. When asked whether LoanStream accepted business generated by Cynthia Roberts' branch, Ms. Vernon testified that "Yeah, there were a few loans that came through the branch. Not very many, but there were a few." Vernon Dep. Tr. 49:6-9. But Ms. Vernon did ***not*** testify that LoanStream "accepted the loans the campaign generated." Ms. Vernon also repeatedly testified that LoanStream does not participate in telemarketing campaigns—a fact Mrs. Roberts likewise confirmed when discussing the policies and practices she agreed to follow as a LoanStream employee—***and more importantly, LoanStream never participated in Resmo's Call Campaign and it never received any direct or indirect financial benefit from it***. Vernon Dep. Tr. 49:23-50:5, 59:1-7; Vernon Decl. ¶¶ 19-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5 (Non-Producing Branch Manager Employment Agreement). Because LoanStream did not participate in or benefit from the Call Campaign, there is no evidence or testimony to support Plaintiff's claim that LoanStream accepted any loans that originated from the Call Campaign and were subsequently routed through Mrs. Roberts' branch. And, in fact, the very opposite is true. LoanStream had robust measures in place to ensure it only accepted and processed loans that complied with the company's policies and applicable law—an expectation and

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| requirement that Mrs. Roberts understood and enforced as the branch manager. Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25.<br><br>Additionally, branch managers (including Cynthia Roberts) were not given unqualified discretion to obtain business and could not, for example, use impermissible telemarketing methods—*a fact confirmed by Mrs. Roberts herself*. *See* Vernon Dep. Tr. 40:5-41:6, 41:18-42:25, 55:19-57:19; Vernon Decl. ¶¶ 7-9, 11, 14-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5.<br><br>Plaintiff's statement that "Vernon acknowledged LoanStream's products and services were being promoted on the calls" is also inaccurate and misleading because Ms. Vernon merely responded to a hypothetical question raised by Plaintiff's counsel concerning what a "reasonable customer" might think after hearing the recorded call from October 19, 2021. However, Ms. Vernon does not have knowledge about what products or services were contemplated by the caller at that time, nor does she have knowledge about any other alleged calls listed in the Unauthenticated Data Set. *See* Vernon Dep. Tr. 78:16-80:3, 83:12-16; Landers Decl. ¶ 6, Ex. 1 (Dkt. 79-1). | |
| 81.     LoanStream did not generate any business from the Call Campaign.<br><br>*Evidence*: Vernon Decl. ¶ 29. | 81.     **Disputed.**<br><br>Vernon testified LoanStream accepted the loans the campaign generated, which were LoanStream loans.<br><br>*Evidence:* Vernon Dep. 49:6-9. |

81.     Moving Party's Response

Plaintiff misstates the testimony. There is a difference between LoanStream funding loans generated by Mrs. Roberts' branch, and LoanStream funding loans that arose from the Global Experts Call Campaign. Plaintiff's argument assumes, without evidence, that the few loans the branch generated came from the Call Campaign. When asked whether LoanStream accepted business generated by Cynthia Roberts' branch, Ms. Vernon testified that "Yeah, there were a few loans that came through the branch. Not very many, but there were a few." Vernon Dep. Tr. 49:6-9. But Ms. Vernon did *not* testify that LoanStream "accepted the loans the campaign generated." Ms. Vernon also repeatedly testified that LoanStream does

