# EXHIBIT 18

Page 1

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

KIMBERLY HUDSON-BRYANT,           )
An individual,                    )Case No.
                                  )8:24-cv-67-FWS-JDE
              Plaintiff,           )
Vs.                               )
                                  )
                                  )
OCMBC, INC. DBA LOANSTREAM,        )
                                  )
                                  )
                                  )
                                  )
                                  )
              Defendants.          )
_____)

REMOTE DEPOSITION OF
CYNTHIA ROBERTS
TUESDAY, MAY 27, 2025

Reported by:  MICHELLE NINO, CSR No. 13580
              Job No. 1341333



Page 2

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

KIMBERLY HUDSON-BRYANT,          )
An individual,                   )Case No.
                                 )8:24-cv-67-FWS-JDE
               Plaintiff,        )
Vs.                              )
                                 )
                                 )
OCMBC, INC. DBA LOANSTREAM,      )
                                 )
                                 )
                                 )
                                 )
                                 )
               Defendants.       )
_____)

REMOTE DEPOSITION OF CYNTHIA ROBERTS, taken on behalf of PLAINTIFF, in the state of California, commencing at 10:02 a.m. and pausing at 12:06 p.m., on TUESDAY, MAY 27, 2025, reported by MICHELLE NINO, RPR, CSR No. 13580, a Certified Shorthand Reporter in and for the State of California.



Page 10

Q    Okay.  To your knowledge, did LoanStream operate other beta branches similar to the C. Roberts Branch?

A    I assumed so, but I have no real knowledge of that.

Q    Under what circumstances did the branch close?

A    Rates went up, and it was not tenable any longer to do that business.

Q    I think that you mentioned that you were involved in the marketing and lead generation activities for the beta branch.

Could you explain how LoanStream funded those activities?

A    No, I wasn't involved in it.  They helped us have funding by paying marketing.

Q    And when you started your work at the beta branch, were you new to the finance business, or had you had previous jobs working in mortgages?

A    Yes.  I was new to the finance business, and so this is one reason why some of my answers seem like I don't know about what I'm talking about.  I have done a lot of work with software programs similar to what they use and done a lot of work in accounting, and so they thought that those skills would transfer.  I was in between careers, to be very simple.



Page 12

A    We worked through Premiere Financial.

Q    And Premier Financial was your husband's company?

A    Yes.

Q    So you communicated then directly with Premier Financial regarding these matters?

A    Right.  I would say, Okay.  We need the phone to ring X many times or however many calls, and they would coordinate that with LizDev.

Q    Did Premier Financial submit invoices to the C. Roberts Branch?

A    No, no.  The invoices were from LizDev.

Q    And what's -- walk me through the process of an invoice from LizDev.  Where would the invoice go to be paid?

A    To LoanStream's accounting.

Q    And then LoanStream would -- would they cut a check to the branch or would they cut a check to LizDev directly?

A    Oh, boy.  I don't remember.  I'm sorry.  I don't remember how that worked.

Q    Are you familiar with a company called Global Experts?

A    No.

Q    When you sent the -- or let me clarify.



Page 13

Who was the actual individual responsible for sending the LizDev invoices to LoanStream accounting?

A    Liz in LizDev, Liz something.

Q    So Liz would presumably email those invoices to LizDev -- or I'm sorry -- to LoanStream?

A    Yes.

Q    And would you be copied on those emails?

A    You know, I may have been.  In your request for documents or emails, I did look back through my emails, I don't have my LoanStream email anymore, obviously.  So it may have gone there.  I don't have any in my personal email.  All I have in my personal email is on-boarding information from LoanStream, which you're welcome to.  It is like, The on-boarding meeting will be Tuesday at 9:00, things like that.

Q    And in terms of your email you mentioned, when you had at LoanStream, you had an at LoanStream.com email address?

A    I did.  Uh-huh.

Q    And LoanStream authorized you to hold yourself out as a mortgage consultor -- as a mortgage consultant with LoanStream?

MS. IMANAKA:  Objection.  Calls for legal conclusion.  Calls for speculation.

THE WITNESS:  I can't really answer that.



Page 16

THE WITNESS:  Yeah.  I don't know if anyone else received that.

BY MR. PERRONG:

Q    Were you involved in the drafting or implementing of any policies related to the branch?

A    No.

Q    Did you ever receive complaints from customers regarding calls made by the branch?

A    No.

Q    Did you ever receive complaints regarding calls made by LizDev?

