# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

KIMBERLY HUDSON-BRYANT,               )

individually and on behalf of        )

others similarly situated,           ) CASE NO.

                                     ) 8:24-cv-67-FWS-

    Plaintiff,                       ) JDE

                                     )

V.                                   )

                                     )

OCMBC, INC., D/B/A LOANSTREAM,        )

PREMIER FINANCIAL MARKETING, LLC,    )

D/B/A RESMO LENDING, and SEAN        )

ROBERTS,                             )

                                     )

    Defendants.                      )

- - - - - - - - - - - - - - - - - - )


REMOTE 30(b)(1) and INDIVIDUAL DEPOSITION OF

SERENE ROSENBERG VERNON

VOLUME 1

Tuesday, March 31, 2026


Reported Stenographically by:  Shaaron M. Shigio

CSR No. 12286

Job No:  1505818


Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 2

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - - - )

KIMBERLY HUDSON-BRYANT,                )

individually and on behalf of         )

others similarly situated,            ) CASE NO.

                                      ) 8:24-cv-67-FWS-

        Plaintiffs,                   ) JDE

                                      )

V.                                     )

                                      )

OCMBC, INC., D/B/A LOANSTREAM,         )

PREMIER FINANCIAL MARKETING, LLC, )

D/B/A RESMO LENDING, and SEAN         )

ROBERTS,                               )

                                      )

        Defendants.                   )

- - - - - - - - - - - - - - - - - - )

Remote Deposition of SERENE ROSENBERG VERNON, taken on behalf of Plaintiffs, witness appearing via Zoom Videoconference, commencing at 9:03 A.M., Tuesday, March 31, 2026, before Shaaron M. Shigio, Certified Shorthand Reporter No. 12286.



Page 18

A.    Yes.

Q.    And what -- what sort of accounting records did you review?

A.    We found that we had -- had paid Cynthia one time.  We were only able to pay her, unfortunately, one time.  The branch was not very profitable so it looks like we were only able to give her a profit payment one time of $7,000 and, you know, the rest of it was -- you know, just wages, W-2 wages.

Q.    So other than a profit payment, the branch, who funded the startup of the branch?

MR. LANDERS:  Objection; vague and ambiguous. Which branch are you referring to?

MR. PERRONG:  I'm sorry.  The C. Roberts Branch.

THE WITNESS:  There is no such thing as a startup payment.  When we start a branch, the -- you know, if we take a risk on bringing a branch on, we unfortunately suck up a loss for a while until they turn profitable, and if they stay unprofitable for a period of time and they do not catch up, we have to part ways with the branch.

BY MR. PERRONG:

Q.    So what -- when you -- obviously, there's start -- I think you'd agree with me that there's



Page 30

A.   No.

Q.   Were any payments made to Premier Financial Marketing?

A.   Yes.   That was the 7,000 profit to Cynthia. That was her corporation.

Q.   And in terms of the Premier Financial Marketing payment, was the amount of the payment for $7,000 in profit?

A.   Yes.

Q.   Okay.   So that implies that there were expenses, correct?

MR. LANDERS:   Objection; calls for speculation; misstates testimony.

THE WITNESS:   No.

BY MR. PERRONG:

Q.   If there's a profit -- what is the basis for calling it a profit payment?

A.   What it was was it was actually an advance against future pro- -- profits.   Unfortunately, her branch was never profitable.   They pulled at my heart -- you know, she pulled at my heartstrings there right before Christmas that, you know, she needed -- she needed money and, you know, I -- I gave her that, but unfortunately, it never became profitable so that was the only profit payment I ever made to her.



Page 35

A.   I believe they did.

Q.   Who would pay for that office space?

A.   I believe they did.

Q.   And who -- would they receive any payments from LoanStream for the cost of that office space?

A.   Yes.

Q.   How would they receive payments from LoanStream for the cost of that office space?

A.   During the time that a branch is together with LoanStream, LoanStream would actually cut that payment directly to the landlord, so it -- it would have been direct from LoanStream accounting to that landlord for whatever period of time they were employed by LoanStream.

Q.   Would LoanStream also do that same arrangement with respect to venders that conducted marketing and advertising for the branches?

MR. LANDERS:   Objection; calls for speculation; assumes facts not in evidence.

You may answer if you know.

THE WITNESS:   Well, first of all, we -- we would -- we would never allow any sort of marketing or advertisement so absolutely not.

BY MR. PERRONG:

Q.   When you say that you wouldn't allow marketing


MAGNA
LEGAL SERVICES

Page 36

or advertisement, how do you mean?