| Moving Party's Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Facts and Supporting Evidence |
|---|---|
| not participate in telemarketing campaigns—a fact Mrs. Roberts likewise confirmed when discussing the policies and practices she agreed to follow as a LoanStream employee—*and more importantly, LoanStream never participated in Resmo's Call Campaign and it never received any direct or indirect financial benefit from it*. Vernon Dep. Tr. 49:23-50:5, 59:1-7; Vernon Decl. ¶¶ 19-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5 (Non-Producing Branch Manager Employment Agreement). Because LoanStream did not participate in or benefit from the Call Campaign, there is no evidence or testimony to support Plaintiff's claim that LoanStream accepted any loans that originated from the Call Campaign and were subsequently routed through Mrs. Roberts' branch. And, in fact, the very opposite is true. LoanStream had robust measures in place to ensure it only accepted and processed loans that complied with the company's policies and applicable law—an expectation and requirement that Mrs. Roberts understood and enforced as the branch manager. Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25. <br><br> Additionally, branch managers (including Cynthia Roberts) were not given unqualified discretion to obtain business and could not, for example, use impermissible telemarketing methods—*a fact confirmed by Mrs. Roberts herself*. *See* Vernon Dep. Tr. 40:5-41:6, 41:18-42:25, 55:19-57:19; Vernon Decl. ¶¶ 7-9, 11, 14-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5. | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| 82. Plaintiff Kimberly Hudson-Bryant personally answered calls placed to the Number and recorded the October 19, 2021 call. <br><br> *Evidence*: ECF 81-10 (call recording) (filed under seal). | 82. **Disputed.** <br><br> As relevant here, Plaintiff answered one call made to the Number, which was previously defined as the "Global Experts Call." The first call, placed on October 12, 2021, was unanswered. Plaintiff answered and recorded the second call on October 19, 2021. <br><br> *Evidence:* FAC ¶¶ 19-20; Pl.'s Dep. Tr. |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | 185:21-187:3, 188:4-189:12, 189:21-190:21. |
| 83.    During the recorded October 19, 2021 call, the caller stated that she was calling from "LoanStream Mortgage."<br><br>*Evidence:* ECF 81-10 (call recording) (filed under seal). | 83.    **Disputed in part.**<br><br>Undisputed that Plaintiff recorded a call on October 19, 2021.<br><br>Disputed that the caller stated she was calling "***from*** LoanStream Mortgage." According to the audio file created and produced by Plaintiff, the caller stated that she was calling "***with*** LoanStream Mortgage."<br><br>*Evidence*: Landers Decl. ¶ 5, Ex. 1 (Dkt. 79-1). |
| 84.    The data set LizDev produced in discovery reflects that the Number was called three times.<br><br>*Evidence:* Stone Decl. (ECF 58-5) ¶¶ 6-7; Ex. 4 to Landers Dec. (filed under seal), ("called_count" references "3"). | 84.    **Disputed in part.**<br><br>Undisputed that the Unauthenticated Data Set purports to indicate that Eleanora's Number was called *three* times.<br><br>Disputed that the Unauthenticated Data Set confirms all three calls came from the same caller or for the same purpose. LoanStream has shown that "Composite Exhibit A" – i.e. what Plaintiff refers to as the "LizDev call logs" and what LoanStream has defined as the "Unauthenticated Data Set" – is not trustworthy because, among other things, it is not authenticated and it lists three phone calls made to the Number, but the AT&T records, and Plaintiff's own testimony, establish there were only two calls to the Number.  The |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | Unauthenticated Data Set also does not reference *when* each call occurred.<br><br>*Evidence*: Landers Decl. ¶ 8, 10 & Ex. 4 (Dkt. 79-2), Ex. 13 ¶ 40 (Moran Report) (Dkt. 79-4); Sean Roberts Decl. ¶¶ 8-11 (Dkt. 81-8). |
| 85.   Plaintiff's AT&T telephone records reflect at least two calls placed to the Number from ▮▮▮▮▮▮▮.<br><br>*Evidence:* Ex. 9 to Landers Dec. (redacted under seal), ECF 81-17 at Page ID 2285-86. | 85.   **Disputed.**<br><br>The AT&T records, which Defendant produced in discovery, only show that two calls were made to the Number from ▮▮▮▮▮▮—one on October 12, 2021, and one on October 19, 2021.<br><br>*Evidence:* Landers Decl. ¶ 13, Ex. 9 (Dkt. 79-3). |
| 86.   Plaintiff's January 3, 2023 written letter to LoanStream identified two specific calls, on October 12, 2021 and October 19, 2021.<br><br>*Evidence:* ECF 81-2, Ex. 4 to Landers Dec. | 86.   **Disputed in part.**<br><br>Undisputed that Plaintiff produced a document in discovery titled "LoanStream Mortgage DL", which states that two "illegal communications" were made to Eleanora's Number—one on October 12, 2021, and one on October 19, 2021.<br><br>Disputed that Plaintiff wrote the letter on her own behalf. As the letter indicates (and as Plaintiff testified in her deposition), Plaintiff composed and sent the letter on Eleanora's behalf based on the belief that ***Eleanora's phone and phone number received illegal phone calls***.<br><br>Disputed to the extent the "fact" implies |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | LoanStream received the letter dated January 3, 2023. LoanStream has no record of the letter.<br><br>*Evidence:* Pl.'s Dep. Tr. 206:24-213:17 & Ex. 14 (Deposition Exhibit). |