A    No.

Q    And as I understand it, Premier Financial Marketing was directly involved in the hiring of LizDev?  You had no involvement in that process?

A    No.  I didn't have involvement in the process.

Q    Why did you choose Premier Financial Marketing to do the marketing for the beta branch?

A    Fees and availability.

Q    Did you vouch for Premier Financial Marketing or bring them up to LoanStream?

A    No.

Q    Did LoanStream do any reviews of Premier Financial Marketing?

MS. IMANAKA:  Calls for speculation.



Page 18

more formal review side?

A   Oh, I think it was informal.

Q   Okay.  Did you ever receive any complaints from LoanStream regarding Global -- I'm sorry -- regarding Premier Financial's performance?

A   No.  It was resulting in us putting in loans, so people were happy with the calls and the contacts, and they didn't have a question with it.

Q   Approximately how many leads were generated from the global experts Premier LizDev arrangement?

A   I'm sorry.  I don't know that.

Q   Did you maintain internal do not call policy at the beta branch?

A   I know that there is.  I don't know exactly how it works, but I know that if someone says, Do not call, or that they're on a do-not-call list or however that is, that, of course, that's followed.

Q   Was the list maintained by LoanStream?

A   That, I don't know.

Q   Were there any formal policies that you had in your possession at the beta branch outlining a policy for a do-not-call list, or was it just a list?

A   I don't remember.

Q   Were you involved in the coordination of efforts between Premier Financial and LizDev?



A    No.

Q    Did you ever provide feedback to LizDev or Premiere Financial regarding the quality of leads?

A    No, because by the time that I was involved in the loan, it was, you know, when it was processing. There may have been some feedback from the loan agent because they're the ones that are having that first talk to the people, but not from me, and I don't remember any feedback.  I just may have not been aware of it.

Q    Based on my understanding of the mortgage industry, the loan agent is paid a commission on the loan product that they sell.

Was that the arrangement under the beta branch concept?

A    I'm not 100 percent sure of how it worked, but I think the branch got the commission, and then the agent gets a portion of that.  I'm not a hundred percent on that.

Q    Did the branch maintain a payroll?

A    See, that is what I don't remember doing, and I think I would remember that if we had payroll.  So --

Q    Did the branch --

A    -- that must have come from LoanStream because I don't remember doing payroll.

Q    Did the branch ever file taxes?



Page 29

A    Maybe.  I don't remember, but I could have.

Q    Did you use the invoices to justify further funding for the beta branch?

A    Well, they were paying that, so that we could survive long enough to create our own profit.  Does that make sense?  Yes.

Q    Were there any disputes or unresolved issues between the beta branch and the LoanStream at the time of its closure?

A    No.

Q    Did LoanStream provide any funding or cash advances for the purpose of marketing, or did it just pay invoices?

A    Right.  It paid invoices.

Q    Who were the individuals at LoanStream with whom you interacted most frequently?

A    Hmm.  Well, there were several people.  There were -- let's see.  There was one woman who would help me with questions of -- if there was a question on a loan that I didn't understand.  So there was a person like that.  There were people in accounting, guys at the rate lock desks.  It's like a processing manager that was also helping me with questions, or like if I needed to talk to a certain type of person there, then they would tell me who that was, you know.



Page 30

Q   Uh-huh.

A   So those are the people that I dealt with on a daily basis.

Q   And those were daily interactions?

A   Some daily, some weekly.

Q   I see that you have exchanged at least some emails with Serene Vernon.

How often did you communicate with her?

A   Once or twice a month maybe.

Q   Okay.

A   Not often.  It wasn't needed for a day-to-day.

Q   What was the degree of control that LoanStream exercised over the beta branch?

A   It was --

MS. IMANAKA:  Calls for conclusion.  Calls for speculation.

BY MR. PERRONG:

Q   You can answer.

A   I don't really know how to answer that question.

Q   Okay.  Are you familiar with the Bistango Restaurant in Irvine, California?

A   Uh-huh, yes.

Q   Were you present at a meeting between yourself, Sean Roberts, and Serene Vernon at the Bistango


MAGNA
LEGAL SERVICES

Page 37

just communications back and forth about the profit of the loans and, like you said, that email that Mr. Perrong put up.  Other than that, it was just focusing on loan processing.  That was the day-to-day.

Q    Can you describe to what extent, if at all, you were involved in marketing efforts on behalf of LoanStream as a non-producing branch manager?