A.    We don't -- just exactly like I said.  We don't allow any sort of telemarketing or advertising.

Q.    So how were the branches supposed to get business?

A.    They work with -- for the most part, they work with B2B with the Realtors.  Some work with, you know, department of -- Department of Commerce.  A lot of different ways.  They do what's called, you know, self-sourcing their business.

Q.    Would LoanStream pay for costs associated with that self-sourcing of business?

A.    No.

Q.    Did LoanStream ever explicitly prohibit its branches from engaging in forms of marketing other than reaching out to Realtors?

A.    Yes.

Q.    Where?

A.    It's in the -- the branch manager agreement.  We don't allow them to enter into any contract, period.

Q.    Would LoanStream enter into contracts then?

MR. LANDERS:  Objection; calls for speculation; vague and ambiguous.

THE WITNESS:  I'm sorry.

MR. LANDERS:  Contracts with whom, Counselor?



Page 37

MR. PERRONG:  She just stated that --

BY MR. PERRONG:

    Q.    She stated -- you just stated that you didn't allow branch managers to engage in any contracts, correct?

    A.    Yes.

    Q.    So who would -- a lease agreement is a contract.  Who would sign the lease agreement?

    A.    When -- when a branch boards with us, that's something known up front, there's an existing lease and we have a -- a -- a document that we all sign up front if there's a lease present that would basically sublet that space to us, so that doesn't actually become an issue later.

    MR. PERRONG:  I'm going to attach a document that's been marked -- that we'll mark as Exhibit A.

    [Whereupon, Exhibit A was marked for identification.]

    THE WITNESS:  I'm sorry, sir.  Is that going to be in the Chat?

    MR. PERRONG:  Yup.  Take a moment.

    MR. LANDERS:  Counsel.  Can you describe the document, because I am having trouble accessing it.

    THE WITNESS:  Yeah, me too.

    MR. PERRONG:  It's the OCMBC LoanStream



Page 38

Mortgage Division, Non-Producing Branch Manager Employment Agreement.

It should be in the Chat.

MR. LANDERS:  Yeah, I see it.  Thank you.

BY MR. PERRONG:

Q.   Where -- just let me know when you've had the time to review the agreement.  I have a few questions about it.

A.   Please go ahead.

Q.   Okay.  Where in this agreement does it say that branch managers are not allowed to advertise?

MR. LANDERS:  Objection; the document speaks for itself.

THE WITNESS:  So number 5, compliance.  The last, f, which has policy regarding telemarketing and phone fax logs.  Unfortunately, I was not able to find the attachment for her -- her records so that's, you know, unfortunately -- that was unfortunate.

The -- number 6, expenses, is very clear in, you know, big letters even branch manager is not authorized to enter into any contractual or financial agreements, you know, and you can read it from there, but the document does speak for itself.

MR. PERRONG:  All right.  This is a good stopping point I think, especially because I have to


MAGNA
LEGAL SERVICES

Page 40

MR. PERRONG:  So we can go back on the record then.

MR. LANDERS:  Yes.

BY MR. PERRONG:

Q.    All right.  So before we breaked, we were looking at Exhibit A and, specifically, paragraphs f -- or I'm sorry, paragraph 5f and paragraph 6.

So with respect to paragraph 5f iv, there is a -- there is a representation that the branch manager has read the following OCMBC policies and one of those is the policy regarding telemarketing and phone fax solicitation laws.

Do you have a copy of that policy?

A.    As I mentioned right before we went off the record, unfortunately I was unable to get my hands on that one, so we can't produce that, unfortunately.

Q.    Do you recall reviewing that policy when it was drafted?

A.    You know, the -- the -- vaguely.  We had everybody sign that.  We don't do it, but it's -- irregardless, unfortunately, because we can't get our hands on it.

Q.    Did the policy ever state that the telemarketing was prohibited?

A.    Yes.



Page 41

Q.   So there was no permission to conduct any sort of telephonic marketing of any sort?

A.   Absolutely not.

Q.   Would telemarketing be permitted to customers with their consent?

A.   No.

Q.   Did LoanStream ever discipline or terminate branches for making telephone calls?

A.   No.

Q.   Did LoanStream ever communicate that the only permissible form of marketing was through Realtors to its branch managers?

MR. LANDERS:  Objection; misstates testimony.

You may proceed.

THE WITNESS:  No, because that wasn't the only method.

BY MR. LANDERS:

Q.   What are the methods that LoanStream authorized its branch managers to advertise?

A.   Anything that was self-sourced.

Q.   If they self-sourced telephone calls, would that be authorized?

A.   No.  That's why it was specifically called out.

Q.   What other forms of marketing would be



Page 42

authorized as opposed to not authorized?

A.   Again, things that -- that drummed up business through third-party relationships, the biggest one being Realtor.  Other was things like chamber of commerce work.  You know, a lot of people -- people that, you know, were ethnic had things that were done in those communities.  You know, things like that.