| 87. The telemarketing campaign solicited recipients for LoanStream's mortgage products.<br><br>*Evidence:* Stone Decl. ¶ 4; ECF 81-10 (call recording) (filed under seal). | 87. **Disputed.**<br><br>Plaintiff's statement incorrectly assumes facts not in evidence and contains legal conclusions (*e.g.*, that a "telemarketing campaign" occurred for/on behalf of LoanStream, that calls were "solicitations" under the TCPA, etc.).<br><br>The record currently shows that Eleanora's Number received a single call from an individual who, although not affiliated with LoanStream, stated she was calling "with LoanStream Mortgage." Nothing else – and there is no evidence that -- supports the suggestion that a "telemarketing campaign" "solicited recipients for LoanStream's mortgage products."<br><br>*Evidence:* Landers Decl. ¶ 5, Ex. 1 (Dkt. 79-1); Vernon Decl. ¶¶ 17-21, 28-29, 34 (Dkt. 81-3); Sean Roberts Decl. ¶ 20 (Dkt. 81-8). |
| 88. Sean Roberts ran the calling campaign for LoanStream.<br><br>*Evidence:* Stone Decl. ¶ 4; S. Roberts Dep. 52:8-21, 52:15-53:8. | 88. **Disputed.**<br><br>Plaintiff's statement incorrectly assumes facts not in evidence and contains legal conclusions (*e.g.*, that a "calling campaign" occurred for/on behalf of LoanStream, that LoanStream knew |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | about and/or oversaw the campaign, that Sean Roberts acted "for LoanStream," etc.).<br><br>Additionally, as evidenced by sworn testimony from Serene Vernon and Sean Roberts, no relationship existed between Resmo and LoanStream, including because LoanStream did not approach Resmo to conduct a call campaign and Resmo did not offer to perform a campaign on LoanStream's behalf.<br><br>*Evidence:* Sean Roberts Dep. Tr. 30:23-32:17, 41:20-42:5; Sean Roberts Decl. ¶¶ 5, 13-14, 18, 20 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13, 15-21, 34 (Dkt. 81-3). |
| 89.   Resmo/Premier Financial Marketing hired LizDev to supply leads and hired Global Experts to place the calls.<br><br>*Evidence:* S. Roberts Dep. 52:15-53:8; Stone Decl. ¶¶ 4, 7. | 89.   **Disputed in part.**<br><br>Undisputed that Sean Roberets merely purchased "opt – in leads from LizDev" and then provided the information to Global Experts..<br><br>Disputed to the extent this statement suggests or assumes facts not in evidence and/or contains legal conclusions (*e.g.*, that the calls were made for or "on behalf of" LoanStream, Resmo "hired" LizDev, Resmo "hired" Global Experts, etc.). Additionally, as evidenced by sworn testimony, no relationship existed between Resmo and LoanStream, including because (i) LoanStream did not approach Resmo to conduct a call campaign and (ii) Resmo did not offer to perform a campaign on |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | LoanStream's behalf.<br><br>*Evidence:* Sean Roberts Dep. Tr. 23:2-19, 24:2-18, 30:23-32:17, 33:8-21, 39:15-40:1, 41:12-42:13; Sean Roberts Decl. ¶¶ 5, 13-14, 18, 20 (Dkt. 81-8); Vernon Decl. ¶¶ 12-13, 15-21, 24-28, 34 (Dkt. 81-3). |
| 90.    Global Experts physically placed the calls in connection with the LoanStream campaign.<br><br>*Evidence:* Stone Decl. ¶ 7. | 90.    **Disputed.**<br><br>Plaintiff's statement incorrectly suggests or assumes facts not in evidence (*e.g.*, that a call "campaign" occurred for/on behalf of LoanStream).<br><br>Additionally, as evidenced by sworn testimony, no relationship existed between Resmo and LoanStream, including because (i) LoanStream did not approach Resmo to conduct a call campaign and (ii) Resmo did not offer to perform a campaign on LoanStream's behalf.<br><br>*Evidence:* Sean Roberts Dep. Tr. 23:2-19, 24:2-18, 30:23-32:17, 33:8-21, 39:15-40:1, 41:12-42:13; Sean Roberts Decl. ¶¶ 5, 13-14, 18, 20 (Dkt. 81-8); Cynthia Roberts Dep. Tr. 37:15-22, 40:5-25, 99:13-25; Vernon Dep. Tr. 49:25-50:5, 59:1-7; Vernon Decl. ¶¶ 12-13, 15-21, 34 (Dkt. 81-3). |
| 91.    LoanStream employed Cynthia Roberts, the wife of Sean Roberts, as a W-2 employee and branch manager.<br><br>*Evidence:* C. Roberts Dep. 9:1-10:15, | 91.    **Undisputed.** |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| 20:2-8, 44:20-45:18. | |
| 92.   LoanStream funded the branch and paid its rent.<br><br>*Evidence:* C. Roberts Dep. 9:1-10:15, 44:20-45:18. | 92.   **Disputed in part.**<br><br>Undisputed that LoanStream supports its branches in various ways, including by paying rent for commercial space to conduct business.<br><br>Disputed to the extent this statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence (*e.g.*, that LoanStream ratified all activities performed by the branch, even if they did not comply with, or were inconsistent with, the company's standard policies and practices).<br><br>*Evidence:* Vernon Dep. Tr. 40:5-41:6, 41:18-42:25, 55:19-57:19, 62:2-63:13; Vernon Decl. ¶¶ 7-9 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5. |