A    It didn't take a lot.  It was that we needed the phone to ring, and so we needed leads, and they were ordered, and they came.  And it's a five-minute phone call, a five-minute discussion, or less than that.

Q    And is it fair to say that's the full extent of your role in any marketing efforts at LoanStream?

A    Yes.

Q    Were you involved in any call campaigns at LoanStream?

A    Like me personally on the phone?

Q    Correct.

A    No.

Q    Did you have any even remote involvement in call campaigns at LoanStream?

A    No.

MR. PERRONG:  Objection to form.

BY MS. IMANAKA:

Q    While you were at LoanStream as a non-producing



Page 40

then I kept that for about ten or 12 years.

And then when I left LoanStream, about maybe a year after that, I went back into marketing, and that's what I do now.

Q    And when you worked in marketing, have you been involved in telemarketing?

A    No.  It's mostly -- well, it used to be a lot of business-to-business.  Now I do business-to-consumer.

Q    Is it fair to say that prior to working for LoanStream, you never were involved in any telemarketing?

A    No, never.

Q    Prior to working at LoanStream, you also were never involved in any call campaigns; is that right?

A    No.  That was never the part of marketing that I was doing.

Q    How would you describe the marketing work that you did for the 20 or so years before you worked for LoanStream?

A    A lot of print, a lot of brochures, newspaper ads, magazines, billboards, TV/radio.  That sort of advising.

Q    Have you ever been involved in any telemarketing campaigns in any capacity?

A    No.


MAGNA
LEGAL SERVICES

Page 44

copy?

MR. PERRONG:  Yes, I'm bringing it up again.

MS. IMANAKA:  Let me know when you're ready. Mr. Perrong, may I proceed?

MR. PERRONG:  Yes.

BY MS. IMANAKA:

Q    Ms. Roberts, this is a single-page document with some DocuSign information following that dated November 9th, 2021.

Do you see that?

A    Uh-huh.

MR. PERRONG:  I just want to object on the basis that this hasn't been produced in discovery, but you can ask about them.

THE WITNESS:  I'm sorry.  I keep coughing.

MS. IMANAKA:  No worries.

BY MS. IMANAKA:

Q    Would you like some water?  Okay.  Great.

Ms. Robert, does this document refresh your recollection that you began as an MLO assistant at LoanStream for a period of time and then were eventually shifted positions to a non-producing branch manager?

A    Yes.  I didn't remember this actually.

Q    And so is it fair to say that you did start as an MLO assistant for a period of time and then sometime,



Page 45

it looks like, November 16th, 2021, you then were -- changed rolls and became a non-producing manager; is that right?

A    Uh-huh.  I guess so.

Q    Do you have any reason to believe that this document is not accurate?

A    No.  I'm sure that's accurate.  My memory isn't accurate.

Q    And do you see at the bottom of that page, the employee signature line?

A    Uh-huh.

Q    And it's signed your name.  Do you recall signing your on-boarding documents via DocuSign?

A    Yes, uh-huh.  Yes, I did.

Q    Is it fair to say that prior to November 16th, 2021, you did not perform any job duties as a non-producing branch manager for LoanStream?

A    Right.

Q    Thank you.  I have no further questions on that exhibit.

I'll drop into the chat box a new exhibit, which we will mark as Exhibit C.  It should be uploading now.  Counsel, and, Ms. Roberts, please let me know when you're ready to proceed.

///



Page 46

(Whereupon Exhibit C was marked for identification.)

THE WITNESS:  Okay.  I'm ready to proceed.

MS. IMANAKA:  Are you both okay?

THE WITNESS:  Uh-huh.

MS. IMANAKA:  Great.

BY MS. IMANAKA:

Q    Ms. Roberts, this document marked as Exhibit C is titled OCMBC, Inc., LoanStream Mortgage Division Non-Producing Branch Manager Employment Agreement.

Do you see that?

A    Uh-huh.

Q    Is that a yes?

A    Yes, yes.  Sorry.  Sorry.

Q    My apologies.  I don't mean to be rude.  I just want to make it a clean record.

A    No, I understand.

Q    Do you see that this agreement is dated November 16th, 2021?

A    Uh-huh.  Yes.

Q    And is this the agreement that you were referring to during the first half of your testimony with Mr. Perrong regarding your working relationship with LoanStream being governed by a written agreement?

A    Yes.



Page 49

document requests --

MR. PERRONG:  Let's go off the record, and I'll give you a call.