Q.   Would branch managers be authorized to self-source leads from lead generators?

A.   No.

Q.   But you're not in possession of any documents that reflect that that was the position?

A.   Unfortunately, I was unable to get my hands on that -- that for Cynthia Roberts.

Q.   If telemarketing was forbidden outright, then why is there a telemarketing compliance policy instead of simply just a statement that telemarketing is prohibited?

MR. LANDERS:  Objection; misstates testimony.

You may proceed.

THE WITNESS:  Because it was important enough to call out.

BY MR. PERRONG:

Q.   Was telemarketing forbidden outright?

A.   Absolutely.



Page 43

Q.    And I realize that you were not at Cynthia Roberts' deposition, but at Cynthia Roberts' deposition she testified that LoanStream helped us have funding by paying marketing.  Why would she make such a statement?

MR. LANDERS:  Objection; calls for speculation.  Also, exceeds the scope of the deposition notice.

You may proceed.

THE WITNESS:  Unfortunately, you would have to ask her.  If I had to guess, she may be confusing us with another firm.

MR. LANDERS:  Ms. Vernon, on a going-forward basis, please don't guess.

MR. PERRONG:  Please don't coach the witness.

MR. LANDERS:  You should have told her that, Counselor.

MR. PERRONG:  I did.

BY MR. PERRONG:

Q.    Did Cynthia Roberts ever send invoices to LoanStream's accounting department referencing LizDev's telephone calls?

A.    In -- in hindsight now it looks like that they were at least one occasion one came over.

Q.    And LoanStream didn't instruct Ms. Roberts that telephone calls were impermissible, did it?



Page 44

MR. LANDERS:  Objection; vague and ambiguous. What -- what medium of communication are you referring to?  Are you referring to the contract documents or are you referring to a conversation?

MR. PERRONG:  I'm asking.

BY MR. PERRONG:

Q.    Ms. Vernon, you stated that LoanStream had invoices from LizDev referencing telephone calls, right?

A.    No.

Q.    LoanStream received -- what was your testimony then?

A.    I didn't say invoices.  I said one.

Q.    Okay.  LoanStream receive any invoice from LizDev referencing telemarketing, right?

MR. LANDERS:  Objection; calls for speculation and misstates the documents.  If you have the document, just show it to her, Counselor.

MR. PERRONG:  Calls for speculation is a valid objection under the federal rules, by the way.

MR. LANDERS:  You're asking the witness to speculate about a document.

MR. PERRONG:  Okay.  She -- she made a testimony as to documents.  That's not calling for the witness to speculate, sir.



Page 48

sort of deposition, but with every file there is typically a credit report fee.  There's errors and omission fee.  There are also profit-related fees from the loans such as, you know -- such as origination fees on the file.  Fees for -- for selling the loan on the secondary market.  There's profit, you know, and there's loss, all, you know, together to figure out if they're in the green or in the red.

Q.   And there were no marketing fees?

A.   Correct.

Q.   No advertising fees?

A.   Correct.

Q.   Did OCMBC pay the LizDev invoice?

A.   No.

Q.   Did it reimburse the Roberts branch or anybody else for that invoice?

A.   No.

Q.   Did it delete the invoice?

A.   Did it what?

Q.   Delete the invoice.

A.   It -- it appears to have just been discarded by our accounting team.

Q.   Was any record made of why it was discarded?

A.   No.

Q.   Has OCMBC ever shut a branch down on the basis



that it was conducting telephone marketing?

A.    Not that I can recall.

Q.    Why did OCMBC terminate the C. Roberts Branch?

A.    I don't believe we did.  I believe business just dried up.

Q.    And LoanStream accepted the business that was generated by the C. Roberts Branch?

A.    Yeah, there were a few loans that came through the branch.  Not very many, but there were a few.

Q.    And LoanStream never sent any notices to the C. Roberts Branch stating that the use of LizDev violated Section 6 of the agreement, did it?

A.    We -- our accounting department wouldn't have known what LizDev was.

Q.    Does LoanStream have the prohibited activity policy in section 5f ii of the agreement?

A.    Prohibited activities?  I'm not sure.  I know we -- we didn't have that as it related to Cynthia Roberts, but we can look and see if we have those in general even though we didn't have them in Cynthia's file to put our fingers on.  We can -- we can certainly get you a copy of just those policies.

Q.    Does LoanStream maintain an internal, do-not-call list?

A.    No, there's no reason to.  We don't -- we



Page 50

don't participate in any sort of telemarketing campaigns.