| 93.   LoanStream accepted the loans the branch generated.<br><br>*Evidence:* Vernon Dep. 49:6-9. | 93.   **Disputed in part.**<br><br>Undisputed that LoanStream accepts loans generated by its branches, as long as they comply with internal policies and applicable laws and regulations.<br><br>Disputed to the extent this statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence (*e.g.*, that LoanStream received benefits from loans identified through an alleged call campaign). For example, Ms. Vernon's deposition testimony confirms that one goal of a |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
| --- | --- |
| | LoanStream branch is to identify and secure consumer direct loans through local networking and "B2B" relationships. However, branch managers (including Cynthia Roberts) were not given unqualified discretion to obtain business and could not, for example, use impermissible telemarketing methods. Furthermore, Ms. Vernon unequivocally stated that the alleged Call Campaign did not generate any leads that were fulfilled for LoanStream's benefit at any time. LoanStream received no revenue from the Call Campaign. And LoanStream did not generate any business from the Call Campaign.<br><br>*Evidence:* Vernon Dep. Tr. 40:5-41:6, 41:18-42:25, 55:19-57:19; Vernon Decl. ¶¶ 7-9, 11, 14-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5. |
| 94. LoanStream knew that Sean Roberts, who had lost his DFPI license, was associated with the branch.<br><br>*Evidence*: Vernon Dep. 59:8-18, 60:1-12. | 94. **Disputed.**<br><br>Plaintiff's statement misstates sworn deposition testimony.<br><br>There is no evidence, and Ms. Vernon never testified, that Mr. Roberts was "associated with the branch." Ms. Vernon expressly denied that Sean Roberts ever worked for LoanStream (in any capacity). Instead, Ms. Vernon testified that she learned about Mr. Roberts' DFPI licensure revocation after he expressed a desire to work for LoanStream (a request that LoanStream |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | denied). Mr. Roberts also confirmed that he was never hired by LoanStream and even his company, Resmo, "never had a relationship with LoanStream." *Evidence:* Vernon Decl. 59:8-61:1; Vernon Decl. ¶¶ 11-21, 34 (Dkt. 81-3); Sean Roberts Dep. Tr. 29:22-32:13; Sean Roberts Decl. ¶¶ 4-5, 8-9, 12-14, 18-20 (Dkt. 81-8). |
| 95.    LoanStream authorized its branches to generate business on their own. *Evidence:* Vernon Dep. 14:9-11, 88:21-25. | 95.    **Disputed in part.** Undisputed that LoanStream accepts loans generated by its branches, as long as they comply with internal policies and applicable laws and regulations. Disputed to the extent this statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence (*e.g.*, that LoanStream received benefits from loans identified through an alleged call campaign). For example, Ms. Vernon's deposition testimony confirms that one goal of a LoanStream branch is to identify and secure consumer direct loans through local networking and "B2B" relationships. However, branch managers (including Cynthia Roberts) were not given unqualified discretion to obtain business and could not, for example, use impermissible telemarketing methods. Furthermore, Ms. Vernon unequivocally stated that the alleged Call Campaign did not generate any leads that were fulfilled for LoanStream's benefit at any time. |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | LoanStream received no revenue from the Call Campaign. And LoanStream did not generate any business from the Call Campaign.<br><br>*Evidence:* Vernon Dep. Tr. 40:5-41:6, 41:18-42:25, 55:19-57:19; Vernon Decl. ¶¶ 7-9, 11, 14-22, 26-29, 34 (Dkt. 81-3); Cynthia Roberts Dep. Tr. 44:18-46:25, 49:14-59:25 & Dkt. 81-5. |
| 96.   LoanStream's profit and loss statement records a December 22, 2021 ACH payment of $███ under general ledger account "73700 MARKETING."<br><br>*Evidence:* ECF 60-5 (accounting ledger/profit and loss statement) (filed under seal). | 96.   **Disputed in part.**<br><br>Undisputed that the unauthenticated P&L statement submitted by Plaintiff (Dkt. 85-6, 87-3) contains a $███ entry with the following information: (i) a date of "12/22/2021"; and (ii) a category header of "73700 • MARKETING."<br><br>Disputed to the extent this statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Plaintiff never authenticated the P&L Statement as required by FRE 901. Although LoanStream produced the document in discovery, Plaintiff never took steps to confirm its accuracy, including during the deposition of Serene Vernon. Instead, Plaintiff's counsel initially attached the document to its Motion for Class Certification without any explanation, and then continued to include it in similar manner in future filings, including its Opposition to LoanStream's current motion for summary judgment, resulting in several |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | evidentiary issues, including a lack of foundation and hearsay. *See* Dkt. 85-6, 87-3. |