What's a good number for you?

(Off the record.)

THE REPORTER:  Back on the record.

BY MS. IMANAKA:

Q    Ms. Roberts, I believe you had Exhibit C in front of you?

A    Yes.  Let me pull it back up.

Q    Please take your time.  Let me know when you're ready.

A    Okay.  I'm ready.

Q    Are you familiar with this document titled OCMBC, Inc., LoanStream Mortgage Division Non-Producing Branch Manager Employment Agreement?

A    Yes, uh-huh.

Q    What is it?

A    This is the contract I was referring to earlier.

Q    It's a multipage document, so feel free to take your time.

Do you believe this is a true and accurate copy of the agreement you had with LoanStream related to your employment?



Page 50

A    Yes.

Q    And you agreed to be bound by the terms and conditions of this agreement?

A    Yes.

Q    Can you scroll please to Page 7 of Exhibit C, and there contains a signature block.

Do you see that?

A    Yes.

Q    Do you see your name Cynthia Roberts signed?

A    Yes.

Q    Did you authorize your signature via DocuSign to this agreement?

A    Yes, uh-huh.

Q    Scroll back please to Page 1, and it says that the agreement was dated November 16th, 2021, which is consistent with Exhibit B in terms of when you started working as a non-producing branch manager at LoanStream; correct?

A    Right.

Q    Can you please scroll down to Section 1b regarding compliance.

A    Right.

Q    Do you see that?

A    Yes.

Q    It states quote:



Page 51

"Branch manager warrants, promises, and covenants that he slash she will take all necessary actions to comply with all State, Federal, and other licensing requirements and obligations as well as with all of OCMBC's policies and procedures and terms and conditions of this agreement," end quote.

Do you see that?

A    Yes.

Q    Did you agree with that provision?

A    Right, yes.

Q    Did you comply with that during your time working for LoanStream?

A    Yes.

Q    Section 2a, discusses your employment being at will.

Do you see that?

A    Yes.

Q    Did you understand that your employment at LoanStream was on an at-will basis, meaning it could be terminated at any time, with or without cause, with or without notice?

A    Yes.



Page 52

Q    And Section 2b, discusses confidentiality.

Do you see that?

A    Uh-huh, yes.

Q    You also agreed to be bound by that term; correct?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    Thank you.

Section 3 discusses title and duties of employment beginning on the top of Page 2 of Exhibit B.

Do you see that?

A    Uh-huh.

Q    Please review that and then let me know if that is consistent with your understanding of your duties as a non-producing branch manager at LoanStream?

A    Uh-huh, yes.

Q    Section 4 regarding conflict of interest, states quote:

"While employed at OCMBC, branch manager shall not, without the written consent of OCMBC, directly or indirectly engage in or acquire an equity interest in any mortgage business.  Branch manager will not,



Page 53

during the term of this agreement and for two years after its termination, be a consultant, partner, owner, proprietor, stockholder or employee or in any other way be affiliated with any company that directly or indirectly uses or duplicates OCMBC's business plan or model.  Branch manager agrees not to enter into or devise a plan to originate loans personally or through another person or represent products or services for any other lender or broker during the term of this agreement."  End quote.

Do you see that?

A    Uh-huh, yes.

Q    Did you agree to comply with that term of your arrangement with LoanStream?

A    Uh-huh.

Q    Yes?

A    Yes.  Sorry.

Q    Thank you.

Scrolling down to Section 5 regarding compliance, feel free to take your time to review those six subparts, and my general question is going



Page 54

to be if you agreed to comply with those provisions while at LoanStream?

A    Uh-huh.  This is all of the training that I was referring to.  So a lot of regulations.

Q    And you agreed to comply with all of those provisions while at LoanStream?

A    Uh-huh, yes.

Q    And you, in fact, did comply with these provisions while at LoanStream; right?

A    Yes, uh-huh, yes.

Q    Specifically regarding Section 5b under compliance, it states, quote:

"Branch manager will become familiar with and comply with (1) all policies, procedures, standards, regulations, programs, and pricing schedules of OCMBC, (2) all applicable Federal, State, and local laws, rules, regulations, programs and pricing schedules."  End quote.

You see that; right?

A    Yes.

Q    And you complied with that term during your tenure at LoanStream?

A    Yes.



Page 55

Q    Now, on Page 3, we're still under compliance, Section 5d, it states, quote:

"Branch manager always agrees to follow OCMBC's compliance procedures and quality assurance plan."  End quote.