Q.    Does it maintain an internal do-not-call policy?

A.    No, for the same reason.

Q.    So sitting here today, you can't point to any specific document stating that telemarketing is prohibited?

A.    I did not look for it outside of just Cynthia's records.

Q.    Did LoanStream require its branches to disclose to LoanStream where it obtained a particular customer from?

A.    No.

Q.    Who designed the LoanStream beta branch concept?

MR. LANDERS:  Objection; vague and ambiguous.

THE WITNESS:  Sorry.  There is no beta branch concept.

BY MR. PERRONG:

Q.    Who designed this beta branch -- this C. Roberts Branch, this branch idea?

A.    So are you -- are you asking who developed just our retail branch network in general?

Q.    Who developed that business plan to hire



Page 52

Q.    Did LoanStream ever receive any complaints from people complaining about calls made from the C. Roberts Branch?

A.    Not that I'm aware of.

Q.    Did LoanStream ever receive any complaints regarding telephone conduct or telemarketing conduct from any of its branches?

A.    No, not that I'm aware of.

Q.    LoanStream holds a California Finance Lenders Law license, correct?

A.    We do, amongst others, but yes.

Q.    You also operate under an NMLS number?

A.    We do.

Q.    And as such, you're subject to periodic oversight and examination from California's DFPI?

A.    Yes.

Q.    And those laws require LoanStream to maintain its books and records in good order?

A.    Yes.

Q.    DFPI examiners have the right to inspect LoanStream's books and records, correct?

A.    Yes.

MR. LANDERS:  Objection; exceeds the scope of the deposition notice.

You may proceed.



Page 53

BY MR. LANDERS:

Q.    LoanStream told the DFPI that it couldn't locate records as to its branches because the records were lost or destroyed.  How do you think the DFPI would respond to that?

MR. LANDERS:  Objection; calls for speculation, rampant speculation.

Please don't speculate in your answer.

THE WITNESS:  I can't answer without speculation.

BY MR. PERRONG:

Q.    Would the DFPI be happy about that?

MR. LANDERS:  Objection; calls for speculation; incomplete hypothetical; also exceeds the scope of the deposition notice.

You can answer if you can.

THE WITNESS:  Yeah, I mean, I can't answer -- answer without speculation.  I mean, we've had things like this, you know, come up in the past.  And if we -- and make a good faith effort, then that -- we might have to close an exam with some open items, but that would be it.

BY MR. PERRONG:

Q.    So has DFPI ever made some sort of unfactory -- unsatisfactory determination of LoanStream


MAGNA
LEGAL SERVICES

Page 54

based on the ability to not produce documents?

MR. LANDERS:  Objection; exceeds the scope of the deposition notice.

You may answer if you can.

THE WITNESS:  Not to date.

BY MR. PERRONG:

Q.    I'm sorry.  Not to you?

A.    Not to date.

Q.    Okay.  Has LoanStream ever been sanctioned or disciplined by the DFPI?

MR. LANDERS:  Objection; exceeds the scope of the deposition notice.

You may answer if you can.

THE WITNESS:  No, we have not.

BY MR. PERRONG:

Q.    Has LoanStream ever engaged an independent auditor to review its document retention policies?

MR. LANDERS:  Objection; exceeds the deposition notice.

You may answer if you can.

THE WITNESS:  Not specifically.

BY MR. PERRONG:

Q.    Has LoanStream engaged an independent auditor for any purpose?

A.    Yes.



Page 55

Q.    For what purpose?

MR. LANDERS:  Objection; exceeds the scope of the deposition notice.

THE WITNESS:  We've had various ones.  We've had a recent one for warehouse operations.  We do anti-money laundering.  We have a whole laundry list of audits.

BY MR. PERRONG:

Q.    Do any of those audits address telemarketing or marketing conduct?

A.    No.

MR. LANDERS:  Belated -- excuse me.  Belated objection that exceeds the scope of the deposition notice.

You may answer.

BY MR. PERRONG:

Q.    Was that a "no"?

A.    No.

Q.    Walk me through how a branch like the C. Roberts Branch generates business.

A.    As I mentioned a couple of times previously, most of them generate business through Realtor relationships.  So for the most part, they have what's called desk rental fees.  So -- so, again, if no one's familiar with our company, we are business-to-business.



MAGNA
LEGAL SERVICES

So 95 percent of our business is wholesale business-to-business.  So our salespeople go and get smaller mortgage companies who deal with the consumer, and then, you know, we end up working with that broker from a business-to-business standpoint.

These branches, which is a smaller part of our business, when the market, you know, allows for it, the -- the branches are basically going direct to the customer, but there's still a business-to-business element of it.  So what they do is, you know, our salespeople, our branches, they go find real estate agents.  Let's just use Keller Williams as an example.  And Keller Williams is maybe, you know, you know, 30 to 60, you know, transactions, most of them being purchases a month.  So our, you know, loan officer will do a desk rental fee and become the -- and preferred lender for those Realtors, you know, at that shop.