| 97.     That $▇▇▇ entry is the sole entry under "MARKETING" on LoanStream's profit and loss statement. *Evidence:* ECF 60-5 (accounting ledger/profit and loss statement) (filed under seal). | 97.     **Disputed in part.** Undisputed that the unauthenticated P&L statement submitted by Plaintiff (Dkt. 85-6) contains a $▇▇▇ entry with the following information: (i) a date of "12/22/2021"; (ii) a name of "PREMIE…"; and (iii) a memo of "INVOICE". Disputed to the extent this statement suggests or assumes facts not in evidence (*e.g.*, that LoanStream paid Premier Marketing/Resmo for an alleged call campaign, etc.). *Evidence:* Dkt. 85-6 (Ex. B to Plaintiff's Application to Seal) |
| 98.     Cynthia Roberts testified that LoanStream "helped us have funding by paying marketing." *Evidence:* C. Roberts Dep. 10:14-15. | 98.     **Disputed in part.** Undisputed that Mrs. Roberts made this statement during her deposition. Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Mrs. Roberts testified that she submitted invoices to LoanStream accounting, but also testified that she was not involved in any call campaigns during her employment. Ms. Vernon also testified that marketing expenses were rare and normally limited to rental fees and print |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | media costs—not telemarketing—since LoanStream does not participate in telemarketing campaigns.<br><br>*Evidence:* Cynthia Roberts Dep. Tr. 10:9-15, 37:5-22; Vernon Dep. Tr. 35:15-36:10, 40:23-41:6, 62:23-63:13, 64:2-65:6. |
| 99.    Cynthia Roberts testified that LoanStream "paid invoices."<br><br>*Evidence:* C. Roberts Dep. 29:11-14. | 99.    **Disputed in part.**<br><br>Undisputed that Mrs. Roberts made this statement during her deposition.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, the quote referred to as an additional material fact arose when Mrs. Roberts' was asked if "LoanStream provide[s] any funding or cash advances for the purpose of marketing, or did it just pay invoices?" Mrs. Roberts' responded that LoanStream "paid invoices"—no other context or explanation was provided. Mrs. Roberts also testified that she submitted invoices to LoanStream accounting for payment—because she was not authorized to pay vendor invoices on the company's behalf. Mrs. Roberts also testified that she was not involved in any call campaigns during her employment at LoanStream and she likewise confirmed that telemarketing campaigns are expressly prohibited at LoanStream.<br><br>*Evidence:* Cynthia Roberts Dep. Tr. |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | 12:10-16, 29:11-30:5, 37:15-22, 40:23-25, 49:14-59:25. |
| 100.   Cynthia Roberts testified that LizDev invoices went to LoanStream's accounting to be paid.<br><br>*Evidence:* C. Roberts Dep. 12:14-16. | 100.   **Disputed in part.**<br><br>Undisputed that Mrs. Roberts previously testified that any LizDev invoices received were passed along to LoanStream's accounting department.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Mrs. Roberts testified that she could not recall the process of how a LizDev invoice was submitted to LoanStream for payment or whether she was even included on such communications. Mrs. Roberts also testified that she submitted invoices to LoanStream accounting for payment because she was not authorized to pay vendor invoices on the company's behalf and she was not involved in any relationship between Resmo and LizDev. Mrs. Roberts also testified that she was not involved in any call campaigns during her employment at LoanStream and she likewise confirmed that telemarketing campaigns are expressly prohibited at LoanStream.<br><br>*Evidence:* Cynthia Roberts Dep. Tr. 12:10-21, 13:1-15, 16:10-16, 18:24-19:9, 37:15-22, 40:23-25, 49:14-59:25. |
| 101.   Sean Roberts testified that LoanStream was provided LizDev's | 101.   **Disputed in part**. |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| invoices so that it could provide or justify the funding for the branch.<br><br>*Evidence:* S. Roberts Dep. 52:15-53:8. | Undisputed that Mr. Roberts testified that "LoanStream was provided LizDev's invoices so that they could provide the funding or – or justify the funding necessary – [i]n advance."<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Mr. Roberts testified that he never had a contractual or employment relationship with LoanStream. Similarly, Resmo never had a relationship with LoanStream and even though Resmo did marketing on its own behalf (in hopes of providing loans to LoanStream), LoanStream did not "participate in advertising" and it "never talked to LizDev."<br><br>Mr. Roberts also testified that his understanding is that when LoanStream paid an invoice for Cynthia's branch, it "wasn't just for marketing; it was for labor as well.. . . It was a way that they could justify on a balance sheet to provide additional resources."<br><br>*Evidence:* Sean Roberts Dep. Tr. 31:8-32:21, 33:8-24, 34:2-16, 41:20-42:5, 52:22-53:8; Sean Roberts Decl. ¶¶ 4-10, 12-14, 18-20 (Dkt. 81-8). |