Do you see that?

A    Yes.

Q    You agreed to comply with that term; correct?

A    I guess that I did.  I don't see that in here. I don't know where that is exactly, but I'm sure that I did at the time.

Q    And during your tenure at LoanStream, you, in fact, did comply with any OCMBC's or LoanStream's procedures or policies that you're aware of; correct?

A    Yes, yes.  I believe that we did, yes.

Q    And Section 5f, under compliance states:

"Branch manager has read and agrees to follow the following OCMBC policies, (1) loan fraud zero tolerance policy, (2) prohibited activities, (3) no kickback certifications, and (4) policy regarding telemarketing and phone slash fax solicitation laws."



Page 56

Do you see that?

A    (No audible response.)

Q    Sorry.  Ms. Roberts, did I miss your response?  Do you see that provision?

A    Yes.

Q    And you agreed to comply with that during your tenure at LoanStream?

A    I'm sorry.  It was cutting out there.

Q    Sure.  You agreed to comply with the entirety of Section 5f of the compliance portion of your employment agreement during your tenure at LoanStream?

A    Yes.

Q    Right.  And you, in fact, did comply with Section 5f during the duration of your time with LoanStream; right?

A    Yes.

Q    And Section 6 regarding expenses, feel free to take your time to review it.  I won't read it for the record for the sake of the court reporter, but my question for you is going to be, you were aware of, agreed to be bound, and, in fact, did comply with Section 6 regarding expenses; correct?

A    Yes, uh-huh, yes.

Q    Throughout the duration of this exhibit we've been referring to, quote, "branch manager."  That's a



Page 57

defined term in here, and your understanding is that branch manager refers to you for purposes of this agreement; correct?

A    That it refers to me?

Q    Yes.

A    Yes.

Q    Can you please turn to Page 4 of Exhibit C. Section 11 discusses professionalism.

A    Uh-huh.  Yes.

Q    And you agreed to comply with Section 11 of your employment agreement with LoanStream, which states that:

"Manager" -- in this case I believe it's the branch manager -- "always agrees to conduct business in a professional manner, abide by all laws and operate in good faith toward the public, government, OCMBC and OCMBC's investors and honor all commitments entered into by branch manager and OCMBC."

Correct?

A    Yes.

Q    And you comply with this provision during the duration of your time working for LoanStream; correct?



Page 58

A    Yes, correct.

Q    Section 12 regarding authority, it says under Subsection b:

"Branch manager is explicitly forbidden to negotiate with or enter into any lender agreement or any other contact off any kind, including, but not limited to, contracts with vendors, office leases, credit reporting agencies, credit cards, or anything that binds OCMBC for responsibility of payment of any kind without written corporate officer approval in advance" --

A    Right.

Q    (Reading):

"Branch manager agrees to not profess to have any authority to bind OCMBC on any of the above."

A    Right.  Yes.

Q    And you agreed to be bound by Section 12 of your employment agreement?

A    Yes.

Q    And you, in fact, did comply with Section 12?

A    Yes.



Page 59

Q     Similarly under Section 12, Subsection c, it says:

"As a Non-Producing Branch Manager, you are not to originate loans on behalf of OCMBC."

Do you see that?

A     Right, me, myself.

Q     Okay.  So you did comply with Section 12c --

A     Yes.

Q     -- during your tenure?

Okay.  Are you aware of ever entering into any agreement with LoanStream that would provide you authority to enter into contracts on behalf of LoanStream outside of what's reflected in the agreement marked as Exhibit C?

A     No.

Q     Were you authorized to pay vendor invoices on behalf of LoanStream while working for the company?

A     Were we authorized to pay them?

MR. PERRONG:  Objection to form.

BY MS. IMANAKA:

Q     Yes.  Were you authorized to pay vendor's invoices on behalf of LoanStream while you were working for LoanStream?

A     No.  I -- no.



DEPOSITION ERRATA SHEET

Assignment No. 1341333

Case Caption: HUDSON-BRYANT VS. OCMBC

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20___, at_____, California.

_____

CYNTHIA ROBERTS



Page 64

REPORTER'S CERTIFICATION

I, Michelle Nino, a Certified Shorthand Reporter in and for the State of California, hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 29th day of May, 2025.

_\_\_*Michelle Nino*_____

Michelle Nino, CSR No. 13580



Page 65

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

          CYNTHIA ROBERTS



Page 66

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

          CYNTHIA ROBERTS