So that's how most of it is drummed up.  Then of course, they have relationships, friends and family loans.  A lot of them go to, you know, department of chamber of commerce.  A lot of them, you know, have, especially the Hispanic communities, they're very well-knit with those Realtors so there's a lot of different ways that that B2B works with our loan officers and our branches.  So that's -- that's how it


MAGNA
LEGAL SERVICES

works.

Q.    If -- and I'm asking based on your understanding of the policies with respect to beta branchs.  If -- or these branches.

If a branch manager were to say, for example, I want to purchase leads from LendingTree to reach out to potential mortgage customers, and I want LoanStream to pay for those leads, would that be something that LoanStream would pay for as part of the branch operations?

MR. LANDERS:  Objection --

THE WITNESS:  Sorry, Tom.

MR. LANDERS:  Let me say my objection.  Thank you.

Objection; exceeds the scope of the deposition notice; incomplete hypothetical; and -- and calls for speculation.

With those objections, you may answer.

THE WITNESS:  Yeah, that's a hard no.  Never.

BY MR. PERRONG:

Q.    Why?

A.    You have to understand with -- with leads, aside from all of this we're going through with you guys over, you know, whatever, aside from that, it is extremely costly.  The -- the -- the hit rate with



Page 59

Q.  So in that time frame, that would -- the idea to use a lead generator, that would have been shot down during that time as well?

A.  Hundred percent.  I -- I would not, you know, give anybody hundreds of thousands of dollars to, you know, try -- try to make some call campaign work.  That would be a hard no.

Q.  Was LoanStream aware that Cynthia Roberts's husband was banned from the mortgage company by the DFPI?

MR. LANDERS:  Objection; vague and ambiguous as to time.

BY MR. PERRONG:

Q.  At any time.

A.  He wasn't banned from the mortgage industry. He had lost one of his licenses so he was -- from what I can recall, he was still active with his DRE license, but he had lost his DFPI license, yes.

Q.  And when did LoanStream become aware of this fact?

A.  I think June or July of 2021.

Q.  And it continued to permit the C. Roberts Branch to operate?

A.  I -- you'll have to rephrase it.  I don't get what that one has to do with the other.



Page 61

physically working in her branch, no.

MR. PERRONG:  I want to bring up a document that's been -- that we'll mark as Exhibit B.

[Whereupon, Exhibit B was marked for identification.]

MR. PERRONG:  Just let me know when you have it and are ready to discuss it.

THE WITNESS:  Got it.  Give me a minute.

Okay.  I'm ready.

BY MR. PERRONG:

Q.    If you can go to page 4 it looks like Sean Roberts e-mailed you directly on February 7th of 2022. And in this e-mail he discusses -- third -- third line from -- in that paragraph:  (Reading.)

"We are continuing to build our pipeline and we have some fixed (office rent) and variable (marketing) expenses due/past due."

Do you see that?

A.   I do.

Q.   And then you replied:  (Reading.)

Oh no!  Please reply with your cost center number and I will ask accounting for produce asap!

Do you recall sending that message?



Page 62

A.    I do.

Q.    Why would accounting be paying for marketing expenses if it was your testimony that these branches were not authorized to conduct -- to pay for marketing expenses?

MR. LANDERS:    Objection; state --

THE WITNESS:    Well, first of all -- sorry, Tom.

MR. LANDERS:    Objection; misstates testimony.

You may proceed.

THE WITNESS:    First of all, you have to understand that -- the context.    So I was answering from my -- my cell phone which you can tell from, you know, the -- the e-mails I produced.    So I was sitting in my car replying from my cell phone, you know, and that was just a quick, you know, hey, got your e-mail. Let my accounting department, you know, follow up.

So I wasn't, you know, digging into what this guy was saying.    This was probably the second time I even respond -- responded, you know, myself to, you know, e-mails from either him or his wife or, you know, whatever.

And second, you know, whatever marketing they have, I don't have a problem with marketing expenses. Typically, they're desk rental fees and, you know,


MAGNA
LEGAL SERVICES

Page 63

their -- their print media.  So like I said, it's -- it's routine that our people have these, you know, desk rental fees.

A lot of times, you know, we -- we have, you know, the -- the -- the cover -- what are they called? Oh, like print media campaigns.  So they'll do like co-branding, the agent along with our mortgage company, and then they'll have flyers and pamphlets and whatever and there will be a training session done -- done with the real estate agents.  Anyway, we're very used to marketing, just not telemarketing campaigns.