| 102.   Sean Roberts testified that, before the calling began, LoanStream asked how he obtained his data and he told them, in a conversation that included | 102.   **Disputed in part.**<br><br>Undisputed that Mr. Roberts testified that he previously informed LoanStream that his call data and marketing |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| Cynthia Roberts.<br><br>*Evidence:* S. Roberts Dep. 45:8-25, 46:10-18. | practices were TCPA-compliant.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Mr. Roberts did not testify when that conversation occurred or who was involved. Mr. Roberts' testimony also does not mention the "calling" referenced in Plaintiff's Additional Material Fact.<br><br>*Evidence:* Sean Roberts Dep. Tr. 45:8-47:2. |
| 103.   Sean Roberts testified that he met LoanStream's president, Serene Vernon, at the Bistango restaurant in Irvine, California, and gave her a description of the scripts and how clients were contacted.<br><br>*Evidence:* S. Roberts Dep. 54:7-24, 55:1-13. | 103.   **Disputed in part.**<br><br>Undisputed that Mr. Roberts testified that he had a prior conversation with Ms. Vernon.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Mr. Roberts testified that he spoke with Ms. Vernon, but could not recall if it occurred over the phone or at Bistango. Mr. Roberts' also testified that his meeting with Ms. Vernon occurred in May or June of 2022—***over six months after*** the Global Experts Call to the Number.<br><br>*Evidence:* Sean Roberts Dep. Tr. 54:7-55:13. |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| 104.   Sean Roberts testified that he communicated with Vernon regarding lead generation and payments.<br><br>*Evidence:* S. Roberts Dep. 51:15-52:7, 54:10-24; Vernon Dep. 61:11-24. | 104.   **Disputed in part.**<br><br>Undisputed that Mr. Roberts testified that he had a conversation with Ms. Vernon and provided "a description of the scripts and how [Resmo] contact[s] . . . clients."<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Mr. Roberts testified that he had a conversation with Ms. Vernon about his approach to lead generation, but his testimony regarding "payments" related to an entirely different conversation involving Cynthia Roberts—not the aforementioned meeting with Ms. Vernon.<br><br>*Evidence:* Sean Roberts Dep. Tr. 49:6-52:7, 54:7-55:13. |
| 105.   Vernon acknowledged that an invoice was sent to LoanStream's accounting and was "discarded."<br><br>*Evidence:* Vernon Dep. 48:13-24. | 105.   **Disputed in part.**<br><br>Undisputed that Ms. Vernon testified that a single invoice was sent from LizDev to LoanStream and "appears to have just been discarded by [LoanStream's] accounting team."<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Ms. Vernon was not asked to explain the meaning of the term "discarded." However, Ms. Vernon did testify that |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | LoanStream did not pay the LizDev Invoice and that LizDev has never been an approved vendor of LoanStream.<br><br>*Evidence:* Vernon Dep. Tr. 48:13-24; Vernon Decl. ¶¶ 22-26 (Dkt. 81-3). |
| 106.  When Sean Roberts emailed Vernon about "variable (marketing) expenses due/past due," Vernon responded by requesting a cost center number so accounting could process payment.<br><br>*Evidence:* Vernon Dep. 61:11-24. | 106.  **Disputed in part.**<br><br>Undisputed that Mr. Roberts and Ms. Vernon exchanged emails on February 7, 2022.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Ms. Vernon acknowledged the existence of the February 7 email, but also explained that she was "sitting in [her] car replying from [her] cell phone, you know, and that was just a quick, you know, hey, got your e-mail. Let my accounting department, you know, follow up. So [she] wasn't, you know, digging into what this guy was saying."<br><br>*Evidence:* Vernon Dep. Tr. 61:11-62:22. |
| 107.  Vernon acknowledged that a customer receiving such a call would believe the call was made on LoanStream's behalf.<br><br>*Evidence:* Vernon Dep. 83:14-16. | 107.  **Disputed in part.**<br><br>Undisputed that Ms. Vernon listened to the phone call between Plaintiff and an individual named "Karisha," and subsequently responded to Plaintiff's counsel's hypothetical questions about what a "reasonable customer" might think after receiving such a call. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Ms. Vernon cannot testify as to the thoughts of a "reasonable customer" and Plaintiff's implication that she "acknowledged that a customer receiving such a call" would have certain beliefs is not reflected in Ms. Vernon's testimony. *Evidence:* Vernon Dep. Tr. 78:16-80:3, 83:12-16. |
| 108.   Vernon acknowledged that LoanStream was the entity whose products and services were being promoted on the calls. *Evidence:* Vernon Dep. 84:9-13. | 108.   **Disputed in part.** Undisputed that Ms. Vernon listened to the phone call between Plaintiff and an individual named "Karisha," and subsequently responded to Plaintiff's counsel's hypothetical questions about what was said in that conversation. Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Ms. Vernon only listened to a single call— not "calls" as Plaintiff's Additional Material Fact suggests. Ms. Vernon also responded to a hypothetical question raised by Plaintiff's counsel concerning what a "reasonable customer" might think after hearing the recorded call from October 19, 2021. However, she does not have knowledge about what products or services were contemplated by the caller at that time, nor does she |