So I have no issue with what they asked for here, but certainly not telemarketing.

BY MR. PERRONG:

Q.   Did LoanStream ever pay for expenses that were characterized as marketing for the C. Roberts Branch?

A.   Sorry.  Sorry.  Somebody was knocking on my door.  My apologies.  Please restate that.

Q.   Yes.  So did LoanStream ever pay invoices for marketing as articulated here with respect to the C. Roberts Branch?

A.   No.  In fact, there were no lump-sum payments at all after that $7,000 one.

Q.   And that 7,000 was in approximately December of '21?



Page 64

A.    Yeah, I think it was the 21st of December.

Q.    Did LoanStream have a practice of paying expenses from branches that were categorized as "marketing expenses"?

A.    Sorry.  Rephrase that for me.

Q.    So I think you -- you mentioned that there were some -- some marketing expenses would be printing expenses, co-renting expenses, right?

A.    Yes.

Q.    And those would all be characterized as marketing, right?

A.    Yes.

Q.    And LoanStream paid those expenses with respect to other branches?

A.    Generally not.

Q.    In what circumstances would it?

A.    It's very rare for one of the branches to come say, hey -- hey, you know, we need help.  We need -- we need you to do an advance, you know, blah, blah, blah.  Typically, they earn their money, they're in the black, and we actually just pay them for their profit on their loans.

You know, on the rare occasion we have something like this where, you know, they're -- it looks like, you know, the train that could.  You know,



Page 65

they're getting there, you know, for their profit, but they're not quite there and they need a little bit of a bridge.  So like I said, generally not, but, you know, if they're needing a little bit of support while they, you know, get in the black, I have been known to, you know, give them a lump-sum payment from time to time.

Q.   Are you aware that the terms of Sean Roberts' discipline with the DFPI bars him from working for a company that holds a DFPI license?

MR. LANDERS:  Objection; calls for speculation; exceeds the scope of the deposition notice.

You may answer.

THE WITNESS:  It was so long ago, I don't recall.

BY MR. PERRONG:

Q.   Did you ever discuss -- did you ever speak with Sean Roberts?

A.   Yes.

Q.   In the context of your speaking with Sean Roberts, did you ever discuss his DFPI ban?

A.   Yes, I believe so.

Q.   And what was the nature of that discussion?

A.   I believe we -- we had gone to lunch and I looked up that -- that license issue and just briefly



Page 67

Q.    Did you speak with anybody during the break?

A.    No, I did not.

Q.    Are you familiar with the Bistango Restaurant in Irvine, California?

A.    Yes.

Q.    Did you meet with Cynthia Roberts and Sean Roberts at that restaurant in around May or June of 2022?

A.    No.

Q.    Did you meet with Cynthia Roberts and Sean Roberts at that restaurant at any time?

A.    No.

Q.    In what context, then, do you know the Bistango Restaurant in Irvine, California?

A.    I met with Sean Roberts and one of my employees at the Bistango in 2021.

Q.    What was the purpose of that meeting?

A.    My employee at the time was personal friends with Sean Roberts and asked me to go to lunch because I guess at the time Sean Roberts was looking -- looking to move from his -- I believe the company was lending three (phonetic) or something -- something similar to that name and was looking for a new branch away from this lending three.

Q.    And who was the employee?



Page 68

A.    Michelle Tinoosh.

Q.    Okay.   Do you recall meeting with Cynthia Roberts and/or Sean Roberts in around May or June of 2022?

A.    No.

Q.    At some point around May or June of 2022, the C. Roberts Branch shut down, right?

A.    Yes.

Q.    Did you discuss that shutdown with either Cynthia or Sean Roberts?

A.    No.

Q.    So how did LoanStream learn that the C. Roberts Branch was shutting down?

A.    To the best of my recollection, excuse me, I believe they just stopped producing loans and we finally just terminated them or her somewhere in early 2023.

MR. PERRONG:  I want to bring up another document that we're going to mark as Exhibit 3.

MR. LANDERS:  Counselor, you've been using letters to identify exhibits.

MR. PERRONG:  C.

[Whereupon, Exhibit C was marked for identification.]

MR. PERRONG:  Let me know when you have it up.



Page 73

Q.    Does LoanStream have a formal vendor onboarding process?

A.    We do, yes.

Q.    And what are the steps in that process?

A.    So we have a system called the vendor risk system, and our policy is that there is -- there's only a small amount of people that can sign on behalf of the company and that -- that is basically the -- the board of directors.  And every -- every vendor that comes in that gets a signature by the board of directors, gets forwarded to our compliance department, gets loaded into our vendor risk system.