-85-

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | have knowledge about any other alleged calls listed in the Unauthenticated Data Set.<br><br>*Evidence:* Vernon Dep. Tr. 78:16-80:3, 83:12-84:18; Landers Decl. ¶ 6, Ex. 1 (Dkt. 79-1). |
| 109.   Vernon acknowledged meeting Sean Roberts at the Bistango restaurant with a LoanStream employee, but testified she never met Cynthia Roberts. However, Sean Roberts testified to a meeting at which his wife was "in the room."<br><br>*Evidence:* Vernon Dep. 67:6-24, 92:23-24; S. Roberts Dep. 46:10-22. | 109.   **Disputed in part.**<br><br>Undisputed that both Ms. Vernon and Mr. Roberts testified that they previously had a conversation that may have occurred at the Bistango restaurant in Irvine, California.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Ms. Vernon recalls being introduced to Mr. Roberts by a LoanStream employee during a lunch at Bistango (a meeting that, according to Mr. Roberts, occurred in May or June of 2022) during which time they discussed that Mr. Roberts was looking for employment. Mr. Roberts also testified that he spoke with Ms. Vernon, but could not recall if it occurred over the phone or at Bistango. Mr. Roberts further testified that he had a separate meeting with someone at LoanStream—which he joined with his wife, Cynthia Roberts.<br><br>*Evidence:* Vernon Dep. Tr. 67:3-68:5, Sean Roberts Dep. Tr. 45:8-47:2, 54:7-55:13. |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| 110. Vernon testified that she is currently facing a murder charge.<br><br>*Evidence:* Vernon Dep. 25:25-26:1. | 110. **Undisputed, But Improper Evidence For Plaintiff's Opposition.**<br><br>Ms. Vernon did testify that she is currently involved in a separate criminal proceeding, but that information is irrelevant to this proceeding and also violates this Court's Civil Standing Order, which only permits Plaintiff to submit additional material facts that "bear on the issues raised by the movant."<br><br>The pending criminal charges against Ms. Vernon arise from an automobile accident. It is a matter of public record that the accident resulted in a fatality, as well as subsequent criminal charges against Ms. Vernon (which remain pending to this day). But, the automobile accident is reported to have taken place on January 31, 2025, which is *years* after the events that are the subject of this lawsuit. The criminal charges filed against Ms. Vernon also have nothing to do with the issues in this lawsuit, which stem from alleged phone calls from Global Experts, Ltd., a non-party and now-defunct Jamaican company, in 2021. That counsel quotes her testimony about those charges in Plaintiff's Opposition is an attempt to capitalize on a tragedy affecting multiple families, including Ms. Vernon's family, but has nothing to do with this case.<br><br>*Evidence:* Slaughter Civil Standing Order, Section IX(f)(i); Landers Reply |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | Decl. ¶ 6. |
| 111.   The LizDev invoice LoanStream received stated that the leads were not obtained under procedures intended to comply with the TCPA and may contain leads from consumers registered on state and/or federal Do-Not-Call registries.<br><br>*Evidence:* Ex. 6 to Landers Decl. (LizDev invoice) (filed under seal). | 111.   **Disputed in part.**<br><br>Undisputed that the LizDev Invoice contains disclosures concerning the terms and conditions relating to the agreement.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, no evidence exists regarding when, how, and who received the invoice at LoanStream. Similarly, the LizDev Invoice was not addressed to a particular individual, nor was it signed by anyone in the LoanStream accounting department. Mr. Roberts also testified that he merely purchased "opt – in leads from LizDev" and then provided the information to Global Experts. Mr. Roberts' company, Resmo, also had its own independent procedures to comply with the TCPA, which were separate and apart from any efforts undertaken by LizDev.<br><br>*Evidence:* Sean Roberts Dep. Tr. 43:10-14, 44:1-45:7. |
| 112.   LoanStream discarded that LizDev invoice.<br><br>*Evidence:* Vernon Dep. 48:18-24. | 112.   **Disputed in part.**<br><br>Undisputed that Ms. Vernon testified that a single invoice was sent from LizDev to LoanStream and "appears to have just been discarded by |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | [LoanStream's] accounting team." Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Ms. Vernon did not explain the meaning of the term "discarded." Ms. Vernon also confirmed that LoanStream did not pay the LizDev Invoice and that LizDev has never been an approved vendor of LoanStream. *Evidence:* Vernon Dep. Tr. 48:13-24; Vernon Decl. ¶¶ 22-26 (Dkt. 81-3). |
| 113.   Vernon testified that LoanStream did not discipline the branch, did not ask how the branch generated leads, and did not produce any written telemarketing prohibition. *Evidence:* Vernon Dep. 40:14-25, 41:1-9, 48:25-49:2, 51:21-25. | 113.   **Disputed in part.** Undisputed that Ms. Vernon testified that LoanStream did not ask Cynthia Roberts about how her branch was generating leads. Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Ms. Vernon also testified that LoanStream has multiple policies in place that prohibit certain types of marketing, including telemarketing campaigns that violate the TCPA, as well as a robust vendor onboarding policy to ensure proper compliance considerations are taken into account. Ms. Vernon also testified that LoanStream never received any complaints about Mrs. Roberts' branch and had no reason to suspect any wrongdoing by Mrs. Roberts (or any |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | other employees at the branch) and had no knowledge of an alleged Call Campaign until the filing of this lawsuit.<br><br>Mrs. Roberts also independently testified that she reviewed, signed, and agreed to multiple LoanStream policies, including marketing-specific requirements as a branch manager and LoanStream employee.<br><br>*Evidence:* Vernon Dep. Tr. 48:25-49:5, 49:23-50:5, 52:1-8, 53:24-54:14, 73:1-74:18; Cynthia Roberts Dep. Tr. 49:14-59:25. |
| 114.   LoanStream did not produce any written telemarketing prohibition or policy applicable to the branch.<br><br>*Evidence:* Vernon Dep. 38:10-23, 40:5-16. | 114.   **Disputed in part.**<br><br>Undisputed that LoanStream did not produce a specific policy that primarily focuses on the company's prohibition on telemarketing.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, LoanStream produced the Non-Producing Branch Manager Employment Agreement for Cynthia Roberts, which Mrs. Roberts electronically signed and, by so doing, agreed to comply with multiple LoanStream policies, including the "Policy Regarding Telemarketing and Phone/Fax Solicitation Laws" referenced in Section 5(f) of that agreement. Mrs. Roberts also confirmed that she reviewed those policies at the |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | time of her hire and agreed to comply with, and did in fact comply with, their terms.<br><br>Ms. Vernon also repeatedly testified that although the telemarketing policy referenced in Mrs. Roberts' employment agreement could not be located, LoanStream has multiple policies in place that prohibit telemarketing—particularly campaigns that violate the TCPA.<br><br>*Evidence:* Cynthia Roberts Dep. Tr. 49:14-56:16; Vernon Dep. Tr. 37:15-38:23, 40:5-25. |
| 115.   Vernon testified that nobody ever asked about how the branch was generating leads.<br><br>*Evidence:* Vernon Dep. 51:21-25. | 115.   **Disputed in part.**<br><br>Undisputed that Ms. Vernon testified that LoanStream did not ask Cynthia Roberts about how her branch was generating leads.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Ms. Vernon also testified that LoanStream has multiple policies in place that prohibit certain types of marketing, including telemarketing campaigns that violate the TCPA, as well as a robust vendor onboarding policy to ensure proper compliance considerations are taken into account. Ms. Vernon also testified that LoanStream never received any complaints about Mrs. Roberts' branch and had no reason to suspect any |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | wrongdoing by Mrs. Roberts (or any other employees at the branch) and had no knowledge of an alleged Call Campaign until the filing of this lawsuit.<br><br>Mrs. Roberts also independently testified that she reviewed, signed, and agreed to multiple LoanStream policies, including marketing-specific requirements as a branch manager and LoanStream employee.<br><br>*Evidence:* Vernon Dep. Tr. 48:25-49:5, 49:23-50:5, 52:1-8, 53:24-54:14, 73:1-74:18; Cynthia Roberts Dep. Tr. 49:14-59:25. |
| 116.   Elizabeth Stone is the Chief Executive Officer of LizDev.<br><br>*Evidence:* Stone Decl. ¶ 1. | 116.   **Undisputed.** |
| 117.   The LizDev call logs were made and kept in the ordinary course of LizDev's business.<br><br>*Evidence:* Stone Decl. ¶¶ 2-3. | 117.   **Disputed.**<br><br>The only evidence supporting Plaintiff's claim that the Unauthenticated Data Set "were made and kept in the ordinary course of LizDev's business" is the self-serving declaration of Elizabeth Stone ("Stone Declaration"), which states that "Composite Exhibit A contains logs of outbound calls placed by Global Experts, LLC in connection with the LoanStream Campaign." However, the Stone Declaration does not actually attach any information for authentication. Ms. Stone's statement concerning the data set is also an improper legal conclusion that fails to |