We have low-risk vendors, medium-risk vendors, high-risk vendors, and critical vendors.  And depending on that where that vendor falls, the system will help us -- help us notate them.  So high-risk we may recertify them every, you know, three to six months.  Lower-risk vendors we may recertify them every year just, you know, as an example, but the system helps us kind of set that -- set those up to do that in an automatic fashion.

Q.    Can you give me an example of a high-risk vendor?

A.    Sure.  So our -- our brokers.  So like I mentioned sometime previously, most of our business is



Page 74

B2B so all of our brokers, they sign a broker contract with us.  You can find it right on our website.  And we recertify them once a year.

So -- so the broker system knows when it's been a -- or the vendor system knows when it's been a year and it automatically sends an e-mail out asking for certain documents for that vendor to be, you know, reviewed and recertified, you know, before that, you know, next year goes on.

Q.    Was Sean Roberts or any of his companies onboarded as a vendor?

A.    No.

Q.    Was LizDev ever onboarded as a vendor?

A.    No.

Q.    Does LoanStream require its vendors to certify compliance with the TCPA?

A.    No, we don't telemarket.  There's no reason to.

Q.    LoanStream -- LoanStream's business with Cynthia Roberts was -- during the time 2021 to 2022 was for her to operate as a non-producing branch manager for LoanStream, right?

A.    Correct.

Q.    And in connection with that it used -- it provided her a LoanStream e-mail address?



Page 78

the deposition notice; not relevant to the party's claims or defenses.

You may answer if you understand the question.

THE WITNESS:  As we sit here today, no.

BY MR. PERRONG:

Q.   And other than this document, there is no other writings stating that Mr. Roberts or Mrs. Roberts are not authorized to engage in telemarketing?

MR. LANDERS:  Objection; misstates testimony.

THE WITNESS:  I can find the agreements.  I just can't find them with their particular signature.

MR. PERRONG:  Okay.  I want to bring up another document that we're going to mark as Exhibit E.

[Whereupon, Exhibit E was marked for identification.]

MR. PERRONG:  And I'm going to -- it's an -- it's an audio file so I'm going to play the file. Doesn't need to be transcribed.  And after we're done listening to it, I've got some questions about it.

BY MR. PERRONG:

Q.   Okay.  Can you see my screen?  It should be a -- have like a traffic cone in the lower right-hand or lower left corner.

A.   Yes.

Q.   All right.  Let me play a few seconds in and



let me know if you heard it.

(Audio played.)

BY MR. PERRONG:

Q.    Can you hear that?

A.    Yes.

Q.    Okay.  So I'm going to play the file now. Like I said, it doesn't need to be transcribed, and we'll just listen to it and I've got a few questions about it.

(Audio played.)

BY MR. PERRONG:

Q.    Okay.  You heard in that recording where it's stated that my name is Karisha with LoanStream Mortgage, correct?

A.    That's what I heard, yes.

Q.    So global experts or this LizDev was contacting customers identifying themselves as being with LoanStream Mortgage, correct?

MR. LANDERS:  Objection; calls for speculation; assumes facts not in evidence; and an incomplete hypothetical.

THE WITNESS:  Not that I'm aware of.

BY MR. PERRONG:

Q.    A reasonable customer that would receive such a call would believe that the call was being made by



Page 80

LoanStream, right?

MR. LANDERS:  Objection; calls for speculation; incomplete hypothetical.

MR. PERRONG:  You can't make -- hold on.  You keep making speculation objections.  You keep making hypothetical objections.

These are not objections to form and privilege, which are provided for under the rules.  You -- you can't make these objections.  I don't know why you keep making these objections.  And if you continue to make such objections, we're going to have a problem because we're going to call the Court.  So make an objection to form, if you want to -- have a problem with the form of the question, but you are un -- you are not permitted under the federal rules to make speaking objections which is precisely what you're doing, Mr. Landers.

So I'm going to ask the question again and you can make an objection as to form and, if not, then we're going to call the Court and we're going to inform them that we're suspending the deposition because you continue to make improper speaking objections.

MR. LANDERS:  Counsel, I believe my objections are proper, and my objections are not inhibiting your deposition in any --



Page 83

MR. LANDERS:  So you would prefer me to say the words "objection as to form," and then just leave it to you to speculate what my objection was?

MR. PERRONG:  That is how the federal rules anticipate an objection during a deposition to work is just stating an objection to form.

MR. LANDERS:  And that's how you want to proceed?

MR. PERRONG:  Yes.

MR. LANDERS:  Okay.

BY MR. PERRONG:

Q.   So, Ms. Vernon, would a customer receiving such a call believe that the call was made on LoanStream's behalf?

MR. LANDERS:  Object as to form.

THE WITNESS:  Yes, I can see that.