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
|  | establish the requisite elements of the business records exception to the hearsay rule.<br><br>Additionally, the Stone Declaration does not actually affirm that the data set was made ***in the course of LizDev's business dealings***—it only states that the Stone Declaration "is based on [Ms. Stone's] personal knowledge along with [her] review of the business records and reports generated and maintained by LizDev, as well as documents reviewed in connection with LizDev's business dealings, in the ordinary course of its regularly conducted business." Furthermore, the Stone Declaration confirms that Ms. Stone only had access to the "call logs" (the non-existent Composite Exhibit A) "by virtue of either [her] prior business dealings with Sean Roberts at Resmo in relation to the LoanStream Campaign, or because [she] invested in Global Experts, which [she] understand[s] is now defunct." There is no evidence that LizDev created the Unauthenticated Data Set, nor does Ms. Stone state *who* created the Unauthenticated Data Set.<br><br>*Evidence:* Stone Decl. (Dkt. 85-5) ¶¶ 3, 5-6. |
| 118.   LizDev prepared invoices to be sent to either Resmo or LoanStream directly.<br><br>*Evidence:* Stone Decl. ¶ 5. | 118.   **Disputed in part.**<br><br>Undisputed that Mr. Roberts and Ms. Vernon both testified that LizDev prepared and sent a single invoice to |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | LoanStream.<br><br>Disputed to the extent Plaintiff's statement misstates sworn deposition testimony and/or suggests or assumes facts not in evidence. For example, Mr. Roberts and Ms. Vernon both testified that no relationship ever existed between LoanStream and LizDev. Ms. Vernon also testified that LoanStream did not pay the LizDev Invoice. The record and evidence also shows that LoanStream only located a single invoice from LizDev (not "invoices").<br><br>*Evidence:* Sean Roberts Dep. Tr. 32:14-21, 33:8-23, 41:12-42:5; Sean Roberts Decl. ¶¶ 6-14, 16-18 (Dkt. 81-8); Vernon Dep. Tr. 48:13-24, 49:10-14, 74:13-14; Vernon Decl. ¶¶ 22-26 (Dkt. 81-3). |
| 119.   The LizDev call logs reflect outbound calls placed by Global Experts in connection with the LoanStream campaign.<br><br>*Evidence:* Stone Decl. ¶ 7. | 119.   **Disputed.**<br><br>The Stone Declaration states that "Composite Exhibit A contains logs of outbound calls placed by Global Experts, LLC in connection with the LoanStream Campaign"—but it does not actually attach "Composite Exhibit A" or authenticate such. Ms. Stone's statement concerning the Unauthenticated Data Set is an improper legal conclusion that fails to establish the requisite elements of the business records exception to the hearsay rule. Moreover, no additional information has ever been provided to support Ms. Stone's unfounded, conclusory |

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

| Plaintiff's Additional Material Fact | Defendant's Response and Supporting Evidence |
|---|---|
| | statements.<br><br>There is also no evidence that a "call campaign" was ever organized or conducted on LoanStream's behalf or at its direction. But more importantly, documents produced in discovery and deposition testimony confirm that Resmo, regardless of its motive, was sourcing leads for three different companies—Lending 3, AFN, and LoanStream. And the Unauthenticated Data Set produced by LizDev does not indicate the purpose or nature of each call (i.e., for which company a call was made "on behalf of")—only the supposed number of calls made to a specific number and the date and time of the last call placed. Consequently, Plaintiff only knows that a single call was made to her mother's Number, but there is no basis to conclude that the Unauthenticated Data Set broadly "reflect[s] outbound calls placed by Global Experts in connection with the LoanStream campaign."<br><br>*Evidence:* Stone Decl. (Dkt. 85-5) ¶¶ 3, 5-7; Sean Roberts Dep. Tr. 31:8-32:21; Sean Roberts Decl. ¶¶ 4-14, 16-18 (Dkt. 81-8); Vernon Dep. Tr. 49:23-50:2, 74:10-14. |

//

//

//

//

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA

Respectfully submitted,


DATED:  June 25, 2026                    SOLOMON WARD SEIDENWURM & SMITH, LLP


By:  _____/s/ Thomas F. Landers_____
THOMAS F. LANDERS
ADAM R. SCOTT
Attorneys for Defendant OCMBC, INC.
d/b/a LOANSTREAM MORTGAGE

DEFENDANT'S RESPONSE TO PLAINTIFF'S GENUINE DISPUTES ISO MSJ OR MSA