BY MR. PERRONG:

Q.   Did LoanStream ever investigate the calling practices or telemarketing practices allegedly used by the C. Roberts Branch?

A.   I mean, hindsight, you know, yes.  Once we got that information, we certainly -- we certainly looked into it.

Q.   When you say "when we got this information," what -- what is this information that you refer to?



Page 84

A.    This lawsuit that you've pushed on us.

Q.    When you say "pushed on us," why do you say pushed on us?

A.    We don't -- we don't concur that we ever, you know, made any phone calls.  We don't concur that we've ever had a call center.  I can go on and go on for days, but in any case, we certainly did our due diligence to confirm those things.

Q.    By the plain audio of the call, LoanStream was the entity whose products and services were being promoted, right?

MR. LANDERS:  Object as to form.

THE WITNESS:  By somebody, possibly.

BY MR. PERRONG:

Q.    And it would have been the beneficiary of the call if the person had said that they were interested?

MR. LANDERS:  Object as to form.

THE WITNESS:  None of us know that.

BY MR. PERRONG:

Q.    Is LoanStream a defendant in any other telemarketing case?

A.    No.

Q.    Are you aware of a case against LoanStream entitled Winslow versus OCMBC, Inc.?

A.    Vaguely.



Page 102

(Whereupon, at the hour of 12:54 p.m. the matter was adjourned.)

---o0o---

I declare under penalty of perjury that the foregoing is true and correct.  Subscribed at _____, California, this_____day of _____, 2026.


                              _____
                              SERENE ROSENBERG VERNON



CERTIFICATE OF REPORTER

I, SHAARON M. SHIGIO, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:  That I am a disinterested person herein; that the witness, SERENE ROSENBERG VERNON, named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth, and nothing but the truth; that said deposition was reported in shorthand by me, SHAARON M. SHIGIO, a Certified Shorthand Reporter of the State of California, and thereafter reduced to typewriting, by computer.

Shaaron M. Shigio

CSR # 12286



Page 104

Date:_____

Check One:

_____            Signature waived on the record.

_____            I certify that the witness was given
                     the statutorily allowable time within
                     which to read and sign the deposition,
                     and the witness failed to appear for
                     such reading and signing.

_____            I certify that the witness has read
                     and signed the deposition and has
                     made any changes indicated therein.

_____            I certify that the transcript was sent
                     To the witness for reading and signing
                     and the transcript was returned
                     unsigned.

By_____
        Magna Legal Services



Page 105

I, SERENE ROSENBERG VERNON, make the following changes to my  deposition taken in the matter of KIMBERLY HUDSON-BRYANT, individually and on behalf of others similarly situated, Plaintiffs, vs. OCMBC, INC., D/B/A LOANSTREAM, PREMIER FINANCIAL MARKETING, LLC, D/B/A RESMO LENDING, and SEAN ROBERTS, Defendants, Case Number 8:24-cv-67-FWS-JDE

Date: _____     _____

SERENE ROSENBERG VERNON

Page     Line     Change, Add, Delete

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____

____     ____     _____



Page 106



Docusign Envelope ID: DDE6E9C9-5F16-4957-003F-9E5D1F24812D

MAGNA LEGAL SERVICES

Deposition of Serene Rosenberg Vernon

March 31, 2026

ERRATA

| PAGE | LINE(S) | CHANGE | REASON |
|------|---------|--------|--------|
| 34 | 19 | **Original Language**: "Before that time, no." <br><br> **Updated Language**: "Before that time for emails, no." | Correct / clarify inaccurate response or transcription |
| 72 | 17–20 | **Original Language**: "but, yes, if they were out there telemarketing with, you know, these things behind our back, I can't tell you for sure that, you know, we were in sort of a beneficiary for any type of loans." <br><br> **Updated Language**: "but, yes, if they were out there telemarketing with, you know, these things behind our back, I can't tell you for sure that, you know, we were a beneficiary for those types of loans." | Correct / clarify inaccurate response or transcription |
| 97 | 22–23 | **Original Language**: "Yeah, it was instant QuickBooks that reside – resided on the actual machines." <br><br> **Updated Language**: "Yeah, it was in house QuickBooks that reside – resided on the actual machines." | Correct / clarify inaccurate response or transcription |

I, Serene Vernon, certify that I have reviewed the transcript of my deposition, which was taken on March 31, 2026, and hereby declare, under penalty of perjury under the laws of the United States of America, that it is true and accurate, to the best of my knowledge, except for the foregoing changes and corrections.

Executed on 5/8/2026 | 11:37:02 AM PDT, at Irvine _____, California.

DocuSigned by:

Serene Vernon

80F1BD9B10694CB...

Serene Vernon

P:4935-7107-6776.3:66075-002                                      2